# **<u>EXHIBIT I</u>**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):

### Relief Requested

1.      The Debtors seek entry of an interim order (the "Interim Order"), substantially in the form attached hereto, and a final order (the "Final Order"), *inter alia*: (a) authorizing the Debtors' use of Cash Collateral (as defined below); (b) granting adequate protection to the Prepetition Secured Parties (as defined below) for any diminution in value of their interests in the Prepetition Collateral (as defined below), including Cash Collateral; and (c) vacating and modifying the automatic stay solely to the extent necessary to implement and effectuate the terms and provisions of the Interim Order.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

2.     In addition, the Debtors request that the Court schedule a final hearing within approximately 35 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

## Jurisdiction and Venue

3.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     The bases for the relief requested herein are sections 105, 361, 362, 363, 503, 506, 507 and 552 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 4001 and 9014, and Bankruptcy Local Rules 4401-2 and 9013.1(m).

## Background

6.     The Debtors operate 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations.  The Debtors do business under brand names, including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture.  The Debtors were founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("THL")

2

in March 2017. Pennsylvania based Levin Furniture and Wolf Furniture were acquired by Art Van in November 2017. As of the Petition Date (as defined below), the Debtors operate stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia. The Debtors are headquartered in Warren, Michigan and have approximately 4,500 employees as of the Petition Date (as defined below).

7.      On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of David Ladd, Executive Vice President and Chief Financial Offer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein. Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

**Statement of the Material Terms of the Interim Order**

8.      Pursuant to Bankruptcy Rule 4001(b), (c) and (d) and Bankruptcy Local Rule 4001-2(a)(i) and (ii), the following is a concise statement and summary of the material terms of the Interim Order (collectively, the "Highlighted Provisions"):

13144876 v3

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| **Entities with an Interest in Cash Collateral**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(i)* | The Prepetition ABL Parties[2] and the Prepetition Term Loan Parties[3] (collectively, the "<u>Prepetition Secured Parties</u>") | ¶¶ F & H |
| **Purposed Use of Cash Collateral**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(ii)*<br><br>*Local Rule 4001-2(a)(ii)* | The Debtors seek authority to use Cash Collateral to:<br><br>(i) finance their working capital needs and for any other general corporate purposes; and (ii) pay related transaction costs, fees, liabilities and expenses (including all professional fees and expenses) and other administration costs incurred in connection with and for the benefit of these chapter 11 cases, in each case solely to the extent consistent with the Budget (as defined below) and the Interim Order. | ¶ 2 |
| **Budget and Variance Reporting**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(ii)*<br><br>*Local Rule 4001-2(a)(ii)* | <u>Budget</u>:  The use of Cash Collateral for the first thirteen-week period from the Petition Date shall be in accordance with the budget (the "<u>Budget</u>"), which Budget shall be updated, modified, or supplemented by the Debtors not less than one time in each four-week period. | ¶ 11 |
|  | <u>Budget Compliance</u>:  The Debtors shall not, without the consent of the Prepetition Agents, permit (i) the actual Total Cash Receipts (as defined in the Interim Order) for any rolling four-week period to be less than 90% of the Total Cash Receipts set forth in the Budget for such period, (ii) the actual GOB Disbursements (as defined in the Interim Order) for any rolling four-week period to exceed 110% of the aggregate GOB Disbursements set forth in the Budget for such period, (iii) the actual Operating Disbursements (as defined in the Interim Order) for any rolling four-week period to exceed 110% of the aggregate Operating | ¶ 12(a) |

---

[2] The "Prepetition ABL Parties" are Wells Fargo Bank, National Association, as administrative agent, issue bank, and collateral agent (in such capacity, the "<u>Prepetition ABL Agent</u>") and the lenders party to the Prepetition ABL Agreement (as defined in the Interim Order).

[3] The "Prepetition Term Loan Parties" are Virtus Group, LP, as administrative agent and collateral agent and the lenders party to the Prepetition Term Loan Agreement (as defined in the Interim Order).

13144876 v3

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | Disbursements set forth in the Budget for such period, or (iv) the actual Non-Operating Disbursements (as defined in the Interim Order) for any rolling four week period to exceed 110% of the aggregate Non-Operating Disbursements set forth in the Budget for such period (with any unspent amounts in the subparagraph (iv) being carried forward for subsequent periods). | |
| **Duration of Use of Cash Collateral/ Events of Default/ Rights and Remedies Upon Event of Default** | <u>Specified Period</u>:  The Debtors are authorized to use Cash Collateral for the period from the Petition Date through the date which is the earliest to occur of: (a) the Termination Date (as defined in the Interim Order), (b) thirty (30) days after the Petition Date, and (c) entry of the Final Order; provided, however, that, during the Remedies Notice Period (as defined in the Interim Order) the Debtors may use Cash Collateral for certain specified purposes. | ¶ 2 |
| | <u>Events of Default</u>:  The occurrence of any of the following events, unless consented to or waived by the Prepetition Agents in advance in writing, each in their sole and absolute discretion, shall constitute an event of default (collectively, the "<u>Events of Default</u>"):

(a)  the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under the Interim Order (including, without limitation, the Covenants in paragraph 12 of the Interim Order);

(b)  the failure of the Debtors to obtain a Final Order on the Motion on terms acceptable to the Prepetition Agents on or before 30 days after the Petition Date;

(c)  (i) the failure by the Debtors to continue sales of the Assets in accordance with the Consulting Agreement and to assume the Consulting Agreement on a timely basis;

(d)  the filing of a motion or any plan of reorganization or disclosure statement attendant | ¶ 20 |

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | thereto by and of the Debtors: (i) to obtain additional financing under section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to the Interim Order; (ii) to grant any lien other than Permitted Prior Liens (as defined in the Interim Order) upon or affecting any Postpetition Collateral(as defined in the Interim Order); or (iii) except as provided in the Interim Order, to use Cash Collateral under section 363(c) of the Bankruptcy Code; | |
| | (e)    (i) the filing of any Prohibited Plan (as defined in the Interim Order) or disclosure statement attendant thereto, or any direct or indirect amendment to such chapter 11 plan or disclosure statement, by a Debtor, (ii) the entry or request for entry of any order terminating any Debtor's exclusive right to file a chapter 11 plan (unless actively contested by the Debtors), or (iii) the expiration of any Debtor's exclusive right to file a chapter 11 plan; | |
| | (f)    the entry of an order in any of the cases confirming a Prohibited Plan; | |
| | (g)    the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Interim Order or the Cash Management Order, the filing by a Debtor of a motion for reconsideration with respect to the Interim Order or the Cash Management Order, or the Interim Order shall cease to be in full force and effect; | |
| | (h)    the payment of, or application by the Debtors for authority to pay, any prepetition claim unless in accordance with the Budget, subject to variances permitted by the Interim Order; | |
| | (i)    the appointment of an interim or permanent trustee in the cases, the appointment of a receiver, receiver and manager, interim receiver or similar official over any substantial portion of the assets of the Debtors, or the appointment of a | |

6

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | trustee receiver or an examiner in the cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Debtors; | |
| | (j) the filing of a motion to approve a Prohibited Sale (as defined in the Interim Order) or to sell all or substantially all of the Debtors' assets other than in accordance with the Consulting Agreement or the Levin LOI (as those terms are defined in the Interim Order); | |
| | (k) the dismissal of any case, or the conversion of any case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or any Debtor filing a motion or other pleading seeking the dismissal of the cases under section 1112 of the Bankruptcy Code or otherwise or the conversion of the cases to Chapter 7 of the Bankruptcy Code; | |
| | (l) the filing of a motion seeking, or the Court shall enter an order granting, relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor (other than the Prepetition ABL Agent and, subject to the Intercreditor Agreement (as defined in the Interim Order), the Prepetition Term Loan Agent) to execute upon or enforce a lien on any Postpetition Collateral or Prepetition Collateral, (ii) approving any settlement or other stipulation with any secured creditor of any Debtor providing for payments as adequate protection or otherwise to such secured creditor, or (iii) with respect to any lien on or the granting of any lien on any Postpetition Collateral or the Prepetition Collateral to any federal, state or local environmental or regulatory agency or authority, which in either case involves a claim of [$250,000] or more; | |
| | (m) the existence of any claim or charges, or the entry of any order of the Court authorizing any | |

7

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | claims or charges entitled to superpriority administrative expense claim status in any Case pursuant to section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the Prepetition Secured Parties under the Interim Order, or there shall arise or be granted by the Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code or (ii) any lien on the Postpetition Collateral or the Prepetition Collateral having a priority senior to or *pari passu* with the liens and security interests granted in the Interim Order, except, in each case, as expressly provided in the Interim Order; | |
| | (n)   the filing of a motion or entry of an order materially adversely impacting the rights and interests of the Prepetition Secured Parties shall have been entered by the Court or any other court of competent jurisdiction; | |
| | (o)   any Debtor shall challenge, support or encourage a challenge of any payments made to any Prepetition ABL Party with respect to the Prepetition ABL Obligations; | |
| | (p)   any Debtor shall challenge, support or encourage the challenge of any payments made to any Prepetition Term Loan Party with respect to the Prepetition Term Loan Obligations; | |
| | (q)   the entry of any order by the Court granting, or the filing by any Debtor of any motion or other request with the Court seeking authority to use cash proceeds of any of the Postpetition Collateral  or Prepetition Collateral other than as set forth in the Interim Order or to obtain any financing under section 364(d) of the Bankruptcy Code; | |
| | (r)   any Debtor or any person on behalf of any Debtor shall file any motion seeking authority to | |

8

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | consummate a sale of assets, other than in connection with the Consulting Agreement or the Levin APA (as defined in the Interim Order), with respect to Postpetition Collateral or Prepetition Collateral having a value in excess of [$250,000] outside the ordinary course of business and not otherwise permitted under the Interim Order; | |
| | (s)   any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise provide any credit on account of any prepetition indebtedness or payables other than payments (i) under customary "first day orders as approved by the Prepetition Agents in writing (provided that the Interim Order and all orders relating to cash management shall be acceptable to the Prepetition Agents) and (ii) payments approved (A) by the Court or (B) by the Prepetition Agents in writing, in each case in accordance with the Budget, subject to variances permitted by the Interim Order; | |
| | (t)   any Debtor shall fail to contest in good faith a request to take any action that if taken by the Debtor would constitute an event of default under paragraph 20 of the Interim Order; | |
| | (u)   the automatic stay shall be modified, reversed, revoked or vacated in a manner that has a material adverse impact on the rights and interests of the Prepetition Agents or the Prepetition Secured Parties. | |
| | <u>Rights and Remedies Upon Entry of Default</u>: Immediately upon the occurrence and during the continuation of an Event of Default, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of the Interim Order (and the Remedies Notice Period), (a) (i) the Prepetition ABL Agent may declare (any such declaration delivered by the Prepetition ABL Agent or | ¶ 21 |

9

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | the Prepetition Term Loan Agent, as applicable, shall be referred to as a "<u>Termination Declaration</u>") (A) all Prepetition ABL Obligations owing under the Prepetition ABL Documents to be immediately due and payable, and (B) that the application of the Carve Out (as defined in the Interim Order) has occurred through the delivery of the Carve Out Trigger Notice (as defined in the Interim Order); and (ii) the Prepetition ABL Agent may declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, and (b) the Prepetition Term Loan Agent may (i) declare a termination, reduction, or restrict on the ability of the Debtors to use Cash Collateral that is Postpetition Term Priority Collateral and (ii) after the Prepetition ABL Obligations have been Paid in Full, declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral (the date a Termination Declaration is delivered shall be referred to as the "<u>Termination Date</u>").  The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to a Committee (if appointed), the Prepetition ABL Agent (if delivered by the Prepetition Term Loan Agent), the Prepetition Term Loan Agent (if delivered by the Prepetition ABL Agent), and the U.S. Trustee.  The automatic stay in the Cases otherwise applicable to the Prepetition ABL Parties is hereby modified so that five (5) business days after the date a Termination Declaration is delivered (the "<u>Remedies Notice Period</u>"), the Prepetition ABL Parties shall be entitled to exercise their rights and remedies in accordance with the Prepetition ABL Documents and the Interim Order to satisfy the Prepetition ABL Obligations, Prepetition ABL Superiority Claims, and Prepetition ABL Adequate Protection Liens, subject to the Carve Out (to the extent applicable).  During the Remedies Notice Period, the Debtors and/or a Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court.  Upon expiration of the Remedies Notice Period, unless the Court orders otherwise, the automatic stay, as to the Prepetition ABL Parties, shall automatically be terminated without further notice or order and the | |

10

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | Prepetition ABL Parties shall be permitted to exercise all remedies set forth in the Interim Order, in the Prepetition Documents, and as otherwise available at law without further order of or application or motion to the Court consistent with the Intercreditor Agreement and the Interim Order.  Upon the occurrence and during the continuation of an Event of Default, in each case, subject to the Intercreditor Agreement, the Prepetition ABL Agent and any liquidator or other professional will have the right to access and utilize, at no cost or expense, any trade names, trademarks, copyrights or other intellectual property and any warehouse, distribution centers, store or other locations to the extent necessary or appropriate in order to sell, lease or otherwise dispose of any of the Postpetition ABL Priority Collateral, including pursuant to any Court approved sale process. | |
| **Proposed Adequate Protection**<br><br>*Bankruptcy Rule 400l(b)(1)(B)(iv)*<br><br>*Local Rule 4001-2(a)(ii)* | The Prepetition Secured Parties shall be granted, to the extent of any diminution in value of its interests in the Prepetition Collateral from and after the Petition Date, the following:<br><br>Adequate Protection Liens.<br>(a)   Prepetition ABL Adequate Protection Liens.  Subject to the Carve Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors grant to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "Prepetition ABL Adequate Protection Liens") on any Postpetition Collateral.<br><br>(b)   Prepetition Term Loan Adequate Protection Liens.  Subject to the Carve Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the | ¶¶ 3, 5, 7-8<br><br><br><br><br><br>¶ 3(a)-(b) |

11

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | Prepetition Term Loan Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors grant to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "<u>Prepetition Term Loan Adequate Protection Liens</u>," and together with the Prepetition ABL Adequate Protection Liens, the "<u>Adequate Protection Liens</u>") on the Postpetition Collateral. | |
| | <u>Adequate Protection Superpriority Claims.</u><br>(a)    <u>Prepetition ABL Superpriority Claim.</u>  As further adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Parties, is granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "<u>Prepetition ABL Superpriority Claim</u>").<br><br>(b)    <u>Prepetition Term Loan Superpriority Claim.</u>  As further adequate protection of the interests of the Prepetition Term Loan Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Parties, is granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "<u>Prepetition Term Loan Superpriority Claim</u>," and together with the Prepetition ABL Superpriority Claim, the "<u>Adequate Protection Superpriority Claims</u>"). | ¶ 5(a)-(b) |

12

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | Adequate Protection Payments and Protections for Prepetition ABL Parties.  As further adequate protection, the Debtors are authorized and directed to pay in cash the following:  (a) all principal and interest at the default rate due under the Prepetition ABL Documents (but subject to the Challenge rights to the extent preserved in paragraph 27 of the Interim Order), (b) immediately upon entry of the Interim Order, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Agent arising prior to the Petition Date and reimbursable under the Prepetition ABL Documents, (c) om accordance with paragraph 22 of the Interim Order, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Agent on and subsequent to the Petition Date reimbursable under the Prepetition ABL Documents, (d) the Prepetition ABL Obligations in accordance with the Budget, and (e)the Prepetition ABL Obligations with the Deposit (as defined in the Levin LOI) upon such Deposit becoming non-refundable in accordance with the terms of the Levin LOI.  In addition, immediately upon the payment in full in cash of the Prepetition ABL Obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted),  the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, in each case, in accordance with the terms of the Prepetition ABL Documents, the Debtors shall fund to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Parties, $500,000 into a non-interest bearing account maintained at Wells Fargo Bank, National Association (the "Prepetition ABL Indemnity Reserve") to secure | ¶ 7 |

13

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | contingent indemnification, reimbursement, or similar continuing obligations arising under or related to the Prepetition ABL Documents (the "<u>Prepetition ABL Indemnity Obligations</u>"). The Prepetition ABL Indemnity Reserve shall secure all costs, expenses, and other amounts (including reasonable and documented attorneys' fees) owed to or incurred by the Prepetition ABL Agent and the Prepetition ABL Lenders related to the Prepetition ABL Documents, the Prepetition ABL Obligations, or the Prepetition ABL Liens, as applicable, whether in these Cases or independently in another forum, court, or venue. The Prepetition ABL Indemnity Obligations shall be secured by a first priority lien on the Prepetition ABL Indemnity Reserve and the funds therein (which shall not be subject to the Carve-Out) and by a lien on the Postpetition Collateral and the Prepetition Collateral (subject in all respects to the Intercreditor Agreement). Subject to paragraph 22 of the Interim Order, the Debtors shall pay all Prepetition ABL Indemnity Obligations as and when they arise and paid; *provided, that* the Prepetition ABL Agent shall have authority in its sole discretion, but not an obligation, to apply amounts in the Prepetition ABL Indemnity Reserve to any Prepetition ABL Indemnity Obligations, without further notice to or consent from the Debtors, a Committee (if appointed), or any other parties in interest and without further order of this Court; *provided*, that (i) any such indemnification claims shall be subject to (a) the terms of the Prepetition ABL Documents (including with respect to application of proceeds) and (b) the rights of parties in interest with requisite standing to object to such indemnification claim(s) to the extent set forth in paragraph 27 of the Interim Order. The Prepetition ABL Agent (for itself and on behalf of the Prepetition ABL Parties) shall retain and maintain the Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens granted to the Prepetition ABL Agent as security for the amount of any Prepetition ABL Indemnity Obligations in excess of the funds on deposit in the Prepetition ABL Indemnity Reserve. The Prepetition ABL Indemnity Reserve shall be released at such time as the Prepetition ABL Indemnity | |

14

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | Obligations are Paid in Full. | |
| | <u>Adequate Protection Payments and Protections for Prepetition Term Loan Agent</u>.  As further adequate protection, the Debtors are authorized and directed to pay in cash the following:  (a) the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Term Loan Agent arising prior to the Petition Date and reimbursable under the Prepetition Term Loan Documents, and (b) in accordance with paragraph 22 of the Interim Order, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Term Loan Agent on and subsequent to the Petition Date reimbursable under the Prepetition Term Loan Documents; *provided, however*, that any payments made under this paragraph 8 shall be made solely from proceeds of Postpetition Term Priority Collateral. | ¶ 8 |
| **Liens on Chapter 5 Actions** <br><br> *Local Rule 4001-2(a)(i)(D)* | Subject to the entry of the Final Order, the Adequate Protection Liens include the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents. | ¶ 3(a)-(b) |

15

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| **Carve Out**<br><br>*Local Rule 4001-2(a)(i)(F)* | The "<u>Carve Out</u>" means (i) all fees required to be paid to (A) the Clerk of the Court and (B) the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code; (ii) all reasonable fees and expenses up to $50,000 (and any interest thereon) incurred by a trustee under section 726(b) of the Bankruptcy Code (the "<u>Chapter 7 Trustee Carve Out</u>"); (iii) to the extent allowed at any time (regardless of whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (as defined below)), whether by interim order, procedural order, or otherwise, all accrued and unpaid fees and expenses incurred by persons or firms retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and a Committee (if appointed) pursuant to sections 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") (such fees and expenses, the "<u>Allowed Professional Fees</u>") at any time on or prior to the first business day following delivery by the Prepetition ABL Agent of a Carve Out Trigger Notice (as defined in the Interim Order), provided that the amount of such Allowed Professional Fees shall, as relates to the Prepetition ABL Parties, the Prepetition ABL Priority Collateral and the Postpetition ABL Priority Collateral, not exceed, at any time, the amount set forth for Allowed Professional Fees in the Budget at such time (the "<u>ABL Professional Fee Cap</u>"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $[500,000] incurred after the first business day following delivery by the Prepetition ABL Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "<u>Post Carve Out Trigger Notice Cap</u>").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Prepetition ABL Agent to lead restructuring counsel for the Debtors, the U.S. Trustee, and lead counsel to a Committee (if appointed), which notice may be delivered following the occurrence and during the | ¶ 24 |

16

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | continuation of an Event of Default (as defined above), stating that the Post-Carve Out Trigger Notice Cap has been invoked. Each Professional Person shall deliver bi-weekly (on Thursday of each such week, beginning on the second Thursday following the Petition Date) to the Debtors (and the Debtors shall cause the same to be delivered to the Prepetition Agents on the same day received by the Debtors) a statement setting forth a good-faith estimate of the amount of fees and expenses incurred during the preceding week by such Professional Persons (through Saturday of such week). | |
| **Cross Collateralization**<br><br>*Local Rule 4001-2(a)(i)(A)* | None, other than replacement liens as adequate protection. | N/A |
| **Findings Regarding Validity/ Perfection/ Amount**<br><br>*Local Rule 4001-2(a)(i)(B)* | As set forth in the Interim Order, the Debtors have acknowledged and agreed as set forth therein, to the validity, perfection, priority, amount and enforceability of the Prepetition Secured Obligations, without prejudice to any other party's rights to assert claims, counterclaims or causes of actions, objections, contests or defenses prior to the expiration of the Challenge Period (as defined below). | ¶¶ F, 27 |
| **Challenge Period**<br><br>*Local Rule 4001-2(a)(i)(B)* | The "Challenge Period" is (A) for a Committee (if appointed), sixty (60) days from the date of formation of the Committee (if appointed), or (B) seventy-five (75) days following the entry of the Interim Order for any other party in interest with requisite standing (the occurrence of (A) and (B), as applicable, the "Challenge Deadline"), as such applicable date may be extended in writing from time to time in the sole discretion of the Prepetition ABL Agent (with respect to the Prepetition ABL Documents) and the Prepetition Term Loan Agent (with respect to the Prepetition Term Loan Documents), or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline. | ¶ 27 |

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| **506(c) Waiver**<br><br>*Local Rule 4001-2(a)(i)(C)* | Subject to entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the cases at any time shall be charged against the Prepetition Secured Parties or any of their respective claims, the Postpetition Collateral, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such parties. | ¶ 29 |
| **552(b) Wavier**<br><br>*Local Rule 4001-2(a)(i)(H)* | Subject to entry of the Final Order, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties, with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral. | ¶ 31 |
| **Releases**<br><br>*Local Rule 4001-2(a)(ii)* | The Debtors stipulate and agree that they forever and irrevocably release, discharge, and acquit the Prepetition Agents, the Prepetition Secured Parties, all former, current and future Prepetition Secured Parties, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys and agents, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever relating to, as applicable, the Prepetition Secured Facilities, the Prepetition Documents, and/or the transactions contemplated under the Interim Order or thereunder occurring prior to the entry of the Interim Order including (x) any so-called "lender liability" or equitable subordination or recharacterization claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, | ¶ F(x) |

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | priority, perfection or avoidability of the liens or claims of the Prepetition Agents and the Prepetition Secured Parties.  The Debtors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Prepetition Secured Obligations which the Debtors may now have or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to this Court entering the Interim Order. | |
| **Provisions Deeming Prepetition Debt to be Postpetition Debt** <br><br> *Local Rule 4001-2(a)(i)(E)* | None. | N/A |
| **Non-Consensual Priming** <br><br> *Local Rule 4001-2(a)(i)(G)* | None. | N/A |

## Basis for Relief

### I.    The Debtors' Request to Use Cash Collateral and Proposed Adequate Protection are Appropriate

10.    The Debtors' use of property of their estates, including Cash Collateral, is governed by section 363 of the Bankruptcy Code.[4]  Pursuant to section 363(c)(2) of the Bankruptcy Code, a

---

[4] The Bankruptcy Code defines "cash collateral" as follows:

> Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as

13144876 v3

debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

11.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral. 11 U.S.C. § 363(e). Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); *In re Satcon Tech. Corp.*, No. 12-12869, 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 COLLIER ON BANKRUPTCY ¶ 361.01 [1] at 361-66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding"); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry left to the vagaries of each case . . . ") (citation and quotation omitted).

12.     The concept of adequate protection is designed to shield a secured creditor from diminution in the value of its interest in collateral during the period of a debtor's use. *See In re*

---

provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

*Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral."); *see also In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180-81 (Bankr. D. Del. 1993) (holding that adequate protection for use of collateral under section 363 of the Bankruptcy Code is limited to use-based decline in value).

### A.   The Proposed Adequate Protection for the Prepetition Secured Parties is Sufficient

13.     As set forth in the Interim Order and described above in the Highlighted Provisions, the Debtors propose to provide the Prepetition Secured Parties with various forms of Adequate Protection.  The Debtors respectfully submit that, in light of the circumstances of these chapter 11 cases, the proposed Adequate Protection is appropriate and sufficient to protect the Prepetition Secured Parties from any diminution in value to the Collateral during the Specified Period.  In particular, the Cash Collateral will be used to sustain the Debtors' business operations, allowing for the maximization of the value of the Debtors' estates, specifically the arms' length negotiated terms to protect the Debtors' customer programs.  If Cash Collateral is not available for this purpose, the Debtors will be unable to fund payroll obligations, procure goods and services from vendors or otherwise maintain their operations and service their customers, thereby dissipating value to the detriment of the Prepetition Secured Parties and other stakeholders.  The use of the Cash Collateral will therefore protect the Prepetition Secured Parties' security interests by preserving the value of their collateral. *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (evaluating "whether the value of the debtor's property will increase as a result of the" use of collateral in determining sufficiency of adequate protection); *In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a debtor's use of cash collateral to pay operating expenses, thereby "preserv[ing] the base that generates the income stream,"

21

provided adequate protection to the secured creditor); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (observing that debtor's use of rents to maintain and operate property "will serve to preserve or enhance the value of the building which, in turn, will protect the collateral covered by [the secured lender's] mortgage").

14.     In light of the foregoing, the Debtors submit that the proposed Adequate Protection to be provided for the benefit of the Prepetition Secured Parties is appropriate. Thus, the Debtors' proposed Adequate Protection not only is necessary to protect the Prepetition Secured Parties against any diminution in value, but also is fair and appropriate on an interim basis under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using Cash Collateral in the near term, for the benefit of their estates and all parties in interest.

## II.     Failure to Obtain Immediate Interim Use of Cash Collateral Would Cause Immediate and Irreparable Harm

15.     Bankruptcy Rule 4001(b)(2) provides that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion. Fed. R. Bankr. P. 4001(b)(2). However, the Court is authorized to conduct a preliminary expedited hearing on the Motion and authorize the Debtors' proposed use of Cash Collateral to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.  *Id.*

16.     The Debtors has an immediate postpetition need to use Cash Collateral.  The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to cash. The Debtors will use cash to, among other things, continue operating their business and satisfy other working capital needs during the chapter 11 cases, including, among other things, to fund their customer programs. The Debtors believe that all or substantially all of their available cash constitutes the Prepetition Secured Parties' Cash Collateral, as that term is

22

used by section 363(c) of the Bankruptcy Code. The Debtors therefore will be unable to proceed with operating their business without the ability to use Cash Collateral, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  In short, the Debtors' ability to finance their operations and the availability of sufficient working capital and liquidity to the Debtors through the use of Cash Collateral is vital to the preservation and maintenance of the value of the Debtors' estates.

17.    The Debtors, therefore, seek immediate authority to use the Cash Collateral on an interim basis and as set forth in this Motion and in the Interim Order to prevent immediate and irreparable harm to their estates pending the Final Hearing pursuant to Bankruptcy Rule 4001(b)(2). Accordingly, to the extent that the Debtors require the use of Cash Collateral, the Debtors respectfully submit that they have satisfied the requirements of Bankruptcy Rule 4001(b)(2) to support an expedited preliminary hearing and immediate Cash Collateral availability on an interim basis.

### III.    <u>Modification of the Automatic Stay is Appropriate</u>

18.    The Interim Order and Final Order (together, the "<u>Cash Collateral Orders</u>") contemplate a modification of the automatic stay (to the extent applicable) as necessary to, *inter alia*, permit the Debtors to: (a) grant the security interests, liens and superpriority claims described above, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; and (b) authorize the Debtors to make certain payments in accordance with the terms of the Cash Collateral Orders.  In addition, the Cash Collateral Orders provide for modification of the automatic stay to allow the Prepetition Secured Partiers to exercise remedies upon the occurrence and during the continuance of an Event of Default, and after the giving of five (5) business days' prior written notice to the Debtors.

23

19.     Stay modification provisions of this kind are ordinary and standard terms of postpetition use by debtors-in-possession of prepetition collateral, and, in the Debtors' business judgment, are reasonable under the present circumstances. *See, e.g., In re Open Road Films, LLC*, Case No. 18-12012 (LSS) [Docket No. 51] (Bankr. D. Del. September 7, 2018) (terminating automatic stay after occurrence of termination event and applicable notice*); In re RM Holdco LLC*, Case No. 18-11795 (MFW) [Docket No. 53] (Bankr. D. Del. August 7, 2018) (same); *In re Heritage Home Grp. LLC*, Case No. 18-11736 (KG) [Docket No. 46] (Bankr. D. Del. July 31, 2018) (same); *In re EBH Topco, LLC*, Case No. 18-11212 (BLS) [Docket No. 55] (Bankr. D. Del. May 24, 2018) (same); *In re Gibson Brands, Inc.*, Case No. 18-11025 (CSS) [Docket No. 71] (Bankr. D. Del. May 2, 2018) (same); *In re Appvion, Inc.*, Case No. 17-12082 (KJC) [Docket No. 75] (Bankr. D. Del. October 5, 2017).  Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Cash Collateral Orders.

## Request for Final Hearing

20.     Pursuant to Bankruptcy Rule 400l(b)(2), the Debtors request that the Court set a date for the Final Hearing within thirty-five (35) days of the Petition Date and fix the date and time prior to the Final Hearing for parties to file objections to the relief requested by this Motion.

## The Requirements of Bankruptcy Rule 6003(b) Are Satisfied

24.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  For the reasons discussed above, authorizing the Debtors to use Cash Collateral and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases smoothly.  Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would

24

severely disrupt the Debtors' operations at this critical juncture. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

25. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Reservation of Rights

26. Nothing contained in this Motion or any actions taken by the Debtors pursuant to any order granting the relief requested by this Motion is intended or should be construed as: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's Interim Order and Final Order is not intended and should not be construed as an admission as to the validity,

13144876 v3

priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

## Notice

27.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances.  Without limiting the foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition secured facilities and counsel thereto; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the state attorneys general for states in which the Debtors conduct business; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

28.     No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

13144876 v3

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, and based on the record of the Chapter 11 Case, the Debtors respectfully request that this Court (a) enter the Cash Collateral Orders (i) authorizing the Debtors to use Cash Collateral on an interim and final basis subject to the terms and conditions set forth therein; (ii) granting adequate protection to the Prepetition Secured Parties to the extent set forth in the Cash Collateral Orders; (iii) scheduling the Final Hearing, pursuant to the Interim Order, within approximately thirty-five (35) days of the commencement of the chapter 11 cases, to consider approval of this Motion on a final basis; and (iv) granting related relief; and (b) grant the Debtors such other and further relief as may be just and proper.

Dated:  March 8, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

   */s/ Gregory W. Werkheiser*
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer Hoover (DE No. 5111)
Kevin Capuzzi (DE No. 5462)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
        mbarrie@beneschlaw.com
        jhoover@beneschlaw.com
        kcapuzzi@beneschlaw.com
        jgentile@beneschlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

13144876 v3

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | |

### INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of (a) AVF Parent, LLC (the "Borrower"), and (b) AVF Holdings II, LLC, Art Van Furniture, LLC, Art Van Furniture of Canada, LLC, AV Pure Sleep Franchising, LLC, AVCE, LLC, AVF Franchising, LLC, AVF Holding Company, Inc., AVF Holdings I, LLC, Levin Parent, LLC, LF Trucking, Inc., Comfort Mattress, LLC and Sam Levin, Inc., each as a debtor and debtor in possession (collectively, with the Borrower, the "Debtors") in the above-captioned Chapter 11 cases (collectively, the "Cases"), seeking entry of an order (this "Interim Order") pursuant to sections 105, 361, 362, 363 and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") *inter alia*:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion.

(i)        authorizing the Debtors to use the Prepetition Collateral (as defined herein), including all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral") of the Prepetition ABL Parties under the Prepetition ABL Documents and the Prepetition Term Loan Parties under the Prepetition Term Loan Documents (each as defined herein), and providing adequate protection to the Prepetition ABL Parties and Prepetition Term Loan Parties for any diminution in value, including resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral, and, in the case of the Prepetition Secured Parties, the priming of their respective interests in the Prepetition Collateral (including by the Carve Out) pursuant to the terms and conditions set forth herein ("Diminution in Value");

(ii)       vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of this Interim Order; and

(iii)      scheduling a final hearing (the "Final Hearing") within 30 days of the Petition Date to consider the relief requested in the Motion on a final basis (the "Final Order") and approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the exhibits attached thereto, the *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* and the evidence submitted and argument made at the interim hearing held on March [__], 2020 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b) and (d), and all applicable Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"); and the Interim Hearing having

been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

    A.    **Petition Date**.  On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").

    B.    **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

    C.    **Jurisdiction and Venue**.  This Court has jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue for the Cases and proceedings on the Motion is proper before this Court pursuant to 28

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

U.S.C. §§ 1408 and 1409.

D.  **Committee Formation**.  As of the date hereof, the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

E.  **Notice**.  Proper, timely, adequate, and sufficient notice of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

F.  **Debtors' Stipulations**.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest as set forth in paragraph 27 herein, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows (paragraphs F(i) through F(xii) below are referred to herein, collectively, as the "Debtors' Stipulations"):

(i)  *Prepetition ABL Facility*.  Pursuant to that certain *ABL Credit Agreement* dated as of March 1, 2017 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition ABL Agreement," and collectively with the Loan Documents (as defined in the Prepetition ABL Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition ABL Documents"), among (a) the Borrower (the "Prepetition ABL Borrower"), (b) the guarantors party thereto (the "Prepetition ABL Guarantors"), (c) Wells Fargo Bank, National Association, as administrative agent, issuing bank and collateral agent (in such capacity, the "Prepetition ABL Agent"), and (d) the lenders party

4

thereto (collectively, including the Prepetition ABL Agent, the "Prepetition ABL Lenders," and the Prepetition ABL Lenders and the Prepetition ABL Agent, together, the "Prepetition ABL Parties"), the Prepetition ABL Lenders provided revolving credit, term loans and other financial accommodations to, and issued letters of credit for the account of, the Prepetition ABL Borrowers pursuant to the Prepetition ABL Documents (the "Prepetition ABL Facility") in an aggregate principal amount of up to $82,500,000.

(ii)     *Prepetition ABL Obligations*.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition ABL Facility was not less than approximately $33,573,784.18, inclusive of not less than $14,900,000 of issued and outstanding letters of credit and the Early Termination Premium as defined in the Prepetition ABL Documents (collectively, together with accrued and unpaid interest, bankers' acceptances, any reimbursement obligations (contingent or otherwise) in respect of letters of credit and bankers' acceptances, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition ABL Borrowers' or the Prepetition ABL Guarantors' obligations pursuant to, or secured by, the Prepetition ABL Documents, including all "Obligations" as defined in the Prepetition ABL Agreement, and all interest, fees, prepayment premiums, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "Prepetition ABL Obligations"").

(iii)     *Prepetition ABL Liens and Prepetition ABL Priority Collateral*.  As more fully set forth in the Prepetition ABL Documents, prior to the Petition Date, the Prepetition

5

13167798 v1

ABL Borrowers and the Prepetition ABL Guarantors granted to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Lenders, security interests in and continuing liens on (the "Prepetition ABL Liens") substantially all of their assets and property, including (a) a first priority security interest in and continuing lien on the ABL Priority Collateral (as defined in that certain Intercreditor Agreement referred to in paragraph F(vii) below) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition ABL Priority Collateral"), and (b) a second priority security interest in and continuing lien on the Term Loan Priority Collateral (as defined in the Intercreditor Agreement) and proceeds, products, and rents of any of the foregoing (collectively, the "Prepetition Term Priority Collateral," and together with the Prepetition ABL Priority Collateral, the "Prepetition Collateral"), subject only to the liens of the Prepetition Term Loan Agent on the Prepetition Term Priority Collateral and Prepetition ABL Permitted Prior Liens (as defined herein).

(iv)  *Prepetition Term Loan Facility*.  Pursuant to that certain Credit Agreement dated as of March 1, 2017 (as amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition Term Loan Agreement," and collectively with the Loan Documents (as defined in the Prepetition Term Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition Term Loan Documents," and together with the Prepetition ABL Documents, the "Prepetition Documents"), among (a) the Borrower (the "Prepetition Term Loan Borrower" and together with the Prepetition ABL Borrower, the "Prepetition Borrowers"), (b) Virtus Group, LP, as administrative agent and collateral agent (in such capacities, the "Prepetition Term Loan Agent," and together with the

6

Prepetition ABL Agent, the "<u>Prepetition Agents</u>"), (c) the guarantors thereunder (the "<u>Prepetition Term Loan Guarantors</u>" and, together with the Prepetition ABL Guarantors, the "<u>Prepetition Guarantors</u>"), and (d) the lenders party thereto (the "<u>Prepetition Term Loan Lenders</u>," and collectively, including the Prepetition Term Loan Agent, the "<u>Prepetition Term Loan Parties</u>," and together with the Prepetition ABL Parties, the "<u>Prepetition Secured Parties</u>"), the Prepetition Term Loan Lenders provided term loans to the Prepetition Term Loan Borrower (the "<u>Prepetition Term Loan Facility</u>," and together with the Prepetition ABL Facility, the "<u>Prepetition Secured Facilities</u>") in an aggregate principal amount of $100,000,000.

(v)     *Prepetition Term Loan Obligations*.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Term Loan Facility was not less than approximately $175,000,000 (collectively, together with accrued and unpaid interest, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, appraisers' fees, and financial advisors' fees and related expenses and disbursements reimbursable thereunder), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Term Loan Borrower's and the Prepetition Term Loan Guarantors' obligations pursuant to, or secured by, the Prepetition Term Loan Documents, including all "Obligations" as defined in the Prepetition Term Loan Agreement, and all interest, fees, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "<u>Prepetition Term Loan Obligations</u>," and together with the Prepetition ABL Obligations, the "<u>Prepetition Secured Obligations</u>").

(vi)     *Prepetition Term Loan Liens and Prepetition Term Priority Collateral*.  As more fully set forth in the Prepetition Term Loan Documents, prior to the Petition

7

Date, the Prepetition Term Loan Borrower and the Prepetition Term Loan Guarantors granted to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders, security interests in and continuing liens on (the "Prepetition Term Loan Liens," and together with the Prepetition ABL Liens, the "Prepetition Liens") substantially all of their assets and property, including (a) a first priority security interest in and continuing lien on the Prepetition Term Priority Collateral, and (b) a second priority security interest in and continuing lien on the Prepetition ABL Priority Collateral, subject only to the liens of the Prepetition ABL Agent on the Prepetition ABL Priority Collateral and Prepetition Term Loan Permitted Prior Liens (as defined herein).

(vii) *Priority of Prepetition Liens; Intercreditor Agreement.* The Prepetition Agents entered into that certain Intercreditor Agreement dated as of March 1, 2017 (as may be further amended, restated, supplemented, or otherwise modified in accordance with its terms, the "Intercreditor Agreement") to govern the respective rights, interests, obligations, priority, and positions of the Prepetition Secured Parties with respect to the assets and properties of the Debtors and other obligors. Each of the Prepetition Borrowers and Prepetition Guarantors under the Prepetition Documents acknowledged and agreed to the Intercreditor Agreement.

(viii) *Validity, Perfection, and Priority of Prepetition ABL Liens and Prepetition ABL Obligations.* The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition ABL Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition ABL Parties for fair consideration and reasonably equivalent value; (b) the Prepetition ABL Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (1) the Prepetition Term Loan Liens on the Prepetition Term Priority Collateral and (2) certain liens senior by operation of law (solely to the extent such liens were valid, non-avoidable, and

8

senior in priority to the Prepetition ABL Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or otherwise permitted by the Prepetition ABL Documents (the "Prepetition ABL Permitted Prior Liens"); (c) the Prepetition ABL Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition ABL Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition ABL Liens or Prepetition ABL Obligations exist, and no portion of the Prepetition ABL Liens or Prepetition ABL Obligations is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition ABL Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition ABL Facility; (f) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition ABL Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition ABL Obligations; and (g) the Prepetition ABL Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(ix)     *Validity, Perfection, and Priority of Prepetition Term Loan Liens and Prepetition Term Loan Obligations.*  The Debtors further acknowledge and agree that, as of the Petition Date, (a) the Prepetition Term Loan Liens on the Prepetition Collateral were valid,

9

binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Term Loan Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Term Loan Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (1) the Prepetition ABL Liens on the Prepetition ABL Priority Collateral and (2) certain liens senior by operation of law (solely to the extent such liens were valid, non-avoidable, and senior in priority to the Prepetition Term Loan Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or otherwise permitted by the Prepetition Term Loan Documents (the "<u>Prepetition Term Loan Permitted Prior Liens</u>" and, together with the Prepetition ABL Permitted Prior Liens, the "<u>Permitted Prior Liens</u>");[4] (c) the Prepetition Term Loan Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Term Loan Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Term Loan Liens or Prepetition Term Loan Obligations exist, and no portion of the Prepetition Term Loan Liens or Prepetition Term Loan Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Term Loan Parties, or any of their

---

[4] For the avoidance of doubt, as used in this Interim Order, no reference to the Prepetition ABL Permitted Prior Liens, the Prepetition Term Loan Permitted Prior Liens, or the Permitted Prior Liens shall refer to or include the Prepetition ABL Liens or the Prepetition Term Loan Liens.

10

respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition Term Loan Facility; (f) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition Term Loan Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Term Loan Obligations; and (g) the Prepetition Term Loan Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(x)      *Release*.  The Debtors hereby stipulate and agree that they forever and irrevocably release, discharge, and acquit the Prepetition Agents, the Prepetition Secured Parties, all former, current and future Prepetition Secured Parties, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys and agents, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever relating to, as applicable, the Prepetition Secured Facilities, the Prepetition Documents, and/or the transactions contemplated hereunder or thereunder occurring prior to entry of this Interim Order, including (x) any so-called "lender liability" or equitable subordination or recharacterization claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Agents and the Prepetition Secured Parties.  The Debtors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Prepetition Secured Obligations which the Debtors may now have or may claim to have against

11

the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to this Court entering this Interim Order.

(xi)     *Default by the Debtors.* The Debtors acknowledge and stipulate that (i) they have been, since February 5, 2020, and are in default of their obligations under the Prepetition ABL Documents, and that an Event of Default has occurred under the Prepetition ABL Documents, and that since February 5, 2020, interest has accrued, and will continue to accrue, on the Prepetition ABL Obligations at the default rate set forth in the Prepetition ABL Agreement, and (ii) they have been, since February 29, 2020, and are in default of the obligations under the Prepetition Term Loan Documents, and that a Default has occurred under the Prepetition Term Loan Documents, and that as of the Petition Date, interest will accrue, on the Prepetition Term Loan Obligations at the default rate set forth in the Prepetition Term Loan Documents.

(xii)    *Consulting Agreement with the Liquidators.* Pursuant to that certain Consulting and Marketing Services Agreement, dated as of March 5, 2020, by and among Hilco Merchant Resources, LLC, Hilco IP Services, LLC, d/b/a Hilco Streambank, Hilco Real Estate, LLC, Hilco Receivables, LLC, Gordon Brothers Retail Partners, LLC, DJM Realty Services, LLC, d/b/a Gordon Brothers Real Estate, Gordon Brothers Commercial & Industrial, LLC and Gordon Brothers Brands, LLC and certain of the Debtors, acknowledged by the Prepetition Agents (as amended, restated or otherwise modified from time to time, the "Consulting Agreement"), the Debtors have retained the Consultant to conduct "Going Out of Business" sales of the Assets (each as defined in the Consulting Agreement). The continued existence and validity of the Consulting Agreement and the uninterrupted continuation of the sales contemplated thereby is a condition to the consent of the Prepetition Agents to this Interim Order and the Debtors' use of Cash Collateral hereunder.

G. Levin DIP Facility. [Insert description of Levin DIP motion/relief, to be referenced as the "Levin DIP Facility."].  The Prepetition Agents have consented to the Levin DIP Facility (in accordance with the Levin DIP Order and Levin DIP Documents, in form and substance reasonably acceptable to the Prepetition Agents), and the Debtors' compliance with, and the obligations incurred under, the Levin DIP Facility (in accordance with the Levin DIP Order and Levin DIP Documents, in form and substance reasonably acceptable to the Prepetition Agents) shall not give rise to an Event of Default under this Interim Order.

H. **Permitted Prior Liens**.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing shall prejudice the rights of any party-in-interest, including, but not limited to the Debtors, the Prepetition Secured Parties, or a Committee (if appointed), to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien.  The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien, rather, any such alleged claim arising or asserted as a right of reclamation (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) shall have the same rights and priority with respect to the Prepetition ABL Liens as such claims had on the Petition Date.

I. **Cash Collateral**.  All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition Secured Parties.

J. **Adequate Protection**.  The Prepetition ABL Agent, for the benefit of itself and the other Prepetition ABL Parties, and the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Parties, are each entitled to receive adequate protection as set

13

forth herein to the extent of any Diminution in Value of their respective interests in the Prepetition Collateral.

      K.     **Sections 506(c) and 552(b).**  In light of: (i) the Prepetition ABL Parties' agreement that their liens shall be subject to the Carve Out and, in the case of the Prepetition Term Priority Collateral, subordinate to the Prepetition Term Loan Liens and the Prepetition Term Loan Adequate Protection Liens; (ii) the Prepetition Term Loan Parties' agreement that their liens shall be subject to the Carve Out and, in the case of the Prepetition ABL Priority Collateral, subordinate to the Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens; and (iii) the payment of claims and/or expenses as set forth in the Budget (as defined herein) to the extent approved by the Court in connection with the Debtors' "first day motions," subject to entry of a Final Order, the Prepetition Secured Parties are each entitled to (a) a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (b) a waiver of the provisions of section 506(c) of the Bankruptcy Code.

      L.     **Good Faith**.  The Prepetition Secured Parties and the Debtors have negotiated at arms' length and in good faith regarding the Debtors' use of Cash Collateral to fund the continued operation of the Debtors' businesses during the Specified Period (defined below). The Prepetition Secured Parties have agreed to permit the Debtors to use their Cash Collateral for the Specified Period, subject to the terms and conditions set forth herein, which terms and conditions are fair and reasonable and have been stipulated to by the Debtors in the exercise of their sound business judgment.  Entry of this Interim Order is in the best interests of the Debtors, their estates and their creditors.

      M.     **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

13167798 v1

N.    **Interim Hearing**.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) those entities or individuals included on the Debtors' list of 30 largest unsecured creditors on a consolidated basis; (iii) counsel to the Prepetition ABL Agent; (iv) counsel to the Prepetition Term Loan Agent; (v) counsel to the Consultant (as defined in the Consulting Agreement); (vi) counsel to Levin Furniture, LLC and Levin Trucking, LLC, and (vii) all other parties entitled to notice under the Bankruptcy Rules and the Local Rules.  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and no other notice is required in connection with the relief set forth in this Interim Order.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.    <u>Motion Granted</u>.  The Motion is granted, subject to the terms and conditions set forth in this Interim Order.  The Debtors shall not use Cash Collateral except as expressly authorized and permitted herein or by subsequent order of the Court.  All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled.

2.    <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Interim Order, and in accordance with the Budget, subject to such variances as are permitted by this Interim Order, the Debtors are authorized to use Cash Collateral for the period (the "<u>Specified Period</u>") from the Petition Date through the date which is the earliest to occur of: (a) the Termination Date, (b) thirty (30) days after the Petition Date and (c) entry of the Final Order;

15

13167798 v1

*provided, however*, that, during the Remedies Notice Period (as defined herein), the Debtors may use Cash Collateral solely to meet payroll obligations and pay expenses necessary or reasonably advisable to avoid immediate and irreparable harm to the Debtors' estates in accordance with the Budget and as otherwise agreed to by the Prepetition ABL Agent in its sole discretion.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any use of Cash Collateral or proceeds resulting therefrom, except (x) as permitted in the Consulting Agreement or the Levin APA (as defined below), (y) as otherwise consented to by the Prepetition ABL Agent (with respect to Postpetition ABL Priority Collateral) or the Prepetition Term Loan Agent (with respect to Postpetition Term Priority Collateral) in writing, or (z) as otherwise disposed of, or used, in accordance with the Budget, subject to such variances as are permitted by this Interim Order.

      3.     <u>Adequate Protection Liens</u>.

      (a)     *Prepetition ABL Adequate Protection Liens*.  Subject to the Carve Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "<u>Prepetition ABL Adequate Protection Liens</u>") on any Postpetition Collateral.[5]

---

[5] "Postpetition Collateral" means: all personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors, including: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including all of the issued and outstanding capital stock of each of its subsidiaries), hedge agreements, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the

16

(b)      *Prepetition Term Loan Adequate Protection Liens*.  Subject to the Carve Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Term Loan Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "Prepetition Term Loan Adequate Protection Liens," and together with the Prepetition ABL Adequate Protection Liens, the "Adequate Protection Liens") on the Postpetition Collateral.

4.      Priority of Adequate Protection Liens.

(a)      The Prepetition ABL Adequate Protection Liens shall be senior to

---

payment of money (including tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all proceeds of leased real property; (c) subject to entry of a Final Order, the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents; (d) subject to entry of a Final Order, proceeds of the Debtors' rights under section 506(c) (solely to the extent such rights result from the use of Postpetition Collateral, and are, therefore, enforceable against parties other than the Prepetition Agents or the Prepetition Secured Parties) and 550 of the Bankruptcy Code; and (e) all Prepetition Collateral that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date.  Notwithstanding the foregoing, Postpetition Collateral shall not include the Debtors' real property leases (but shall include all proceeds of such leases).  Postpetition Collateral that is (i) Prepetition ABL Priority Collateral, (ii) of a type that would be Prepetition ABL Priority Collateral; (iii) of a type that would be Prepetition ABL Priority Collateral, but that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date; and (iv) the "Deposit", as defined in that certain letter agreement dated as of March 4, 2020 by and among Levin Furniture, LLC, Levin Trucking, LLC, as Buyer, and Sam Levin, Inc. and LF Trucking, Inc., as Seller (the "Levin LOI") shall, in each case, constitute "Postpetition ABL Priority Collateral."  Postpetition Collateral that is (i) Prepetition Term Priority Collateral, (ii) of a type that would be Prepetition Term Priority Collateral; and (iii) of a type that would be Prepetition Term Priority Collateral, but that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date shall constitute "Postpetition Term Priority Collateral."  Postpetition Collateral that is (i) the proceeds of the Debtors' real property leases; and (ii) the proceeds of avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents shall be shared Postpetition Collateral, and the Prepetition ABL Liens and Prepetition Term Loan Liens (and corresponding adequate protection liens and claims) on such proceeds shall rank equally in priority and share such proceeds equally (with 50% of such proceeds applied to the Prepetitition ABL Obligations and 50% applied to the Prepetition Term Loan Obligations).

all other security interests in, liens on, or claims against any of the Postpetition Collateral; *provided that*, the Prepetition ABL Adequate Protection Liens shall be subject to the Carve Out and shall be junior only to:  (i) with respect to the Postpetition ABL Priority Collateral, (A) Prepetition ABL Permitted Prior Liens and (B) the Prepetition ABL Liens; and (ii) with respect to the Postpetition Term Priority Collateral, (A) Prepetition Term Loan Permitted Prior Liens, (B) the Prepetition Term Loan Liens, (C) the Prepetition Term Loan Adequate Protection Liens, and (D) the Prepetition ABL Liens.

(b)     The Prepetition Term Loan Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the Postpetition Collateral; *provided that*, the Prepetition Term Loan Adequate Protection Liens shall be subject to the Carve Out and shall be junior only to:  (i) with respect to the Postpetition ABL Priority Collateral, (A) Prepetition ABL Permitted Prior Liens, (B) the Prepetition ABL Liens, (C) the Prepetition ABL Adequate Protection Liens, and (D) the Prepetition Term Loan Liens; and (ii) with respect to the Postpetition Term Priority Collateral, (A) Prepetition Term Loan Permitted Prior Liens, and (B) the Prepetition Term Loan Liens.

(c)     Except as provided herein (including with respect to the Carve Out), the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Cases or any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"), and shall be valid and enforceable against any trustee appointed in any of the Cases or any Successor Cases, or upon the dismissal of any of the Cases or Successor Cases.  The Adequate Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of

18

the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Prepetition Liens or the Adequate Protection Liens.

     5.    <u>Adequate Protection Superpriority Claims</u>.

     (a)    *Prepetition ABL Superpriority Claim*.  As further adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Parties, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "<u>Prepetition ABL Superpriority Claim</u>").

     (b)    *Prepetition Term Loan Superpriority Claim*.  As further adequate protection of the interests of the Prepetition Term Loan Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Parties, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "<u>Prepetition Term Loan Superpriority Claim</u>," and together with the Prepetition ABL Superpriority Claim, the "<u>Adequate Protection Superpriority Claims</u>").

     6.    <u>Priority of the Adequate Protection Superpriority Claims</u>.  Except as set forth herein, the Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b),

19

507(a), 506(c) (subject to entry of the Final Order), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code.  The Adequate Protection Superpriority Claims shall be subject to the Carve Out and shall be subject to the following priorities:  (a) with respect to Postpetition ABL Priority Collateral, (1) the Prepetition ABL Superpriority Claim and (2) the Prepetition Term Loan Superpriority Claim; and (b) with respect to Postpetition Term Priority Collateral, (1) the Prepetition Term Loan Superpriority Claim and (2) the Prepetition ABL Superpriority Claim.

   7. <u>Adequate Protection Payments and Protections for Prepetition ABL Parties</u>. As further adequate protection, the Debtors are authorized and directed to pay in cash the following: (a) all principal and interest at the default rate due under the Prepetition ABL Documents (but subject to the Challenge rights to the extent preserved in paragraph 27 below, (b) immediately upon entry of this Interim Order, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Agent arising prior to the Petition Date and reimbursable under the Prepetition ABL Documents, (c) in accordance with paragraph 22 herein, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Agent on and subsequent to the Petition Date reimbursable under the Prepetition ABL Documents, (d) the Prepetition ABL Obligations in accordance with the Budget, and (e) the Prepetition ABL Obligations with the Deposit (as defined in the Levin LOI) upon such Deposit becoming non-refundable in accordance with the terms of the Levin LOI.  In addition, immediately upon the payment in full in cash of the Prepetition ABL

Obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted), the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the Prepetition ABL Documents, the Debtors shall fund to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Parties, $500,000 into a non-interest bearing account maintained at Wells Fargo Bank, National Association (the "Prepetition ABL Indemnity Reserve") to secure contingent indemnification, reimbursement, or similar continuing obligations arising under or related to the Prepetition ABL Documents (the "Prepetition ABL Indemnity Obligations").  The Prepetition ABL Indemnity Reserve shall secure all costs, expenses, and other amounts (including reasonable and documented attorneys' fees) owed to or incurred by the Prepetition ABL Agent and the Prepetition ABL Lenders related to the Prepetition ABL Documents, the Prepetition ABL Obligations, or the Prepetition ABL Liens, as applicable, whether in these Cases or independently in another forum, court, or venue.  The Prepetition ABL Indemnity Obligations shall be secured by a first priority lien on the Prepetition ABL Indemnity Reserve and the funds therein (which shall not be subject to the Carve-Out) and by a lien on the Postpetition Collateral and the Prepetition Collateral (subject in all respects to the Intercreditor Agreement).  Subject to paragraph 22 below, the Debtors shall pay all Prepetition ABL Indemnity Obligations as and when they arise and paid; *provided, that* the Prepetition ABL Agent shall have authority in its sole discretion, but not an obligation, to apply amounts in the Prepetition ABL Indemnity Reserve to any Prepetition ABL Indemnity Obligations, without further notice to or consent from the Debtors, a Committee (if appointed), or any other parties in interest and without further order of this Court; *provided*, that (i) any such

indemnification claims shall be subject to (a) the terms of the Prepetition ABL Documents (including with respect to application of proceeds) and (b) the rights of parties in interest with requisite standing to object to such indemnification claim(s) to the extent set forth in paragraph 27 hereof.  The Prepetition ABL Agent (for itself and on behalf of the Prepetition ABL Parties) shall retain and maintain the Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens granted to the Prepetition ABL Agent as security for the amount of any Prepetition ABL Indemnity Obligations in excess of funds on deposit in the Prepetition ABL Indemnity Reserve.  The Prepetition ABL Indemnity Reserve shall be released at such time as the Prepetition ABL Indemnity Obligations are Paid in Full.[6]

8. <u>Adequate Protection Payments and Protections for Prepetition Term Loan Agent</u>.  As further adequate protection, the Debtors are authorized and directed to pay in cash the following:  (a) the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Term Loan Agent arising prior to the Petition Date and reimbursable under the Prepetition Term Loan Documents, and (b) in accordance with paragraph

---

[6] "Paid in Full" means the indefeasible repayment in full in cash of all obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted) under the applicable credit facility, the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the applicable credit facility.  No facility shall be deemed to have been Paid in Full until such time as, with respect to the applicable facility, (a) the commitments to lend thereunder have been terminated, (b) with respect to the Prepetition ABL Obligations (i) the Challenge Deadline (as defined in paragraph 27 of this Interim Order) shall have occurred without the timely and proper commencement of a Challenge or (ii) if a Challenge is timely and properly asserted prior to the Challenge Deadline, upon the final, non-appealable disposition of such Challenge; and (c) the Prepetition ABL Agent has received (i) a countersigned payoff letter in form and substance satisfactory to the Prepetition ABL Agent and (ii) releases in form and substance satisfactory to the Prepetition ABL Agent in its sole discretion.

22 herein, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Term Loan Agent on and subsequent to the Petition Date reimbursable under the Prepetition Term Loan Documents; *provided*, *however*, that any payments made under this paragraph 8 shall be made solely from proceeds of Postpetition Term Priority Collateral.

9. <u>Perfection of Adequate Protection Liens</u>. This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the Adequate Protection Liens, or to entitle the Prepetition Secured Parties to the priorities granted herein. Notwithstanding the foregoing, each Prepetition Agent is authorized to file, as it in its sole discretion deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the Adequate Protection Liens, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the Adequate Protection Liens. The Debtors are authorized and directed to execute and deliver promptly upon demand to the Prepetition Agents, as applicable,

23

all such financing statements, mortgages, notices, and other documents as the Prepetition Agents may reasonably request. Each Prepetition Agent, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instrument.

10.     _Adequate Protection Reservation_.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution in Value of their respective interests in the Prepetition Collateral during the Cases or any Successor Cases.  The receipt by the Prepetition Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected.  Further, this Interim Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.

11.     _Budget_.  The use of Cash Collateral during the Specified Period is permitted solely in accordance with a cash collateral budget (the "_Budget_") approved by the Prepetition Agents,[7] each in their sole discretion, subject to such variances as are permitted by this Interim Order or agreed to in writing by the Prepetition Agents.  A copy of the initial approved Budget is attached hereto as _Exhibit [ ]_.  The Budget shall depict, on a weekly basis and line item basis (i) projected cash receipts, (ii) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees of the Debtors' professionals

---

[7] For the avoidance of doubt, any reference to the consent rights of the Prepetition Term Loan Agent shall mean the Prepetition Term Loan Agent acting at the direction of the Required Lenders (as defined in the Prepetition Term Loan Agreement).

24

and advisors), asset sales and any other fees and expenses), and (iii) net cash flow, for the first thirteen (13) week period from the Petition Date, and such initial Budget shall be approved by, and in form and substance satisfactory to the Prepetition Agents, each in their sole discretion (it being acknowledged and agreed that the initial Budget attached hereto is approved by and satisfactory to the Prepetition Agents). The Budget shall be updated, modified, or supplemented by the Debtors with the written consent of the Prepetition Agents, but in any event the Budget shall be updated by the Debtors not less than one time in each four (4) consecutive week period, and each such updated, modified, or supplemented budget shall be approved in writing (including by email) by, and shall be in form and substance satisfactory to, the Prepetition Agents, each in their sole discretion), and no such updated, modified, or supplemented budget shall be effective until so approved, and once so approved shall be deemed the Budget; *provided, however*, that in the event the Prepetition Agents, on the one hand, and the Debtors, on the other hand, cannot agree as to an updated, modified or supplemented budget, the Debtors shall continue to operate under the most recent prior-approved Budget and such disagreement shall give rise to an Event of Default once the period covered by such prior Budget has terminated. Each Budget delivered to the Prepetition Agents shall be accompanied by such customary supporting documentation as reasonably requested by the Prepetition Agents and shall be prepared in good faith based upon assumptions the Debtors believe to be reasonable at the time of delivery. A copy of any Budget (or updated Budget once approved by the Prepetition Agents) shall simultaneously be delivered to the counsel for a Committee (if appointed), and the U.S. Trustee. All Cash Collateral use must be strictly in accordance with the terms of the Budget, subject to such variances as are permitted by this Interim Order or agreed to in writing by the Prepetition Agents.

12.     Covenants.

(a)      *Budget Compliance*.  The Debtors shall not, without the consent of the Prepetition Agents, permit (i) the actual Total Cash Receipts for any rolling two week period to be less than 90% of the Total Cash Receipts set forth in the Budget for such period, (ii) the actual GOB Disbursements for any rolling two week period to exceed 110% of the aggregate GOB Disbursements set forth in the Budget for such period, (iii) the actual Operating Disbursements for any rolling two week period to exceed 110% of the aggregate Operating Disbursements set forth in the Budget for such period, or (iv) the actual Non-Operating Disbursements for any rolling two week period to exceed 110% of the aggregate Non-Operating Disbursements set forth in the Budget for such period (with any unspent amounts in this subparagraph (iv) being carried forward for subsequent periods).

(b)      *Borrowing Base*.  Until the Prepetition ABL Obligations are Paid in Full, the Debtors shall at all times maintain actual Total Excess ABL Availability After Covenant (calculated in the manner set forth in the Borrowing Base Certificate attached to the Budget) in an amount not less than $0, it being understood and agreed that the Availability Block set forth in the Borrowing Base Certificate attached to the Budget shall be deemed to be $5,000,000 for each of the weeks beginning March 8, 2020 and March 15, 2020.  Until the Prepetition ABL Obligations are Paid in Full, the Borrowing Base Certificate shall be updated and delivered weekly in accordance with the requirements of an "Increased Reporting Event" as defined in the Prepetition ABL Agreement.  For the avoidance of doubt, the calculation of the Borrowing Base shall at all times deduct the amount of the Carve Out Reserves.  Until the Prepetition ABL Obligations are Paid in Full, the Debtors shall deliver to the Prepetition Agents, by not later than Thursday of each week, an updated Borrowing Base Certificate, substantially in the form attached hereto as Exhibit

26

[_] (the "<u>Borrowing Base Certificate</u>"), and such Borrowing Base Certificate shall include such detail as is reasonably satisfactory to the Prepetition Agents (it being agreed the detail required by the Prepetition ABL Agreement shall be deemed so satisfactory).

(c)     *Variance Testing*.  The Debtors shall, commencing with the week beginning March 15, 2020, deliver to the Prepetition Agents, by not later than Thursday of each week, a certificate, substantially in the form attached hereto as Exhibit [_] (the "<u>Budget Variance Certificate</u>") and such Budget Variance Certificate shall include such detail as is reasonably satisfactory to the Prepetition Agents, showing a reconciliation for the prior two week cumulative period, and certifying that (i) the Debtors are in compliance with the covenants contained in this Section 12 and (ii) to the knowledge of the Debtors, no Event of Default hereunder has occurred or, if such an Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto.

(d)     *Consent Fee for Prepetition ABL Parties*.  The Debtors shall pay the Prepetition ABL Agent, for the benefit of the Prepetition ABL Parties, a consent fee ("<u>Consent Fee</u>") in the amount of $150,000 per week until such time as the Prepetition ABL Obligations have been repaid in full in cash (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted), the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the Prepetition ABL Documents.  The Consent Fee shall be fully earned on Saturday of each week and shall be paid to the Prepetition ABL Agent on the immediately following Tuesday and shall not be subject

13167798 v1

to refund, offset or rebate under any circumstances.

(e)     *Levin Sale Milestones*.   The Debtors shall achieve each of the following milestones, if and when applicable (as the same may be extended from time to time with the consent of the Prepetition ABL Agent (in its sole discretion), the "Levin Sale Milestones"), in each case on terms and conditions, and subject to documentation in form and substance, reasonably acceptable to the Prepetition ABL Agent in all respects:

(i)     On or before the date that is five (5) days following the Petition Date, the Debtors shall file a motion to approve the sale of the "Assets", as such term is defined in the Levin LOI (the "Levin Sale"), to the Buyer under the Levin LOI.

(ii)     On or before the date that is ten (10) days following the Petition Date, the Debtors shall enter into an asset purchase agreement with the Buyer under the Levin LOI for the Levin Sale (the "Levin APA").

(iii)     On or before the date that is twenty-one (21) days following the Petition Date, the Debtors shall receive an order from the Court approving the Levin Sale.

(iv)     On or before the date that is two (2) business days after the order approving the Levin Sale, the Debtor shall have consummated the Levin Sale and the proceeds thereof shall have been applied to the Prepetition ABL Obligations.

13.     Modification of Automatic Stay.   The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including to:  (a) permit the Debtors to grant the Adequate Protection Liens and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the Prepetition ABL Agent may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to

the Prepetition ABL Parties under this Interim Order; and (d) authorize the Debtors to pay, and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order.

14.    Protections of Rights of Prepetition Secured Parties.

(a)    Subject to the Intercreditor Agreement, unless the Prepetition ABL Agent and Prepetition Term Loan Agent have each provided their respective prior written consent, or all Prepetition ABL Obligations and Prepetition Term Loan Obligations (excluding contingent indemnification obligations for which no claim has been asserted) have been Paid in Full, the Debtors shall neither seek entry of, nor support any motion or application seeking entry of, and otherwise shall object to any motion or application seeking entry of, any order (other than this Interim Order or the Final Order, but including any order confirming any plan of reorganization or liquidation) that authorizes any of the following:  (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the Postpetition Collateral or Prepetition Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the Prepetition Liens, the Prepetition Adequate Protection Liens, and/or the Adequate Protection Superpriority Claims except as expressly set forth in this Interim Order; (ii) the use of Cash Collateral for any purpose other than as permitted in this Interim Order (including any use in accordance with the Budget, subject to variances permitted by this Interim Order); (iii) the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor or any creditor's taking any setoff or recoupment against any of its prepetition indebtedness based upon any such return of goods pursuant to section 553 of the Bankruptcy Code or otherwise; or (iv) any modification of any of the Prepetition

29

Secured Parties' rights under this Interim Order, the Prepetition ABL Documents, or the Prepetition Term Loan Documents with respect any Prepetition ABL Obligations or Prepetition Term Loan Obligations. It shall be an Event of Default under this Interim Order if, in any of these Cases or any Successor Cases, the Debtors take or take to take any of the actions contemplated with respect to provisions (i) through (iv) of the previous sentence or if any order is entered granting any of the relief enumerated in provisions (i) through (iv) of the previous sentence.

(b)     The Debtors shall (i) maintain books, records, and accounts to the extent and as required by the Prepetition Documents (and subject to the applicable grace periods set forth therein); (ii) reasonably cooperate with, consult with, and provide to the Prepetition Agents, as applicable, all such information and documents that any or all of the Debtors are obligated (including upon reasonable request by any of the Prepetition Agents, as applicable) to provide under the Prepetition Documents, or the provisions of this Interim Order; (iii) upon reasonable advance notice, permit the Prepetition Agents to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants, and other professional advisors (other than legal counsel) as and to the extent required by the Prepetition Documents; (iv) permit the Prepetition Agents to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations, and assets; and (v) upon reasonable advance notice, permit the Prepetition Agents to conduct, at their discretion and at the Debtors' cost and expense, field audits, collateral examinations, liquidation valuations, and inventory appraisals at reasonable times in respect of any or all of the Postpetition

Collateral and Prepetition Collateral, in each case, in accordance with the Prepetition Documents.

15. <u>Credit Bidding</u>. No Debtor shall object to any Prepetition ABL Parties credit bidding up to the full amount of the applicable outstanding Prepetition ABL Obligations, or with respect to the Prepetition Term Loan Parties, credit bidding up to the full amount of the applicable outstanding Prepetition Term Loan Obligations, in each case including any accrued interest, fees, and expenses, in any sale of any Prepetition Collateral, as applicable, whether such sale is effectuated through sections 363 or 1129 of the Bankruptcy Code, by a Chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, to the extent permitted by section 363(k) of the Bankruptcy Code, and subject in each case to the rights, duties, and limitations, as applicable, of the parties under the Intercreditor Agreement, Prepetition Documents and to the provision of consideration sufficient to pay in full in cash any senior liens on the collateral that is subject to the credit bid.

16. <u>Proceeds of Subsequent Financing</u>. If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Cases or any Successor Cases, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code at any time prior to the Prepetition Obligations being Paid in Full, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, and such facilities are secured by any Prepetition Collateral or Postpetition Collateral, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the Prepetition ABL Agent (or, following the Prepetition ABL Obligations being Paid in Full, to the Prepetition Term Loan Agent) to be applied in accordance with this Interim Order and the Intercreditor Agreement.

17. <u>Cash Collection</u>. From and after the date of the entry of this Interim Order,

31

all collections and proceeds of any Postpetition Collateral and Prepetition Collateral or services provided by any Debtor and all Cash Collateral (that does not constitute Prepetition or Postpetition Term Priority Collateral) that shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same lock-box and/or deposit accounts into which the collections and proceeds of the Prepetition ABL Priority Collateral were deposited under the Prepetition Documents (or in such other accounts as are designated by the Prepetition ABL Agent from time to time) (collectively, the "Cash Collection Accounts"), which accounts shall, until the Prepetition ABL Obligations are Paid in Full, be subject to the sole dominion and control of the Prepetition ABL Agent and any amounts deposited into the Cash Collection Accounts shall be deemed to be Postpetition ABL Priority Collateral.  Proceeds and other amounts in the Cash Collection Accounts shall be used, subject to the conditions set forth herein, to fund the Budget during the Specified Period, and the Debtors are authorized and directed to pay to the Prepetition ABL Agent, and the Prepetition ABL Agent is authorized to apply, amounts in excess thereof in accordance with the Budget until the Prepetition ABL Obligations are Paid in Full.  In furtherance of the foregoing, each Thursday during the Specified Period the Debtors shall deliver to the Prepetition Agents a schedule of all proposed disbursements for the following seven (7) day period (each a "Disbursement Schedule"), including identification of which line item(s) in the Budget such proposed disbursements relate to.  Upon the Prepetition ABL Agent's receipt of a written cash collateral draw request (each a "CC Draw Request," which shall be delivered to the Prepetition Term Loan Agent at the same time such CC Draw Request is delivered to the Prepetition ABL Agent) (which may be made on a daily basis), and following verification of conformity with the associated Disbursement Schedule and Budget, the Prepetition ABL Agent shall disburse funds

from the Cash Collection Account as appropriate to fund the amounts specified in the CC Draw Request; *provided* that, during the period prior to the Prepetition ABL Obligations being Paid in Full, the Prepetition ABL Agent shall only be required to disburse funds if the Debtors are in compliance with the provisions of this Interim Order (including, without limitation, that after giving effect to such disbursement, actual Total Excess ABL Availability After Covenant at such time (calculated in the manner as set forth in the Borrowing Base Certificate attached to the Budget) shall not be less than $0).  For the avoidance of doubt, it shall be a condition to the Debtors' ability to access and use the Prepetition Secured Parties' Cash Collateral that they submit to the Prepetition ABL Agent the CC Draw Request and associated Disbursement Schedule in the manner and time provided herein.  In addition to the foregoing, the Prepetition ABL Agent (or the Prepetition Term Loan Agent, after the Prepetition ABL Obligations are Paid In Full) is authorized to debit the Debtors' accounts and apply Cash Collateral on deposit therein in an amount sufficient to maintain the "Ending Balance" set forth in the Budget for any applicable weekly period (at the end of the relevant week) and, until the Prepetition ABL Obligations are Paid in Full, the Prepetition ABL Agent is authorized to debit the Debtors' accounts and apply Cash Collateral on deposit therein in an amount such that actual Total Excess ABL Availability After Covenant at such time (calculated in the manner as set forth in the Borrowing Base Certificate attached to the Budget) shall not be less than $0.  Until the Prepetition ABL Obligations are Paid in Full, unless otherwise agreed to in writing by the Prepetition ABL Agent or otherwise provided for herein, the Debtors shall maintain no accounts except those identified in any cash management order entered by the Court (a "<u>Cash Management Order</u>").  The Debtors and the financial institutions where the Debtors' Cash Collection Accounts are maintained (including those accounts identified in any Cash Management Order), are authorized and directed to remit, without offset or deduction, funds

13167798 v1

in such Cash Collection Accounts upon receipt of any direction to that effect from the Prepetition ABL Agent (or the Prepetition Term Loan Agent, after the Prepetition ABL Obligations are Paid in Full), in each case, to the extent such direction is made in accordance with this Interim Order. The Debtors shall cause the proceeds of Prepetition and Postpetition Term Priority Collateral as identified by the Consultant to be deposited into a segregated, non-commingled account which is required to be subject to the control of the Prepetition Term Loan Agent, and the Debtors' use of such proceeds shall be subject to (and limited to the extent set forth in) this Interim Order but, for the avoidance of doubt, may be used in accordance with the Budget, subject to variances permitted by this Interim Order.

18. <u>Maintenance of Collateral</u>. Until all Prepetition ABL Obligations are Paid in Full, the Debtors shall: (a) insure the Postpetition Collateral and Prepetition Collateral as required under the Prepetition Documents; and (b) maintain the cash management system in effect as of the Petition Date, as may be modified with the consent of the Prepetition Agents (such consent not to be unreasonably withheld) or as a result of entry of any order by the Court.

19. <u>Disposition of Collateral</u>. The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the Postpetition Collateral or Prepetition Collateral other than in the ordinary course of business and in accordance with the Consulting Agreement and the Levin APA, without (subject to the Intercreditor Agreement) the prior written consent of the Prepetition ABL Agent (with respect to Postpetition ABL Priority Collateral) or the Prepetition Term Loan Agent (with respect to Postpetition Term Priority Collateral), and no such consent shall be implied, from any other action, inaction or acquiescence by the Prepetition Secured Parties or from any order of this Court.

20. <u>Events of Default</u>. The occurrence of any of the following events, unless

consented to or waived by the Prepetition Agents in advance, in writing, each in their sole and absolute discretion, shall constitute an event of default (collectively, the "Events of Default"):

        (a)      the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order (including, without limitation, the Covenants in paragraph 12 herein);

        (b)      the failure of the Debtors to obtain a Final Order on the Motion on terms acceptable to the Prepetition Agents on or before 30 days after the Petition Date;

        (c)      (i) the failure by the Debtors to continue sales of the Assets in accordance with the Consulting Agreement and to assume the Consulting Agreement on a timely basis;

        (d)      the filing of a motion or any plan of reorganization or disclosure statement attendant thereto by and of the Debtors: (i) to obtain additional financing under section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Interim Order; (ii) to grant any lien other than Permitted Prior Liens upon or affecting any Postpetition Collateral; or (iii) except as provided in this Interim Order, to use Cash Collateral under section 363(c) of the Bankruptcy Code;

        (e)      (i) the filing of any Prohibited Plan (as defined herein) or disclosure statement attendant thereto, or any direct or indirect amendment to such chapter 11 plan or disclosure statement, by a Debtor, (ii) the entry or request for entry of any order terminating any Debtor's exclusive right to file a chapter 11 plan (unless actively contested by the Debtors) or (iii) the expiration of any Debtor's exclusive right to file a chapter 11 plan;

        (f)      the entry of an order in any of the Cases confirming a Prohibited

Plan;

(g)     the entry of an order amending, supplementing, staying, vacating or otherwise modifying this Interim Order or the Cash Management Order, the filing by a Debtor of a motion for reconsideration with respect to this Interim Order or the Cash Management Order, or the Interim Order shall cease to be in full force and effect;

(h)     the payment of, or application by the Debtors for authority to pay, any prepetition claim unless in accordance with the Budget, subject to variances permitted by this Interim Order;

(i)     the appointment of an interim or permanent trustee in the Cases, the appointment of a receiver, receiver and manager, interim receiver or similar official over any substantial portion of the assets of the Debtors, or the appointment of a trustee receiver or an examiner in the Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Debtors;

(j)     the filing of a motion to approve a Prohibited Sale or to sell all or substantially all of the Debtors' assets other than in accordance with the Consulting Agreement or the Levin LOI;

(k)     the dismissal of any Case, or the conversion of any Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or any Debtor filing a motion or other pleading seeking the dismissal of the Cases under section 1112 of the Bankruptcy Code or otherwise or the conversion of the Cases to Chapter 7 of the Bankruptcy Code;

(l)     the filing of a motion seeking, or the Court shall enter an order granting, relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor (other than the Prepetition ABL Agent and, subject to the Intercreditor

Agreement, the Prepetition Term Loan Agent) to execute upon or enforce a lien on any Postpetition Collateral or Prepetition Collateral, (ii) approving any settlement or other stipulation with any secured creditor of any Debtor providing for payments as adequate protection or otherwise to such secured creditor, or (C) with respect to any lien on or the granting of any lien on any Postpetition Collateral or the Prepetition Collateral to any federal, state or local environmental or regulatory agency or authority, which in either case involves a claim of [$250,000] or more;

      (m)      the existence of any claim or charges, or the entry of any order of the Court authorizing any claims or charges, entitled to superpriority administrative expense claim status in any Case pursuant to section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the Prepetition Secured Parties under this Interim Order, or there shall arise or be granted by the Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code or (ii) any lien on the Postpetition Collateral or the Prepetition Collateral having a priority senior to or *pari passu* with the liens and security interests granted herein, except, in each case, as expressly provided in this Interim Order;

      (n)      the filing of a motion or entry of an order materially adversely impacting the rights and interests of the Prepetition Secured Parties shall have been entered by the Court or any other court of competent jurisdiction;

      (o)      any Debtor shall challenge, support or encourage a challenge of any payments made to any Prepetition ABL Party with respect to the Prepetition ABL Obligations;

      (p)      any Debtors shall challenge, support or encourage a challenge of any payments made to any Prepetition Term Loan Party with respect to the Prepetition Term Loan Obligations;

(q)     the entry of any order by the Court granting, or the filing by any Debtor of any motion or other request with the Court seeking authority to use cash proceeds of any of the Postpetition Collateral or Prepetition Collateral other than as set forth in this Interim Order or to obtain any financing under section 364(d) of the Bankruptcy Code;

(r)     any Debtor or any person on behalf of any Debtor shall file any motion seeking authority to consummate a sale of assets, other than in connection with the Consulting Agreement or the Levin APA, with respect to Postpetition Collateral or Prepetition Collateral having a value in excess of [$250,000] outside the ordinary course of business and not otherwise permitted hereunder;

(s)     any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise provide any credit on account of any prepetition indebtedness or payables other than payments (i) under customary "first day orders" as approved by the Prepetition Agents in writing (provided that this Interim Order and all orders relating to cash management shall be acceptable to the Prepetition Agents) and (ii) payments approved (A) by the Court or (B) by the Prepetition Agents in writing, in each case in accordance with the Budget, subject to variances permitted by this Interim Order;

(t)     any Debtor shall fail to contest in good faith a request to take any action that if taken by the Debtor would constitute an event of default under this paragraph 20;

(u)     the automatic stay shall be modified, reversed, revoked or vacated in a manner that has a material adverse impact on the rights and interests of the Prepetition Agents or the Prepetition Secured Parties.

21.     <u>Rights and Remedies Upon Event of Default</u>.  Immediately upon the occurrence and during the continuation of an Event of Default under this Interim Order,

notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order (and the Remedies Notice Period), (a) (i) the Prepetition ABL Agent may declare (any such declaration delivered by the Prepetition ABL Agent or the Prepetition Term Loan Agent, as applicable, shall be referred to herein as a "Termination Declaration") (A) all Prepetition ABL Obligations owing under the Prepetition ABL Documents to be immediately due and payable, and (B) that the application of the Carve Out has occurred through the delivery of the Carve Out Trigger Notice (as defined herein); and (ii) the Prepetition ABL Agent may declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, and (b) the Prepetition Term Loan Agent may (i) declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral that is Postpetition Term Priority Collateral and (ii) after the Prepetition ABL Obligations have been Paid in Full, declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral (the date a Termination Declaration is delivered shall be referred to herein as the "Termination Date").  The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to a Committee (if appointed), the Prepetition ABL Agent (if delivered by the Prepetition Term Loan Agent), the Prepetition Term Loan Agent (if delivered by the Prepetition ABL Agent), and the U.S. Trustee. The automatic stay in the Cases otherwise applicable to the Prepetition ABL Parties is hereby modified so that five (5) business days after the date a Termination Declaration is delivered (the "Remedies Notice Period"), the Prepetition ABL Parties shall be entitled to exercise their rights and remedies in accordance with the Prepetition ABL Documents and this Interim Order to satisfy the Prepetition ABL Obligations, Prepetition ABL Superpriority Claims, and Prepetition ABL Adequate Protection Liens, subject to the Carve Out (to the extent applicable).   During the

13167798 v1

Remedies Notice Period, the Debtors and/or a Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court.  Upon expiration of the Remedies Notice Period, unless the Court orders otherwise, the automatic stay, as to the Prepetition ABL Parties, shall automatically be terminated without further notice or order and the Prepetition ABL Parties shall be permitted to exercise all remedies set forth herein, in the Prepetition Documents, and as otherwise available at law without further order of or application or motion to the Court consistent with the Intercreditor Agreement and this Interim Order.  Upon the occurrence and during the continuation of an Event of Default, in each case, subject to the Intercreditor Agreement, the Prepetition ABL Agent and any liquidator or other professional will have the right to access and utilize, at no cost or expense, any trade names, trademarks, copyrights or other intellectual property and any warehouse, distribution centers, store or other locations to the extent necessary or appropriate in order to sell, lease or otherwise dispose of any of the Postpetition ABL Priority Collateral, including pursuant to any Court approved sale process.

22.      <u>Prepetition Secured Parties' Expenses</u>.  The Debtors are authorized and directed to pay, in accordance with this Interim Order, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of (a) the Prepetition ABL Agent (limited in the case of counsel, to all reasonable and documented out of pocket fees, costs, disbursements and expenses of Morgan, Lewis & Bockius LLP and Burr & Forman LLP, and any successor counsel) and, (b) solely from the proceeds of Postpetition Term Priority Collateral, the Prepetition Term Loan Agent (limited in the case of counsel, to all reasonable and documented out of pocket fees, costs, disbursements and expenses of Riemer & Braunstein LLP and Greenberg Traurig, LLP, and any successor counsel).  Payment of all such fees and expenses shall not be subject to allowance by the Court.  Professionals for the Prepetition Agents shall not be required to comply with the

U.S. Trustee fee guidelines, *provided*, *however* that any time such professionals seek payment of fees and expenses from the Debtors that were incurred after the Petition Date, each professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the U.S. Trustee and counsel for a Committee (if appointed) contemporaneously with the delivery of such summary fee and expense statements to the Debtors. Any objections raised by the Debtors, the U.S. Trustee, or a Committee (if appointed) with respect to such invoices within ten (10) days of the receipt thereof will be subject to resolution by the Court to the extent they cannot be resolved by the applicable parties. Pending such resolution, the undisputed portion of any such invoice will be paid promptly by the Debtors. Notwithstanding the foregoing, the Debtors are authorized and directed to pay upon entry of this Interim Order all reasonable and documented fees, costs, and out-of-pocket expenses of the Prepetition ABL Parties as provided in the Prepetition ABL Documents, incurred on or prior to such date without the need for any professional engaged by the Prepetition ABL Parties to first deliver a copy of its invoice as provided for herein. No attorney or advisor to any Prepetition ABL Party shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.

23.     <u>Proofs of Claim</u>.  Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Cases or any Successor Cases to the contrary, the Prepetition ABL Parties and the Prepetition Term Loan Parties will not be required to file proofs of claim in any of the Cases or Successor Cases for any claims arising under the

41

Prepetition ABL Documents or the Prepetition Term Loan Documents.  The Debtors' stipulations, admissions, and acknowledgments and the provisions of this Interim Order shall be deemed to constitute a timely filed proof of claim for the Prepetition ABL Parties and the Prepetition Term Loan Parties with regard to all claims arising under the Prepetition ABL Documents or the Prepetition Term Loan Documents, as the case may be.  Notwithstanding the foregoing, the Prepetition ABL Agent on behalf of itself and the Prepetition ABL Parties, and the Prepetition Term Loan Agent on behalf of itself and the Prepetition Term Loan Parties, are hereby authorized and entitled, in their sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate or master proofs of claim in each of the Cases or Successor Cases for any claim described herein (with any such aggregate or master proof of claim filed in any of the Cases deemed to be filed in all Cases of each of the Debtors and asserted against all of the applicable Debtors).  Any proof of claim filed by the Prepetition ABL Agent or the Prepetition Term Loan Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition ABL Parties or Prepetition Term Loan Parties. Any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases shall not apply to any claim of the Prepetition ABL Parties or the Prepetition Term Loan Parties.  The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

24.    <u>Carve Out</u>.

(a)    *Carve Out*.  As used in this Interim Order, the "<u>Carve Out</u>" means (i) all fees required to be paid to (A) the Clerk of the Court and (B) the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code; (ii) all reasonable fees and

expenses up to $50,000 (and any interest thereon) incurred by a trustee under section 726(b) of the Bankruptcy Code (the "Chapter 7 Trustee Carve Out"); (iii) to the extent allowed at any time (regardless of whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (as defined below)), whether by interim order, procedural order, or otherwise, all accrued and unpaid fees and expenses incurred by persons or firms retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "Debtor Professionals") and a Committee (if appointed) pursuant to sections 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") (such fees and expenses, the "Allowed Professional Fees") at any time on or prior to the first business day following delivery by the Prepetition ABL Agent of a Carve Out Trigger Notice (as defined herein), *provided* that the amount of such Allowed Professional Fees shall, as relates to the Prepetition ABL Parties, the Prepetition ABL Priority Collateral and the Postpetition ABL Priority Collateral, not exceed, at any time, the amount set forth for Allowed Professional Fees in the Budget at such time (the "ABL Professional Fee Cap"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $[500,000] incurred after the first business day following delivery by the Prepetition ABL Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "Post Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Prepetition ABL Agent to lead restructuring counsel for the Debtors, the U.S. Trustee, and lead counsel to a Committee (if appointed), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined herein), stating that the Post-Carve Out Trigger Notice Cap has been invoked.  Each Professional

43

Person shall deliver bi-weekly (on Thursday of each such week, beginning on the second Thursday following the Petition Date) to the Debtors (and the Debtors shall cause the same to be delivered to the Prepetition Agents on the same day received by the Debtors) a statement setting forth a good-faith estimate of the amount of fees and expenses incurred during the preceding week by such Professional Persons (through Saturday of such week).

(b)      *Carve Out Reserves*.   On the day on which a Carve Out Trigger Notice is given by the Prepetition ABL Agent (the "Termination Declaration Date"), the Carve Out Trigger Notice shall be deemed a demand to the Debtors, and authorization for the Debtors, to utilize cash on hand and proceeds of the Postpetition Collateral to fund a reserve in an amount equal to the Carve Out.  The Debtors shall deposit and hold such amounts in a segregated account at the Prepetition ABL Agent in trust exclusively to pay such unpaid Allowed Professional Fees (each, a "Carve Out Reserves").   For the avoidance of doubt, the Carve Out Reserves shall constitute the primary source for payment of Allowed Professional Fees entitled to benefit from the Carve Out, and any lien priorities or superpriority claims granted pursuant to this Interim Order or the Final Order to secure payment of the Carve Out shall be limited to the Carve Out Reserves, once funded.

(i)      Following payment of all Allowed Professional Fees entitled to benefit from the Carve Out, any remaining funds in the Carve-Out Reserves funded by (x) the proceeds of Postpetition ABL Priority Collateral shall be distributed (A) first, to the Prepetition ABL Agent on account of the Obligations (as defined in the Prepetition ABL Agreement) until such obligations have been Paid in Full, and (B) second, to the Prepetition Term Loan Agent on account of the Obligations (as defined in the Prepetition Term Loan Agreement) until such obligations have been Paid in Full; and (y) the proceeds of Postpetition Term Priority Collateral

44

shall be distributed (A) first, to the Prepetition Term Loan Agent which shall apply such funds to the Obligations (as defined in the Prepetition Term Loan Agreement) in accordance with the Prepetition Term Loan Agreement until such obligations have been Paid in Full, and (B) second, to the Prepetition ABL Administrative Agent on account of the Obligations (as defined in the Prepetition ABL Agreement) until such obligations have been Paid in Full.

(ii)    Notwithstanding anything to the contrary in this Interim Order, following the end of the third business day after delivery of a Carve Out Trigger Notice, (x) the Prepetition ABL Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but the Prepetition ABL Agent, on the one hand, and the Prepetition Term Loan Agent, on the other hand, shall have a security interest in any residual interests in the Carve Out Reserves, with any excess paid as provided above; and (y) the Prepetition Term Loan Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves required to be funded by the proceeds of Postpetition Collateral have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves held in accounts by the Prepetition Term Loan Agent, with any excess paid as provided above.

(iii)    For the avoidance of doubt and notwithstanding anything to the contrary herein or in any Prepetition Secured Facilities, to the extent of any shortfall in the Carve Out Reserves, the Carve Out shall be senior to all liens and claims securing the Adequate Protection Liens and any and all other forms of adequate protection, liens, or claims securing the obligations under the Prepetition Documents; provided that in all cases, the Carve Out priority with regard to the Prepetition ABL Priority Collateral and the Postpetition ABL Priority Collateral

will always be subject to the limitations applicable thereto set forth in the definition of Carve Out.

   (c) *No Direct Obligation To Pay Allowed Professional Fees*. The Prepetition Secured Parties shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the Prepetition Secured Parties in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

   (d) *Payment of Allowed Professional Fees Prior to the Termination Declaration Date*. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

   (e) *Payment of Carve Out On or After the Termination Declaration Date*. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

   (f) *Release of Prepetition ABL Parties*. Notwithstanding anything to the contrary contained herein, (i) prior to the delivery of the Carve Out Trigger Notice, the Debtors shall fund the Carve Out Reserves at the reasonable request of the Prepetition ABL Agent in consultation with the Prepetition Term Loan Agent, the Debtors and their advisors, and (ii) upon the repayment in full of the principal amount of all Loans under the Prepetition ABL Agreement, the cash-collateralization of all Letters of Credit under the Prepetition ABL Agreement and the funding of the Prepetition ABL Indemnity Reserve (the date that such events occur, the "ABL

13167798 v1

Repayment Date"), and after the funding of the Carve Out Reserves in an amount equal to, as of the ABL Repayment Date, the lesser of (x) the amount set forth in the Budget for Professional Persons (plus the amounts set forth in 24(a)(i) and (ii)) and (y) the then accrued Carve Out, the Prepetition ABL Parties and the Prepetition ABL Liens shall be released from all further liability from the Carve Out (such release shall be a condition to the Prepetition ABL Obligations being deemed Paid in Full).

25.     <u>Limitations on Use of Cash Collateral, and Carve Out</u>.  The Postpetition Collateral, the Prepetition Collateral, the Cash Collateral, and the Carve Out may not be used in connection with:  (a) except to contest the occurrence of an Event of Default, preventing, hindering, or delaying any of the Prepetition Secured Parties' permitted enforcement or realization upon any of the Postpetition Collateral or Prepetition Collateral; (b) using or seeking to use Cash Collateral except as provided for in this Interim Order; (c) selling or otherwise disposing of Postpetition Collateral without the consent of the Prepetition Agents; (d) using or seeking to use any insurance proceeds constituting Prepetition Collateral or Postpetition Collateral except as provided for in this Interim Order without the consent of the Prepetition ABL Agent or the Prepetition Term Loan Agent (in the case of Postpetition Term Priority Collateral); (e) incurring Indebtedness (as defined in the Prepetition Documents) without the prior consent of the Prepetition Agents; (f) seeking to amend or modify any of the rights granted to the Prepetition Secured Parties under this Interim Order or the Prepetition Documents, including seeking to use Cash Collateral and/or Collateral on a contested basis; (g) objecting to or challenging in any way the Prepetition Liens, Prepetition Secured Obligations, Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral, or any other claims or liens, held by or on behalf of any of the Prepetition Secured Parties, respectively; (h) asserting, commencing, or prosecuting any claims or causes of action

47

whatsoever, including any actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions to recover or disgorge payments, against any of the Prepetition Secured Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees; (i) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition Liens, Prepetition Secured Obligations, or any other rights or interests of any of the Prepetition Secured Parties; or (j) seeking to subordinate, recharacterize, disallow, or avoid the Prepetition Secured Obligations; *provided, however*, without prejudice to the ability of a Committee (if appointed) to contest the Investigation Budget Amount (as defined herein) in connection with the Final Hearing, that the Carve Out and such collateral proceeds may be used for allowed fees and expenses, in an amount not to exceed, subject to the Final Order, $50,000 in the aggregate (the "Investigation Budget Amount"), incurred solely by a Committee (if appointed), in investigating (but not prosecuting or challenging), the Prepetition Lien and Claim Matters (as defined herein).

26.    <u>Payment of Compensation</u>.  Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Professional Person or shall affect the right of the Prepetition Secured Parties to object to the allowance and payment of such fees and expenses.  So long as an unwaived Event of Default has not occurred, the Debtors shall be permitted to pay fees and expenses allowed and payable by final order (that has not been vacated or stayed, unless the stay has been vacated) under sections 328, 330, 331, and 363 of the Bankruptcy Code, as the same may be due and payable, as reflected in the most recent Budget provided by the Debtors to the Prepetition Agents.

27.    <u>Effect of Stipulations on Third Parties</u>.

48

       (a)     *Generally.*  The admissions, stipulations, agreements, releases, and waivers set forth in paragraph F of this Interim Order (collectively, the "Prepetition Lien and Claim Matters") are and shall be binding on the Debtors, any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties in interest and all of their successors in interest and assigns, including a Committee (if appointed), unless and to the extent that a party in interest with proper standing granted by order of the Bankruptcy Court (or other court of competent jurisdiction) has properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (other than the Debtors, as to which any Challenge (as defined below) is irrevocably waived and relinquished) and (i) has timely filed the appropriate pleadings, and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph 27) challenging the Prepetition Lien and Claim Matters (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "Challenge") by no later than the earlier of (A) for a Committee (if appointed), sixty (60) days from the date of formation of the Committee (if appointed), or (B) seventy-five (75) days following the entry of the Interim Order for any other party in interest with requisite standing (the occurrence of (A) and (B), as applicable, the "Challenge Deadline"), as such applicable date may be extended in writing from time to time in the sole discretion of the Prepetition ABL Agent (with respect to the Prepetition ABL Documents) and the Prepetition Term Loan Agent (with respect to the Prepetition Term Loan Documents), or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any

such judgment has become a final judgment that is not subject to any further review or appeal.

(b)     *Binding Effect*.  To the extent no Challenge is timely and properly commenced by the Challenge Deadline, or to the extent such proceeding does not result in a final and non-appealable judgment or order of this Court that is inconsistent with the Prepetition Lien and Claim Matters, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Prepetition Lien and Claim Matters shall, pursuant to this Interim Order, become binding, conclusive, and final on any person, entity, or party in interest in the Cases, and their successors and assigns, and in any Successor Case for all purposes and shall not be subject to challenge or objection by any party in interest, including a trustee, responsible individual, examiner with expanded powers, or other representative of the Debtors' estates.  Notwithstanding anything to the contrary herein, if any such proceeding is properly and timely commenced, the Prepetition Lien and Claim Matters shall nonetheless remain binding on all other parties in interest and preclusive as provided in subparagraph (a) above except to the extent that any of such Prepetition Lien and Claim Matters is expressly the subject of a timely and properly filed Challenge, which Challenge is successful as set forth in a final judgment as provided in subparagraph (a) above, and only as to plaintiffs or movants that have complied with the terms hereof.  To the extent any such Challenge proceeding is timely and properly commenced, the Prepetition Secured Parties shall be entitled to payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred under the Prepetition Documents in defending themselves in any such proceeding as adequate protection.  Upon a successful Challenge brought pursuant to this paragraph 27, the Court may fashion any appropriate remedy.

28.     <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this

50

Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

      29.   <u>Section 506(c) Claims</u>.  Subject to entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the Prepetition Secured Parties or any of their respective claims, the Postpetition Collateral, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such parties.

      30.   <u>No Marshaling/Applications of Proceeds</u>.  Subject to entry of a Final Order, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Postpetition Collateral or the Prepetition Collateral, as the case may be, and proceeds shall be received and applied pursuant to this Interim Order, notwithstanding any other agreement or provision to the contrary.

      31.   <u>Section 552(b)</u>.  Subject to entry of a Final Order, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties, with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral.

      32.   <u>Access to Collateral</u>.  Subject to and effective upon entry of a Final Order, upon expiration of the Remedies Notice Period, the Prepetition Secured Parties, subject to the Intercreditor Agreement, shall be permitted to (a) access and recover any and all Prepetition and Postpetition Collateral, and (b) enter onto any leased premises of any Debtor and exercise all of

13167798 v1

the Debtors' rights and privileges as lessee under such lease in connection with an orderly liquidation of the Postpetition Collateral, *provided*, *however*, in the case of clause (b), notwithstanding anything to the contrary herein, and subject to the Intercreditor Agreement, the Prepetition Secured Parties can only enter upon a leased premises during the continuation of an Event of Default in accordance with (i) a separate written agreement by and between the Prepetition Secured Parties, as applicable, and any applicable landlord, (ii) pre-existing rights of the Prepetition Secured Parties, as applicable, and any applicable landlord under applicable non-bankruptcy law, (iii) consent of the applicable landlord, or (iv) entry of an order of this Court obtained by motion of the applicable Prepetition Secured Party on such notice to the landlord as shall be required by this Court; *provided*, *however*, that solely with respect to rent due to a landlord of any such leased premises, the Prepetition Secured Parties, as applicable, shall be obligated only for the payment of rent of the Debtors that first accrues after delivery of the Termination Declaration in accordance with paragraph 20 herein that is payable during the period of such occupancy by the Prepetition Secured Parties, as applicable, calculated on a daily per diem basis; *provided*, *further*, that nothing herein shall relieve the Debtors of their obligations pursuant to section 365(d)(3) of the Bankruptcy Code for the payment of rent that accrues prior to delivery of the Termination Declaration through and including any assumption and/or rejection of any lease. Nothing herein shall require the Prepetition Secured Parties to assume any lease as a condition to the rights afforded in this paragraph.

33.     <u>Limits on Lender Liability</u>.  Subject to entry of a Final Order, nothing in this Interim Order, the Prepetition Documents, or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Secured Parties of any liability for any claims arising from any activities by the Debtors in the operation of

Case 20-10553-CSS   Doc 45-1   Filed 03/09/20   Page 81 of 217

their businesses or in connection with the administration of these Cases. The Prepetition Secured Parties shall not, solely by reason of having made loans under the Prepetition Documents, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute). Nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

34.     <u>Insurance Proceeds and Policies</u>.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the Prepetition ABL Agent (on behalf of the Prepetition ABL Parties) and the Prepetition Term Loan Agent (on behalf of the Prepetition Term Loan Parties), shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the Postpetition Collateral.

35.     <u>Additional Rights of the Prepetition Term Loan Agent</u>.  Subject to the Prepetition ABL Obligations being Paid in Full and the rights preserved in paragraph 27 herein, any reference in this Interim Order to the Prepetition ABL Agent agreeing to or having the right to do, or refraining from or having the right to refrain from doing, an act, or providing any consent or waiver hereunder, shall automatically, without further order of the Court, be construed as referring to the Prepetition Term Loan Agent.

36.     Levin DIP Facility.  Notwithstanding anything to the contrary contained herein or in any order approving the Levin DIP Facility, (a) the DIP Lenders (as defined in the

Levin DIP) shall not have a lien on any Prepetition or Postpetition Collateral (other than Prepetition or Postpetition Collateral that is DIP Collateral (as defined in the DIP Order), (b) the Prepetition ABL Agent (for the benefit of itself and the Prepetition ABL Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders and the Prepetition ABL Permitted Prior Liens, (c) the Prepetition Term Loan Agent (for the benefit of itself and the Prepetition Term Loan Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders, the Prepetition ABL Agent and the Prepetition Term Loan Permitted Prior Liens, (d) the Levin DIP shall not be repaid from (or have any recourse to) any proceeds of Prepetition or Postpetition Collateral that is not DIP Collateral, and (e) the Debtors shall cause the proceeds of DIP Collateral to be deposited into a segregated, non-commingled account which is required to be subject to the control of the DIP Agent and the Debtors' use of such proceeds shall be subject to, and distributed in accordance with, the Levin DIP Order.

37.     <u>Joint and Several Liability</u>.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder.

38.     <u>No Superior Rights of Reclamation</u>.  The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien; rather, any such alleged claims arising or asserted as a right of reclamation (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) shall have the same rights and priority with respect to the Prepetition ABL Liens as such claim had on the Petition Date.

39.     <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly

54

or implicitly, subject to the Prepetition Documents and the Intercreditor Agreement: (a) the Prepetition Secured Parties' right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of any of the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the Prepetition Secured Parties.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', a Committee's (if appointed), or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim Order.  Entry of this Interim Order is without prejudice to any and all rights of any party in interest with respect to the terms and approval of the Final Order and, unless otherwise set forth in this Interim Order or the Final Order, any other position which any party in interest deems appropriate to raise in the Debtors' Chapter 11 cases.

40. <u>No Waiver by Failure to Seek Relief</u>.  The failure of the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Prepetition Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Prepetition Secured Parties.

41. <u>Binding Effect of Interim Order</u>.  Immediately upon execution by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to

13167798 v1

the benefit of the Debtors, the Prepetition Secured Parties, all other creditors of any of the Debtors,

a Committee (if appointed), or any other court appointed committee, and all other parties-in-

interest and their respective successors and assigns, including any trustee or other fiduciary

hereafter appointed in any of the Cases, any Successor Cases, or upon dismissal of any Case or

Successor Case.

42.     No Modification of Interim Order.  Until and unless the Prepetition Secured

Obligations have been Paid in Full (such payment being without prejudice to any terms or

provisions contained in the Prepetition ABL Documents which survive such discharge by their

terms) the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or

indirectly:  (a) without the prior written consent of the Prepetition Agents, (i) any modification,

stay, vacatur, or amendment to this Interim Order; or (ii) a priority claim for any administrative

expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or

nature whatsoever, including any administrative expense of the kind specified in sections 503(b),

506(c), 507(a), or 507(b) of the Bankruptcy Code) in any of the Cases or Successor Cases, equal

or superior to the Adequate Protection Superpriority Claims, other than the Carve Out; (b) without

the prior written consent of the Prepetition ABL Agent for any order allowing use of Cash

Collateral (other than as permitted during the Remedies Notice Period) resulting from Collateral

or Prepetition Collateral; or (c) without the prior written consent of the Prepetition Agents, any

lien on any of the Postpetition Collateral with priority equal or superior to the Prepetition Liens or

Adequate Protection Liens, other than the Carve Out.  The Debtors irrevocably waive any right to

seek any amendment, modification, or extension of this Interim Order without the prior written

consent, as provided in the foregoing, of the Prepetition Agents, and no such consent shall be

implied by any other action, inaction or acquiescence of the Prepetition ABL Agent or the

Prepetition Term Loan Agent.

43.     <u>Continuing Effect of Intercreditor Agreement</u>.  The Debtors and Prepetition Secured Parties each shall be bound by, and be subject to all the terms, provisions and restrictions of the Intercreditor Agreement.

44.     <u>Interim Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the Intercreditor Agreement and this Interim Order (solely as between the Prepetition Secured Parties), the provisions of the Intercreditor Agreement shall govern and control.

45.     <u>Discharge</u>.  The obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been Paid in Full, on or before the effective date of such confirmed plan of reorganization, or each of the Prepetition ABL Agent and Prepetition Term Loan Agent, as applicable, has otherwise agreed in writing.  None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that does not require that all Prepetition ABL Obligations be Paid in Full (in the case of the sale of Postpetition ABL Priority Collateral) or that all Prepetition Term Loan Obligations be Paid in Full (in the case of the sale of Postpetition Term Priority Collateral), and the payment of the Debtors' obligations with respect to the adequate protection provided for herein, in full in cash within a commercially reasonable period of time (and in no event later than the effective date of such plan of reorganization or sale) (a "<u>Prohibited Plan or Sale</u>") without the written consent of each of the Prepetition ABL Agent and Prepetition Term Loan Agent, as applicable.  For the avoidance of doubt, the Debtors' proposal or

support of a Prohibited Plan or Sale, or the entry of an order with respect thereto, shall constitute an Event of Default hereunder.

46. <u>Survival</u>. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Cases; (b) converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Cases or Successor Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections granted to the Prepetition Secured Parties granted pursuant to this Interim Order, notwithstanding the entry of any such orders described in (a)-(d), above, shall continue in the Cases, in any Successor Cases, or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until: (x) in respect of the Prepetition ABL Facility, all of the Prepetition ABL Obligations pursuant to the Prepetition ABL Documents and this Interim Order, have been Paid in Full; and (y) in respect of the Prepetition Term Loan Agreement, all of the Prepetition Term Loan Obligations pursuant to the Prepetition Term Loan Documents and this Interim Order have been Paid in Full. In addition, the terms and provisions of this Interim Order shall continue in full force and effect for the benefit of the Prepetition Term Loan Parties notwithstanding the repayment in full of the Prepetition ABL Obligations.

47. <u>Final Hearing</u>. The Final Hearing to consider entry of the Final Order is scheduled for **[_____], 2020 at [__]:00 [_].m. (EST)** before the Honorable [_____], United States Bankruptcy Judge at the United States Bankruptcy Court for the District of Delaware. On or before [_____], 2020, the Debtors, or an agent appointed for such purpose, shall serve, by United States mail, first-class postage prepaid, notice of the entry of this

58

Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order and the Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Committee (if appointed); (d) the Securities and Exchange Commission; (e) the Internal Revenue Service; (f) counsel for the Consultant; and (g) counsel for Levin Furniture, LLC, and Levin Towing, LLC.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on **[_____], 2020, at [__]:00 p.m. (EST)**, which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter, and Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (iii) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (iv) counsel to the Committee (if appointed).

48.    *Nunc Pro Tunc Effect of this Interim Order*.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

49.    Retention of Jurisdiction.  The Court has and will retain jurisdiction to enforce the terms of, any and all matters arising from or related to the this Interim Order.

13167798 v1

Dated: _____
Wilmington, Delaware                                    _____
                                                        UNITED STATES BANKRUPTCY JUDGE

# **EXHIBIT J**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) APPROVING PROCEDURES FOR STORE
CLOSING SALES, (II) AUTHORIZING CUSTOMARY BONUSES TO
EMPLOYEES OF CLOSING STORES, (III) AUTHORIZING ASSUMPTION
OF THE CONSULTING AGREEMENT UNDER §§ 363 AND 365 OF THE
BANKRUPTCY CODE, (IV) AUTHORIZING THE DEBTORS TO RETAIN
CERTAIN CONSULTANT ENTITIES AS SPECIAL ASSET DISPOSITION
ADVISORS TO THE DEBTORS PURSUANT TO §327(A) OF THE
BANKRUPTCY CODE AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")

respectfully state as follows in support of this motion (this "<u>Motion</u>"):[2]

**Relief Requested**

1.      The Debtors seek entry of interim and final orders, substantially in the forms

attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "<u>Interim Order</u>" and the "<u>Final

Order</u>"):  (a) authorizing and approving, on an interim and final basis, store closing or similar

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484);  Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]   A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (D.I. 12) (the "<u>First Day Declaration</u>") filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") on March 8, 2020 (the "<u>Petition Date</u>").  Capitalized terms used but not otherwise defined in this Motion shall have the meanings given to them in the First Day Declaration.

themed sales ("Store Closings") in accordance with the terms of the store closing sale procedures (the "Store Closing Procedures," attached as **Exhibit 1** to **Exhibit A** hereto), with such sales to be free and clear of all liens, claims, and encumbrances; (b) authorizing the Debtors to pay customary bonuses to employees of the stores listed on **Exhibit 2** to **Exhibit B** attached hereto (collectively, the "Closing Stores"); (c) in accordance with sections 363 and 365 of the Bankruptcy Code, authorizing the Debtors to assume that certain Consulting and Marketing Services Agreement, dated as of March 5, 2020 (the "Consulting Agreement"), by and between Debtor AVF Holding Company, Inc. and the following entities: Hilco Merchant Resources, LLC ("HMR"), Hilco IP Services, LLC, d/b/a Hilco Streambank, Hilco Real Estate, LLC, Hilco Receivables, LLC (such entities collectively, the "Hilco Consulting Entities"), Gordon Brothers Retail Partners, LLC ("GBRP"), DJM Realty Services, LLC, d/b/a Gordon Brothers Real Estate, Gordon Brothers Commercial & Industrial, LLC, Gordon Brothers Brands, LLC (such entities collectively the "GB Consulting Entities", and together with the Hilco Consulting Entities the "Consultant"), a copy of which is attached as **Exhibit 3** to **Exhibit A** hereto; (d) authorizing the Debtors to retain certain of the entities comprising the Consultant that will be providing receivables collection (at the Debtors' option) and intellectual property disposition services as special asset disposition advisors and consultants to the Debtors, pursuant to Section 327(a) of the Bankruptcy Code[3]; and (e) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within approximately 25 days of the commencement of these chapter 11 cases to consider entry of the Final Order with respect to the relief sought in the Motion.

---

[3]    The Consultant affiliated entities that will provide these specific asset disposition services are: Hilco IP Services, LLC, d/b/a Hilco Streambank, Hilco Receivables, LLC, Gordon Brothers Commercial & Industrial, LLC, Gordon Brothers Brands, LLC

2

**Jurisdiction and Venue**

2.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105(a), 363, 365 and 554(a) of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002, 6003, and 6004, and Bankruptcy Local Rule 9013-1(m).

**The Store Closings**

**I.      The Store Closing Decisions and the Consulting Agreement**

5.      As described more fully in the First Day Declaration, in the wake of extreme market conditions and faced with limited liquidity, the Debtors have commenced these chapter 11 cases to effectuate a going-concern sale of approximately 44 stores and two distribution centers operating under the Wolf and Levin banners and to wind down their remaining store locations and other operations through a going-out-of-business sales process. Given continuously declining profitability and operational challenges over the past three years, and despite the best efforts of the Company and its advisors to secure the capital necessary to preserve the entire business as a going

3

concern, the Company is simply unable to meet its financial obligations. The Company has worked in concert with its secured lenders to develop a budget for the use of cash collateral to facilitate an expedited sale and orderly wind-down process that will maximize value and recoveries for stakeholders in these cases.

6.      In connection with the aforementioned wind-down process, prior to the Petition Date the Debtors conducted a competitive process to engage an exclusive consultant(s) to provide a wide range of asset disposition consulting and related services to assist in and facilitate the Debtors' planned wind-down efforts.  During the course of that same proposal solicitation process, Hilco and Gordon Brothers were engaged in parallel discussions with the Debtors' prepetition term loan lenders, FS KKR Capital Corp. and FS KKR Capital Corp. II (collectively, "KKR") concerning the status of the prepetition term loan debt (the "Term Loans"), and the prospects for development of a creative consulting structure such that the Debtors' estates and their various stakeholders could be spared the burden of having to pay the types of consulting fees that are customary for the types of asset disposition services required by the Debtors.

7.      After arm's-length and extensive negotiations, these discussions ultimately yielded a series of agreements under which (a) the Debtors determined to engage the Consultant to provide the full range of asset disposition consulting services required by the Debtors in respect of merchandise inventories, fixed assets, receivables (subject to a Debtors' option), and intellectual property[4], (b) HGB AVF Lending, LLC ("HGB"), an entity controlled by affiliates of Hilco and Gordon Brothers, entered into an agreement with KKR under which HGB acquired KKR's

---

[4]     The Consulting Agreement presently provides that in addition to the consulting services described herein, the Debtors were to engage the Consultant to market and sell Debtors' real estate holdings.  Subsequent to execution of the Consulting Agreement, the Debtors and the Consultant agreed to exclude the real estate services from the scope of Consultant's engagement.

13172884 v1

interests in the Term Loans (and as part of such transaction GBH agreed to share a portion of any recovery, if any, it may later receive on account of the Term Loans), and (c) the Consultant simultaneously agreed with the Debtors that the Consultant would **NOT** earn or be paid any consulting or other fee or compensation from the Debtors or their estates, other than reimbursement of certain out-of-pocket expenses incurred in connection with the conduct of the Store Closing Sales, any such reimbursement being strictly in accordance with a budget agreed to by the Debtors and the Debtors' secured lenders.

8.      Through this approach - whereby the Consultant's only opportunity to realize any compensation on account of the consulting services being provided under the Consulting Agreement is through a recovery realized by its affiliates on account of the Term Loans (a portion of which recovery, if any, will be shared with KKR) - the Debtors, in consultation with their professionals and key stakeholders, determined that the above-described arrangement provided the best framework for accomplishing the Debtors' paramount goal of an orderly and efficient liquidation of all assets.  At the same time, this arrangement fully aligned the estates' interests with those of the Term Lender in achieving maximum realizable value for Debtors' assets during the wind-down process.

9.      Based on an evaluation of the circumstances, the economic structure of the Consulting Agreement, and the Consultant's experience in conducting Store Closings on similar timelines, the Debtors' management, in consultation with the Debtors' advisors, determined that the Consultant provided the best and most competitive proposal.

10.     Accordingly, by this Motion, the Debtors seek relief in two essential parts; first, consistent with well-established precedent in this District, the Debtors seek – on an interim basis –to assume the Consulting Agreement under sections 363 and 365 of the Bankruptcy Code, so that

13172884 v1

the HMR and GBRP, the Consultant-constituent entities that are providing the inventory and fixed asset disposition consulting services under the Consulting Agreement, may continue their role as the Debtors' consultant in connection with the conduct of the Store Closings on a post-petition basis without interruption; second, the Debtors seek to retain the remaining Consultant-constituent entities that are providing the receivables, and intellectual property-related disposition consulting services, pursuant to section 327 of the Bankruptcy Code.  In connection with the foregoing, the Debtors have determined, in the exercise of their business judgment, that (a) the continuation of services by the Consultant is necessary for efficient large-scale execution of the Store Closings, and the marketing and sale of the other Assets to maximize the value of the Assets being sold and (b) any change or elimination of the engagement with the Consultant would significantly disrupt the Debtors' reorganization efforts and impair the value of the Assets.[5]  Further, the Store Closings and the marketing and sale of the Assets are a critical component of the Debtors' ability to maximize value for all stakeholders, and assumption of the Consulting Agreement will allow the Debtors to continue to conduct the Store Closings in an efficient, controlled manner that will maximize value for the Debtors' estates.

11.    For the convenience of the Court and interested parties, a summary of the salient terms of the Consulting Agreement is set forth below:[6]

---

[5]    By this Motion, the Debtors' seek approval of the conduct of the Sales at the Stores and the associated disposition of the Merchandise and the owned M&E in a manner consistent with customary practices in this jurisdiction and in jurisdictions throughout the country in connection with Store Closings.  However, nothing in this Motion seeks approval of the Debtors' assumption and assignment of any of their non-residential real property leases or executory contracts. To the extent that the Debtors', through the services of the Consultant, find one or more buyers of the Real Estate Assets and/or the IP Assets, the Debtors' would file one or more separate motions seeking approval of such asset sales on as expedited a basis as the circumstances and/or economics of such sale dictate.

[6]    The following summary chart is for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Consulting Agreement, the Consulting Agreement shall govern in all respects.  Any capitalized terms used in the summary chart but not defined therein are used as defined in the Consulting Agreement.

| Term | Consultant Agreement |
|---|---|
| **Services Provided by Consultant** | Services to be provided by Consultant include, among other things:<br><br>• Provision of qualified Supervisors to supervise and assist the Debtors in its conduct of the Sale;<br><br>• Provision of oversight, supervision, and guidance with respect to the conduct of the Sale and the liquidation and disposal of the Merchandise and the M&E;<br><br>• Recommendation and implementation of appropriate point of purchase, point of sale, and external advertising to effectively sell the Merchandise during the Sale Term;<br><br>• Advice regarding appropriate discounting of Merchandise, staffing levels for the Stores, and appropriate deferred compensation and incentive programs for Store Employees;<br><br>• Other advice regarding and during the Sale;<br><br>• Development of an advertising and marketing plan for the sale, auction, or other disposition of the M&E;<br><br>• Implementation of advertising and marketing as deemed necessary to maximize the net recovery on the M&E;<br><br>• Preparation for the sale of the M&E;<br><br>• Developing a Strategic Plan with the Debtors for disposition of the Properties;<br><br>• Subject to the Debtors' exercise of the election under the Consulting Agreement, collecting, settling, and otherwise resolving the Receivables on the Debtors' behalf;<br><br>• Collecting and securing available information regarding the Intellectual Property;<br><br>• Preparing marketing materials designed to advertise the availability of the Intellectual Property for sale, assignment, license, or other disposition; and<br><br>• Assisting the Debtors in connection with the transfer of the Intellectual Property to the acquirer(s) who offer the highest or otherwise best consideration for the Intellectual Property.<br><br>• To the extent that the Consultant locates a purchaser of the Assets, other that the Merchandise and the M&E, the Debtors (in consultation with the Secured Lenders) shall file one or motion seeking approval of such underlying transaction(s) on such notice (or Court approved shortened notice) as the terms and the economics of such transactions dictate. |
| **Sale Term** | The Store Closing began on March 6, 2020, and are to continue to no later than May 31, 2020; provided, however, absent the prior consent of the Debtors, the Sale shall conclude in the Stores no later than April 30, 2020. |

7

| Asset Marketing Period | The period commencing on the Sale Commencement Date through the earlier of (i) the applicable Sale Termination Date for each of the Stores (or, with respect to any Distribution Center(s), the last day of available occupancy for each such center, as may be mutually agreed by the Debtors and the Consultant (in consultation with the Secured Lenders); (ii) April 30, 2020; or (iii) such other earlier or extended date as may be mutually agreed upon by the Debtors (in consultation with the Secured Lenders) and the Consultant |
|---|---|
| Sale Expenses | The Debtors shall be responsible for all Sale Expenses (including without limitation, the Consultant Incurred Expenses). The Debtors, Consultant and Secured Lenders have agreed on a *pro forma* budget relating to the Sale describing in reasonable detail the projected Sale Expenses (the "Budget") in the form and content annexed hereto and made a part hereof as Exhibit B. The Budget may only be modified by mutual agreement of the Debtors, the Consultant and the Secured Lenders. In connection with the Sale and subject to the limitations set forth in the Budget as to the Consultant Incurred Expenses, the Debtors shall be responsible for the payment of all expenses incurred in connection with the Sale, including, without limitation, all Sale Expenses (and Consultant shall not be responsible for any such expenses or Sale Expenses except as expressly provided for in Section 11 below). Consultant Incurred Expenses shall not exceed the aggregate line item amount of Consultant Incurred Expenses set forth in the Budget without the prior written consent of the Debtors and Secured Lenders, which consent shall not be unreasonably withheld, delayed or conditioned. Subject to the limitations of the Sale Budget, the Debtors shall reimburse Consultant for any reasonable and documented Consultant Incurred Expense on a weekly basis in connection with the weekly Sale reconciliation provided for in Section 4 hereof upon presentation of invoices and statements for such expenses. In addition, to the extent that the Consultant anticipates that it, or the Debtors will incur any additional out of pocket expenses in connection with the Services being provided by the Consultant in relating to its provision of Services in connection with the marketing and disposition of the other Assets, such expenses shall be subject to Supplemental Expense Budget to be agreed to between the Debtors (in consultation with the Secured Lenders) and the Consultant prior to such expenses being incurred. |
| Consultant's Compensation | In consideration of the Consultant providing the consulting, marketing and asset disposition-related Services provided for herein, the Consultant shall not earn any fee or other compensation from the Debtors, other than reimbursement of all Consultant Incurred Expenses and such other Sale Expenses as may be advanced by Consultant from time to time in the course of performing Services hereunder, in each case limited to the amounts set forth in the Budget and at the times provided herein. Any fees payable to Consultant shall be paid to Consultant by the Term Loan Lenders from their recovery on account of their secured claim. |
| Tracking of Proceeds of the Sales | The Debtors shall keep (i) a strict count of gross register receipts less applicable sales taxes, and (ii) cash reports of sales within each Store. Register receipts shall show for each item sold the retail price (as reflected on Debtors' books and records) for such item, and the markdown or other discount granted by Consultant in connection with such sale. The Debtors shall make all such records and reports available to Consultant and the Secured Lenders during regular business hours upon reasonable notice. |
| Expenses Deposit | The Interim Approval Order and the Final Approval Order shall include approval on the part of the Debtors to fund, and the Debtors shall thereafter promptly fund, to Consultant $3,353,912 (the "Expense Deposit"). The Debtors shall be entitled to apply the Expense Deposit to, or otherwise offset any portion of the Expense Deposit against, any weekly reimbursement or other amount owing to Consultant under this |

8

| | |
|---|---|
| | Agreement prior to the Final Settlement; provided, however, at no time prior to the Final Settlement shall the Expense Deposit be reduced below $1,000,000. Without limiting any of Consultant's other rights, Consultant may apply the Expense Deposit to any unpaid obligation owing by the Debtors to Consultant under this Agreement. Any portion of the Expense Deposit not used to pay amounts contemplated by this Agreement shall be returned to Debtors (or their designee) within three (3) business days following the Final Settlement. |
| **Debtors' Employees** | The Debtors and the Consultant shall cooperate to retain the employees of the Debtors (including the Store Employees) to be utilized to conduct the Sale at the Stores during the Sale Term, as such employees may be designated from time to time by Consultant, in its discretion.  Such employees shall remain employees of the Debtors, and Consultant shall have no liability to such employees (including, without limitation, all the Store Employees and any of Debtors' other current or former employees) of any kind or nature whatsoever, including, without limitation, with respect to severance pay, termination pay, vacation pay, pay in lieu of reasonable notice of termination, Worker Adjustment and Retraining Notification Act ("WARN Act") payments, or any other costs, expenses, obligations, or liabilities arising from the Debtors' employment  or termination of such employees prior to, during, and subsequent to the Sale Term.  Other than advising Debtors that Consultant no longer desires to utilize the services of any employee in connection with the sale or other disposition of the Assets, including as part of the Sale, Consultant shall not have the right to change the terms of employment of any employee(s). |
| **Fulfillment of Pre-Sale Customer Orders** | Consistent with the relief sought in the Debtors' companion Customer Programs Motion, in addition to providing the forgoing Services in connection with the Sale, the Consultant shall use commercially reasonable efforts to assist the Debtors in fulfilling certain pre-Sale Commencement Date orders for which the Debtors has received customer deposits (collectively, the "Pre-SCD Orders").<br><br>• On-Hand Fulfillment Orders. Consultant shall assist the Debtors in fulfilling certain Pre-SCD Orders having an aggregate retail value of approximately $22 Million (collectively, the "On-Hand Fulfillment Orders"), on account of which orders (i) the Debtors has received customer deposits in the aggregate amount of $18 Million (collectively, the "On-Hand Customer Deposits") and (ii) with respect to which all of the goods necessary to fulfill such orders are on-hand either at the Debtors' Distribution Centers or the Stores (collectively, the "On-Hand Fulfillment Merchandise").  As soon as reasonably practicable after the Sale Commencement Date, the Consultant shall assist the Debtors in earmarking the On-Hand Fulfillment Merchandise (and, to the extent necessary segregated by the Debtors) in order to fulfill and complete the On-Hand Fulfillment Orders. Consultant shall advise the Debtors in the development of efficient methods aimed at fulfilling the On-Hand Fulfillment Orders, and the Debtors and the Consultant shall use commercially reasonable efforts to deliver the On-Hand Fulfillment Merchandise as promptly as practicable, giving due consideration to the Debtors' existing distribution/fulfillment capabilities. Any usual and customary costs and expenses incurred in connection with the fulfillment of any On-Hand Fulfillment Orders, including, but not limited to, labor, sales commissions and delivery (collectively, the "On-Hand Fulfillment Processing Expenses"), shall be borne exclusively by the Debtors, and the Consultant shall not be responsible for any such costs or expenses.  Any funds received from customers on account of the On-Hand Fulfillment Orders, whether received prior to or after the Sale Commencement Date (including, without |

9

<table>
<tr>
<td></td>
<td>

limitation, any On-Hand Customer Deposits), shall be retained by and/or remitted to the Debtors. To the extent any such funds are received from the customer in connection with the delivery of such On-Hand Fulfillment Goods, those funds shall be delivered by the Consultant to the Debtors on a weekly basis as part of the weekly reconciliation contemplated by <u>Section 4.2</u> hereunder. Subject to <u>Section 7.5</u> hereof, the On-Hand Fulfillment Merchandise shall be excluded from the definition of Merchandise hereunder; <u>provided</u>, that any proceeds realized by the Debtors upon fulfillment and completion of an On-Hand Fulfillment Order(s) in excess of the applicable On-Hand Customer Deposit shall constitute Gross Proceeds hereunder.

- <u>Back-Order Fulfillment Orders</u>. Following the Sale Commencement Date, Consultant shall also assist the Debtors in evaluating the status certain Pre-SCD Orders (collectively, the "<u>Back-Order Fulfillment Orders</u>"), on account of which orders (i) the Debtors has received customer deposits (collectively, the "<u>Back-Order Customer Deposits</u>") and (ii) with respect to which the goods necessary to fulfill such orders are <u>not</u> on-hand either at the Debtors' Distribution Centers or the Stores (collectively, the "<u>Back-Order Fulfillment Merchandise</u>"). To the extent that a Back-Order Fulfillment Order(s) can be filled by the Debtors within a reasonable time after the Sale Commencement Date, the Debtors and the Consultant shall work together to implement a protocol for fulfillment of such order(s). To the extent that the Debtors is unable to fulfill a Back-Order Fulfillment, such Back-Order Fulfillment Order shall be cancelled by the Debtors, and the Debtors and the Consultant shall offer the affected customer the option of either (i) a merchandise credit in the amount of such customer's respective Back-Order Customer Deposit (the "<u>Cancelled Back-Order Merchandise Credit</u>"), which Cancelled Back-Order Merchandise Credit must be used by the affected customer no later than April 15, 2020; or (ii) filing a claim in the Debtors' bankruptcy case for the full amount of such customer's Back-Order Customer Deposit.

- If a customer cancels a Pre-SCD Order, or refuses to accept completion/delivery of either On-Hand Fulfillment Merchandise or a Back-Order Fulfillment Order (where the goods become available), the subject the On-Hand Fulfillment Merchandise, Back-Order Fulfillment Merchandise, as the case may be, attributable to such cancelled Pre-SCD Orders, shall thereupon constitute Merchandise and be included in the Sale, and the affected customer can file a claim in the bankruptcy case for the full amount of such customer's deposit.

- During the Sale Term, the Debtors shall provide, and continue to provide through the Sale Term, Consultant with all reports reasonably requested by Consultant with respect to the status of all Pre-SCD Orders.

</td>
</tr>
<tr>
<td>

**Additional Consultant Goods**

</td>
<td>

- In connection with the Sale, and subject to compliance with applicable law (or if and when applicable, the Approval Orders), Consultant shall have the right, at Consultant's sole cost and expense, to supplement the Merchandise in the Sale with additional goods procured by Consultant which are of like kind, and no lesser quality to the Merchandise ("<u>Additional Consultant Goods</u>"). The Additional Consultant Goods shall be purchased by Consultant as part of the Sale, and delivered to the Stores (or direct shipped to customers) at Consultant's sole cost and expense (including, without limitation, all acquisition costs, sales commissions, credit card processing

</td>
</tr>
</table>

10

fees, labor, freight and insurance relative to shipping and/or delivery of such Additional Consultant Goods). Sales of Additional Consultant Goods shall be run through Debtors' point-of-sale systems; provided, however, that Consultant shall mark the Additional Consultant Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise. Consultant and Debtors shall also cooperate so as to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods as non-Debtors goods. Additionally, Consultant shall provide signage in the Stores notifying customers that the Additional Consultant Goods have been included in the Sale. Absent the Debtors' written consent and subject to Consultant's agreement to reimburse Debtors for any associated expenses, Consultant shall not use Debtors' distribution centers for any Additional Consultant Goods.

- Consultant shall pay to the Debtors an amount equal to seven and one-half percent (7.5%) of the aggregate Gross Proceeds, net only of sales taxes collected in respect thereof, realized by Consultant from the sale of Additional Consultant Goods (the "Additional Consultant Goods Fee"). Consultant shall pay the Debtors any earned and accrued Additional Consultant Goods Fee on a weekly basis as part of each weekly sale reconciliation. Except for sales taxes associated with the sale of Additional Consultant Goods and Debtors' Additional Consultant Goods Fee, all proceeds from the sale of Additional Consultant Goods shall be for the sole and exclusive account of Consultant, and shall be remitted to Consultant in connection with each weekly sale reconciliation. Consultant shall be responsible for collecting and remitting sales taxes to the applicable taxing authorities on account of sales of Additional Consultant Goods.

- The Consultant, the Debtors, and the Secured Lenders intend that the transactions relating to the Additional Consultant Goods are, and shall be construed as, a true consignment from Consultant to Debtors in all respects and not a consignment for security purposes. Subject solely to Consultant's obligations to pay to Debtors the Additional Consultant Goods Fee, at all times and for all purposes the Additional Consultant Goods and their proceeds shall be the exclusive property of Consultant, and no other person or entity, including, without limitation, the Lenders and Secured Lenders, shall have any claim against any of the Additional Consultant Goods or their proceeds. The Additional Consultant Goods shall at all times remain subject to the exclusive control of Consultant. In furtherance of the foregoing, the Debtors acknowledge that the Additional Consultant Goods shall be consigned to Debtors as a true consignment under Article 9 of the Uniform Commercial Code (the "UCC"). The Consultant is hereby granted a first priority security interest in and lien upon (i) the Additional Consultant Goods and (ii) the Additional Consultant Goods proceeds (less any Additional Consultant Goods Fee), and Consultant is hereby authorized to file UCC financing statements and provide notifications to any prior secured parties, including, but not limited to, the Secured Lenders.

- The Debtors shall, at Consultant's sole cost and expense, insure the Additional Consultant Goods and, if required, promptly file any proofs of loss with regard to same with the Debtors' insurers. Consultant shall be responsible for payment of any deductible (but only in relation to the

| | |
|---|---|
| | Additional Consultant Goods) under any such insurance in the event of any casualty affecting the Additional Consultant Goods. |
| **Debtors' Indemnification Obligations** | The Debtors shall indemnify and hold the Consultant and its affiliates, and their respective officers, directors, employees, agents and independent contractors (collectively, "Consultant Indemnified Parties"), harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: |
| |       (a)    Debtors' material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith; |
| |       (b)    any failure of Debtors to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term; |
| |       (c)    any consumer warranty or products liability claims relating to any Merchandise; |
| |       (d)    any liability or other claims asserted by customers, any of Debtors' employees, or any other person against any Consultant Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the "WARN Act"); except where due to the negligence or willful misconduct of Consultant or from a breach of the terms hereof by Consultant; |
| |       (e)    any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees, agents, or representatives of Consultant (including, without limitation, any Supervisors) by Debtors or any of Debtors' employees, agents, or representatives (including, without limitation, any Debtors employees); and |
| |       (f)    the negligence or willful misconduct of Debtors or any of its officers, directors, employees, agents or representatives. |
| **Consultant Indemnification Obligations** | The Consultant shall indemnify and hold Debtors and its affiliates, and their respective officers, directors, employees, agents, lenders and independent contractors (collectively, "Debtors Indemnified Parties"), harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: |
| |       (a)    Consultant's material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith; |
| |       (b)    any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Debtors (including, without limitation, any Store Employees) by Consultant or any |

<table>
<tr><td></td><td>of Consultant's representatives (including, without limitation, any Supervisor);

(c)    any claims by any party engaged by Consultant as an employee or independent contractor (including, without limitation, any Supervisor) arising out of such employment or engagement; except where due to the negligence or willful misconduct of Debtors or Debtors Indemnified Parties or from a breach of the terms hereof by Debtors; and

(d)    the negligence or willful misconduct of Consultant or any of its officers, directors, employees, agents or representatives, or any Supervisor.</td></tr>
</table>

## II. Store Closing Procedures.

12.    In connection with and in facilitation of the ongoing conduct of the store closing sales, the Debtors further seek approval of the Store Closing Procedures, the form and substance of which are consistent with the procedures utilized by debtors in this and many other jurisdictions in connection with the similar such store closing processes.

13.    As is customary, the Store Closing Procedures provide, among other things, that: (a) all sales of Store Assets will be deemed free and clear of all liens, claims, interests, and other encumbrances; (b) the Merchandise and the M&E (as each term is defined in the Consulting Agreement) will be sold with the benefit of various marketing techniques and price markdowns to promote efficient liquidation; and (c) certain unsold M&E and other Store assets that cannot be promptly liquidated may be abandoned if and when the Debtors determine, in their business judgment, that retaining, storing, or removing such assets would result in unnecessary expense with little or no benefit to the estates. The Debtors seek approval of the Store Closing Procedures to, among other things, provide local regulatory authorities and media in which the Store Closings may be advertised with knowledge that the Debtors are conducting the Store Closings in compliance with the Court's order.

13172884 v1

14. The Debtors also respectfully request a waiver of any contractual restrictions that could otherwise inhibit or prevent the Debtors from maximizing value for creditors through the Store Closings.  In certain cases, the contemplated Store Closings may be inconsistent with various provisions of leases, subleases, or other documents with respect to the premises in which the Debtors operate, including, without limitation, reciprocal easement agreements, agreements containing covenants, conditions, and restrictions (including, without limitation, "go dark" provisions and landlord recapture rights), or other similar documents or provisions.  Such restrictions, unless waived, would hamper the Debtors' ability to maximize value in selling their inventory.

15. As set forth in the Store Closing Procedures, the Debtors also request that no entity, including, without limitation, utilities, landlords, shopping center managers and personnel, creditors, and all persons acting for or on the behalf of the foregoing parties shall interfere with or otherwise impede the conduct of the Store Closings, nor institute any action against the Debtors in any court (other than this Court) or before any administrative body that in any way directly or indirectly interferes with, obstructs, or otherwise impedes the conduct of the Store Closings or the advertising and promotion (including through the posting of signs) of the Store Closings.

16. The Debtors have determined, in the exercise of their business judgment and in consultation with their advisors, that the Store Closing Procedures will provide the best, most efficient, and most organized means of selling the Merchandise and the M&E to maximize the value of the Debtors' estates.  The Debtors intend to facilitate the Store Closings using current personnel at no increased cost (except as set forth herein), and estimate that, with perhaps a few exceptions, the Stores Closings will be completed by no later than April 30, 2020, with May 31, 2020 being the outside Sale Termination Date at locations that the Debtors (in consultation with

13172884 v1

their secured lenders) and the Consultant agree generate a net positive return by continuing in the month of May 2020.

**III.     Liquidation Sale Laws and Dispute Resolution Procedures.**

17.     Certain states in which the Debtors operate stores have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including, without limitation, state and local laws, statutes, rules, regulations, and ordinances (the "Liquidation Sale Laws").  Liquidation Sale Laws may establish licensing, permitting, or bonding requirements, waiting periods, time limits, and bulk sale restrictions and augmentation limitations that would otherwise apply to the Store Closings.  Such requirements hamper the Debtors' ability to maximize value in selling their inventory.  Subject to the Court's approval, the Debtors intend to conduct the Store Closings in accordance with the Store Closing Procedures, and to the extent such procedures conflict with the Liquidation Sale Laws, the Store Closing Procedures should control.

18.     To facilitate the orderly resolution of any disputes between the Debtors and any Governmental Units (as defined in section 101(27) of the Bankruptcy Code) arising due to the Store Closing Procedures and the alleged applicability of any Liquidation Sale Laws, the Debtors respectfully request that the Bankruptcy Court authorize the Debtors to implement the following dispute resolution procedures (the "Dispute Resolution Procedures"), on an interim and final basis:

> a.     Provided that the Store Closings are conducted in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures, and in light of the provisions in the laws of many Governmental Units (as defined in the Bankruptcy Code) that exempt court-ordered sales from their provisions, the Debtors will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct Store Closings in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures without the necessity of further showing compliance with any such Liquidation Sale Laws.

b.      Within three business days after entry of the Interim Order, the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order, the proposed Final Order and the Store Closing Procedures on the following:  (i) the landlords for the Stores; (ii) the Attorney General's office for each state in which the Store Closings are being held; (iii) the county consumer protection agency or similar agency for each county in which the Store Closings are being held; (iv) the division of consumer protection for each state in which the Store Closings are being held; (v) the chief legal counsel for each local jurisdiction in which the Store Closings are being held (collectively, the "<u>Dispute Notice Parties</u>").

c.      With respect to any additional Stores, within three business days after Court authorization to close additional stores (each, an "<u>Additional Closing Store List</u>"), the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order or Final Order, as applicable, and the Store Closing Procedures on the Dispute Notice Parties.  To the extent that there is a dispute arising from or relating to the Sales, the Interim Order, or the proposed Final Order, as applicable, the Store Closing Procedures, which dispute relates to any Liquidation Sale Laws (a "<u>Reserved Dispute</u>"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within ten days following entry of the Interim Order or service of any Additional Closing Store List, as applicable, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "<u>Dispute Notice</u>") explaining the nature of the dispute to:  (a) proposed counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 801, Wilmington, Delaware 19801, Attn: Gregory Werkheiser, Michael J. Barrie, Jennifer R. Hoover, Kevin M. Capuzzi, and John C. Gentile; (b) proposed special counsel to the Debtors, Montgomery McCracken Walker & Rhoads LLP, 437 Madison Avenue, New York, NY 10022, Attn. Maura I. Russell; (c) the Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (d) counsel to the administrative agent under the Debtors' ABL loan facilities (i) Morgan, Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie S. Crider, (ii) Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York 10178, Attn: Jennifer Feldsher, and (iii) Burr & Forman LLP, 1201 N. Market Street, Wilmington, Delaware 19801, Attn:  J. Cory Falgowski; (e) lead counsel to the Consultant, Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036, Attn: Steven E. Fox; (f) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (g) counsel to any statutory committee appointed in these chapter 11 cases.  If the Debtors and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the Dispute Notice, the Governmental Unit may file a motion with the Court requesting that the Bankruptcy Court resolve the Reserved Dispute (a "<u>Dispute Resolution Motion</u>").

d.    In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, or any other interested party from asserting (i) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (ii) that neither the terms of the Interim Order or the Final Order nor the conduct of the Debtors pursuant to the Interim Order or the Final Order violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Order or the Final Order or to limit or interfere with the Debtors' ability to conduct or to continue to conduct the Store Closings pursuant to the Interim Order or the Final Order, absent further order of the Court. Upon the entry of the Interim Order or the Final Order, as applicable, the Court grants authority for the Debtors to conduct the Store Closings pursuant to the terms of the Interim Order or the Final Order, as applicable, the Store Closing Procedures and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

e.    If, at any time, a dispute arises between the Debtors and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (c) and (d) above by serving a notice to the other party and proceeding thereunder in accordance with those subparagraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo.*

## IV.   Fast Pay Laws.

19. Many states in which the Debtors operate have laws and regulations that require the Debtors to pay an employee contemporaneously with his or her termination (the "Fast Pay Laws" and, together with the Liquidation Sale Laws, the "Applicable State Laws"). These laws often require payment to occur immediately or within a period of only a few days from the date such employee is terminated.

20. The nature of the Store Closings contemplated by this Motion will result in a substantial number of employees being terminated at or near the end of the Store Closings. To be

17

clear, the Debtors intend to pay their terminated employees as expeditiously as possible, under normal payment procedures, and pursuant to applicable Court order.[7]  Moreover, the Debtors' approved Cash Collateral Budget expressly contemplates the payment of employee wages in the ordinary course during the Store Closings.  The Debtors therefore believe that their current systems will allow their employees to be paid expeditiously and in accordance with any Applicable State Laws.  However, given the number of employees who will likely be terminated during the Store Closings, the Debtors request a waiver of compliance with the Applicable State Laws to the extent that the Debtors' payroll systems limit their ability to so comply.

### V.      Store Closing Bonus Plan.

21.      Through this Motion, the Debtors are requesting the authority, but not the obligation, to pay bonuses (the "Store Closing Bonuses") to store-level non-insider employees at the Closing Stores who remain in the employ of the Debtors during the Store Closings (the "Store Closing Bonus Plan").  The Debtors believe that the Store Closing Bonus Plan will motivate employees during the Store Closings and will enable the Debtors to retain those employees necessary to successfully complete the Store Closings.

22.      The amount of the bonuses offered under the Store Closing Bonus Plan will vary depending upon a number of factors, including the employee's position with the Debtors and the performance of the Closing Stores in which the relevant employees work.

23.      The Debtors will set the amounts of the Store Closing Bonuses and eligible employees in consultation with the Consultant, who typically utilizes such bonuses to retain

---

[7]      The Debtors are seeking such relief pursuant to the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief*, (the "Wages Motion") filed contemporaneously herewith.

18

employees and incentivize higher recoveries during store closing sales and are well-acquainted with optimal methods for designing such bonus plans.[8]

24.     The total aggregate cost of the Store Closing Bonus Plan will also vary depending on how many Closing Stores are ultimately closed.  If the Debtors were to close every Closing Store, the aggregate amount of Store Closing Bonuses paid will be not more than approximately $600,000, assuming one hundred percent of the performance targets were met during the Store Closings at every Closing Store.

25.     Providing such non-insider bonus benefits is critical to ensuring that key employees that will be affected by the reduction in the Debtors' work force due to the Store Closings will continue to provide critical services to the Debtors during the ongoing Store Closing process.  For the avoidance of doubt, the Debtors do not propose to make any payment on account of Store Closing Bonuses to any insiders.

26.     Accordingly, the Debtors respectfully submit that the Store Closing Bonus Plan is in the best interests of their estates and request that the Court authorize the payments under the Store Closing Bonus Plan as a sound exercise of their business judgment.

## **Basis for Relief**

### I.     **The Debtors Have a Valid Business Justification for the Store Closings.**

27.     Section 363(b)(1) of the Bankruptcy Code, which governs asset sales outside of a debtor's ordinary course of business, provides that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  When selling assets outside of the ordinary course of business, a debtor

---

[8]     The final terms of the Store Closing Bonus Plan are still being formulated in consultation with the Consultant.

must articulate a valid business justification to obtain court approval. *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citation omitted); *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983)); *In re Delaware & Hudson Ry, Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies* decision). When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11 cases, especially where the debtor is a Delaware corporation).

28.    Store closing or liquidation sales are a routine occurrence in chapter 11 cases involving retail debtors. *See, e.g., Ames Dept. Stores*, 136 B.R. at 359 (noting that liquidation sales are an important part of "overriding federal policy requiring [a] Debtor to maximize estate assets"). As such, bankruptcy courts in this jurisdiction have approved similar store closing sales. *See, e.g., In re Destination Maternity Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019); *In re Fred's Inc.*, No. 19-11984 (CSS) (Bankr. D. Del. Sept. 27, 2019); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019); *In re Things Remembered, Inc.*, No. 19-10234

(KG) (Bankr. D. Del. Feb. 28, 2019); *In re Charming Charlie Holdings, Inc.*, No. 17-12906 (CSS) (Bankr. D. Del. Jan. 13, 2017).[9]

29.     Sufficient business justification exists to approve the proposed Store Closings under section 363(b)(1) of the Bankruptcy Code.  The Debtors, with the assistance of their advisors, have determined that the Store Closings represent the best alternative to maximize recoveries to the Debtors' estates with respect to the Merchandise and the M&E  and provide the Debtors with much-needed liquidity.  There are meaningful amounts of Merchandise, in the aggregate, that will be monetized most efficiently and quickly through an orderly process conducted in consultation with an experienced liquidation firm.  Further, delay in commencing the Store Closings would diminish the recovery tied to monetization of the Merchandise and the M&E for several important reasons.  Many of the Closing Stores fail to generate positive cash flow and therefore are a significant drain on liquidity.  As such, the Debtors will realize an immediate benefit in terms of financial liquidity upon the sale of the Merchandise and the M&E  and the termination of operations at the Closing Stores.  Further, uninterrupted and orderly Store Closings will allow the Debtors to timely reject leases associated with the Closing Stores and, therefore, avoid the accrual of unnecessary administrative expenses for rent and related costs.  Suspension of the Store Closings until entry of the Final Order may cause the Debtors to incur claims for rent at many of these stores, creating a further drain on the Debtors' liquidity.

30.     Courts in this district and courts in other jurisdictions have approved sale guidelines in chapter 11 cases on an interim basis.  Importantly, a number of courts have granted retail debtors first day authority to implement such procedures.  *See, e.g.*, *In re Destination Maternity*

---

[9]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

13172884 v1

*Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Oct. 22, 2019) (approving procedures on an interim basis); *In re Fred's, Inc.*, No. 19-11984 (CSS) (Bankr. D. Del. Sept. 11, 2019) (same); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Mar. 15, 2019) (same); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 7, 2019) (same) (*In re Payless Holdings LLC*, No. 17-42267 (E.D. Mo. April 7, 2017) (same).

**II.      The Court Should Approve the Sale of the Merchandise and the M&E  Free and Clear of all Liens, Encumbrances, and Other Interests Under Bankruptcy Code Section 363(f).**

31.      The Debtors request approval to sell the Merchandise and the M&E on a final "as is" basis, free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code.   A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:  (a) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (b) such entity consents; (c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (d) such interest is in bona fide dispute; or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f); *see also Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met).   Moreover, the Third Circuit has indicated that a debtor possesses broad authority to sell assets free and clear of liens.  *See In re TWA Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

32.      Although the term "any interest" is not defined in the Bankruptcy Code, the Third Circuit has noted that the trend in modern cases is toward "a broader interpretation which includes

other obligations that may flow from ownership of the property." *Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 258–59 (3d Cir. 2000).  As the Fourth Circuit held in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581–82 (4th Cir. 1996) (cited with approval by the Third Circuit in *Folger Adam*), the scope of section 363(f) is not limited to *in rem* interests in a debtor's assets.  Thus, a debtor can sell its assets under section 363(f) "free and clear of successor liability that otherwise would have arisen under federal statute."  *Folger Adam*, 209 F.3d at 258.

33.     With respect to any other party asserting a lien, claim, or encumbrance against the Merchandise and the M&E, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f).  In connection with the sale of the Merchandise and the M&E , the Debtors propose that any liens, claims, and encumbrances asserted against Merchandise and the M&E  be transferred to and attach to the amounts earned by the Debtors under the Store Closings with the same force, effect, and priority as such liens currently have on the Merchandise and the M&E .

## III.     The Court Should Waive Compliance with Applicable State Laws and Approve the Dispute Resolution Procedures

34.     The Debtors' ability to conduct the Store Closings in accordance with the Store Closing Procedures and without strict compliance with all Applicable State Laws is critical to the Store Closings' success.  Although the Debtors intend to comply with state and local health and safety laws and consumer protection laws in conducting the Store Closings, many Liquidation Sale Laws require special and cumbersome licenses, waiting periods, time limits, and other procedures for store closing, liquidation, or similar sales.

35.     To eliminate the time, delay, and expense associated with the administrative procedures necessary to comply with the Applicable State Laws, the Debtors propose the Store Closing Procedures as a way to streamline the administrative burdens on their estates while still

adequately protecting the broad and varied interests of both landlords and applicable governmental agencies charged with enforcing any Liquidation Sale Laws that may apply to the Store Closings. As such, the Debtors believe the Store Closing Procedures mitigate any concerns that their landlords or governmental agencies may raise with respect to the Store Closings and, therefore, the requested relief is in compliance with any applicable Liquidation Sale Laws.

36.     The Debtors submit that there is strong support for granting them the authority to not comply with the Liquidation Sale Laws. *First*, it is generally accepted that many state statutes and regulations provide that, if a liquidation or bankruptcy sale is court-authorized, a company need not comply with the Liquidation Sale Laws. *See, e.g.*, Ark. Code Ann. § 4-74-103 (exempting from the provisions of the chapter sales pursuant to any court order); Fla. Stat. Ann. 559.25(2) (same); Ga. Code Ann. § 10-1-393(b)(24)(C)(iv) (same); 815 ILCS 350/3 (same); La. Rev. Stat. Ann. § 51:43(1) (same); N.Y. Gen. Bus. Law § 584(a) (same); Or. Rev. Stat. Ann. § 646A.100(2)(b) ("'Going out of business sale' does not include a sale conducted by a bankruptcy trustee."); Tex. Bus. & Com. Code Ann. § 17.91(3) (exempting from subchapter sales conducted pursuant to court order). *Second*, pursuant to section 105(a) of the Bankruptcy Code, the Court has the authority to permit the Store Closings to proceed notwithstanding contrary Applicable State Laws as it is essential to maximize the value of the Debtors' business. *Third*, this Court will be able to supervise the Store Closings because the Debtors and their assets are subject to this Court's exclusive jurisdiction. *See* 28 U.S.C. § 1334. As such, creditors and the public interest are adequately protected by notice of this Motion and the ongoing jurisdiction and supervision of the Court because the Debtors are only seeking interim relief at the outset of these cases, and parties in interest will be able to raise any further issues at the final hearing.

13172884 v1

37.     Further, bankruptcy courts have consistently recognized, with limited exception, that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code.  *See Belculfine v. Aloe (In re Shenango Group. Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . . [A] state statute [] cannot place burdens on [a debtor] where the result would contradict the priorities established by the federal bankruptcy code."), *aff'd*, 112 F.3d 633 (3d Cir. 1997).

38.     Courts in some jurisdictions have found that preemption of state law is not appropriate if the laws deal with public health and safety.  *See Baker & Drake. Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker & Drake. Inc.)*, 35 F.3d 1348, 1353–54 (9th Cir. 1994) (holding that Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in part as public safety measure).  However, preemption is appropriate where, as is the case here, the only state laws involved concern economic regulation rather than the protection of public health and safety.  *See In re Baker & Drake. Inc.*, 35 F.3d at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

39.     Under the circumstances of these chapter 11 cases, enforcing the strict requirements of the Liquidation Sale Laws would undermine the fundamental purpose of section 363(b) of the Bankruptcy Code by placing constraints on the Debtors' ability to maximize estate assets for the benefit of creditors.  Accordingly, authorizing the Store Closings without the delays and burdens associated with obtaining various state and local licenses, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising and similar items is necessary and appropriate.  The Debtors do not seek a general waiver of all state and local

25

13172884 v1

law requirements, but only those that apply specifically to retail liquidation sales. Indeed, the requested waiver is narrowly tailored to facilitate the successful consummation of the Store Closings. Moreover, the Debtors will comply with applicable state and local public health and safety laws, and applicable tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising. Finally, the Dispute Resolution Procedures provide an ordered means for resolving any disputes arising between the Debtors and any Governmental Units with respect to the applicability of any Liquidation Sale Laws, and should therefore be approved.

40. Further, this Court has recognized that the Bankruptcy Code preempts certain state laws and have granted relief similar to that requested herein. *See, e.g.*, *In re Coldwater Creek*, No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (stating that debtors were authorized to conduct store closing sales under the terms of the order "without the necessity of further showing compliance" with liquidation laws); *In re Boscov's*, No. 08-11637 (KG) (Bankr. D. Del. Aug. 15, 2008) (ordering that "[g]overnmental units shall not fine, assess or otherwise penalize Debtors or Agent (or any of the landlords of the Closing Stores) for conducting or advertising the Sales in a manner inconsistent with Liquidation Sales Laws, provided that the Sales are conducted and advertised in compliance with this Order"); *In re Goody's Family Clothing, Inc.*, No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (ordering that the "Store Closing Sales at the Closing Stores shall be conducted by the Debtors and the Store Closing Agent without the necessity of compliance with any federal, state or local statute or ordinance, lease provision or licensing requirement affecting store closing, 'going out of business', liquidation or auction sales, or affecting advertising, including signs, banners, and posting of signage, other than Safety Laws and General Laws").

IV.    **The Court Should Waive Compliance with any Restriction in the Leases and Approve the Store Closing Procedures**

41.    Certain of the Debtors' leases governing the premises of the stores subject to any Store Closings may contain provisions purporting to restrict or prohibit the Debtors from conducting store closing, liquidation, or similar sales.  Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code.  *See Ames Dep't Stores*, 136 B.R. at 359 (deciding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets. . . ."); *In re R. H., Macy and Co. Inc.*, 170 B.R. 69, 73–74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to remain open throughout the lease term, because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467-68 (Bankr. N.D. Ga., 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct a liquidation sale).

42.    This Court has long held that restrictive lease provisions affecting store liquidation sales in chapter 11 cases are unenforceable.  *See, e.g.*, *In re Destination Maternity Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Oct. 22, 2019) (ordering "the sale of the Store Closure Assets shall be conducted by the Debtors and the Consultant notwithstanding any restrictive provision of any lease, sublease, license, reciprocal easement agreement, restrictive covenant, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Store

Closings or the Sales"); *In re Coldwater Creek*, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (ordering that store closing sales be conducted without the further need for compliance with, among other things, lease provisions); *In re Boscov's*, Case No. 08-11637 (KG) (Bankr. D. Del. Aug. 15, 2008) (same); *In re Goody's Family Clothing, Inc.*, Case No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (same); *In re Linens Holding Co.*, Case No. 08-10832 (CSS) (Bankr. D. Del. May 30, 2008) (same).

43.     Thus, to the extent that such provisions or restrictions exist in any of the leases of the stores subject to the Store Closings, the Debtors request that the Court authorize the Debtors conduct the Store Closings without reference to any such restrictive provisions or interference by any landlords or other persons affected, directly or indirectly, by the Store Closings.

## V.     The Court Should Approve the Abandonment of Certain Property in Connection with Any Liquidation Sales and Lease Rejections

44.     After notice and a hearing, a debtor "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C. § 554(a); *see also Hanover Ins. Co. v. Tyco Indus., Inc.*, 500 F.2d 654, 657 (3d Cir. 1974) (stating that a trustee "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim").

45.     The Debtors are seeking to sell all M&E remaining in the Closing Stores.  However, the Debtors may determine that the costs associated with holding or selling certain property or M&E exceeds the proceeds that will be realized upon its sale or that such property is not sellable at all.  In such event, the property is of inconsequential value and benefit to the estates and/or may be burdensome to retain.

46.     To maximize the value of the Debtors' assets and to minimize the costs to the estates, the Debtors respectfully request authority to abandon any of their remaining M&E or other

property located at any of the Closing Stores without incurring liability to any person or entity. The Debtors further request that the landlord of each Closing Store with any abandoned M&E or other property be authorized to dispose of such property without liability to any third parties.

47.     Notwithstanding the foregoing, the Debtors will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information that, alone or in conjunction with other information, identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtors' hardware, software, computers, or cash registers or similar equipment that are to be sold or abandoned.

## VI.     The Store Closing Bonus Plan Is a Sound Exercise of the Debtors' Business Judgment and Should Be Approved

48.     Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Under this section, a court may authorize a debtor to use property of the estate when such use has a "sound business purpose" and when the use of the property is proposed in good faith.  *See In re W.A. Mallory Co.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997); *In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995).

49.     Courts generally require a debtor to demonstrate that a valid business purpose exists for the use of estate property in a manner that is outside the ordinary course of business.  *See, e.g.*, *In re Lionel Corp.*, 722 F.2d 1063, 1070–71 (2d Cir. 1983).  The debtor's articulation of a valid business justification raises a presumption that the debtor's decision was made on an informed basis, in good faith, and with the honest belief that the action is in the best interest of the company. *See In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992).  Furthermore, once "the

debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). The business judgment rule shields a debtor's management from judicial second-guessing. *See Integrated Res.*, 147 B.R. at 656; *Johns-Manville*, 60 B.R. at 615–16 (noting that "the Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions"). Thus, if a debtor's actions satisfy the business judgment rule, then the actions in question should be approved under section 363(b)(1) of the Bankruptcy Code.

50. In this case, the Store Closing Bonus Plan is a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors and their estates. The store employees—along with their skills, knowledge, and hard work—are more critical now than ever. Through their commitment and performance, they can ensure that the Debtors continue to maximize stakeholder value in a challenging economic environment and at a time when those employees' positions will soon be terminated.

51. Additionally, the total cost of the Store Closing Bonus Plan is reasonable in light of competitive market practice and involves compensation structures often used in other restructuring situations to incentivize employees to continue optimal performances despite the added stress inherent in the chapter 11 process.

52. The Store Closing Bonus Plan is comparable to employee incentive plans regularly paid as "expenses of sale" by liquidating agents in other "store closing" and similar-themed sales. As in those other instances, the specific Store Closing Bonus Plan here was devised with the input of the Consultant based on its views of maximizing the sale process and recoveries for creditors.

---

30

As such, courts have approved incentive payments similar to those contemplated by the Store Closing Bonus Plan. *See, e.g.*, *In re Destination Maternity Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019) (authorizing store closing retention bonus program on a final basis); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (same); *In re Toys "R" Us, Inc.*, No. 17- (Bankr. E.D. Va. Feb. 6, 2018) (same); *In re rue21, Inc.*, No. 17-22045 (GLT) (Bankr. W.D. Pa. June 12, 2017) (same); *In re Payless Holdings LLC*, No. 17-42267 (KAS) (Bankr. E.D. Mo. May 9, 2017) (same).

53.     The Debtors respectfully submit that the Store Closing Bonus Plan is a sound exercise of the Debtors' business judgment and should be approved pursuant to section 363 of the Bankruptcy Code as in the best interests of the Debtors, their estates, and all parties in interest in these chapter 11 cases.

**VII.    The Court Should Authorize the Assumption of the Consulting Agreement.**

54.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract . . . of the debtor."  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract is whether the debtor's reasonable business judgment supports such assumption or rejection.  *See, e.g.*, *In re HQ Glob. Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject an executory contract is governed by the business judgment standard, and that such decision may only be overturned if found to be a product of bad faith, whim, or caprice); *see also In re Market Square Inn Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

55.     The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate."

31

*Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987). Any more exacting scrutiny would slow the administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank*, 762 F.3d 1301, 1311 (5th Cir. 1985).

56.     Assumption of the Consulting Agreement is beneficial to the Debtors' estates, and, therefore, is a reasonable exercise of the Debtors' business judgment. In consultation with their advisors, the Debtors have determined that the stores to be closed are unduly burdensome, and the Merchandise and the M&E should be liquidated for the benefit of the Debtors' estates and their creditors. The Store Closings are already in progress. The Debtors determined that entering into the Consulting Agreement, after engaging in extensive negotiations with the Consultant and their prepetition lenders, will provide the greatest return to the Debtors' estates for the Merchandise and the M&E. The Debtors believe, in their business judgment, that the terms set forth in the Consulting Agreement constitute the best available alternative for the conduct of the Store Closings and Sales.

57.     The Consultant has extensive expertise in conducting liquidation sales and can oversee and assist in the management and implementation of the Store Closings in an efficient and cost-effective manner. Assumption of the Consulting Agreement will enable the Debtors to utilize the skills and resources of the Consultant to effectively and efficiently conduct the Store Closings for the benefit of all stakeholders. Given the number of stores and the particular issues in administering the Store Closings, the Debtors may not be able to retain a liquidator able to conduct the process as efficiently and effectively as the Consultant, who already has significant experience

with the Debtors' business operations and outlay of stores. If the Consulting Agreement is not approved, operative, and effective on an interim basis, the Store Closings would lose the benefit of the Consultant's oversight and might be delayed or suspended entirely, leading to a loss of additional liquidity and increased administrative expenses. Moreover, it is imperative that the Consulting Agreement be approved on an interim basis so that the Debtors and the Consultant can immediately begin conducting the Store Closings and closing stores in accordance with the Store Closing Procedures, which will generate more proceeds for the Debtors and their estates.

**VIII. The Court Should Authorize the Retention of the Consultant Pursuant to Section 327(a) in Connection with Assumption of the Consulting Agreement.**

58.     The Debtors have selected the Consultant because they believe that the Consultant has developed an expertise in such matters that will significantly enhance the value recovered for the Assets, whether through the disposition of such through the conduct of strategic store closings for the Merchandise and the M&E, or through targeting marketing of the other Assets through their various divisions having an expertise in each such asset categories. Each entity comprising the Consultant is familiar with retail businesses generally, and the Debtors' business operations specifically, and are well regarded and a leader in the distressed asset acquisition and disposition field.

59.     The Debtors believe the employment of the Consultant as asset disposition consultants and advisors is in the best interest of the Debtors and their creditors since the Consultant will provide invaluable services as the Debtors attempt to maximize the realizable value recovered for its business and assets. The matters for which the Consultant is to be engaged are matters in which no other professional employed in this case will render services duplicative of the services rendered by the Consultant.

60.     Based on the information the Consultant has to date provided to the Debtors, the Debtors believe that the Consultant does not hold an interest adverse to either the Debtors or their estates, and with respect to the subject matter on which the Consultant has been engaged is a "disinterested person" pursuant to sections 327(a) and 101(14) of the Bankruptcy Code.

61.     As is customary in this district, each entity comprising the Consultant will file declarations of their connections prior to the final hearing on this Motion (the "Consultant's Declarations").

62.     To the best of the Debtors' knowledge, and except as may be disclosed in the respective Consultant Declarations when filed, the Consultant has not provided services to the Debtors' creditors, equity security holders, or any other parties-in-interest, or its respective attorneys, in any matter relating to the Debtors or their estates.

63.     The Debtors respectfully requests that the Consultant be retained in conjunction with the Court's approval of the assumption of the Consulting Agreement, *nunc pro tunc* to the Petition Date.  Since the Petition Date, the Consultant has provided valuable services that were time sensitive and critical to protection of the interests of the Debtors' stakeholders.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

64.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003.  For the reasons discussed above, authorizing the Debtors reject certain unexpired leases, approving store closing or similar themed sales in accordance with the Store Closing Procedures, and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases smoothly.  Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  For the reasons discussed herein, the relief

34

13172884 v1

requested is necessary in order for the Debtors to operate their business in the ordinary course, preserve the going concern value of the Debtors' operations, and maximize the value of their estates for the benefit of all stakeholders.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

### Reservation of Rights

65.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Interim Order and Final Order is intended or should be construed as:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party-in-interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code (other than the Consulting Agreement); (f) a waiver or limitation of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

66.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

67.     The Debtors will provide notice of this Motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the United States Attorney's Office for the District of Delaware; (d) the Internal Revenue Service; (e) the state attorneys general for all states in which the Debtors conduct business; (f) the Dispute Notice Parties; (g) all of the Debtors' landlords at the locations of the Closing Stores, and counsel thereto, if known; and (h) any party that requests service pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

68.     No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B,** respectively, (a) granting the relief requested herein and (b) granting such other relief as is just and proper.

Dated:  March 9, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

_____ /s/ Gregory W. Werkheiser _____
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer Hoover (DE No. 5111)
Kevin Capuzzi (DE No. 5462)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
        mbarrie@beneschlaw.com
        jhoover@beneschlaw.com
        kcapuzzi@beneschlaw.com
        jgentile@beneschlaw.com

_Proposed Counsel to the Debtors and Debtors in Possession_

# EXHIBIT A

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (CSS) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) **Re: Docket No. _____** |

## INTERIM ORDER GRANTING DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) APPROVING PROCEDURES FOR STORE CLOSING SALES, (II) AUTHORIZING CUSTOMARY BONUSES TO EMPLOYEES OF CLOSING STORES, (III) AUTHORIZING ASSUMPTION OF THE CONSULTING AGREEMENT UNDER §§ 363 AND 365 OF THE BANKRUPTCY CODE, (IV) AUTHORIZING THE DEBTORS TO RETAIN CERTAIN CONSULTANT ENTITIES AS SPECIAL ASSET DISPOSITION ADVISORS TO THE DEBTORS PURSUANT TO §327(A) OF THE BANKRUPTCY CODE AND (V) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order"): (a) authorizing and approving the conduct of store closing or similar themed sales in accordance with the terms of the store closing procedures (the "Store Closing Procedures") attached hereto as **Exhibit 1**, with such sales to be free and clear of all liens, claims and encumbrances; (b) authorizing the Debtors to conduct the Store Closings; (c) authorizing the Debtors to pay customary bonuses to employees of Closing Stores; (d) authorizing the Debtors to assume the Consulting Agreement; (e)

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVCE, LLC (2509); AVF Franchising, LLC (6325); AVF Holding Company, Inc. (0291); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); LF Trucking, Inc. (1484); and Sam Levin, Inc. (5198).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

13172880 v2

authorizing the Debtors to retain the Consultant as special asset disposition advisor pursuant ot Section 327(a) fo the bankruptcy Code; (f) scheduling a final hearing to consider approval of the Motion on a final basis; and (g) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND AND DETERMINED THAT:[3]

A.     The Debtors have advanced sound business reasons for seeking to implement the Store Closing Procedures and assume the Consulting Agreement, as set forth in the Motion and at the Hearing, and such relief is in the best interests of the Debtors and their estates.

---

[3]   Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.

2

13172880 v2

B.     The Store Closing Procedures are reasonable, and the conduct of the Closing Sales in accordance with the Store Closing Procedures will provide an efficient means for the Debtors to dispose of the Merchandise and the M&E and will maximize the returns on the Merchandise and the M&E.

C.     The Consulting Agreement was negotiated, proposed, and entered into by the Debtors and the Consultant without collusion, in good faith, and from arm's-length bargaining positions, and the operation and effectiveness of the Consulting Agreement on an interim basis is a sound exercise of the Debtors' business judgment.

D.     The relief set forth herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates and the Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief approved herein.

E.     The Store Closings and Closing Sales are in the best interest of the Debtors' estates.

F.     The entry of this Interim Order is in the best interest of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein; and now therefore it is HEREBY ORDERED THAT:

1.     The Motion is granted on an interim basis as provided herein.

2.     The final hearing (the "Final Hearing") on the Motion shall be held on _____, 2020, at__:__ _.m., prevailing Eastern Time.  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _____, 2020, and shall be served on:   (a) the Debtors, 6500 14 Mile Road, Warren, Michigan 48092, Attn:  Michael Zambricki; (b) proposed counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 801, Wilmington, Delaware 19801, Attn: Gregory Werkheiser, Michael J. Barrie, Jennifer R. Hoover, Kevin M. Capuzzi, and John C. Gentile; (c)

proposed special counsel to the Debtors, Montgomery McCracken Walker & Rhoads LLP, 437 Madison Avenue, New York, NY 10022, Attn. Maura I. Russell; (d) the Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (e) counsel to the administrative agent under the Debtors' ABL loan facilities (i) Morgan, Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie S. Crider, (ii) Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York 10178, Attn: Jennifer Feldsher, and (iii) Burr & Forman LLP, 1201 N. Market Street, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (f) lead counsel to the Consultant, Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036, Attn: Steven E. Fox; (g) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (h) counsel to any statutory committee appointed in these chapter 11 cases.. In the event no objections to entry of the Final Order on the Motion are timely received, this Court may enter such Final Order without need for the Final Hearing.

3.      The Debtors are authorized, but not directed, to make payments under the Store Closing Bonus Plan.

4.      The Debtors and the Consultant are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion. The failure to specifically include any provision of the Consulting Agreement in this Interim Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Consulting Agreement and all of its provisions, payments, and transactions be, and hereby are, authorized and approved as and to the extent provided in this Interim Order.

4

5.      To the extent of any conflict between this Interim Order, the Consulting Agreement, and the Store Closing Procedures, the terms of this Interim Order shall control.

6.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

**I.      Authority to Engage in Closing Sales and Conduct Store Closings.**

7.      The Debtors and the Consultant are authorized, on an interim basis pending the Final Hearing, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to immediately continue and conduct Closing Sales at the Closing Stores in accordance with this Interim Order, the Store Closing Procedures, and the Consulting Agreement.

8.      The Store Closing Procedures are approved in their entirety on an interim basis.

9.      The Debtors are authorized to discontinue operations at the Closing Stores in accordance with this Interim Order, the Store Closing Procedures, and the Consulting Agreement.

10.     All entities that are presently in possession of some or all of the Merchandise or M&E in which the Debtors hold an interest that are hereby are directed to surrender possession of such Merchandise or M&E to the Debtors.

11.     Neither the Debtors nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including, without limitation, any Governmental Unit (as defined in Bankruptcy Code section 101(27)) or landlord, to conduct the Closing Sales and to take the related actions authorized herein.

**II.     Conduct of the Sales.**

12.     All media in which the Closing Sales may be advertised and all landlords are directed to accept this Interim Order as binding authority so as to authorize the Debtors and the Consultant to conduct the Closing Sales and the sale of Merchandise, M&E, and Additional Consultant Goods, including, without limitation, to conduct and advertise the sale of the

Merchandise, M&E, and Additional Consultant Goods in the manner contemplated by and in accordance with this Interim Order, the Store Closing Procedures, and the Consulting Agreement.

13.     The Debtors and the Consultant are hereby authorized to take such actions as may be necessary and appropriate to conduct the Store Closings without necessity of further order of this Court as provided in this Interim Order, the Store Closing Procedures, and the Consulting Agreement, including, but not limited to, advertising the sale as a "store closing sale," "sale on everything," "everything must go," or similar-themed sales through the posting of signs (including the use of exterior banners at non-enclosed mall closing locations, and at enclosed mall closing locations to the extent the applicable closing location entrance does not require entry into the enclosed mall common area), use of signwalkers, and street signage; *provided*, *however*, that only Debtor-approved terminology will be used at each Closing Store in connection with the Sales.

14.     The Consultant is authorized to supplement the Merchandise in the Closing Stores with Additional Consultant Goods, provided that any such supplementing with Additional Consultant Goods must be of like kind and no lesser quality than goods sold in the Closing Stores prior to the Petition Date. Sales of Additional Consultant Goods shall be run through the Debtors' cash register systems; provided, however, that the Consultant shall mark the Additional Consultant Goods using either a "dummy" SKU or department number or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise. The Consultant and Merchant shall cooperate to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods from the Merchandise.

15.     All transactions relating to the Additional Consultant Goods are, shall be construed as, and are acknowledged by the Debtors to be, a true consignment from Consultant to the Debtors

13172880 v2

under Article 9 of the Uniform Commercial Code in effect in the State of Delaware (the "UCC") and not a consignment for security purposes. At all times and for all purposes, the Additional Consultant Goods and their proceeds shall be the exclusive property of the Consultant, and no other person or entity (including, without limitation, the Debtors, or any third person claiming a security interest in the Debtors' property, including any of the Debtors' secured lenders) shall have any claim against any of the Additional Consultant Goods or the proceeds thereof. The Additional Consultant Goods shall at all times remain subject to the exclusive control of the Consultant. The Debtors shall, at Consultant's sole cost and expense, insure Additional Consultant Goods and, if required, promptly file any proofs of loss with regard thereto.

16. Consultant is hereby granted a first priority security interest in and lien upon (i) the Additional Consultant Goods and (ii) the Additional Consultant Goods proceeds, which security interest shall be deemed perfected on a interim basis pursuant to this Interim Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Consultant is hereby authorized to deliver any notices and file any financing statements and amendments thereof under the applicable UCC identifying Consultant's interest in the Additional Consultant Goods (and any proceeds from the sale thereof) as consigned goods thereunder and the Debtors as the consignee therefor, and Consultant's security interest in such Additional Consultant Goods and Additional Consultant Goods proceeds). As part of each weekly reconciliation, the Debtors shall turnover all proceeds from the sale of Additional Consultant Goods to the Consultant, net of any fee payable to the Debtors pursuant to the Consulting Agreement.

17. Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the sale of the Merchandise, M&E, and

Additional Consultant Goods, to the extent that, prior to the Final Hearing, disputes arise during the course of such sale regarding laws regulating the use of sign-walkers, banners, or other advertising and the Debtors are unable to resolve the matter consensually, any party may request an immediate telephonic hearing with this Court pursuant to these provisions. Such hearing will, to the extent practicable, be scheduled initially no later than the earlier of (a) the Final Hearing, or (b) within two (2) business days of such request. This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

18.     The sale of the Merchandise, M&E, and Additional Consultant Goods shall be conducted by the Debtors notwithstanding any restrictive provision of any lease, sublease, restrictive covenant, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Store Closings or the Closing Sales (including the sale of the Merchandise, M&E, and Additional Consultant Goods) and the rejection of leases, abandonment of assets, or "going dark" provisions, and such provisions shall not be enforceable in conjunction with the Sales or the Store Closings. Breach of any such provisions in these chapter 11 cases in conjunction with the Store Closings or the Closing Sales shall not constitute a default under a lease or provide a basis to terminate the lease; *provided* that the Store Closings and Closing Sales are conducted in accordance with the terms of this Interim Order and the Store Closing Procedures.

19.     Except as expressly provided for herein or in the Store Closing Procedures, and except with respect to any Governmental Unit (as to which paragraphs 22 and 23 shall apply) no person or entity, including, but not limited to, any landlord, licensor, service provider, utility, or creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Closing Sales or the sale of merchandise, M&E, or Additional Consultant Goods, or the advertising and promotion (including the posting of signs and exterior banners or

8

the use of signwalkers) of such sales, and all such parties and persons of every nature and description, including, but not limited to, any landlord, licensor, service provider, utility, and creditor and all those acting for or on behalf of such parties, are prohibited and enjoined from (a) interfering in any way with, obstructing, or otherwise impeding the conduct of the Closing Sales and/or Store Closings, and/or (b) instituting any action or proceeding in any court (other than this Court) or administrative body seeking an order or judgment against, among others, the Debtors, or the landlords at the Closing Stores that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Closing Sales or other liquidation sales at the Closing Stores and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

20.     In accordance with and subject to the terms and conditions of the Consulting Agreement, the Consultant shall have the right to use the Closing Stores and all related Closing Store services, furniture, fixtures, equipment, and other assets of the Debtors for the purpose of conducting the Store Closings, free of any interference from any entity or person, subject to compliance with the Store Closing Procedures and this Interim Order.

21.     All sales of Merchandise, M&E and Additional Consultant Goods shall be "as is" and final.  Returns related to the purchase of Store Assets shall not be accepted at stores that are not participating in the Store Closings.  However, as to the Closing Stores, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."

22.     The Consultant shall not be liable for sales taxes except wither respect to the Additional Consultant Goods, and  as expressly provided in the Consulting Agreement, and the payment of any and all sales taxes is the responsibility of the Debtors, subject to Consultant's

9

obligation to collect and remit the sales taxes attributable to the sale of Additional Consultant Goods.  The Debtors are directed to remit all taxes arising from the Sales to the applicable Governmental Units as and when due; *provided* that in the case of a *bona fide* dispute the Debtors are only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit.  For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected.  This Interim Order does not enjoin, suspend, or restrain the assessment, levy, or collection of any tax under state law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state law.

23.     Pursuant to section 363(f) of the Bankruptcy Code, the Consultant, on behalf of the Debtors, is authorized to sell Store Assets—and all sales of Store Assets whether by the Consultant or the Debtors, shall be—free and clear of any and all of any liens, claims, encumbrances, assignments, preferences, debts, easements, charges, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state, and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, environmental, tax, labor, ERISA, CERCLA, alter ego and other liabilities, causes of action, contract rights, and claims, to the fullest extent of the law, in each case, of any kind or nature (including, without limitation, all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether pre-petition or post-petition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-

13172880 v2

contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable (collectively, "Encumbrances")s; as provided for herein because in each case, one or more of the standards set forth in section 363(f)(1)–(5) has been satisfied; *provided*, *however*, that any such Encumbrances shall attach to the proceeds of the sale of the Merchandise and the M&E with the same validity, in the amount, with the same priority as, and to the same extent that any such Encumbrances have with respect to the Merchandise and the M&E, subject to any claims and defenses that any party may possess with respect thereto and subject to the Consultant's fees and expenses (as provided in the Consulting Agreement).

24.     To the extent that the Debtors propose to sell or abandon M&E that may contain personal and/or confidential information about the Debtors' employees and/or customers (the "Confidential Information"), the Debtors shall remove the Confidential Information from such items of M&E before such sale or abandonment.

25.     The Debtors are authorized and empowered to transfer merchandise, M&E and Additional Consultant Goods among, and into, the Stores.

**III.    Dispute Resolution Procedures with Governmental Units.**

26.     Nothing in this Interim Order, or the Store Closing Procedures, releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Interim Order.  Nothing contained in this Interim Order, or the Store Closing Procedures shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with its rights and obligations as debtor in possession under the Bankruptcy Code. The Store Closings and the Sales shall not be exempt from laws of general applicability, including,

11

without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "General Laws").  Nothing in this Interim Order, the Consulting Agreement, or the Store Closing Procedures, shall alter or affect obligations to comply with all applicable federal safety laws and regulations.  Nothing in this Interim Order shall be deemed to bar any Governmental Unit (as such term is defined in section 101(47) of the Bankruptcy Code) from enforcing General Laws, subject to the Debtors' rights to assert in that forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the bankruptcy Code or this Interim Order. Notwithstanding any other provision in this Interim Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Interim Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code. Nothing in this Interim Order shall be deemed to have made any rulings on any such issues.

27.     To the extent that the sale of Merchandise, M&E, and Additional Consultant Goods is subject to any Liquidation Sale Laws, including any federal, state or local statute, ordinance, or rule, or licensing requirement directed at regulating "going out of business," "store closing," similar inventory liquidation sales, or bulk sale laws, laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely in connection with the sale and including ordinances establishing license or permit requirements, waiting periods, time limits, or bulk sale restrictions that would otherwise apply solely to the sale of the merchandise, M&E, and Additional Consultant Goods, the Dispute Resolution Procedures in this section shall apply:

      a.     Provided that the Closing Sales are conducted in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing

Procedures, and in light of the provisions in the laws of many Governmental Units (as defined in the Bankruptcy Code) that exempt court-ordered sales from their provisions, the Debtors will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Closing Sales in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures without the necessity of further showing compliance with any such Liquidation Sale Laws.

b.    Within three business days after entry of the Interim Order, the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order, the proposed Final Order and the Store Closing Procedures on the following: (i) the landlords for the Stores; (ii) the Attorney General's office for each state in which the Closing Sales are being held; (iii) the county consumer protection agency or similar agency for each county in which the Closing Sales are being held; (iv) the division of consumer protection for each state in which the Closing Sales are being held; (v) the chief legal counsel for each local jurisdiction in which the Closing Sales are being held (collectively, the "Dispute Notice Parties").

c.    With respect to any additional Stores, within three business days after Court authorization to close additional stores (each, an "Additional Closing Store List"), the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order or Final Order, as applicable, and the Store Closing Procedures on the Dispute Notice Parties. To the extent that there is a dispute arising from or relating to the Sales, the Interim Order, or the proposed Final Order, as applicable, the Store Closing Procedures, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within ten days following entry of the Interim Order or service of any Additional Closing Store List, as applicable, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "Dispute Notice") explaining the nature of the dispute to: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter, and Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (iii) counsel to the Consultant, Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036; (iii) the United States Trustee's Office for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (iv) counsel to the Prepetition Term Loan Lenders, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf. If the Debtors and the Governmental Unit are unable to resolve the Reserved

13

Dispute within 15 days after service of the Dispute Notice, the Governmental Unit may file a motion with the Court requesting that the Bankruptcy Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

d.      In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, or any other interested party from asserting (i) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (ii) that neither the terms of the Interim Order or the Final Order nor the conduct of the Debtors pursuant to the Interim Order or the Final Order violates such Liquidation Sale Laws.  Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Order or the Final Order or to limit or interfere with the Debtors' ability to conduct or to continue to conduct the Closing Sales pursuant to the Interim Order or the Final Order, absent further order of the Court.  Upon the entry of the Interim Order or the Final Order, as applicable, the Court grants authority for the Debtors to conduct the Closing Sales pursuant to the terms of the Interim Order or the Final Order, as applicable, the Store Closing Procedures and to take all actions reasonably related thereto or arising in connection therewith.  The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code.  Nothing in the Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

e.      If, at any time, a dispute arises between the Debtors and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (c) and (d) above by serving a notice to the other party and proceeding thereunder in accordance with those subparagraphs.  Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

28.     Subject to paragraphs 22 and 23 above, each and every federal, state, or local agency, departmental unit, or Governmental Unit with regulatory authority over the Closing Sales, and all newspapers and other advertising media in which the Closing Sales are advertised shall consider this Interim Order as binding authority that no further approval, license, or permit of any Governmental Unit shall be required, nor shall the Debtors be required, to post any bond, to conduct the Sales.

14

29.     Within three business days of this Interim Order, the Debtors shall serve copies of this Interim Order, and the Store Closing Procedures via e-mail, facsimile, or regular mail, on: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the United States Attorney's Office for the District of Delaware; (d) the Internal Revenue Service; (e) the state attorneys general for all states in which the Debtors conduct business; (f) all parties who are known by the Debtors to assert liens against the Merchandise and the M&E ; (g) all state attorneys general in which the Merchandise and the M&E  are located; (h) municipalities in which the Merchandise and the M&E are located; (i) all of the Debtors' landlords at the locations of the Stores; (j) all applicable state and consumer protection agencies; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## IV.     Effectiveness of the Consulting Agreement.

30.     The Consulting Agreement is operative and effective on an interim basis.  The Debtors are authorized to act and perform in accordance with the terms of the Consulting Agreement, including, without limitation, reimbursing all expenses to the Consultant as required by the Consulting Agreement without the need for any application of the Consultant or a further order of the Court.  For avoidance of doubt, the Debtors are also authorized to fund the Expense Deposit in accordance with the terms of the Consulting Agreement.

31.     The treatment of Pre-SCD Orders, including the Cancelled Back-Order Merchandise Credit, described in the Consulting Agreement is a sound exercise of the Debtors' business judgment, complies with applicable law, and is hereby approved, subject to entry of the Final Order.

13172880 v2

32.     Subject to the restrictions set forth in this Interim Order and the Store Closing Procedures, the Debtors and the Consultant are hereby authorized to take any and all actions as may be necessary or desirable to implement the Consulting Agreement, the Store Closings, and the Closing Sales, and each of the transactions contemplated by the Consulting Agreement, and any actions taken by the Debtors and the Consultant necessary or desirable to implement the Consulting Agreement and the Closing Sales prior to the date hereof, are hereby approved and ratified.  The failure to specifically include any particular provision of the Consulting Agreement in this Interim Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the Consulting Agreement and all of its provisions, payments, and transactions, be and hereby are authorized and approved as and to the extent provided for in this Interim Order.

33.     Notwithstanding anything to the contrary in the Consulting Agreement, the Debtors and their estates shall not indemnify the Consultant for any damages arising primarily out of any act or omission by the Consultant constituting fraud, gross negligence, or willful misconduct.

**V.     Debtors are Authorized to Retain Consultant as Special Asset Disposition Consultant Pursuant to the Consulting Agreement.**

34.     The This Court is satisfied that the Consultant represents and holds no interest adverse to the Debtors or their estates, and that the Consultant will not represent any other entity in connection with these cases and that its employment is necessary and would be in the best interests of the Debtors and the estates.  Accordingly, pursuant to sections 327(a), 330 and 331 of Bankruptcy Code, the Debtors be, and hereby are, authorized to retain the Consultant as their special asset disposition advisors and consultants, to assist the Debtors in the marketing and sale process for the Assets in accordance with the Consulting Agreement; provided however, it is agreed and understood that no fees shall be payable to the Consultant in connection with Services

16

13172880 v2

rendered by it to the Debtors pursuant to the Consulting Agreement, and other than the right to reimbursement of Consultant Incurred Expenses, Consultant shall have to claim or right to payment from the Company; provided further however, Consultant shall not be required to file a fee application for reimbursement of the Consultant Incurred Expenses. Debtors shall not be required to comply with any state or local law requiring that the Debtors pay an employee substantially contemporaneously with his or her termination; *provided*, however, that the Debtors shall pay any accrued wages to terminated employees as expeditiously as possible

## VI.    Other Provisions.

35.    The Consultant shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against Consultant, in each case, other than as expressly provided for in the Consulting Agreement.

36.    The Debtors shall not be required to comply with any state or local law requiring that the Debtors pay an employee substantially contemporaneously with his or her termination; *provided*, *however*, that the Debtors shall pay any accrued wages to terminated employees as expeditiously as possible.

37.    Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party-in-interest's right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Interim Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code (other than the Consulting Agreement); (f) a waiver or limitation of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable law; or

17

(g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Interim Order are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection or to seek avoidance of all such liens.  Any payment made pursuant to this Interim Order should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

38.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

39.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

40.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

41.     Cause exists to shorten the notice period set forth in Bankruptcy Rule 2002, to the extent possible.

42.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

43.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order, including, but not limited to, (a) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and sign-walker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional, and non-deceptive manner, (b) any claim of the Debtors, the landlords for protection from interference with the Store

18

Closings or Closing Sales, (c) any other disputes related to the Store Closings or Closing Sales, and (d) protect the Debtors against any assertions of any liens, claims, encumbrances, and other interests.  No such parties or person shall take any action against the Debtors, the landlords, the Store Closings, or the Closing Sales until this Court has resolved such dispute.  This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

Dated: _____, 2020
Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

13172880 v2

# **EXHIBIT 1**

## <u>Store Closing Procedures</u>[1]

1. The Sales shall be conducted so that the Stores in which Sales are to occur will remain open no longer than during the normal hours of operation or such hours as otherwise provided for in the respective leases for the Stores.

2. The Store Closing Sales shall be conducted in accordance with applicable state and local "Blue Laws," where applicable, so that no Store Closing Sale shall be conducted on Sunday unless the Debtors had been operating such Stores on a Sunday prior to the commencement of the Store Closing Sales.

3. On "shopping center" property, the Consultant shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or if distribution is customary in the "shopping center" in which such Stores is located; *provided* that the Consultant may solicit customers in the Stores themselves. On "shopping center" property, the Consultant shall not use any flashing lights or amplified sound to advertise the Store Closing Sales or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4. At the conclusion of the Store Closing Sales, the Consultant shall, subject to the Consulting Agreement, vacate the Stores and the Distribution Centers in broom clean condition; *provided* that Consultant may abandon any M&E not sold in the Store Closing Sales at the conclusion of the Store Closing Sales, without cost or liability of any kind to the Consultant. The Debtors will have the option to remove the M&E at their own cost prior to the termination date. Any abandoned M&E left in a Stores after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Debtors. For the avoidance of doubt, as of the Sale Termination Date, the Consultant may abandon, in place and without further responsibility or liability of any kind, any M&E.

5. The Consultant and the Debtors may advertise each Store Closing Sale as a "store closing," "sale on everything," "everything must go," or similar themed sale, and to the extent permitted in the Approval Orders, "going out of business". The Consultant and the Debtors may also have "countdown to closing" signs prominently displayed in a manner consistent with these Store Closing Procedures. All signs, banners, ads and other advertising collateral, promotions, and campaigns will be approved by the Debtors in accordance with these Store Closing Procedures.

6. The Consultant shall be permitted to utilize sign walkers, display, hanging signs, and interior banners in connection with the Sales; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Debtors and the Consultant shall not use neon or day-glo on its sign walkers, display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs

---

[1] Capitalized terms used but not defined in these Store Closing Procedures have the meanings given to them in the Interim Order to which these Store Closing Procedures are attached as **Exhibit 1** or the Motion to which the Interim Order is attached as **Exhibit A**, as applicable.

or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Store Closing Procedures. In addition, the Debtors and the Consultant shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Stores does not require entry into the enclosed mall common area; *provided*, however, that such banners shall be located or hung so as to make clear that the Store Closing Sales are being conducted only at the affected Stores, and shall not be wider than the storefront of the Closing Stores. In addition, the Debtors and the Consultant shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Order. Nothing contained in these Store Closing Procedures shall be construed to create or impose upon the Debtors or the Consultant any additional restrictions not contained in the applicable lease agreement.

7.     The purchasers of any Merchandise sold during the Store Closing Sales shall be permitted to remove the Merchandise through the front of the Closing Stores, or through the back or alternative shipping areas at any time.

8.     Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

9.     Except with respect to the hanging of exterior banners, the Consultant shall not make any alterations to the storefront or exterior walls of any Stores, except as authorized by the applicable lease.

10.     The Consultant shall not make any alterations to interior or exterior Stores lighting, except as authorized by the applicable lease. No property of the landlord of a Stores shall be removed or sold during the Store Closing Sales. The hanging of exterior banners or in-store signage and banners shall not constitute an alteration to a Stores.

11.     The Consultant shall keep Stores premises and surrounding areas clean and orderly consistent with present practices.

12.     Subject to the provisions of the Consulting Agreement, the Consultant shall have the right to use and sell all M&E. The Consultant may advertise the sale of the M&E in a manner consistent with these guidelines. The purchasers of any M&E sold during the Store Closing Sales shall be permitted to remove the M&E either through the back or alternative shipping areas at any time, or through other areas after applicable business hours, *provided, however* that the foregoing shall not apply to *de minimis* M&E sales made whereby the item can be carried out of the Closing Stores in a shopping bag. For the avoidance of doubt, as of the Sale Termination Date, the Consultant and the Debtors may abandon, in place and without further responsibility, any M&E.

13.     At the conclusion of the Store Closing Sales at each Stores, pending assumption or rejection of applicable leases, the landlords of the Closing Stores shall have reasonable access to the Closing Stores' premises as set forth in the applicable leases. The Debtors, the Consultant, and their representatives and agents shall continue to have access to the Closing Stores as provided for in the Consulting Agreement.

14.     The rights of landlords against the Debtors for any damages to a Stores shall be reserved in accordance with the provisions of the applicable lease.

15.     If and to the extent that the landlord of any Stores affected hereby contends that the Debtors or the Consultant is in breach of or default under these Store Closing Procedures, such landlord shall email or deliver written notice by overnight delivery to the Debtors and the Consultant as follows:

        If to the Debtors:

        Art Van Furniture, LLC
        6500 14 Mile Road
        Warren, MI 48092
        Attention: Michael Zambricki

        with copies (which shall not constitute notice) to:

        Benesch, Friedlander, Coplan & Aronoff LLP
        222 Delaware Avenue, Suite 801
        Wilmington, Delaware 19801
        Attn: Gregory Werkheiser & Michael J. Barrie

        -and-

        Montgomery McCracken Walker & Rhoads LLP
        437 Madison Avenue
        New York, NY 10022
        Attn. Maura I. Russell

If the parties are unable to resolve the dispute, either the landlord or the Debtors shall have the right to schedule a hearing before the Court on no less than five (5) days' written notice to the other party, served by email or overnight delivery.

# **EXHIBIT B**

# **Proposed Final Order**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (CSS) |
|  | ) |
| Debtors. | ) (Joint Administration Requested) |
|  | ) |
|  | ) **Re: Docket No. _____** |

## FINAL ORDER GRANTING DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) APPROVING PROCEDURES FOR STORE CLOSING SALES, (II) AUTHORIZING CUSTOMARY BONUSES TO EMPLOYEES OF CLOSING STORES, (III) AUTHORIZING ASSUMPTION OF THE CONSULTING AGREEMENT UNDER §§ 363 AND 365 OF THE BANKRUPTCY CODE, (IV) AUTHORIZING THE DEBTORS TO RETAIN CERTAIN CONSULTANT ENTITIES AS SPECIAL ASSET DISPOSITION ADVISORS TO THE DEBTORS PURSUANT TO §327(A) OF THE BANKRUPTCY CODE AND (V) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Final Order"):  (a)  authorizing and approving the conduct of store closing or similar themed sales in accordance with the terms of the store closing procedures (the "Store Closing Procedures") attached hereto as **Exhibit 1**, with such sales to be free and clear of all liens, claims and encumbrances; (b) authorizing the Debtors to conduct the Store Closings; (c) authorizing the Debtors to pay customary bonuses to employees of

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVCE, LLC (2509); AVF Franchising, LLC (6325); AVF Holding Company, Inc. (0291); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); LF Trucking, Inc. (1484); and Sam Levin, Inc. (5198).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Closing Stores; (d) authorizing the Debtors to assume the Consulting Agreement; (e) authorizing the Debtors to retain the Consultant as special asset disposition advisor pursuant to Section 327(a) of the Bankruptcy Code; (f) scheduling a final hearing to consider approval of the Motion on a final basis; and (g) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND AND DETERMINED THAT:[3]

---

[3]  Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.

13172872 v1

A.       The Debtors have advanced sound business reasons for seeking to implement the Store Closing Procedures and assume the Consulting Agreement, as set forth in the Motion and at the Hearing, and such relief is in the best interests of the Debtors and their estates.

B.       The Store Closing Procedures are reasonable, and the conduct of the Closing Sales in accordance with the Store Closing Procedures will provide an efficient means for the Debtors to dispose of the Merchandise and the M&E and will maximize the returns on the Merchandise and the M&E.

C.       The Consulting Agreement was negotiated, proposed, and entered into by the Debtors and the Consultant without collusion, in good faith, and from arm's-length bargaining positions, and the operation and effectiveness of the Consulting Agreement on a final basis is a sound exercise of the Debtors' business judgment.

D.       The relief set forth herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates and the Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief approved herein.

E.       The Store Closings and Closing Sales are in the best interest of the Debtors' estates.

F.       The entry of this Final Order is in the best interest of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein; and now therefore it is HEREBY ORDERED THAT:

1.       The Motion is granted on a final basis as provided herein.

2.       The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

3.       The Debtors are authorized, but not directed, to make payments under the Store Closing Bonus Plan.

4

4.       The Debtors and the Consultant are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.  The failure to specifically include any provision of the Consulting Agreement in this Final Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Consulting Agreement and all of its provisions, payments, and transactions be, and hereby are, authorized and approved as and to the extent provided in this Final Order.

5.       To the extent of any conflict between this Final Order, the Consulting Agreement, and the Store Closing Procedures, the terms of this Final Order shall control.

6.       Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of the Final Order are immediately effective and enforceable upon its entry.

**I.       Authority to Engage in Closing Sales and Conduct Store Closings.**

7.       The Debtors and the Consultant are authorized, on a final pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to continue and conduct Closing Sales at the Closing Stores in accordance with this Final Order, the Store Closing Procedures, and the Consulting Agreement as may be modified by a Side Letter (as defined below) between the Debtors and the landlords at the closing locations.

8.       The Store Closing Procedures are approved in their entirety on a final basis. The Store Closing Procedures shall be used for all permitted store closings in these chapter 11 cases, unless otherwise ordered.

9.       The Debtors are authorized to discontinue operations at the Closing Stores in accordance with this Final Order, the Store Closing Procedures, and the Consulting Agreement.

10.      All entities that are presently in possession of some or all of the Merchandise or M&E in which the Debtors hold an interest that are or may be subject to this Final Order hereby are directed to surrender possession of such Merchandise or M&E to the Debtors.

11.     Neither the Debtors nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including, without limitation, any Governmental Unit (as defined in Bankruptcy Code section 101(27)) or landlord, to conduct the Closing Sales and to take the related actions authorized herein.

**II.     Conduct of the Sales.**

12.     All media in which the Closing Sales may be advertised and all landlords are directed to accept this Final Order as binding authority so as to authorize the Debtors and the Consultant to conduct the Closing Sales and the sale of Merchandise, M&E, and Additional Consultant Goods, including, without limitation, to conduct and advertise the sale of the Merchandise, M&E, and Additional Consultant Goods in the manner contemplated by and in accordance with this Final Order, the Store Closing Procedures, and the Consulting Agreement.

13.     The Debtors and the Consultant are hereby authorized to take such actions as may be necessary and appropriate to conduct the Store Closings without necessity of further order of this Court as provided in this Final Order,  the Store Closing Procedures, and the Consulting Agreement, including, but not limited to, advertising the sale as a "store closing sale," "sale on everything," "everything must go," or similar-themed sales through the posting of signs (including the use of exterior banners at non-enclosed mall closing locations, and at enclosed mall closing locations to the extent the applicable closing location entrance does not require entry into the enclosed mall common area), use of signwalkers, and street signage; *provided*, *however*, that only Debtor-approved terminology will be used at each Closing Store in connection with the Sales.

14.     The Consultant is authorized to supplement the Merchandise in the Closing Stores with Additional Consultant Goods, provided that any such supplementing with Additional Consultant Goods must be of like kind and no lesser quality than goods sold in the Closing Stores prior to the Petition Date.  Sales of Additional Consultant Goods shall be run through the Debtors'

6

cash register systems; provided, however, that the Consultant shall mark the Additional Consultant Goods using either a "dummy" SKU or department number or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise. The Consultant and Merchant shall cooperate to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods from the Merchandise.

15.     All transactions relating to the Additional Consultant Goods are, shall be construed as, and are acknowledged by the Debtors to be, a true consignment from Consultant to the Debtors under Article 9 of the Uniform Commercial Code in effect in the State of Delaware (the "UCC") and not a consignment for security purposes. At all times and for all purposes, the Additional Consultant Goods and their proceeds shall be the exclusive property of the Consultant, and no other person or entity (including, without limitation, the Debtors, or any third person claiming a security interest in the Debtors' property, including any of the Debtors' secured lenders) shall have any claim against any of the Additional Consultant Goods or the proceeds thereof. The Additional Consultant Goods shall at all times remain subject to the exclusive control of the Consultant. The Debtors shall, at Consultant's sole cost and expense, insure Additional Consultant Goods and, if required, promptly file any proofs of loss with regard thereto.

16.     Consultant is hereby granted a first priority security interest in and lien upon (i) the Additional Consultant Goods and (ii) the Additional Consultant Goods proceeds, which security interest shall be deemed perfected on an final pursuant to this Final Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Consultant is hereby authorized to deliver any notices and file any financing statements and amendments thereof under the applicable UCC identifying Consultant's interest in the Additional

7

Consultant Goods (and any proceeds from the sale thereof) as consigned goods thereunder and the Debtors as the consignee therefor, and Consultant's security interest in such Additional Consultant Goods and Additional Consultant Goods proceeds). As part of each weekly reconciliation, the Debtors shall turnover all proceeds from the sale of Additional Consultant Goods to the Consultant, net of any fee payable to the Debtors pursuant to the Consulting Agreement.

17. Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the sale of the Merchandise, M&E, and Additional Consultant Goods, to the extent that, prior to the Final Hearing, disputes arise during the course of such sale regarding laws regulating the use of sign-walkers, banners, or other advertising and the Debtors are unable to resolve the matter consensually, any party may request an immediate telephonic hearing with this Court pursuant to these provisions. Such hearing will, to the extent practicable, be scheduled initially no later than the earlier of (a) the Final Hearing, or (b) within two (2) business days of such request. This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

18. The sale of the Merchandise, M&E, and Additional Consultant Goods shall be conducted by the Debtors notwithstanding any restrictive provision of any lease, sublease, restrictive covenant, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Store Closings or the Closing Sales (including the sale of the Merchandise, M&E, and Additional Consultant Goods) and the rejection of leases, abandonment of assets, or "going dark" provisions, and such provisions shall not be enforceable in conjunction with the Sales or the Store Closings. Breach of any such provisions in these chapter 11 cases in conjunction with the Store Closings or the Closing Sales shall not constitute a default under a lease or provide a basis to terminate the lease; *provided* that the Store Closings and Closing Sales are conducted in

accordance with the terms of this Final Order and the Store Closing Procedures. Subject to the approval of the Secured Lenders, the Debtors and landlords of the Closing Stores are authorized to enter into agreements ("Side Letters") between themselves modifying the Store Closing Procedures without further order of the Court and such Side Letters shall be binding as among the Debtors and any such landlords. In the event of any conflict between the Store Closing Procedures and any Side Letter, the terms of such Side Letter shall control.

19.    Except as expressly provided for herein or in the Store Closing Procedures, and except with respect to any Governmental Unit (as to which paragraphs and shall apply) no person or entity, including, but not limited to, any landlord, licensor, service provider, utility, or creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Closing Sales or the sale of Merchandise, M&E, or Additional Consultant Goods, or the advertising and promotion (including the posting of signs and exterior banners or the use of signwalkers) of such sales, and all such parties and persons of every nature and description, including, but not limited to, any landlord, licensor, service provider, utility, and creditor and all those acting for or on behalf of such parties, are prohibited and enjoined from (a) interfering in any way with, obstructing, or otherwise impeding the conduct of the Closing Sales and/or Store Closings, and/or (b) instituting any action or proceeding in any court (other than this Court) or administrative body seeking an order or judgment against, among others, the Debtors, or the landlords at the Closing Stores that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Closing Sales or other liquidation sales at the Closing Stores and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

9

20.     In accordance with and subject to the terms and conditions of the Consulting Agreement, the Consultant shall have the right to use the Closing Stores and all related Closing Store services, furniture, fixtures, equipment, and other assets of the Debtors for the purpose of conducting the Store Closings, free of any interference from any entity or person, subject to compliance with the Store Closing Procedures and this Order.

21.     All sales of Merchandise, M&E and Additional Consultant Goods shall be "as is" and final.  Returns related to the purchase of Store Assets shall not be accepted at stores that are not participating in the Store Closings.  However, as to the Closing Stores, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."

22.     The Consultant shall not be liable for sales taxes except with respect to the Additional Consultant Goods, and  as expressly provided in the Consulting Agreement, and the payment of any and all sales taxes is the responsibility of the Debtors, subject to Consultant's obligation to collect and remit the sales taxes attributable to the sale of Additional Consultant Goods.  The Debtors are directed to remit all taxes arising from the Sales to the applicable Governmental Units as and when due; *provided* that in the case of a *bona fide* dispute the Debtors are only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit.  For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected.  This Final Order does not enjoin, suspend, or restrain the assessment, levy, or collection of any tax under state law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state law.

13172872 v1

23.     Pursuant to section 363(f) of the Bankruptcy Code, the Consultant, on behalf of the Debtors, is authorized to sell Store Assets—and all sales of Store Assets whether by the Consultant or the Debtors, shall be—free and clear of any and all of any liens, claims, encumbrances, assignments, preferences, debts, easements, charges, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state, and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, environmental, tax, labor, ERISA, CERCLA, alter ego and other liabilities, causes of action, contract rights, and claims, to the fullest extent of the law, in each case, of any kind or nature (including, without limitation, all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether pre-petition or post-petition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable (collectively, "Encumbrances")s; as provided for herein because in each case, one or more of the standards set forth in section 363(f)(1)–(5) has been satisfied; *provided*, *however*, that any such Encumbrances shall attach to the proceeds of the sale of the Merchandise and the M&E with the same validity, in the amount, with the same priority as, and to the same extent that any such Encumbrances have with respect to the Merchandise and the M&E, subject to any claims and defenses that any party may possess with respect thereto and subject to the Consultant's and expenses (as provided in the Consulting Agreement).

24.     To the extent that the Debtors propose to sell or abandon M&E that may contain personal and/or confidential information about the Debtors' employees and/or customers

13172872 v1

(the "<u>Confidential Information</u>"), the Debtors shall remove the Confidential Information from such items of M&E before such sale or abandonment.

25.     The Debtors are authorized and empowered to transfer merchandise, M&E and Additional Consultant Goods among, and into, the Stores.

**III.     Dispute Resolution Procedures with Governmental Units.**

26.     Nothing in this Final Order, or the Store Closing Procedures, releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Final Order.  Nothing contained in this Final Order, or the Store Closing Procedures shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with its rights and obligations as debtor in possession under the Bankruptcy Code. The Store Closings and the Sales shall not be exempt from laws of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "<u>General Laws</u>").  Nothing in this Final Order, the Consulting Agreement, or the Store Closing Procedures, shall alter or affect obligations to comply with all applicable federal safety laws and regulations.  Nothing in this Final Order shall be deemed to bar any Governmental Unit (as such term is defined in section 101(47) of the Bankruptcy Code) from enforcing General Laws, subject to the Debtors' rights to assert in that forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code or this Final Order.  Notwithstanding any other provision in this Final Order, no party waives any rights to argue any position with

12

respect to whether the conduct was in compliance with this Final Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code. Nothing in this Final Order shall be deemed to have made any rulings on any such issues.

27.    To the extent that the sale of Merchandise, M&E, and Additional Consultant Goods is subject to any Liquidation Sale Laws, including any federal, state or local statute, ordinance, or rule, or licensing requirement directed at regulating "going out of business," "store closing," similar inventory liquidation sales, or bulk sale laws, laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely in connection with the sale and including ordinances establishing license or permit requirements, waiting periods, time limits, or bulk sale restrictions that would otherwise apply solely to the sale of the merchandise, M&E, and Additional Consultant Goods, the Dispute Resolution Procedures in this section shall apply:

> a.    Provided that the Closing Sales are conducted in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures, and in light of the provisions in the laws of many Governmental Units (as defined in the Bankruptcy Code) that exempt court-ordered sales from their provisions, the Debtors will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Closing Sales in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures without the necessity of further showing compliance with any such Liquidation Sale Laws.
>
> b.    Within three business days after entry of the Interim Order, the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order, the proposed Final Order and the Store Closing Procedures on the following:  (i) the landlords for the Stores; (ii) the Attorney General's office for each state in which the Closing Sales are being held; (iii) the county consumer protection agency or similar agency for each county in which the Closing Sales are being held; (iv) the division of consumer protection for each state in which the Closing Sales are being held; (v) the chief legal counsel for each local jurisdiction in which the Closing Sales are being held (collectively, the "Dispute Notice Parties").
>
> c.    With respect to any additional Stores, within three business days after Court authorization to close additional stores (each, an "Additional Closing Store

13

List"), the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order or Final Order, as applicable, and the Store Closing Procedures on the Dispute Notice Parties. To the extent that there is a dispute arising from or relating to the Sales, the Interim Order, or the proposed Final Order, as applicable, the Store Closing Procedures, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within ten days following entry of the Interim Order or service of any Additional Closing Store List, as applicable, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "Dispute Notice") explaining the nature of the dispute to: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter, and Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (iii) counsel to the Consultant, Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036; (iii) the United States Trustee's Office for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (iv) counsel to the Prepetition Term Loan Lenders, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf. If the Debtors and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the Dispute Notice, the Governmental Unit may file a motion with the Court requesting that the Bankruptcy Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

d.      In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, or any other interested party from asserting (i) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (ii) that neither the terms of the Interim Order or the Final Order nor the conduct of the Debtors pursuant to the Interim Order or the Final Order violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Order or the Final Order or to limit or interfere with the Debtors' ability to conduct or to continue to conduct the Closing Sales pursuant to the Interim Order or the Final Order, absent further order of the Court. Upon the entry of the Interim Order or the Final Order, as applicable, the Court grants authority for the Debtors to conduct the Closing Sales pursuant to the terms of the Interim Order or the Final Order, as applicable, the Store Closing Procedures and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any

jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

e.    If, at any time, a dispute arises between the Debtors and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (c) and (d) above by serving a notice to the other party and proceeding thereunder in accordance with those subparagraphs.  Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

28.    Subject to paragraphs  and __ above, each and every federal, state, or local agency, departmental unit, or Governmental Unit with regulatory authority over the Closing Sales, and all newspapers and other advertising media in which the Closing Sales are advertised shall consider the Final Order as binding authority that no further approval, license, or permit of any Governmental Unit shall be required, nor shall the Debtors be required, to post any bond, to conduct the Sales.

29.    Within three business days of the Final Order, the Debtors shall serve copies of the Final Order, and the Store Closing Procedures via e-mail, facsimile, or regular mail, on:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the United States Attorney's Office for the District of Delaware; (d) the Internal Revenue Service; (e) the state attorneys general for all states in which the Debtors conduct business; (f) all parties who are known by the Debtors to assert liens against the Merchandise and the M&E ; (g) all state attorneys general in which the Merchandise and the M&E are located; (h) municipalities in which the Merchandise and the M&E are located; (i) all of the Debtors' landlords at the locations of the Stores; (j) all applicable state and consumer protection agencies; and (k) any party that has requested notice pursuant to

15

Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**IV.    Effectiveness of the Consulting Agreement.**

30.    The Consulting Agreement is operative and effective on a final basis.  The Debtors are authorized to act and perform in accordance with the terms of the Consulting Agreement, including, without limitation, reimbursing all expenses to the Consultant as required by the Consulting Agreement without the need for any application of the Consultant or a further order of the Court.  For avoidance of doubt, the Debtors are also authorized to fund the Expense Deposit in accordance with the terms of the Consulting Agreement.

31.    The treatment of Pre-SCD Orders, including the Cancelled Back-Order Merchandise Credit, described in the Consulting Agreement is a sound exercise of the Debtors' business judgment, complies with applicable law, and is hereby approved, subject to entry of the Final Order.

32.    Subject to the restrictions set forth in this Final Order Order and the Store Closing Procedures, the Debtors and the Consultant are hereby authorized to take any and all actions as may be necessary or desirable to implement the Consulting Agreement, the Store Closings, and the Closing Sales, and each of the transactions contemplated by the Consulting Agreement, and any actions taken by the Debtors and the Consultant necessary or desirable to implement the Consulting Agreement and the Closing Sales prior to the date hereof, are hereby approved and ratified.  The failure to specifically include any particular provision of the Consulting Agreement in this Final Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the Consulting Agreement and all of its provisions, payments, and transactions, be and hereby are authorized and approved as and to the extent provided for in this Final Order.

16

33.     Notwithstanding anything to the contrary in the Consulting Agreement, the Debtors and their estates shall not indemnify the Consultant for any damages arising primarily out of any act or omission by the Consultant constituting fraud, gross negligence, or willful misconduct.

**V.     Debtors are Authorized to Retain Consultant as Special Asset Disposition Consultant Pursuant to the Consulting Agreement.**

34.     The This Court is satisfied that the Consultant represents and holds no interest adverse to the Debtors or their estates, and that the Consultant will not represent any other entity in connection with these cases and that its employment is necessary and would be in the best interests of the Debtors and the estates.  Accordingly, pursuant to sections 327(a), 330 and 331 of Bankruptcy Code, the Debtors be, and hereby are, authorized to retain the Consultant as their special asset disposition advisors and consultants, to assist the Debtors in the marketing and sale process for the Assets in accordance with the Consulting Agreement; provided however, it is agreed and understood that no fees shall be payable to the Consultant in connection with Services rendered by it to the Debtors pursuant to the Consulting Agreement, and other than the right to reimbursement of Consultant Incurred Expenses, Consultant shall have to claim or right to payment from the Company; provided further however, Consultant shall not be required to file a fee application for reimbursement of the Consultant Incurred Expenses. Debtors shall not be required to comply with any state or local law requiring that the Debtors pay an employee substantially contemporaneously with his or her termination; *provided*, however, that the Debtors shall pay any accrued wages to terminated employees as expeditiously as possible

**VI.     Other Provisions.**

35.     The Consultant shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against Consultant, in each case, other than as expressly provided for in the Consulting Agreement.

17

36.     The Debtors shall not be required to comply with any state or local law requiring that the Debtors pay an employee substantially contemporaneously with his or her termination; *provided*, *however*, that the Debtors shall pay any accrued wages to terminated employees as expeditiously as possible.

37.     Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party-in-interest's right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Final Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code (other than the Consulting Agreement); (f) a waiver or limitation of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Final Order are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection or to seek avoidance of all such liens. Any payment made pursuant to this Final Order should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

38.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

39.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

40.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

41.     Cause exists to shorten the notice period set forth in Bankruptcy Rule 2002, to the extent possible.

42.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

43.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order, including, but not limited to, (a) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and sign-walker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional, and non-deceptive manner, (b) any claim of the Debtors, the landlords for protection from interference with the Store Closings or Closing Sales, (c) any other disputes related to the Store Closings or Closing Sales, and (d) protect the Debtors against any assertions of any liens, claims, encumbrances, and other interests.  No such parties or person shall take any action against the Debtors, the landlords, the Store Closings, or the Closing Sales until this Court has resolved such dispute.  This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

Dated: _____, 2020
Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

19

# EXHIBIT 1

## Store Closing Procedures[1]

1.      The Sales shall be conducted so that the Stores in which Sales are to occur will remain open no longer than during the normal hours of operation or such hours as otherwise provided for in the respective leases for the Stores.

2.      The Store Closing Sales shall be conducted in accordance with applicable state and local "Blue Laws," where applicable, so that no Store Closing Sale shall be conducted on Sunday unless the Debtors had been operating such Stores on a Sunday prior to the commencement of the Store Closing Sales.

3.      On "shopping center" property, the Consultant shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or if distribution is customary in the "shopping center" in which such Stores is located; *provided* that the Consultant may solicit customers in the Stores themselves. On "shopping center" property, the Consultant shall not use any flashing lights or amplified sound to advertise the Store Closing Sales or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.      At the conclusion of the Store Closing Sales, the Consultant shall, subject to the Consulting Agreement, vacate the Stores and the Distribution Centers in broom clean condition; *provided* that Consultant may abandon any M&E not sold in the Store Closing Sales at the conclusion of the Store Closing Sales, without cost or liability of any kind to the Consultant. The Debtors will have the option to remove the M&E at their own cost prior to the termination date. Any abandoned M&E left in a Stores after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Debtors. For the avoidance of doubt, as of the Sale Termination Date, the Consultant may abandon, in place and without further responsibility or liability of any kind, any M&E.

5.      The Consultant and the Debtors may advertise each Store Closing Sale as a "store closing," "sale on everything," "everything must go," or similar themed sale, and to the extent permitted in the Approval Orders, "going out of business". The Consultant and the Debtors may also have "countdown to closing" signs prominently displayed in a manner consistent with these Store Closing Procedures. All signs, banners, ads and other advertising collateral, promotions, and campaigns will be approved by the Debtors in accordance with these Store Closing Procedures.

6.      The Consultant shall be permitted to utilize sign walkers, display, hanging signs, and interior banners in connection with the Sales; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Debtors and the Consultant shall not use neon or day-glo on its sign walkers, display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs

---

[1]      Capitalized terms used but not defined in these Store Closing Procedures have the meanings given to them in the Interim Order to which these Store Closing Procedures are attached as **Exhibit 1** or the Motion to which the Interim Order is attached as **Exhibit A**, as applicable.

or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Store Closing Procedures. In addition, the Debtors and the Consultant shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Stores does not require entry into the enclosed mall common area; *provided*, however, that such banners shall be located or hung so as to make clear that the Store Closing Sales are being conducted only at the affected Stores, and shall not be wider than the storefront of the Closing Stores. In addition, the Debtors and the Consultant shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Order. Nothing contained in these Store Closing Procedures shall be construed to create or impose upon the Debtors or the Consultant any additional restrictions not contained in the applicable lease agreement.

7.      The purchasers of any Merchandise sold during the Store Closing Sales shall be permitted to remove the Merchandise through the front of the Closing Stores, or through the back or alternative shipping areas at any time.

8.      Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

9.      Except with respect to the hanging of exterior banners, the Consultant shall not make any alterations to the storefront or exterior walls of any Stores, except as authorized by the applicable lease.

10.     The Consultant shall not make any alterations to interior or exterior Stores lighting, except as authorized by the applicable lease. No property of the landlord of a Stores shall be removed or sold during the Store Closing Sales. The hanging of exterior banners or in-store signage and banners shall not constitute an alteration to a Stores.

11.     The Consultant shall keep Stores premises and surrounding areas clean and orderly consistent with present practices.

12.     Subject to the provisions of the Consulting Agreement, the Consultant shall have the right to use and sell all M&E. The Consultant may advertise the sale of the M&E in a manner consistent with these guidelines. The purchasers of any M&E sold during the Store Closing Sales shall be permitted to remove the M&E either through the back or alternative shipping areas at any time, or through other areas after applicable business hours, *provided, however* that the foregoing shall not apply to *de minimis* M&E sales made whereby the item can be carried out of the Closing Stores in a shopping bag. For the avoidance of doubt, as of the Sale Termination Date, the Consultant and the Debtors may abandon, in place and without further responsibility, any M&E.

13.     At the conclusion of the Store Closing Sales at each Stores, pending assumption or rejection of applicable leases, the landlords of the Closing Stores shall have reasonable access to the Closing Stores' premises as set forth in the applicable leases. The Debtors, the Consultant, and their representatives and agents shall continue to have access to the Closing Stores as provided for in the Consulting Agreement.

14.     The rights of landlords against the Debtors for any damages to a Stores shall be reserved in accordance with the provisions of the applicable lease.

15.     If and to the extent that the landlord of any Stores affected hereby contends that the Debtors or the Consultant is in breach of or default under these Store Closing Procedures, such landlord shall email or deliver written notice by overnight delivery to the Debtors and the Consultant as follows:

> If to the Debtors:
>
> Art Van Furniture, LLC
> 6500 14 Mile Road
> Warren, MI 48092
> Attention: Michael Zambricki
>
> with copies (which shall not constitute notice) to:
>
> Benesch, Friedlander, Coplan & Aronoff LLP
> 222 Delaware Avenue, Suite 801
> Wilmington, Delaware 19801
> Attn: Gregory Werkheiser & Michael J. Barrie
>
> -and-
>
> Montgomery McCracken Walker & Rhoads LLP
> 437 Madison Avenue
> New York, NY 10022
> Attn. Maura I. Russell

If the parties are unable to resolve the dispute, either the landlord or the Debtors shall have the right to schedule a hearing before the Court on no less than five (5) days' written notice to the other party, served by email or overnight delivery.

# EXHIBIT 2

**Art Van Furniture**
Results - Store Count Strategy by Location

**Financial Information ($000's)**

| | |
|---|---|
| 169 # Stores included in liquidation | Yes |
| 2 # stores closed prior to sale commencement | No |

| Store # | Store Name | Original Store Name | Include In Liquidation | Direct Marketing Area | Store Type | Company Affiliation | Gross Sq. Ft. | Selling Sq. Ft. | Lease Beginning Date | Lease Expires | Months Remaining | SLB Property | Landlord | Master Lease | Address |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Bel Air, MD (1) | BEL AIR (#65) | Yes | Baltimore | Standard | WLF | 74,400 | 62,000 | 5/15/2015 | 12/31/2025 | 70 | No | CAMPUS HILLS MARYLAND ASSOCIATES, L.P. | None | 2400 E Churchville Rd, Bel Air, MD, 21015, USA |
| 2 | Pasadena, MD (2) | PASADENA (#61) | Yes | Baltimore | Standard | WLF | 61,646 | 54,000 | 5/15/2015 | 8/31/2025 | 66 | No | ARUNDEL PROPERTY INVESTORS LP | None | 8038 Ritchie Hwy, Pasadena, MD, 21122, USA |
| 3 | Westminster, MD (3) | WESTMINSTER (#64) | Yes | Baltimore | Standard | WLF | 40,550 | 38,000 | 5/15/2015 | 8/31/2021 | 18 | No | WESTMINSTER GATEWAY, LLC | None | 1030 Baltimore Blvd Suite 110, Westminster, MD, 21157, USA |
| 4 | Towson, MD (4) | TOWSON (#63) | Yes | Baltimore | Standard | WLF | 54,000 | 46,000 | 5/15/2015 | 4/30/2038 | 218 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 1530 E Joppa Rd, Towson, MD, 21286, USA |
| 5 | Catonsville, MD (5) | CATONSVILLE (#62) | Yes | Baltimore | Standard | WLF | 115,300 | 40,000 | 5/15/2015 | 8/31/2025 | 66 | No | JMB JOINT VENTURE | None | 6415 Baltimore National Pike, Catonsville, MD, 21228, USA |
| 6 | Downers Grove, IL (6) | DOWNERS GROVE AVF & SSI (#199) | Yes | Chicago | Flagship | AVF | 100,000 | 92,428 | 8/1/2015 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 1021 BUTTERFIELD RD, DOWNERS GROVE, IL, 60515, USA |
| 7 | Merrillville, IN (7) | MERRILLVILLE AVF | Yes | Chicago | Standard | AVF | 50,000 | 43,130 | 8/24/2013 | 2/28/2023 | 36 | No | ACADIA MERRILLVILLE REALTY, L.P. | None | 1600 E 80TH AVE, MERRILLVILLE, IN, 46410, USA |
| 8 | Naperville, IL (8) | NAPERVILLE AVF | Yes | Chicago | Standard | AVF | 62,000 | 52,753 | 8/1/2015 | 8/31/2025 | 66 | No | BRIXMOR HERITAGE SQUARE, LLC | None | 404 SOUTH ROUTE 59, NAPERVILLE, IL, 60540, USA |
| 9 | Bedford Park, IL (9) | BEDFORD PK AVF | Yes | Chicago | Flagship | AVF | 84,505 | 71,590 | 10/26/2013 | 4/30/2024 | 50 | No | SPIRIT SPE LOAN PORTFOLIO 2013-3, LLC | None | 7200 S CICERO AVE, BEDFORD PARK, IL, 60638, USA |
| 10 | Elston, IL (10) | ELSTON AVE AVF | Yes | Chicago | Standard | AVF | 48,000 | 40,660 | 10/26/2013 | 4/30/2024 | 50 | No | Fairbrain Group | None | 2606 ELSTON AVE, CHICAGO, IL, 60647, USA |
| 11 | Batavia, IL (11) | BATAVIA AVF | Yes | Chicago | Standard | AVF | 42,500 | 37,055 | 9/14/2013 | 1/31/2024 | 47 | No | PARAGON BATAVIA, LLC | None | 165 N RANDALL RD, BATAVIA, IL, 60510, USA |
| 12 | Orland Park, IL (12) | ORLAND PARK AVF | Yes | Chicago | Flagship | AVF | 65,523 | 53,329 | 7/13/2013 | 5/31/2024 | 51 | No | 55th & S. Kedzie, LLC | None | 15080 S LA GRANGE RD, ORLAND PARK, IL, 60462, USA |
| 13 | Algonquin, IL (13) | ALGONQUIN AVF | Yes | Chicago | Standard | AVF | 48,397 | 41,272 | 3/31/2016 | 7/31/2025 | 65 | No | c/o Mid America Asset Management, Inc. | None | 1500 S RANDALL ROAD, ALGONQUIN, IL, 60102, USA |
| 14 | Kildeer, IL (14) | KILDEER AVF | Yes | Chicago | Standard | AVF | 40,628 | 34,534 | 10/4/2017 | 9/30/2027 | 91 | No | Kildeer Village Square, LLC | None | 20393 N RAND RD, KILDEER, IL, 60074, USA |
| 15 | Glendale Heights, IL (15) | GLENDALE HEIGHTS AVF | Yes | Chicago | Standard | AVF | 60,820 | 37,044 | 2/26/2016 | 3/31/2026 | 73 | No | 125 W. Army Trail Road LLC | None | 125 ARMY TRAIL ROAD, GLENDALE HGTS, IL, 60139, USA |
| 16 | Deerfield, IL (16) | DEERFIELD AVF | Yes | Chicago | Standard | AVF | 41,966 | 35,671 | 12/13/2017 | 2/29/2028 | 96 | No | Gateway Fairview, Inc. | None | 120 S. WAUKEGAN, DEERFIELD, IL, 60015, USA |
| 17 | Schaumburg, IL (17) | SCHAUMBURG AVF& SSI (#303) | Yes | Chicago | Flagship | AVF | 71,400 | 61,990 | 10/29/2016 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 1293 E HIGGINS RD, SCHAUMBURG, IL, 60173, USA |
| 18 | Joliet, IL (18) | JOLIET PS | Yes | Chicago | Sleep | APS | 3,116 | 2,884 | 12/26/2017 | 12/31/2027 | 94 | No | GW Fidelity PH, LLC | None | 2901 PLAINFIELD, JOLIET, IL, 60435, USA |
| 19 | Burbank, IL (19) | BURBANK PS | Yes | Chicago | Sleep | APS | 3,994 | 3,476 | 3/21/2015 | 3/31/2025 | 61 | No | WM 73 RE, LLC | None | 7712 CICERO AVENUE, BURBANK, IL, 60459, USA |
| 20 | Woodridge, IL (20) | WOODRIDGE AVF | Yes | Chicago | Standard | AVF | 68,400 | 59,687 | 3/27/2014 | 11/30/2017 | 101 | No | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 900 E BOUGHTON RD, WOODRIDGE, IL, 60517, USA |
| 21 | Gurnee, IL (21) | GURNEE AVF | Yes | Chicago | Standard | AVF | 34,000 | 28,900 | 6/26/2018 | 12/31/2028 | 94 | No | 3503 RP Gurnee, L.L.C. | None | 6911 W. GRAND AVE, GURNEE, IL, 60031, USA |
| 22 | Plainfield, IL (22) | PLAINFIELD PS | Yes | Chicago | Sleep | APS | 3,600 | 3,290 | 2/11/2017 | 2/28/2027 | 84 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 13511 S ROUTE 59, PLAINFIELD, IL, 60544, USA |
| 23 | Willowbrook, IL (23) | WILLOWBROOK PS | Yes | Chicago | Sleep | APS | 3,834 | 3,400 | 12/3/2016 | 1/31/2027 | 83 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 6938 KINGERY HIGHWAY, WILLOWBROOK, IL, 60527, USA |
| 24 | Chicago, IL (24) | ASHLAND PS | Yes | Chicago | Sleep | APS | 3,000 | 2,600 | 9/10/2016 | 9/30/2026 | 79 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 2911 N. ASHLAND AVENUE, CHICAGO, IL, 60657, USA |
| 25 | Bloomingdale, IL (25) | BLOOMINGDALE PS | Yes | Chicago | Sleep | APS | 4,788 | 4,370 | 5/26/2017 | 4/30/2027 | 86 | No | Bloomingdale Square, L.P. | None | 398 W ARMY TRAIL RD #102, BLOOMINGDALE, IL, 60108, USA |
| 26 | Harwood Heights, IL (26) | HARWOOD HEIGHTS AVF | Yes | Chicago | Standard | AVF | 60,000 | 51,000 | 11/15/2017 | 12/31/2028 | 226 | No | DBO AVF | None | 7304 WEST LAWRENCE AVE, HARWOOD HEIGHTS, IL, 60706, LT |
| 27 | Avon, OH (27) | AVON (#45, 46 CC) | Yes | Cleveland | Standard | LVF | 77,000 | 72,380 | 7/1/2011 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 1801 NAGEL ROAD, AVON, OH, 44011, USA |
| 28 | North Canton, OH (28) | CANTON (#14, 25, 26 CC) | Yes | Cleveland | Standard | LVF | 65,765 | 60,199 | 3/1/2008 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 6229 PROMLER AVENUE NW, NORTH CANTON, OH, 44720, USA |
| 29 | Akron, OH (29) | AKRON (#23, 24 CC) | Yes | Cleveland | Standard | LVF | 69,422 | 65,257 | 10/1/2005 | 9/30/2020 | 7 | No | TABANI AKRON, LP | None | 3742 BROOKWALL DRIVE, AKRON, OH, 44333, USA |
| 30 | Middleburg Heights, OH (30) | MIDDLEBURG (#11, 31 CC) | Yes | Cleveland | Standard | LVF | 50,000 | 45,172 | 7/1/1993 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 16960 SPRAGUE ROAD, MIDDLEBURG HEIGHTS, OH, 44130, US |
| 31 | Mentor, OH (31) | MENTOR (#9, 27, 28 CC) | Yes | Cleveland | Standard | LVF | 75,600 | 70,712 | 7/1/2009 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 7799 MENTOR AVE, MENTOR, OH, 44060, USA |
| 32 | Oakwood Village, OH (32) | OAKWOOD VILLAGE (#18, 19 CC) | Yes | Cleveland | Standard | LVF | 89,723 | 67,723 | 8/1/2002 | 11/30/2027 | 93 | No | FIRST INERNATIONAL HAWTHORNE, LLC | None | 23100 BROADWAY AVE, OAKWOOD VILLAGE, OH, 44146, USA |
| 33 | North Olmsted, OH (33) | NORTH OLMSTED (#12, 34 CC) | Yes | Cleveland | Standard | LVF | 46,000 | 41,270 | 8/1/1996 | 1/31/2027 | 83 | No | GLITZ AND ASSOCIATES INC | None | 23250 LORAIN ROAD, NORTH OLMSTED, OH, 44070, USA |
| 34 | Strongsville, OH (34) | STRONGSVILLE (#74) | Yes | Cleveland | Standard | LM | 5,000 | 4,400 | 11/5/2015 | 10/31/2025 | 68 | No | ECHO STRONGSVILLE LLC | None | 16105 PEARL ROAD, STRONGSVILLE, OH, 44136, USA |
| 35 | Mayfield Heights, OH (35) | MAYFIELD (#65) | Yes | Cleveland | Sleep | LM | 4,620 | 4,120 | 5/1/2012 | n/a | n/a | No | JACK H SCHWARTS, TRUSTEE OF THE JACK H | None | 6061 Mayfield Rd, Mayfield Heights, OH, 44124, USA |
| 36 | Stow, OH (36) | STOW (#68) | Yes | Cleveland | Sleep | LM | 4,160 | 3,660 | 10/25/2013 | 1/31/2024 | 47 | No | DEVILLE DEVELOPMENTS LLC | None | 1061 GRAHAM RD, STOW, OH, 44224, USA |
| 37 | Medina, OH (37) | MEDINA (#76) | Yes | Cleveland | Sleep | LM | 4,500 | 4,000 | 8/25/2016 | 9/30/2026 | 79 | No | GOWE LEASING LIMITED | None | 3823 PEARL RD, MEDINA, OH, 44256, USA |
| 38 | Sandusky, OH (38) | SANDUSKY (#73) | Yes | Cleveland | Sleep | LM | 5,400 | 4,900 | 11/14/2014 | 2/28/2025 | 60 | No | PLI II LTD | None | 4917 MILAN RD PLAZA, SANDUSKY, OH, 44870, USA |
| 39 | Elyria, OH (39) | ELYRIA (#72) | Yes | Cleveland | Sleep | LM | 6,400 | 5,800 | 6/19/2015 | 6/30/2026 | 76 | No | ELYRIA-CHESTNUT, LLC / NICKLEPLATE REALTY | None | 510 CHESTNUT COMMONS DR, ELYRIA, OH, 44035, USA |
| 40 | Solon, OH (40) | SOLON (#67) | Yes | Cleveland | Sleep | LM | 3,788 | 3,288 | 2/22/2013 | 5/31/2023 | 39 | No | L & J PROPERTIES - SOLON, LLC | None | 6130 KRUSE DRIVE, SOLON, OH, 44139, USA |
| 41 | Canton, OH (41) | MASSILLON (#71) | Yes | Cleveland | Sleep | LM | 5,650 | 5,150 | 6/27/2014 | 11/30/2024 | 57 | No | PERRY TOWN CENTER LLC | None | 5119 WEST TUSCARAWAS ST, CANTON, OH, 44708, USA |
| 42 | Polaris, OH (42) | POLARIS AVF | Yes | Columbus | Flagship | AVF | 70,000 | 59,500 | 3/16/2019 | 10/31/2037 | 212 | Yes | STORE CAPITAL | Other | 1501 GEMINI PLACE, COLUMBUS, OH, 43240, USA |
| 43 | Novi, MI (43) | NOVI AVF | Yes | Detroit | Flagship | AVF | 102,520 | 88,958 | 1/1/1985 | 2/28/2037 | 204 | No | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 27775 NOVI RD, NOVI, MI, 48377, USA |
| 44 | Warren, MI (44) | TECH PLAZA AVF | Yes | Detroit | Flagship | AVF | 109,980 | 87,859 | 11/26/1982 | 2/28/2037 | 204 | Yes | LCN PARTNERS | LCN AVF WARREN (MI) LLC | 6500 E 14 MILE RD, WARREN, MI, 48092, USA |
| 45 | Shelby Township, MI (45) | LAKESIDE AVF | Yes | Detroit | Flagship | AVF | 68,104 | 72,236 | 8/14/1992 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 14055 HALL RD, SHELBY TWP, MI, 48315, USA |
| 46 | Canton, MI (46) | CANTON AVF | Yes | Detroit | Flagship | AVF | 69,929 | 58,740 | 1/3/2018 | 12/31/2038 | 226 | No | Agree Limited Partnership | None | 41661 FORD ROAD, CANTON, MI, 48187, USA |
| 47 | Taylor, MI (47) | TAYLOR AVF | Yes | Detroit | Flagship | AVF | 91,720 | 79,294 | 3/6/1978 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 22035 EUREKA RD, TAYLOR, MI, 48180, USA |
| 48 | Ann Arbor, MI (48) | ANN ARBOR AVF | Yes | Detroit | Flagship | AVF | 70,000 | 60,912 | 7/2/1993 | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 425 E EISENHOWER PKWY, ANN ARBOR, MI, 48108, USA |
| 49 | Southfield, MI (49) | SOUTHFIELD AVF | Yes | Detroit | Standard | AVF | 64,584 | 52,094 | 11/1/2000 | 7/31/2023 | 41 | No | GREENFIELD PLAZA, INC. | None | 22555 GREENFIELD RD, SOUTHFIELD, MI, 48075, USA |
| 50 | Royal Oak, MI (50) | WOODWARD AVF & SSI (#174) | Yes | Detroit | Standard | AVF | 56,520 | 54,943 | 11/14/1997 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 32301 WOODWARD AVE, ROYAL OAK, MI, 48073, USA |
| 51 | Clinton Twp, MI (51) | CLINTON AVF | Yes | Detroit | Flagship | AVF | 69,720 | 60,128 | 1/1/1988 | 2/28/2037 | 204 | No | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 33801 S GRATIOT AVE, CLINTON TWP, MI, 48035, USA |
| 52 | Chesterfield, MI (52) | CHESTERFIELD AVF | Yes | Detroit | Standard | AVF | 73,152 | 58,029 | 12/26/2003 | 2/28/2037 | 204 | No | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 50400 GRATIOT AVE, CHESTERFIELD, MI, 48051, USA |
| 53 | Howell, MI (53) | HOWELL AVF | Yes | Detroit | Standard | AVF | 51,075 | 45,721 | 11/1/1997 | 3/31/2037 | 205 | No | STORE CAPITAL | Store Master Funding XII, LLC | 4101 E GRAND RIVER AVE, HOWELL, MI, 48843, USA |
| 54 | Waterford, MI (54) | DRAYTON PLAINS AVF | Yes | Detroit | Standard | AVF | 53,188 | 57,435 | 6/30/1971 | 3/31/2037 | 205 | No | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 5053 DIXIE HWY, WATERFORD, MI, 48329, USA |
| 55 | Dearborn, MI (55) | DEARBORN AVF | Yes | Detroit | Standard | AVF | 57,633 | 58,164 | 1/1/1997 | 2/28/2037 | 204 | Yes | LCN CAPITAL PARTNERS, LLC | 15701 MARKET DR, DEARBORN, MI, 48126, USA |
| 56 | Auburn Hills, MI (56) | GREAT LAKES AVF | Yes | Detroit | Standard | AVF | 43,319 | 37,296 | 11/1/2011 | 1/31/2021 | 11 | No | Taubman Auburn Hills Associates Limited Partnership | None | 4612 BALDWIN RD, AUBURN HILLS, MI, 48326, USA |
| 57 | Port Huron, MI (57) | PORT HURON AVF | Yes | Detroit | Standard | AVF | 74,800 | 59,123 | 9/20/2002 | 3/31/2037 | 205 | No | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 1234 32ND ST, PORT HURON, MI, 48060, USA |
| 58 | Rochester Hills, MI (58) | ROCHESTER AVF | Yes | Detroit | Standard | AVF | 48,621 | 41,328 | 5/16/2019 | 11/30/2033 | 165 | No | Rochester KM Development, LLC | None | 1032 SOUTH ROCHESTER ROAD, ROCHESTER, MI, 48307, USA |
| 59 | Livonia, MI (59) | 7 MILE AVF | Yes | Detroit | Standard | AVF | 61,752 | 53,795 | 1/1/1985 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 29905 7 MILE RD, LIVONIA, MI, 48152, USA |
| 60 | Warren, MI (60) | SCHOENHERR AVF | Yes | Detroit | Standard | AVF | 38,795 | 41,890 | 11/9/1972 | 3/31/2037 | 205 | No | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 13856 E 14MILE RD, WARREN, MI, 48089, USA |
| 61 | Westland, MI (61) | WESTLAND AVF | Yes | Detroit | Standard | AVF | 79,773 | 70,723 | 4/14/1987 | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 8300 N WAYNE RD, WESTLAND, MI, 48185, USA |
| 62 | Ann Arbor, MI (62) | ANN ARBOR W PS | Yes | Detroit | Sleep | APS | 4,600 | 4,079 | 1/31/2011 | 1/31/2021 | 11 | No | Washtenaw 3000, LLC | None | 2570 JACKSON AVE, ANN ARBOR, MI, 48103, USA |
| 63 | Rochester, MI (63) | ROCHESTER PS | Yes | Detroit | Sleep | APS | 5,000 | 4,414 | 6/30/2017 | 7/31/2029 | 5 | No | McKnight South East, LP c/o McKnight Property Marie | None | 1856 S ROCHESTER ROAD, ROCHESTER, MI, 48307, USA |
| 64 | Grosse Pointe Woods, MI (64) | GROSSE POINTE SOUTH PS | Yes | Detroit | Sleep | APS | 3,500 | 2,982 | 5/16/2018 | 8/31/2028 | 53 | No | Ollie Adam Kandra | None | 19387 MACK AVE, GROSSE POINTE, MI, 48236, USA |
| 65 | Warren, MI (65) | WARREN E PS | Yes | Detroit | Sleep | APS | 5,072 | 4,507 | 5/16/2014 | 5/16/2020 | 3 | No | WARREN VILLAGE, LLC | None | 8200 EAST 14 MILE ROAD, WARREN, MI, 48093, USA |
| 66 | Sterling Hgts, MI (66) | STERLING HTS PS | Yes | Detroit | Sleep | APS | 6,014 | 5,672 | 2/9/2016 | 2/28/2026 | 73 | No | SRS BUSINESS HOLDINGS INC, LLC | None | 36821 VAN DYKE RD, STERLING HEIGHTS, MI, 48312, USA |
| 67 | Washington, MI (67) | WASHINGTON PS | Yes | Detroit | Sleep | APS | 4,000 | 3,425 | 5/16/2011 | 4/30/2021 | 14 | No | AF Jonna Development & Management Company | None | 7887 26 MILE ROAD, WASHINGTON, MI, 48094, USA |
| 68 | Southgate, MI (68) | SOUTHGATE PS | Yes | Detroit | Sleep | APS | 5,117 | 4,768 | 6/1/2018 | 1/16/2016 | 22 | No | VISTANA, LLC | None | 15060 DIX TOLEDO RD, SOUTHGATE, MI, 48195, USA |
| 69 | Canton, MI (69) | CANTON PS | Yes | Detroit | Sleep | APS | 6,600 | 4,280 | 5/1/2015 | 6/30/2025 | 52 | No | Ford Rd Property LLC | None | 44075 FORD RD, CANTON, MI, 48187, USA |
| 70 | Monroe, MI (70) | MONROE PS | Yes | Detroit | Sleep | APS | 4,000 | 3,593 | 5/1/2014 | 6/30/2026 | 73 | No | Frenchtown Square Partnership | None | 2121 N MONROE ST, MONROE, MI, 48162, USA |
| 71 | Troy, MI (71) | TROY N PS | Yes | Detroit | Sleep | APS | 4,500 | 4,070 | 5/1/2017 | 6/30/2027 | 17 | No | Troy Marketplace, LLC | None | 752 JOHN R ROAD, TROY, MI, 48083, USA |
| 72 | West Bloomfield, MI (72) | W BLOOMFIELD PS | Yes | Detroit | Sleep | APS | 4,000 | 3,653 | 11/1/2013 | 10/31/2023 | 44 | No | MAPLE ORCHARD ASSOCIATES, LLC | None | 6545 ORCHARD LAKE RD, WEST BLOOMFIELD, MI, 48322, US |
| 73 | Chesterfield, MI (73) | CHESTERFIELD PS | Yes | Detroit | Sleep | APS | 4,000 | 3,572 | 11/18/2016 | 11/30/2027 | 93 | No | Chesterfield Commons Associates, LLC | None | 50938 GRATIOT AVE, CHESTERFIELD, MI, 48051, USA |
| 74 | Woodhaven, MI (74) | WOODHAVEN PS | Yes | Detroit | Sleep | APS | 3,866 | 3,565 | 5/1/2016 | 6/30/2026 | 73 | No | THE ALLENWEST GROUP, LLC | None | 19410 WEST RD, WOODHAVEN, MI, 48183, USA |
| 75 | Brighton, MI (75) | BRIGHTON E PS | Yes | Detroit | Sleep | APS | 4,300 | 3,218 | 5/16/2011 | 5/16/2021 | 14 | No | BRIGHTON GATE COMMONS, LLC | None | 9990 E GRAND RIVER AVE, BRIGHTON, MI, 48116, USA |
| 76 | Bloomfield Twp, MI (76) | BLOOMFIELD PS | Yes | Detroit | Sleep | APS | 3,600 | 3,100 | 5/1/2016 | 6/30/2026 | 73 | No | BP 40 TELEGRAPH, LLC | None | 6450 TELEGRAPH ROAD, BLOOMFIELD TWP, MI, 48301, USA |
| 77 | New Hudson, MI (77) | NEW HUDSON PS | Yes | Detroit | Sleep | APS | 4,106 | 3,758 | 5/1/2012 | 10/31/2022 | 32 | No | Milford Road Retail Associates, LLC | None | 30821 MILFORD RD, NEW HUDSON, MI, 48165, USA |
| 78 | Lapeer, MI (78) | LAPEER PS | Yes | Detroit | Sleep | APS | 4,300 | 3,864 | 5/1/2016 | 6/30/2026 | 52 | No | JKL REAL ESTATE LLC | None | 806 S MAIN STREET, LAPEER, MI, 48446, USA |
| 79 | Royal Oak, MI (79) | ROYAL OAK PS | Yes | Detroit | Sleep | APS | 5,000 | 4,956 | 5/16/2012 | 5/16/2022 | 28 | No | 4400 North Woodward, LLC | None | 32500 WOODWARD AVE, ROYAL OAK, MI, 48073, USA |
| 80 | White Lake, MI (80) | WHITE LAKE PS | Yes | Detroit | Sleep | APS | 4,000 | 3,680 | 5/1/2016 | 6/30/2026 | 53 | No | Hometown Center Associates, LLC | None | 9851 HIGHLAND ROAD, WHITE LAKE, MI, 48386, USA |
| 81 | Troy, MI (81) | TROY S PS | Yes | Detroit | Sleep | APS | 4,500 | 3,454 | 5/16/2011 | 5/16/2021 | 14 | No | TCW Troy, LLC | None | 1856 W MAPLE RD, TROY, MI, 48084, USA |
| 82 | Waterford, MI (82) | WATERFORD PS | Yes | Detroit | Sleep | APS | 5,000 | 3,816 | 5/1/2016 | 6/30/2026 | 53 | No | Baker Summit, LLC | None | 4400 HIGHLAND ROAD, WATERFORD, MI, 48328, USA |
| 83 | Novi, MI (83) | NOVI PS | No | Detroit | Sleep | APS | 2,000 | 2,073 | 5/16/2011 | 5/16/2021 | n/a | No | RAMCO GERSHENSON, INC. | None | 43420 W OAKS DR, NOVI, MI, 48377, USA |
| 84 | Brighton, MI (84) | BRIGHTON W PS | Yes | Detroit | Sleep | APS | 4,288 | 3,784 | 5/16/2014 | 7/31/2020 | 20 | No | WARREN VILLAGE, LLC | None | 8900 W GRAND RIVER AVE, BRIGHTON, MI, 48116, USA |
| 85 | Ann Arbor, MI (85) | ANN ARBOR E PS | Yes | Detroit | Sleep | APS | 4,274 | 3,062 | 5/16/2011 | 5/16/2021 | 15 | No | WASHTENAW AT ARBOR, MI, LLC | None | 3550 WASHTENAW, ANN ARBOR, MI, 48104, USA |
| 86 | Lake Orion, MI (86) | LAKE ORION PS | Yes | Detroit | Sleep | APS | 4,375 | 4,122 | 4/1/2014 | 4/30/2024 | 49 | No | LAKE ORION PLAZA, LLC | None | 610 N. LAPEER RD, LAKE ORION, MI, 48362, USA |
| 87 | Ferndale, MI (87) | FERNDALE PS | Yes | Detroit | Sleep | APS | 6,553 | 5,587 | 4/1/2016 | 5/31/2026 | 76 | No | WOODWARD AVE, FERNDALE, MI, 48220, USA | None | 23100 WOODWARD AVE, FERNDALE, MI, 48220, USA |
| 88 | Utica, MI (88) | UTICA E PS | Yes | Detroit | Sleep | APS | 5,900 | 2,800 | 8/1/2015 | 1/31/2023 | 35 | No | SHELBY CORNERS, LLC | None | 45040 NORTHPOINTE BLVD, UTICA, MI, 48315, USA |
| 89 | Howell, MI (89) | HOWELL PS | Yes | Detroit | Sleep | APS | 8,400 | 5,540 | 5/16/2011 | 5/16/2021 | 14 | No | COUNTY CORNERS SHOPPING CENTER, L.L.C. | None | 4050 E GRAND RIVER AVE, HOWELL, MI, 48843, USA |
| 90 | Westland, MI (90) | WESTLAND PS | Yes | Detroit | Sleep | APS | 4,000 | 3,250 | 5/16/2011 | 5/16/2021 | 14 | No | 7671 NORTH WAYNE RD, WESTLAND, MI, 48185, USA | None | 7671 NORTH WAYNE RD, WESTLAND, MI, 48185, USA |
| 91 | Grosse Pointe, MI (91) | GROSSE POINTE SSI | Yes | Detroit | SSI | 5,500 | 5,206 | 9/26/2015 | 10/31/2025 | 56 | No | St. John Health | None | 17145 KERCHEVAL AVE, GROSSE POINTE, MI, 48230, USA |
| 92 | Plymouth, MI (92) | PLYMOUTH PS | Yes | Detroit | Sleep | APS | 4,125 | 3,650 | 9/24/2016 | 9/30/2026 | 79 | No | PLYMOUTH ROAD ASSOCIATES | None | 41512 ANN ARBOR RD, PLYMOUTH, MI, 48170, USA |
| 93 | Shelby Twp, MI (93) | SHELBY TWP PS | Yes | Detroit | Sleep | APS | 4,100 | 3,650 | 5/16/2015 | 5/16/2025 | 61 | No | 24 MILE ROAD ASSOCIATES | None | 13575 24 MILE RD, SHELBY TOWNSHIP, MI, 48315, USA |
| 94 | Roseville, MI (94) | ROSEVILLE PS | Yes | Detroit | Sleep | APS | 5,000 | 4,059 | 5/16/2011 | 5/16/2021 | 17 | No | ROSEVILLE CENTER COMPANY, LLC | None | 31851 GRATIOT AVE, ROSEVILLE, MI, 48066, USA |
| 95 | Taylor, MI (95) | TAYLOR PS | Yes | Detroit | Sleep | APS | 4,200 | 3,610 | 5/16/2011 | 5/16/2021 | 14 | No | TAYLOR MEADOWS ASSOCIATES | None | 23419 EUREKA RD, TAYLOR, MI, 48180, USA |
| 96 | Dearborn, MI (96) | DEARBORN PS | Yes | Detroit | Sleep | APS | 5,828 | 4,752 | 5/16/2011 | 5/16/2021 | 14 | No | FAIRLANE TOWN CENTER | None | 22301 MICHIGAN AVE, DEARBORN, MI, 48124, USA |
| 97 | Livonia, MI (97) | LIVONIA PS | Yes | Detroit | Sleep | APS | 3,818 | 3,612 | 3/1/2016 | 3/31/2026 | 73 | No | 29611 7 MILE ASSOCIATES | None | 29611 PLYMOUTH RD, LIVONIA, MI, 48150, USA |
| 98 | Southfield, MI (98) | SOUTHFIELD PS | Yes | Detroit | Sleep | APS | 3,350 | 3,090 | 5/16/2011 | 5/16/2021 | 17 | No | 29119 TELEGRAPH ASSOCIATES | None | 29100 TELEGRAPH RD, SOUTHFIELD, MI, 48034, USA |
| 99 | Bloomfield Hills, MI (99) | BLOOMFIELD PS | Yes | Detroit | Sleep | APS | 4,000 | 3,700 | 5/16/2016 | 5/16/2026 | 76 | No | 2091 S TELEGRAPH ROAD, BLOOMFIELD HILLS, MI, 48302 | None | 2091 S TELEGRAPH ROAD, BLOOMFIELD HILLS, MI, 48302 |
| 100 | Saginaw, MI (100) | SAGINAW AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 77,827 | 56,890 | 11/1/1997 | 3/31/2037 | 205 | No | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 2660 TITTABAWASSEE RD, SAGINAW, MI, 48604, USA |
| 101 | Flint, MI (101) | FLINT AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 64,690 | 51,467 | 6/26/2003 | 3/31/2037 | 205 | No | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 4577 MILLER RD, FLINT, MI, 48507, USA |
| 102 | Burton, MI (102) | BURTON AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 46,116 | 38,090 | 11/1/1997 | 3/31/2037 | 205 | No | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 4095 E COURT ST, BURTON, MI, 48509, USA |
| 103 | Bay City, MI (103) | BAY CITY AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 40,000 | 34,578 | 11/1/1997 | 3/31/2037 | 205 | No | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 4175 WILDER RD, BAY CITY, MI, 48706, USA |
| 104 | Grand Blanc, MI (104) | GRAND BLANC PS | Yes | Flint-Saginaw-Bay City | Sleep | APS | 4,000 | 3,634 | 5/16/2016 | 5/16/2026 | 76 | No | GRAND SAGINAW PLAZA, L.L.C. | None | 11501 SOUTH SAGINAW STREET, GRAND BLANC, MI, 48439 |
| 105 | Flint Twp, MI (105) | FLINT PS | Yes | Flint-Saginaw-Bay City | Sleep | APS | 4,000 | 3,600 | 4/1/2015 | 4/30/2025 | 52 | No | Grand Blanc/PM Associates | None | 4322 MILLER ROAD, FLINT, MI, 48507, USA |
| 106 | Saginaw, MI (106) | SAGINAW PS | Yes | Flint-Saginaw-Bay City | Sleep | APS | 4,500 | 4,368 | 5/16/2016 | 5/16/2026 | 76 | No | 4605 BAY RD #200, SAGINAW, MI, 48604, USA | None | 4605 BAY RD #200, SAGINAW, MI, 48604, USA |
| 107 | Fort Wayne, IN (107) | FORT WAYNE AVF | Yes | Fort Wayne | Standard | AVF | 55,000 | 47,368 | 8/15/2002 | 3/31/2037 | 205 | No | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 311 E COLISEUM BLVD, FORT WAYNE, IN, 46805, USA |
| 108 | Grand Rapids, MI (108) | GRAND RAPIDS AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 70,000 | 61,114 | 11/1/1997 | 10/31/2037 | 212 | Yes | LCN PARTNERS | LCN AVF GRAND RAPIDS (MI) LLC | 4375 28TH ST SE, GRAND RAPIDS, MI, 49512, USA |
| 109 | Portage, MI (109) | PORTAGE AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 60,000 | 50,824 | 11/1/1997 | 3/31/2037 | 205 | No | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 6075 S WESTNEDGE AVE, PORTAGE, MI, 49002, USA |
| 110 | Muskegon, MI (110) | MUSKEGON AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 39,700 | 33,500 | 11/1/1997 | 3/31/2037 | 205 | No | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 5057 HARVEY ST, MUSKEGON, MI, 49444, USA |
| 111 | Grandville, MI (111) | GRANDVILLE AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 55,000 | 46,100 | 11/1/1997 | 3/31/2037 | 205 | No | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 4625 WILSON AVE SW, GRANDVILLE, MI, 49418, USA |
| 112 | Battle Creek, MI (112) | BATTLE CREEK AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 50,220 | 43,411 | 11/1/1997 | 3/31/2037 | 205 | No | STONEBRIAR | SCF RC Funding III, LLC | 6100 B DR N, BATTLE CREEK, MI, 49014, USA |

| Store # | Store Name (Original) | Store Name (New) | Include In Liquidation | Marketing Area | Type | Type2 | Size1 | Size2 | Opening Date | Expiration Date | Months | Property | Master Lease | Address |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 113 | Comstock Park, MI (113) | ALPINE AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Flagship | AVF | 111,077 | 63,525 | 11/09/1999 | 2/28/2037 | 204 | Yes | LCN PARTNERS | LCN AVF WARREN (MI) LLC | 4273 ALPINE AVE NW STE B, COMSTOCK PARK, MI, 49321, USA |
| 114 | Holland, MI (114) | HOLLAND AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 39,950 | 38,443 | 8/18/1993 | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 12610 FELCH ST STE 100, HOLLAND, MI, 49424, USA |
| 115 | Muskegon, MI (115) | MUSKEGON PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,000 | 3,519 | 5/28/2016 | 10/31/2021 | 20 | No | SVH PROPERTIES, LLC | None | 1664 E STERNBERG RD, MUSKEGON, MI, 49444, USA |
| 116 | Portage, MI (116) | PORTAGE PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,018 | 3,632 | 5/24/2014 | 5/31/2024 | 51 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 6947 SOUTH WESTNEDGE AVE, PORTAGE, MI, 49002, USA |
| 117 | Grandville, MI (117) | GRANDVILLE PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,229 | 3,773 | 3/1/2015 | 5/31/2024 | 51 | No | CWD Grandville 1, LLC | None | 4560 IVANREST AVE SW, GRANDVILLE, MI, 49418, USA |
| 118 | Kalamazoo, MI (118) | KALAMAZOO PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 3,481 | 3,186 | 3/8/2013 | 3/31/2023 | 37 | No | Kalamazoo Mall LLC | None | 338 N DRAKE RD, KALAMAZOO, MI, 49009, USA |
| 119 | Grand Rapids, MI (119) | GRAND RAPIDS PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 5,562 | 4,903 | 10/15/2014 | 2/28/2037 | 204 | Yes | Broadstone | BROADSTONE AVF MICHIGAN, LLC | 3500 28TH ST SE, GRAND RAPIDS, MI, 49512, USA |
| 120 | Grand Rapids, MI (120) | GRAND RAPIDS N PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,000 | 3,687 | 9/12/2016 | 8/31/2026 | 78 | No | EAST BELTLINE DEVELOPMENT, LLC | None | 2036 EAST BELTLINE AVE, GRAND RAPIDS, MI, 49525, USA |
| 121 | Comstock Park, MI (121) | ALPINE N PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,300 | 3,797 | 5/16/2011 | 10/31/2022 | 32 | No | ALPINE VALLEY, L.L.C. | None | 4174 ALPINE AVE NW STE A, COMSTOCK PARK, MI, 49321, USA |
| 122 | Lancaster, PA (122) | LANCASTER (#46) | Yes | Harrisburg | Standard | WLF | 60,000 | 52,500 | 9/1/2002 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 2040 Bennett Avenue, Lancaster, PA, 17601, USA |
| 123 | York, PA (123) | YORK (#44) | Yes | Harrisburg | Standard | WLF | 60,000 | 52,500 | 1/1/2002 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | COLE AVF PORTFOLIO | 380 North Northern Way, York, PA, 17402, USA |
| 124 | Harrisburg, PA (124) | HARRISBURG (#42) | Yes | Harrisburg | Standard | WLF | 61,900 | 51,900 | 1/19/1999 | 11/30/2037 | 213 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 4661 Lindle Road, Harrisburg, PA, 17111, USA |
| 125 | Hanover, PA (125) | HANOVER (#50) | Yes | Harrisburg | Standard | WLF | 34,600 | 30,600 | 5/19/2008 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 371 Eisenhower Drive, Hanover, PA, 17331, USA |
| 126 | Mechanicsburg, PA (126) | MECHANICSBURG (#43) | Yes | Harrisburg | Standard | WLF | 45,567 | 42,567 | 8/22/2010 | 7/31/2020 | 5 | No | LESTER ASSOCIATES | None | 75 Gateway Drive, Mechanicsburg, PA, 17055, USA |
| 127 | Chambersburg, PA (127) | CHAMBERSBURG (#51) | Yes | Harrisburg | Standard | WLF | 27,262 | 25,762 | 1/1/2009 | 12/27/2038 | 226 | No | BRITM, LLC | None | 480 Gateway Avenue, Chambersburg, PA, 17201, USA |
| 128 | Altoona, PA (128) | ALTOONA (#28) | Yes | Johnstown | Standard | WLF | 53,136 | 43,176 | 1/1/1978 | 4/30/2038 | 218 | Yes | VEREIT REAL ESTATE LP | Vereit | 4 Sellers Drive/Altoona, Altoona, PA, 16601, USA |
| 129 | Johnstown, PA (129) | JOHNSTOWN (#32) | Yes | Johnstown | Standard | WLF | 40,258 | 37,258 | 9/1/1995 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 1130 Scalp Avenue, Johnstown, PA, 15904, USA |
| 130 | State College, PA (130) | STATE COLLEGE (#40) | Yes | Johnstown | Standard | WLF | 50,000 | 51,402 | 5/1/2007 | 11/21/2037 | 213 | No | PATTON CENTER ASSOCIATES LP | None | 138 Valley Vista Drive, State College, PA, 16803, USA |
| 131 | Lansing, MI (131) | LANSING AVF | Yes | Lansing | Flagship | AVF | 71,581 | 77,379 | 10/25/2000 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 8748 W SAGINAW HWY, LANSING, MI, 48917, USA |
| 132 | Jackson, MI (132) | JACKSON AVF | Yes | Lansing | Standard | AVF | 33,214 | 30,012 | 6/9/1992 | 7/31/2024 | 53 | No | ARGYLE ACRES MALL, LLC | None | 950 N WEST AVE, JACKSON, MI, 49202, USA |
| 133 | E Lansing, MI (133) | OKEMOS PS | Yes | Lansing | Sleep | APS | 5,855 | 4,457 | 5/16/2011 | 8/31/2023 | 42 | No | RICHARD AND MICHELLE BROWN | None | 2660 E. GRAND RIVER, EAST LANSING, MI, 48823, USA |
| 134 | East Lansing, MI (134) | EAST LANSING PS | Yes | Lansing | Sleep | APS | 3,974 | 3,495 | 7/16/2016 | 7/31/2021 | 17 | No | River Castle Development, LLC | None | 1595 LAKE LANSING ROAD, EAST LANSING, MI, 48823, USA |
| 135 | Lansing, MI (135) | LANSING PS | Yes | Lansing | Sleep | APS | 4,590 | 3,689 | 5/16/2011 | 12/31/2021 | 22 | No | John Doezema Real Estate | None | 6007 W SAGINAW HWY, LANSING, MI, 48917, USA |
| 136 | Wexford, PA (136) | WEXFORD (#4, 29, 30 CC) | Yes | Pittsburgh | Standard | LVF | 53,000 | 48,823 | 10/1/2009 | 2/28/2038 | 216 | No | STORE CAPITAL | Store Master Funding XII, LLC | 10688 PERRY HIGHWAY, WEXFORD, PA, 15090, USA |
| 137 | Monroeville, PA (137) | MONROEVILLE (#3 CC, 20, 21 CC) | Yes | Pittsburgh | Standard | LVF | 74,600 | 67,545 | 7/1/2004 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | COLE AV PORTFOLIO / LEVIN FAMILY P | 124 LEVIN WAY, MONROEVILLE, PA, 15146, USA |
| 138 | Mcmurray, PA (138) | SOUTH HILLS (#2, 32 CC) | Yes | Pittsburgh | Standard | LVF | 74,600 | 67,964 | 1/1/2007 | 11/30/2037 | 213 | No | STORE CAPITAL | Store Master Funding XII, LLC | 3664 WASHINGTON ROAD, MCMURRAY, PA, 15317, USA |
| 139 | Greensburg, PA (139) | GREENSBURG (#40, 41 CC) | Yes | Pittsburgh | Standard | LVF | 55,314 | 50,637 | 8/1/2011 | 10/31/2021 | 20 | No | CBLIWESTMORELAND, LP | None | 5280 ROUTE 30, GREENSBURG, PA, 15601, USA |
| 140 | Pittsburgh, PA (140) | THE POINTE (#15, 35 CC) | Yes | Pittsburgh | Standard | LVF | 68,730 | 61,886 | 7/1/1999 | 11/30/2037 | 213 | No | STORE CAPITAL | Store Master Funding XII, LLC | 400 CHALVEST DRIVE, PITTSBURGH, PA, 15275, USA |
| 141 | Pleasant Hills, PA (141) | CURRY HOLLOW (#47, 48 CC) | Yes | Pittsburgh | Standard | LVF | 90,500 | 87,500 | 7/1/1991 | 9/30/2026 | 79 | No | PAUL PROPERTY MANAGEMENT, LP | None | 292 CURRY HOLLOW RD, PLEASANT HILLS, PA, 15236, USA |
| 142 | Mount Pleasant, PA (142) | MOUNT PLEASANT (#1, 22 CC) | Yes | Pittsburgh | Standard | LVF | 34,500 | 30,766 | 1/1/1924 | 4/30/2038 | 218 | No | STORE CAPITAL | Store Master Funding XII, LLC | 600 MAIN STREET, MT. PLEASANT, PA, 15666, USA |
| 143 | Cranberry Township, PA (143) | CRANBERRY (#60) | Yes | Pittsburgh | Sleep | LM | 5,000 | 4,500 | 5/1/2012 | 4/30/2022 | 26 | No | WALNUT CAPITAL PARTNERS - CRANBERRY S | None | 20012 ROUTE 19, CRANBERRY, PA, 16066, USA |
| 144 | Mount Lebanon, PA (144) | MOUNT LEBANON (#36) | Yes | Pittsburgh | Sleep | LM | 3,990 | 3,490 | 6/28/2013 | 7/31/2023 | 41 | No | RELIANCE PITTSBURGH LLC | None | 1600 WASHINGTON RD, MT LEBANON, PA, 15228, USA |
| 145 | Butler, PA (145) | BUTLER (#75) | Yes | Pittsburgh | Sleep | LM | 5,010 | 5,010 | 11/18/2016 | 2/28/2027 | 84 | No | BUTLER SITEWORK ASSOCIATES LLC | None | 620 Butler Crossing Suite 5, BUTLER, PA, 16001, USA |
| 146 | Pittsburgh, PA (146) | SHADYSIDE (#70) | Yes | Pittsburgh | Sleep | LM | 7,145 | 6,645 | 10/10/2014 | 4/30/2024 | 50 | No | MCKNIGHT SOUTH EAST LP | None | 5438 BAUM BLVD, PITTSBURGH, PA, 15232, USA |
| 147 | Washington, PA (147) | WASHINGTON (#63) | Yes | Pittsburgh | Sleep | LM | 7,800 | 7,300 | 3/29/2013 | 4/30/2023 | 38 | No | WASHINGTON MALL - JCP ASSOCIATES, LTD | None | 56 TRINITY POINT DR, WASHINGTON, PA, 15301, USA |
| 148 | Pittsburgh, PA (148) | FOX CHAPEL (#61) | Yes | Pittsburgh | Sleep | LM | 4,000 | 3,500 | 5/1/2012 | 4/30/2022 | 26 | No | WATERWORKS PHASE II | None | 956 FREEPORT ROAD, PITTSBURGH, PA, 15238, USA |
| 149 | Pittsburgh, PA (149) | ROBINSON (#64) | Yes | Pittsburgh | Sleep | LM | 5,593 | 5,093 | 8/30/2013 | 12/31/2023 | 46 | No | MCROBIN LTC AND MOSITES FAMILY GST TRU | None | 6528 STEUBENVILLE PIKE, PITTSBURGH, PA, 15205, USA |
| 150 | Indiana, PA (150) | INDIANA (#33) | Yes | Pittsburgh | Sleep | LM | 4,800 | 4,300 | 6/7/2013 | 9/30/2023 | 43 | No | LIBBY REGENCY ASSOCIATES LP | None | 1570 OAKLAND AVE, INDIANA, PA, 15701, USA |
| 151 | Monroeville, PA (151) | MONROEVILLE (#62) | Yes | Pittsburgh | Sleep | LM | 4,319 | 4,000 | 6/1/2012 | 6/30/2022 | 28 | No | CE-MONROEVILLE 3820 WM PENN LP | None | 3820 WILLIAM PENN HIGHWAY, MONROEVILLE, PA, 15146, USA |
| 152 | St. Louis, MO (152) | AFFTON | Yes | St. Louis | Standard | AVF | 41,352 | 32,759 | 1/17/2018 | 12/31/2023 | 46 | No | South Lindbergh Property LLC | None | 5711 S LINDBERGH BLVD, SAINT LOUIS, MO, 63123, USA |
| 153 | O'fallon, IL (153) | FAIRVIEW | Yes | St. Louis | Standard | AVF | 39,676 | 32,627 | 1/17/2018 | 12/31/2023 | 46 | No | Rohman-O'Fallon LLC | None | 1776 WEST US 50, O FALLON, IL, 62269, USA |
| 154 | O'fallon, MO (154) | O FALLON | Yes | St. Louis | Standard | AVF | 40,884 | 31,674 | 1/16/2018 | 12/31/2023 | 46 | No | O'Fallon Missouri Properties, LLC | None | 2101 E TERRA LN, O FALLON, MO, 63366, USA |
| 155 | Bridgeton, MO (155) | BRIDGETON | Yes | St. Louis | Standard | AVF | 45,314 | 35,975 | 1/17/2018 | 12/31/2023 | 46 | No | JS Westfair, LLC | None | 925 NORTHWEST PLAZA, SAINT ANN, MO, 63074, USA |
| 156 | Richmond Heights, MO (156) | RICHMOND (DESIGN STUDIO) | Yes | St. Louis | Design | AVF | 3,670 | 3,343 | 11/15/2017 | 7/31/2024 | 53 | No | Hanley LM Properties, LLC | None | 1516 S HANLEY RD, SAINT LOUIS, MO, 63144, USA |
| 157 | Holland, OH (157) | TOLEDO AVF | Yes | Toledo | Flagship | AVF | 91,000 | 80,731 | 8/27/2013 | 8/31/2028 | 205 | Yes | STORE SPE AVF I 2017-1, LLC | | 1301 E MALL DR, HOLLAND, OH, 43528, USA |
| 158 | Toledo, OH (158) | TOLEDO PS | Yes | Toledo | Sleep | APS | 4,500 | 4,045 | 5/24/2013 | 11/30/2023 | 45 | No | REED HOLDING-TALMADGE, LLC | None | 4600 TALMADGE RD, TOLEDO, OH, 43623, USA |
| 159 | Holland, OH (159) | HOLLAND PS (TOLEDO) | Yes | Toledo | Sleep | APS | 3,485 | 3,135 | 7/13/2018 | 8/31/2028 | 102 | No | Kazi Properties BG, LLC | None | 6780 AIRPORT HWY SUITE B, HOLLAND, OH, 43528, USA |
| 160 | Perrysburg Township, OH (160) | PERRYSBURGH (FREEMONT) | Yes | Toledo | Sleep | APS | 3,500 | n/a | 2/8/2019 | 4/30/2029 | 110 | No | 10411 Fremont Pike, LLC | None | 10411 FREEMONT PIKE, PERRYSBURG, OH, 43551, USA |
| 161 | Traverse City, MI (161) | TRAVERSE CITY AVF | Yes | Traverse City-Cadillac | Standard | AVF | 63,120 | 49,903 | 11/21/1998 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 1775 OAK HOLLOW DR, TRAVERSE CITY, MI, 49686, USA |
| 162 | Petoskey, MI (162) | PETOSKEY AVF | Yes | Traverse City-Cadillac | Standard | AVF | 48,115 | 40,765 | 10/5/2002 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 1619 ANDERSON ROAD, PETOSKEY, MI, 49770, USA |
| 163 | Traverse City, MI (163) | TRAVERSE CITY PS | Yes | Traverse City-Cadillac | Sleep | APS | 4,509 | 4,104 | 8/30/2016 | 6/30/2026 | 76 | No | ANCHOR MANISTEE | None | 3675 N US 31 S SUITE B, TRAVERSE CITY, MI, 49684, USA |
| 164 | Frederick, MD (164) | FREDERICK (#7) | Yes | Washington DC | Standard | WLF | 60,000 | 52,500 | 7/1/2003 | 1/31/2024 | 47 | No | Frederick-BILCO, LLP | None | 1215 West Patrick Street, Frederick, MD, 21702, USA |
| 165 | Hagerstown, MD (165) | HAGERSTOWN (#9) | Yes | Washington DC | Standard | WLF | 66,829 | 60,000 | 2/1/2004 | 5/31/2029 | 111 | No | OUTLET VILLAGE OF HAGERSTOWN LP | None | 900 Premium Outlets Boulevard, Hagerstown, MD, 21740, USA |
| 166 | Leesburg, VA (166) | LEESBURG (#48) | Yes | Washington DC | Standard | WLF | 46,030 | 41,430 | 8/24/2012 | 11/30/2037 | 213 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 131 Fort Evans Road NE, Leesburg, VA, 20176, USA |
| 167 | Frederick, MD (167) | FREDERICK OUTLET (#52) | No | Washington DC | Standard | WLF | 40,484 | 30,484 | 9/17/2014 | 1/31/2020 | n/a | No | RAVID FREDERICK, LLC | None | 5830 Ballenger Creek Pike, Frederick, MD, 21703, USA |
| 168 | Saint Clairsville, OH (168) | SAINT CLAIRSVILLE (#50) | Yes | Wheeling | Standard | WLF | 24,908 | 21,000 | 9/29/2017 | 10/31/2022 | 32 | No | OHIO VALLEY MALL, CO | None | 67661 MALL RING RD, SAINT CLAIRSVILLE, OH, 43950, USA |
| 169 | Boardman, OH (169) | BOARDMAN (#52) | Yes | Youngstown | Standard | LVF | 52,000 | n/a | 8/21/2018 | 8/31/2028 | 102 | No | A&R Properties | None | 300 BOARDMAN POLAND ROAD, BOARDMAN, OH, 44512, USA |
| 170 | Hermitage, PA (170) | HERMITAGE (#52) | Yes | Youngstown | Standard | LVF | 42,000 | n/a | 9/22/2018 | 9/30/2023 | 43 | No | A&R Properties | None | 1340 N. Hermitage Road Suite 1 Route 18, Hermitage, PA, 16148, USA |
| 171 | Niles, OH (171) | NILES (#56) | Yes | Youngstown | Standard | LVF | 52,000 | n/a | 10/31/2018 | 10/31/2028 | 104 | No | A&R Properties | None | 836 YOUNGSTOWN-WARREN RD, NILES, OH, 44446, USA |
| **Totals** | | | | | | | **5,879,611** | **4,932,964** | | | | | | |

# EXHIBIT 3

## <u>CONSULTING AND MARKETING SERVICES AGREEMENT</u>

This Consulting and Marketing Services Agreement, dated as of March 4, 2020 (this "<u>Agreement</u>"), is made by and between **AVF HOLDING COMPANY, INC.**, and **AVF HOLDING COMPANY, INC.** d/b/a Art Van Furniture, Art Van Pure Sleep, Levin Furniture, Levin Mattress and Wolf Furniture (collectively, the "<u>Company</u>"), and a contractual joint venture comprised of **HILCO MERCHANT RESOURCES, LLC, HILCO IP SERVICES, LLC D/B/A HILCO STREAMBANK, HILCO REAL ESTATE, LLC, AND HILCO RECEIVABLES, LLC**, each a Delaware limited liability company (collectively, "<u>Hilco</u>"), and **GORDON BROTHERS RETAIL PARTNERS, LLC, DJM REALTY SERVICES, LLC D/B/A GORDON BROTHERS REAL ESTATE, GORDON BROTHERS COMMERCIAL & INDUSTRIAL, LLC AND GORDON BROTHERS BRANDS, LLC**, each, a Delaware limited liability company (collectively, "<u>GBG</u>", and together with Hilco, the "<u>Consultant</u>").

## <u>R E C I T A L S</u>:

WHEREAS, the Company is (i) the owner or lessee of certain real property identified on <u>Exhibit A</u> attached hereto (each a "<u>Property</u>", and collectively, the "<u>Properties</u>"), (ii) machinery, equipment, furniture, fixtures and other personal property located at, in, or in the vicinity of the Properties (the "<u>M&E</u>"), (iii) Merchandise (defined below) inventory located at, in, or the vicinity of the Properties, (iv) to the extent the Company exercise the Receivables Option (defined below), outstanding trade accounts receivable for which the Company has the exclusive right to collect, except for those accounts receivable that are currently the subject of litigation (the "<u>Receivables</u>") and (v) intangible assets, including, without limitation, trademarks, trade names, copyrights, domain names, software and source code, URLs, telephone numbers, customer data including customer names, addresses, email addresses, transaction history and other demographic data captured and maintained by the Company, vendor data, franchise agreements, "IP" addresses, and license agreements, logos and assorted artwork used in marketing materials and other contractual rights relating to the foregoing (collectively, the "<u>Intellectual Property</u>"; and collectively with the M&E, Inventory, Receivables (to the extent the Company exercises the Receivables Option), and Properties, the "<u>Assets</u>");

WHEREAS, the Company desires to retain Consultant to provide certain consulting, marketing and related asset disposition services to the Company with respect to the Assets, including where the context makes appropriate assisting the Company in the conduct of certain "Store Closing Sale", "Total Inventory Blowout", "Everything Must Go", "Everything On Sale" or similar themed liquidation sales (the "<u>Sale</u>") at the Company's retail store locations identified on <u>Exhibit A-1</u> attached hereto (each individually, a "<u>Store</u>", and collectively, the "<u>Stores</u>"); and (ii) provide assistance to the Company in fulfilling and delivering On-Hand Fulfillment Merchandise and Back-Order Fulfillment Merchandise on account of goods sold by the Company prior to the Sale Commencement Date (defined  below), in each case as more fully described herein; and

WHEREAS, Consultant is in the business of marketing, selling and otherwise realizing maximum value for assets similar to those comprising the Assets on behalf of its clients, and subject to the terms and conditions set forth herein, including, without limitation, authorization and approval of the Bankruptcy Court (defined below), is willing to serve as the Company's

exclusive agent and consultant to perform the services described herein upon the terms and conditions, and in the manner set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## AGREEMENT

1.     **Definitions**

For the purposes of this Agreement, the terms listed below shall have the respective meanings indicated:

"ABL Agent" means shall mean Wells Fargo Bank, National Association, as administrative agent and collateral agent for itself and the other ABL Lenders.

"ABL Lenders" means those lenders under that certain ABL Credit Agreement, dated as of  March 1, 2017 (as amended, restated, supplemented or otherwise modified from time to time and in effect on the date hereof), by and among, among others, the Company, such lenders and the ABL Agent.

 "Advertising Expenses"  means the costs and expenses incurred in connection with advertising the Sale, including, without limitation, direct media costs, agency fees and production costs) and Signage Costs.

"Approval Orders" shall mean collectively the Interim Order and Final Order.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

 "Cash Collateral Budget" means that certain debtor-in-possession and/or cash collateral Cash Collateral Budget to be approved under the Interim Cash Collateral Order.

"Central Services" shall mean those central administrative services provided by Company that are necessary or appropriate for the conduct and support of the Sale, including, but not limited to, use and/or access to Company's: (i) inventory control system, (ii) payroll system, (iii) accounting system, (iv) office facilities (including use of reasonably sized offices located at Company's central office facility to effect the Sale), (v) central administrative services and personnel to process and perform sales audit, banking, accounting, sale and expense reconciliation, and other normal course administrative services customarily provided to or for the benefit of operating the Stores, (vi) no fewer than one weekly email messages targeted to the customers of the Stores and Company's e-commerce site, which email messages will be designed by Consultant (and approved by Company) and sent by Company or Company's existing service provider and (vii) such other central office services reasonably necessary or appropriate for the Sale.

"Consultant Incurred Expenses" shall mean the aggregate amount of (i) Supervisor Costs; (ii) reasonable and documented travel expenses for members of Consultant's executive team in an

aggregate amount not to exceed $20,000; (iii) Consultant's reasonable and documented general legal fees incurred in connection with the negotiation of this Agreement in an aggregate amount not to exceed $35,000; provided, however, in addition to, and not as part of, such capped amount, Company shall also reimburse Consultant for its reasonable and documented legal fees and expenses incurred in connection with negotiating any "side letters" with landlords of the Stores; and (iv) Advertising Expenses, in each case in as defined herein and in accordance with the Sale Budget (as defined below).

"Final Order" shall mean a final order of the Bankruptcy Court granting final approval, inter alia, for the Company's (a) assumption of this Agreement, (b) retention of the Consultant to perform the consulting, marketing and sale-related services described herein, (c) conduct of the Sale, and (d) granting such other and further relief as is appropriate in order to effectuate the terms and provisions of this Agreement.

"Gross Sales" shall mean the sum of all proceeds derived from the sale of Merchandise during the Sale Term (excluding amounts paid for sales, excise, or gross receipts taxes); plus (i) all proceeds of fire, flood or other insurance covering the Merchandise, and (ii) the amount of any gift cards or merchandise credits redeemed at the Stores during the Sale Term; provided, however, that it is expressly understood and agreed, that Gross Sales shall not include sales made by or on behalf of Company prior to the Sale Commencement Date or after the Sale Termination Date, regardless of when the applicable Merchandise is delivered to or picked up by the customer(s).

"Interim Order" shall mean an order of the Bankruptcy Court granting interim approval, inter alia, for the Company's (a) assumption of this Agreement, (b) retention of the Consultant to perform the consulting, marketing and sale-related services described herein, (c) conduct of the Sale, and (d) granting such other and further relief as is appropriate in order to effectuate the terms and provisions of this Agreement.

"Leases" shall mean all leases, occupancy agreements, reciprocal easement, license, or similar agreements pursuant to which Company has the right to occupy or utilize the Stores.

"Lender Agents" mean collectively, the ABL Agent and the Term Loan Agent.

"Merchandise" shall mean all inventory that is owned by Company and actually sold in the Stores during the Sale Term, the aggregate amount of which shall be determined using the gross rings inventory taking method, which may include inventory that (i) is located at, or in transit to, the Store as of the Sale Commencement Date with respect to each such Store; and/or (ii) is located at the Company's distribution center in the United States during the Sale Term; provided, however, the Company and the Consultant agree that "Merchandise" shall expressly exclude: (1) goods which belong to sublessees, licensees or concessionaires of Company; (2) goods held by the Company on memo or consignment, unless otherwise agreed to by Company (in consultation with the Lender Agents) and Consultant; (3) M&E; and (4) Additional Agent Goods.

"Merchandise File" shall mean the "Store and DC Master Inventory Report Final 020320.xlsx" and "Levin Store & DC Master Inventory as of 2.3.20.xlslx" files together with all subsequent files specifically delivered by Merchant to Agent on or prior to the Sale Commencement Date to be used in connection with this Agreement.

3

"Sale Commencement Date" shall mean a date determined by the Company in consultation with the Consultant, but in no event later than March 6, 2020.

"Sale Expenses" shall mean all expenses incurred in connection with and attributable to the Sale.

"Sale Guidelines" shall mean the Sale Guidelines annexed hereto as Exhibit C which shall serve as the guidelines under which the Sale shall be conducted.

"Sale Term" shall mean the period of time beginning with the Sale Commencement Date and ending on the Sale Termination Date.

"Sale Termination Date" shall mean a date determined by the Consultant in consultation with the Company, but in no event later than May 31, 2020; provided, however, absent the prior consent of the Company, the Sale shall conclude in the Stores no later than April 30, 2020.

"Services" shall mean the services to be performed by Consultant pursuant to Section 2.2 of this Agreement.

"Signage Costs" shall mean all the interior and exterior signage used in connection with the Sale, including, without limitation, banners, A-frames, feather flags, and sign walkers, in each case to the extent approved by Consultant.

"Store Employees" shall mean those employees of the Company retained by Company to conduct the Sale following consultation with Consultant.

"Supervisor(s)" shall mean the individual(s) whom Consultant shall engage to provide Services in the Stores to Company in connection with the Sale in accordance with Section 2.3 below.

"Supervisor Costs" shall mean the following customary costs and expenses incurred by Consultant with respect to Supervisors in accordance with the Sale Budget,: (i) the weekly compensation paid during the Sale Term per Supervisor (which in each case represents Consultant's actual costs); (ii) reasonable and documented travel expenses of the Supervisors between Stores during the term of the Sale, and to and from the Sale locations at the commencement and conclusion of the Sale (and reasonable travel to and from the Supervisors' homes during the Sale Term as is typical and customary in the liquidation industry given the nature of the Merchandise, the length of the Sale, and the actual results of the Sale); and (iii) reasonable Supervisor deferred compensation.

"Term Loan Agent" shall mean Virtus Group, LP, as administrative agent and collateral agent for itself and the other Term Loan Lenders.

"Term Loan Lenders" means those lenders under that certain Credit Agreement, dated as of March 1, 2017 (as amended, restated, supplemented or otherwise modified from time to time and in effect on the date hereof), by and among, among others, the Company, such lenders and the Term Loan Agent.

**2.**     **Consulting Services**

2.1     Company hereby retains Consultant, and Consultant hereby agrees to serve as the exclusive independent consultant to the Company in connection with the conduct of the Sale as set forth herein.  With respect to the Sale, Consultant shall serve as the sole and exclusive consultant to the Company relative to the conduct of the Sale at the Stores, and the sale or other disposition of the other Assets, in each case throughout the Sale Term.

2.2     Conduct of the Sale; Merchandise Services.  On the terms and conditions set forth herein, commencing as of the Sale Commencement Date, the Consultant shall provide the Company with the following Services with respect to the sale or other disposition of the Merchandise as part of the Sale:

(a)     provision of approximately forty six (46) qualified Supervisors to supervise and assist Company in its conduct of the Sale as further described in Section 2.3 below, including such lead, regional, financial, and field Supervisors as needed (after consultation with Company and Lender Agents).  All Supervisors shall have industry-specific experience conducting "Store Closing", "Total Inventory Blowout", "Everything on Sale", "Everything Must Go" or similar themed liquidation sales, and shall act in a professional manner; provided, that from time to time during the Sale Term the Company and the Consultant shall meet and confer to evaluate the level and number of Supervisors being utilized in connection with the conduct of the Sale, and the Company and the Consultant (in consultation with the Lender Agents) shall jointly determine any reasonable adjustments thereto; provided, further, that, once identified, Supervisors cannot be removed from the project absent Company consent;

(b)     provide the Company with such oversight, supervision and guidance as may be appropriate or requested by the Company with respect to the conduct of the Sale and the liquidation and disposal of the Merchandise and M&E as may be required from time to time to maximize the recovery for such Assets;

(c)     recommend and implement appropriate point of purchase, point of sale and external advertising to effectively sell the Merchandise during the Sale Term, consistent with the theme of the Sale and the Sale Guidelines, it being understood that the Sale will be advertised as a "Total Inventory Blowout", "Store Closing", "Everything Must Go", "Everything on Sale" or similar sale themes throughout the term of the Sale; provided, that Consultant shall not utilize "Going Out of Business" sale theme absent (i) prior consultation with and approval by the Company and (ii) as may be set forth in the Approval Orders;

(d)     advise the Company as to appropriate discounting of Merchandise, appropriate staffing levels for the Stores, and appropriate deferred compensation and incentive programs for Store Employees;

(e)     advise the Company in creating the optimal display of Merchandise in the Stores in an effort to maximize the recovery for such Assets;

5

(f)     assist Company in the formulation and implementation of a loss prevention security program designed to protect the Merchandise from theft or other shortages;

(g)     assist Company with accounting functions for the Stores, including evaluation of sales of Merchandise by category, sales reporting and monitoring of expenses, in each case using the Company's infrastructure;

(h)     recommend and implement the transfer and balancing of Merchandise between and among the Stores to maximize results during the Sale;

(i)     participate in weekly calls with representatives of the Company and Lender Agents; and

(j)     provide such other related services deemed necessary or prudent by the Company (in consultation with the Lender Agents), and as may be mutually agreed by the Consultant and the Company under the circumstances giving rise to the Sale.

2.3     <u>M&E Services</u>.

(a)     On the terms and conditions set forth herein, commencing as of the Sale Commencement Date through the earlier of (i) the applicable Sale Termination Date for each of the Stores (or, with respect to any Distribution Center(s), the last day of available occupancy for each such center, as may be mutually agreed by the Company and the Consultant (in consultation with the Lender Agents)); (ii) April 30, 2020; or (iii) such other earlier or extended date as may be mutually agreed upon by the Company (in consultation with the Lender Agents) and the Consultant (as applicable the "<u>Asset Marketing Period</u>"), the Consultant shall provide the Company with the following Services with respect to the sale or other disposition of the M&E (the "<u>M&E Services</u>"):

(i)     Develop an advertising and marketing plan ("<u>M&E Marketing Plan</u>") for the sale or auction of, or other disposition strategy for, the M&E and in connection therewith; <u>provided</u>, that no later than March 13, 2020, the Company (in consultation with the Lender Agents) and the Consultant shall mutually agree upon a supplemental expense budget for the sale or other disposition of the M&E (the "<u>M&E Expense Budget</u>");

(ii)     Implement the M&E Marketing Plan as deemed necessary by Consultant to maximize the net recovery on the M&E;

(iii)     Prepare for the sale of the M&E, including gathering specifications and photographs for brochures;

(iv)     Make the M&E available for viewing by potential buyers on an appointment-only basis;

(v)     Sell or auction the M&E for cash to the highest bidder "as is," "where is," and in accordance with the terms of this Agreement; and

(vi)    Charge and collect on behalf of the Company from all purchasers any purchase price (inclusive of any Buyer's premium paid by the respective buyer(s)) together with all applicable taxes in connection therewith.

(b)    All proceeds collected by Consultant in connection with the M&E Services shall be either remitted directly to the Company to such account as designated by the Company (the "Company's Designated Deposit Account") by the buyer of the M&E, or, to the extent funds are remitted to the Consultant, they shall be remitted by Consultant to the Company as part of the weekly reconciliation provided for in Section 4.2 hereof, with such amounts to be deposited into the Company's Designated Deposit Account.

2.4    Real Estate Services.

(a)    On the terms and conditions set forth herein, during the applicable Asset Marketing Period, the Consultant shall provide the Company with the following Services with respect to the sale or other disposition of the Properties (the "Real Estate Services"):

(i)    Meet with the Company to ascertain the Company's goals, objectives and financial parameters with respect to the sale or other disposition of the Properties;

(ii)    Mutually agree with the Company with respect to a strategic plan for the disposition of each Property (the "Real Estate Strategic Plan");

(iii)    In accordance with the Real Estate Strategic Plan, and in lieu of assigning a Property lease to a third party, work with the Company to secure favorable termination agreements whereby a landlord pays the Company to terminate the lease associated with each such Property; and

(iv)    Solicit interested parties for the assumption/assignment of leases associated with each Property or, where applicable, the sale of each Property, and marketing each Property for assignment/sale in accordance with the Real Estate Strategic Plan.

(b)    In connection with the performance of Real Estate Services, the Consultant agrees that the Company shall not be responsible for the payment of any expenses incurred in connection with the execution of the Real Estate Strategic Plan, except to the extent pursuant to a budget ("Real Estate Services Budget"), which Real Estate Services Budget, if any, shall be subject in all respects to the consent and approval of the Company (in consultation with the Lender Agents) prior to any associated costs or expenses are incurred by the Company or the Consultant.

(c)    All proceeds collected by Consultant in connection with the Real Estate Strategic Plan shall be either remitted directly to Company's Designated Deposit Account by the buyer/assignee of the Company's interests in the Properties, or to the extent funds are remitted to the Consultant, they shall be remitted by Consultant to the Company as part of the weekly reconciliation as part of the weekly reconciliation provided for in Section 4.2 hereof, following Consultant's receipt of such amounts, with such amounts to be deposited into the Company's Designated Deposit Account.

2.5     Receivables Services.  (a)  From the date of execution of this Agreement to and including March 31, 2020, the Company shall retain the exclusive option, in its sole discretion (following consultation with the Lender Agents)(the "Receivables Election") to direct the Consultant to perform Receivables Services (defined below).  The Company shall exercise the Receivables Election, if at all, by delivery of a written notice to the Consultant on or before the above date indicating its direction to the Consultant to commence performance of Receivables Services.  Upon the Company's exercise of the Receivables Election, the Consultant shall thereafter perform Receivables Services on the terms and conditions set forth herein, through the later of (i) expiration of the Asset Marketing Period or (ii) such later date as the Company (in consultation with the Lender Agents) and the Consultant agree (the "Receivables Marketing Period")

(b)     the Services with respect to the collection or other disposition of the Receivables shall include the following (collectively, the "Receivables Services"):

(i)     In consultation with the Company, collect, service, settle, and otherwise resolve the Receivables on the Company's behalf and in otherwise compliance with applicable law;

(ii)     Direct the obligors on the Receivables to make payment to Consultant, as the agent for the Company and the Lender Agents;

(iii)     (a) Receive cash, drafts, checks, wire transfers, credit cards, and money orders on account or in satisfaction of the Receivables; and (b) endorse and negotiate any of the foregoing received by Consultant, as the agent for the Company; and

(iv)     If the Company requests, identify and oversee third party collection attorneys to collect those Receivables Consultant is otherwise unable to collect.

(c)     In connection with the performance of Receivables Services, the Consultant agrees that the Company shall not be responsible for payment of any expenses incurred in connection with the Consultant's performance of the Receivables Services, except to the extent pursuant to a budget ("Receivables Services Budget"), which Receivables Services Budget, if any, shall be subject in all respects to the consent and approval of the Company (in consultation with the Lender Agents) prior to any associated costs or expenses are incurred by the Company or the Consultant.

(d)     Any amounts collected by Consultant in connection with the collection of the Receivables, shall be remitted by the Consultant to the Company as part of the weekly reconciliation as part of the weekly reconciliation provided for in Section 4.2 hereof, following Consultant's receipt of such Proceeds, with such amounts to be deposited into the Company's Designated Deposit Account.

2.6     IP Services.

(a)     Through the later of (i) the expiration of the Asset Marketing Period; or (ii) such later date as the Company (in consultation with the Lender Agents) and the Consultant may

8

agree (the "IP Marketing Period"), the Consultant shall provide the Company with the following Services with respect to the collection or other disposition of the Company's Intellectual Property (the "IP Services"):

> (i)     Work with the Company's management and advisors to collect and secure all of the available information and data concerning the Intellectual Property;

> (ii)    In consultation with the Company, prepare marketing materials designed to advertise the availability of the Intellectual Property for sale, assignment, license, or other disposition;

> (iii)   In consultation with the Company, develop and execute a sales and marketing program designed to elicit proposals to acquire the Intellectual Property from qualified acquirers, with a view toward completing one or more sales, assignments, licenses, or other dispositions of the Intellectual Property; and

> (iv)    Assist the Company in connection with the transfer of the Intellectual Property to the acquirer(s) who offer the highest or otherwise best consideration for the Intellectual Property.

(b)     In connection with the performance of IP Services, the Consultant agrees that the Company shall not be responsible for payment of any expenses incurred in connection with the Consultant's performance of the IP Services, except to the extent pursuant to a budget ("IP Services Budget"), which IP Services Budget, if any, shall be subject in all respects to the consent and approval of the Company (in consultation with the Lender Agents) prior to any associated costs or expenses are incurred by the Company or the Consultant.

(c)     All proceeds collected by Consultant in connection with the IP Services shall be either remitted directly to Company's Designated Deposit Account by the buyer(s) of the IP Assets, or to the extent funds are remitted to the Consultant, they shall be remitted by Consultant to the Company as part of the weekly reconciliation as part of the weekly reconciliation provided for in Section 4.2 hereof, following Consultant's receipt of such amounts, with such amounts to be deposited into the Company's Designated Deposit Account

2.7    License.  (a)  Solely in connection with the performance of the Services as provided herein, the Company hereby grants Consultant a non-exclusive royalty free license ("Services License") to use, including, but not limited to, in all of its advertising and promotional activities related to this Agreement, all Intellectual Property, including, without limitation, the following Company tradenames: "Art Van Furniture", "Wolf Furniture", "Levin Furniture", and/or similar derivations thereof. The Services License shall extend through the later of (i) the expiration of the Asset Marketing Period, or (ii) such later date as the Company (in consultation with the Lender Agents) and the Consultant may agree (the "License Period").

(b)     The Company hereby grants Consultant a license to allow Consultant to enter and occupy the Properties.  Specifically, Consultant shall have the right to enter and  the Properties during the applicable Asset Marketing Period solely for the purposes of performing its obligations under this Agreement, including, without limitation, taking photographs and preparing the marketing material for the Assets, and selling and overseeing the removal of the removable

9

Assets, without interference from any labor unions or any other third parties. The Company shall use reasonable efforts to ensure that the Consultant shall have access to and quiet enjoyment of the Properties for the applicable Asset Marketing Period. Consultant shall not be obligated to pay any rent, taxes, utilities, or other occupancy-related charges arising from or related to its access to and occupancy of the Properties during the applicable Asset Marketing Period. Subject to and limited by the Cash Collateral Budget, the Company agrees to continue to provide and pay for all utilities and other usual and customary occupancy-related costs and expenses during the course of Consultant's occupancy of the Properties. The Company agrees to maintain and bear the cost of any existing security personnel and trash removal for the Properties during the term of this Agreement. The Company acknowledges that Consultant is not an insurer of the Assets. Consultant shall have the right to abandon at the Properties any movable Assets not sold.

       2.8   <u>Supervisory Personnel</u>. (a) In connection with the Sale, Consultant shall directly or indirectly retain and engage the Supervisors. The Supervisors are engaged by Consultant as independent contractors and are not and shall not be deemed to be employees or agents of Company in any manner whatsoever; nor do the Supervisors have any relationship with Company by virtue of this Agreement or otherwise which creates any liability or responsibility on behalf of Company for the Supervisors, except with respect to indemnification pursuant to <u>Section 7.7</u> hereof. During the Sale Term, the Supervisors shall perform Services during normal Store operating hours and for the period of time prior to the Stores' opening and subsequent to the Stores' closing, as required in connection with the Sale, in Consultant's discretion.

       (b)   In consideration of Consultant's engagement of the Supervisors, Company agrees to reimburse Consultant, as a Sale Expense, for the actual Supervisor Costs paid by Consultant for services rendered by the Supervisors during the Sale Term. Company shall reimburse Consultant for all Supervisor Costs weekly, based upon invoices or other documentation reasonably satisfactory to Company (in consultation with the Lender Agents). Company shall not be obligated to pay Supervisor Costs and/or Supervisor deferred compensation that have not been included in, or provided for, in the Sale Budget.

       2.4   <u>Title</u>. (a) Title to all Assets shall remain with Company at all times during the Sale Term until such Asset(s) is sold. Although Consultant shall undertake its obligations under this Agreement in a manner designed to achieve the desired results of the Sale and to maximize the benefits to Company from the sale or other disposition of the other Assets, the Company expressly acknowledges that Consultant is not guaranteeing the results of the Sale or ensuring the recoveries to be realized by the Company from the sale or other disposition of the Assets. All sales of Assets shall be made on behalf of Company. Consultant shall have no liability to the Company or any third party for its failure to sell any Asset(s), and shall have the right to abandon such unsold Asset(s) at the conclusion of the applicable Asset Marketing Period; <u>provided</u>, that any abandonment of any M&E in any Store(s) shall be done in a neat and orderly fashion.

       (b)   the Company further agrees that responsibility for the handling of any Merchandise or other goods held by Company and located in the Properties under any consignment, sale or return, or other similar agreement shall lie exclusively with Company, and Consultant shall have no responsibility with respect thereto.

       (c)   The Company and Consultant agree, and the Company hereby expressly

acknowledges, that Consultant shall not be responsible for the removal or disposition of any environmentally hazardous chemicals, solvents or substances found at or in the Assets, or obtaining or maintaining any Environmental Permits or other permits with respect thereto.  The Company shall be responsible for ensuring that the Company possesses and is in compliance with all Environmental Permits that are required for the operation of the Company's businesses.  As used in this Agreement, "Environmental Laws" means all federal, state and local statutes, regulations, ordinances, rules, regulations and policies, all court orders and decrees and arbitration awards, and the common law, which pertain to environmental matters or contamination of any type whatsoever; and "Environmental Permits" means licenses, permits, registrations, governmental approvals, agreements and consents which are required under or are issued pursuant to Environmental Laws.  In addition to any other indemnities provided herein, the Company hereby agrees to defend, indemnify and hold Consultant harmless from any and all claims, losses, damages and liabilities (including reasonable attorney's fees and costs) of any kind whatsoever which arise from or are in connection with any hazardous chemicals, solvents or substances found at or in the Assets or any violation of any such Environmental Laws or Environmental Permits.

**3.     Sale Expenses; Consultant's Compensation**

3.1     Sale Expenses.  (a)   The Company shall be responsible for all Sale Expenses (including without limitation, the Consultant Incurred Expenses), and Consultant shall not be responsible for any such expenses, including Consultant Incurred Expenses, except as expressly provided for in Section 11 below.  The Company, Consultant and Lender Agents have agreed on a *pro forma* budget relating to the Sale describing in reasonable detail the projected Sale Expenses to be incurred in connection with the sale of Merchandise through the Stores  (the "Sale Budget"), the form and content of which Sale Budget is annexed hereto and made a part hereof as Exhibit B.  The Sale Budget may only be modified by mutual agreement of the Company, the Consultant, and the Lender Agents.  Consultant Incurred Expenses shall not exceed the aggregate amount, per expense category, of Consultant Incurred Expenses set forth in the Sale Budget without the prior written consent of the Company and Lender Agents.  Subject to the limitations of the Sale Budget, the Company shall reimburse Consultant for any reasonable and documented Consultant Incurred Expense on a weekly basis in connection with the weekly Sale reconciliation provided for in Section 4 hereof upon presentation of invoices and statements for such expenses.

(b)     To the extent the Company, Consultant and Lender Agents agree on any separate M&E Budget, Real Estate Budget, Receivables Services Budget, and/or IP Services Budget, as the case may be, such supplemental budgets (each a "Supplemental Budget", and collectively the "Supplemental Budgets") shall be in addition to, and not in substitution of, the Sale Budget.

3.2     Consultant's Compensation.  In consideration of the Consultant providing the consulting, marketing and asset disposition-related Services provided for herein, the Consultant shall NOT earn any fee or other compensation from the Company, other than reimbursement of all Consultant Incurred Expenses and such other Sale Expenses as may be advanced by Consultant from time to time at the request of the Company, in the course of performing Services  hereunder, in each case limited to the amounts set forth in the Sale Budget and at the times provided herein.  The Company shall keep (i) a strict count of gross register receipts less applicable sales taxes, and (ii) cash reports of sales within each Store.  Register receipts shall show for each item sold the

retail price (as reflected on Company's books and records) for such item, and the markdown or other discount granted by Consultant in connection with such sale.  The Company shall make all such records and reports available to Consultant and the Lender Agents during regular business hours upon reasonable notice.

3.3     <u>Expenses Deposit</u>. The Interim Order and/or the Interim Cash Collateral Order (defined below) shall include approval on the part of the Company to fund, and the Company shall thereafter promptly fund, to Consultant $3,353,912 (the "<u>Expense Deposit</u>").  The Company shall be entitled to apply the Expense Deposit to, or otherwise offset any portion of the Expense Deposit against, any weekly reimbursement or other amount owing to Consultant under this Agreement prior to the Final Settlement; provided, however, at no time prior to the Final Settlement shall the Expense Deposit be reduced below $1,000,000. Without limiting any of Consultant's other rights, Consultant may apply the Expense Deposit to any unpaid obligation owing by Company to Consultant under this Agreement. Any portion of the Expense Deposit not used to pay amounts contemplated by this Agreement shall be returned to Company (or its designee) within three (3) business days following the Final Settlement.

## 4.     <u>Sale Proceeds; Weekly/Final Settlement</u>

4.1     During the Sale, the Company shall collect all proceeds realized from the sale of Merchandise and deposit the same in deposit accounts established by Company for the deposit thereof consistent with Company's existing cash management system (which may be Company's existing Store-level deposit accounts) (the "<u>Sale Accounts</u>").  In addition, if in connection with the sale of any M&E hereunder the Consultant assesses or receives any "buyer's premium" or similar sale price enhancement, the Company shall be entitled to receive any such amount, and the Consultant shall remit such amount to the Company in connection with the weekly reconciliation provided for hereunder and/or any Final Settlement (defined herein).  The Company shall, upon request, deliver to Consultant and Lender Agents account statements and such other information relating sale of the Assets (including the Gross Sales and the Sale Accounts) reasonably requested by Consultant or Lender Agents.

4.2     On Wednesday of each week, commencing on the first Wednesday following the Sale Commencement Date, the Company (in consultation with the Lender Agents) and the Consultant shall reconcile the results of the sales of Asset for the prior week, including, without limitation, Gross Sales, sales of Assets, Sale Expenses (including Consultant Incurred Expenses), and any other expenses that may be incurred in connection with the performance of Services that may be in conformity with any Supplemental Budget(s). The Company shall promptly pay or reimburse all amounts due to Consultant on account of Sale Expenses, including Consultant Incurred Expenses and other expenses incurred by Consultant for the previous week on account of which it is entitled to be reimbursed pursuant to the Sale Budget and/or any Supplemental Budget(s).

4.3     No later than fourteen (14) business days following the end of the Sale Term, the Company (in consultation with the Lender Agents) and the Consultant shall complete a final accounting and reconciliation of all amounts contemplated by this Agreement ("<u>Final Settlement</u>"), including, without limitation, the determination and payment/reimbursement of any Sale Expenses, including Consultant Incurred Expenses, and such other expenses reimbursable to

Consultant in connection with the performance of Services that may be in conformity with any Supplemental Budget(s), if any.

4.4     To the extent the Company fails to pay or reimburse the Consultant for any amount for which it is entitled to be reimbursed as and when due, the Consultant shall be entitled to set off Asset sale proceeds in its possession and/or the Expense Deposit as reimbursement for any such unreimbursed amounts as part of the weekly reconciliations under <u>Section 4.2</u> hereof and/or the Final Settlement under <u>Section 4.3</u> hereof.

## 5.     <u>Company Employees</u>

5.1     The Company and the Consultant shall cooperate to retain the employees of the Company (including the Store Employees) to be utilized to conduct the Sale at the Stores during the Sale Term, as such employees may be designated from time to time by Consultant, in its discretion.  Such employees shall remain employees of the Company, and Consultant shall have no liability to such employees (including, without limitation, all the Store Employees and any of Company's other current or former employees) of any kind or nature whatsoever, including, without limitation, with respect to severance pay, termination pay, vacation pay, pay in lieu of reasonable notice of termination, Worker Adjustment and Retraining Notification Act ("<u>WARN Act</u>") payments, or any other costs, expenses, obligations, or liabilities arising from the Company's employment  or termination of such employees prior to, during, and subsequent to the Sale Term. Other than advising Company that Consultant no longer desires to utilize the services of any employee in connection with the sale or other disposition of the Assets, including as part of the Sale, Consultant shall not have the right to change the terms of employment of any employee(s).

## 6.     <u>Fulfillment of Pre-Sale Customer Orders</u>

6.1     In addition to providing the forgoing Services, the Consultant shall use commercially reasonable efforts to assist the Company in fulfilling certain pre-Sale Commencement Date orders for which the Company has received customer deposits (collectively, the "<u>Pre-SCD Orders</u>").

(a)     <u>On-Hand Fulfillment Orders</u>. Consultant shall assist the Company in fulfilling certain Pre-SCD Orders having an aggregate retail value of approximately $22 Million (collectively, the "<u>On-Hand Fulfillment Orders</u>"), on account of which orders (i) the Company has received customer deposits in the aggregate amount of $18 Million (collectively, the "<u>On-Hand Customer Deposits</u>") and (ii) with respect to which all of the goods necessary to fulfill such orders are on-hand either at the Company's Distribution Centers or the Stores (collectively, the "<u>On-Hand Fulfillment Merchandise</u>").  As soon as reasonably practicable after the Sale Commencement Date, the Consultant shall assist the Company in earmarking the On-Hand Fulfillment Merchandise (and, to the extent necessary segregated by the Company) in order to fulfill and complete the On-Hand Fulfillment Orders.  Consultant shall advise the Company in the development of efficient methods aimed at fulfilling the On-Hand Fulfillment Orders, and the Company and the Consultant shall use commercially reasonable efforts to deliver the On-Hand Fulfillment Merchandise as promptly as practicable, giving due consideration to the Company's existing distribution/fulfillment capabilities. Any usual and customary costs and expenses incurred in connection with the fulfillment of any On-Hand Fulfillment Orders, including, but not limited to, labor, sales

commissions and delivery (collectively, the "<u>On-Hand Fulfillment Processing Expenses</u>"), shall be borne exclusively by the Company, and the Consultant shall not be responsible for any such costs or expenses.  Any funds received from customers on account of the On-Hand Fulfillment Orders, whether received prior to or after the Sale Commencement Date (including, without limitation, any On-Hand Customer Deposits), shall be retained by and/or remitted to the Company.  To the extent any such funds are received from the customer in connection with the delivery of such On-Hand Fulfillment Goods, those funds shall be delivered by the Consultant to the Company on a weekly basis as part of the weekly reconciliation contemplated by <u>Section 4.2</u> hereunder.  Subject to <u>Section 7.5</u> hereof, the On-Hand Fulfillment Merchandise shall be excluded from the definition of Merchandise hereunder; <u>provided</u>, that any proceeds realized by the Company upon fulfillment and completion of an On-Hand Fulfillment Order(s) in excess of the applicable On-Hand Customer Deposit shall constitute Gross Proceeds hereunder.

(b)     <u>Back-Order Fulfillment Orders</u>.  Following the Sale Commencement Date, Consultant shall also assist the Company in evaluating the status certain Pre-SCD Orders (collectively, the "<u>Back-Order Fulfillment Orders</u>"), on account of which orders (i) the Company has received customer deposits (collectively, the "<u>Back-Order Customer Deposits</u>") and (ii) with respect to which the goods necessary to fulfill such orders are <u>not</u> on-hand either at the Company's Distribution Centers or the Stores (collectively, the "<u>Back-Order Fulfillment Merchandise</u>").  To the extent that a Back-Order Fulfillment Order(s) can be filled by the Company within a reasonable time after the Sale Commencement Date, the Company and the Consultant shall work together to implement a protocol for fulfillment of such order(s).  To the extent that the Company is unable to fulfill a Back-Order Fulfillment, such Back-Order Fulfillment Order shall be cancelled by the Company, and the Company and the Consultant shall offer the affected customer the option of either (i) a merchandise credit in the amount of such customer's respective Back-Order Customer Deposit (the "<u>Cancelled Back-Order Merchandise Credit</u>"), which Cancelled Back-Order Merchandise Credit must be used by the affected customer no later than April 15, 2020; or (ii) filing a claim in the Company's bankruptcy case for the full amount of such customer's Back-Order Customer Deposit.

(c)     If a customer cancels a Pre-SCD Order, or refuses to accept completion/delivery of either On-Hand Fulfillment Merchandise or a Back-Order Fulfillment Order (where the goods become available), the subject the On-Hand Fulfillment Merchandise, Back-Order Fulfillment Merchandise, as the case may be, attributable to such cancelled Pre-SCD Orders, shall thereupon constitute Merchandise and be included in the Sale, and the affected customer can file a claim in the bankruptcy case for the full amount of such customer's deposit.

(d)     During the Sale Term, the Company shall provide, and continue to provide through the Sale Term, Consultant with all reports reasonably requested by Consultant with respect to the status of all Pre-SCD Orders.

**7.     <u>Affirmative Duties Of Company</u>**

7.1     The Company shall be solely liable for, and shall pay when due (except as provided in this <u>Section 7.1</u>) the following: (i) all Store-level operating expenses, all Sale Expenses (including, but not limited to, Consultant Incurred Expenses), Central Service expenses, any expenses provided for in any Supplemental Budget(s), and all other Sale-related expenses that are

necessary to conduct, or are incurred in the conduct of, the Sale or Company's businesses, including, without limitation, all taxes, costs, expenses, accounts payable and other liabilities relating to the Sale, the Properties, Store Employees, any other agents and representatives of Company, and/or Company's businesses.  For the avoidance of doubt, unless otherwise agreed to by Company and Lender Agents in writing, the Company shall not be responsible for, and shall have no obligation to pay or reimburse, any Consultant Incurred Expenses or other expenses in excess of the amounts set forth in the Sale Budget or any Supplemental Budget(s).

7.2     The Company shall collect all sales, excise, or gross receipts taxes. The Company shall be solely responsible for preparing and processing of all reporting forms, certificates, reports and other documentation required in connection with the payment of all applicable taxes (including, but not limited to, sales taxes collected as part of the Sale) to the appropriate taxing authorities; and Company shall pay all collected sales taxes when due in accordance with applicable law.  The Consultant shall provide all assistance reasonably required or requested by the Company in connection with the preparation and processing of any such reporting forms, certificates, reports and other documentation required in connection with the payment of all applicable taxes (including, but not limited to, sales taxes collected as part of the Sale) to the appropriate taxing authorities.

7.3     Without limiting any other term or provision of this Agreement, during the Sale Term, Company shall provide Consultant, with (i) Central Services; (ii) employees at the Stores necessary or appropriate to implement and conduct the Sale, and (iii) subject to lease expirations, peaceful use and occupancy of, and reasonable access (including reasonable before and after hours access and normal utilities/phone service) to, the Stores and Company's corporate offices and Distribution Centers for the purpose of preparing for, conducting, and completing the Sale as contemplated hereby; provided, however, any incremental cost or expense to the Company in connection with the foregoing that is solely attributable to the Additional Consultant Goods shall reimbursed to the Company by the Consultant.  In furtherance of the foregoing, the Company shall use reasonable efforts to (i) cause the Company's employees, including Store Employees, to cooperate with Consultant and the Supervisors; (ii) execute all agreements determined by the Company and Consultant to be necessary or desirable for the operation of the Stores during the Sale; and (iii) arrange for the ordinary maintenance of all point-of-sale equipment required for the Stores.

7.4     During the period between the Sale Commencement Date and April 15, 2020, the Company and the Consultant agree that gift cards and merchandise credits, including any Cancelled Back-Order Merchandise Credit shall be honored at the Stores in accordance with store-level operation procedures to be mutually agreed upon between the Company, the Consultant, and the Lender Agents. The Company and Consultant further agree that no gift cards shall be sold from the Stores during the Sale Term.

7.5     During the first seven (7) days following the Sale Commencement Date, the Company agrees that returns of inventory sold prior to the Sale Commencement Date and either delivered to customers prior to or after the Sale Commencement Date ("Returned Merchandise") shall be accepted in a manner consistent with Company's customary practices and policies in effect on the Sale Commencement Date; provided however, no pricing adjustments, or returns of inventory sold prior to the Sale Commencement Date followed by the Customer's attempt to

15

repurchase the item (or item of the same sku) at the discounted price shall be accepted or honored during the Sale Term.  All customer requests for cash refunds or merchandise credits in respect of any Returned Merchandise shall be processed exclusively through Company's point-of-sale system. All Returned Merchandise, to the extent it is not defective, shall be included as Merchandise.  No returns of inventory sold prior to the Sale Commencement Date shall be accepted or allowed following the seventh (7th) day following the Sale Commencement Date.

7.6    The Company agrees to procure and maintain, during the Sale Term, all insurance (including, without limitation, commercial general liability, property damage, fire and other perils insurance) currently in effect and in the same amounts, levels, deductibles, and coverages in respect of all Assets until sold.

7.7    The Company shall indemnify and hold the Consultant and its affiliates, and their respective officers, directors, employees, agents and independent contractors (collectively, "Consultant Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to:

(a)    Company's material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;

(b)    any failure of Company to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term;

(c)    any consumer warranty or products liability claims relating to any Merchandise;

(d)    any liability or other claims asserted by customers, any of Company's employees, or any other person against any Consultant Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the "WARN Act"); except where due to the negligence or willful misconduct of Consultant or from a breach of the terms hereof by Consultant;

(e)    any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees, agents, or representatives of Consultant (including, without limitation, any Supervisors) by Company or any of Company's employees, agents, or representatives (including, without limitation, any Company employees); and

(f)    the negligence or willful misconduct of Company or any of its officers, directors, employees, agents or representatives.

## 8.    Affirmative Duties Of Consultant

8.1    To the extent necessary, and except as provided in the Approval Orders, Consultant shall assist the Company in obtaining all required permits and governmental consents required in

order to conduct the Sale, and shall ensure that the Sale is conducted in accordance with all applicable laws, regulations and ordinances.

8.2     The Consultant shall indemnify and hold Company and its affiliates, and their respective officers, directors, employees, agents, lenders and independent contractors (collectively, "Company Indemnified Parties"), harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to:

> (a)     Consultant's material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;

> (b)     any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Company (including, without limitation, any Store Employees) by Consultant or any of Consultant's representatives (including, without limitation, any Supervisor);

> (c)     any claims by any party engaged by Consultant as an employee or independent contractor (including, without limitation, any Supervisor) arising out of such employment or engagement; except where due to the negligence or willful misconduct of Company or Company Indemnified Parties or from a breach of the terms hereof by Company; and

> (d)     the negligence or willful misconduct of Consultant or any of its officers, directors, employees, agents or representatives, or any Supervisor.

## 9.     **Additional Consultant Goods**

9.1     In connection with the Sale, and subject to compliance with applicable law (or if and when applicable, the Approval Orders), Consultant shall have the right, at Consultant's sole cost and expense, to supplement the Merchandise in the Sale with additional goods procured by Consultant which are of like kind, and no lesser quality to the Merchandise ("Additional Consultant Goods"). The Additional Consultant Goods shall be purchased by Consultant as part of the Sale, and delivered to the Stores (or direct shipped to customers) at Consultant's sole cost and expense (including, without limitation, all acquisition costs, sales commissions, credit card processing fees, labor, freight and insurance relative to shipping and/or delivery of such Additional Consultant Goods).  Sales of Additional Consultant Goods shall be run through Company's point-of-sale systems; provided, however, that Consultant shall mark the Additional Consultant Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise.  Consultant and Company shall also cooperate so as to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods as non-Company goods.  Additionally, Consultant shall provide signage in the Stores notifying customers that the Additional Consultant Goods have been included in the Sale. Absent the Company's written

consent and subject to Consultant's agreement to reimburse Company for any associated expenses, Consultant shall not use Company's distribution centers for any Additional Consultant Goods.

9.2     Consultant shall pay to the Company an amount equal to seven and one-half percent (7.5%) of the aggregate Gross Proceeds, net only of sales taxes collected in respect thereof, realized by Consultant from the sale of Additional Consultant Goods (the "Additional Consultant Goods Fee"). Consultant shall pay the Company any earned and accrued Additional Consultant Goods Fee on a weekly basis as part of each weekly sale reconciliation.  Except for sales taxes associated with the sale of Additional Consultant Goods and Company's Additional Consultant Goods Fee, all proceeds from the sale of Additional Consultant Goods shall be for the sole and exclusive account of Consultant, and shall be remitted to Consultant in connection with each weekly sale reconciliation.  Consultant shall be responsible for collecting and remitting sales taxes to the applicable taxing authorities on account of sales of Additional Consultant Goods.

9.3     The Consultant, the Company, and the Lender Agents intend that the transactions relating to the Additional Consultant Goods are, and shall be construed as, a true consignment from Consultant to Company in all respects and not a consignment for security purposes.  Subject solely to Consultant's obligations to pay to Company the Additional Consultant Goods Fee, at all times and for all purposes the Additional Consultant Goods and their proceeds shall be the exclusive property of Consultant, and no other person or entity, including, without limitation, the Lenders and Lender Agents, shall have any claim against any of the Additional Consultant Goods or their proceeds. The Additional Consultant Goods shall at all times remain subject to the exclusive control of Consultant.  In furtherance of the foregoing, the Company acknowledges that the Additional Consultant Goods shall be consigned to Company as a true consignment under Article 9 of the Uniform Commercial Code (the "UCC").  The Consultant is hereby granted a first priority security interest in and lien upon (i) the Additional Consultant Goods and (ii) the Additional Consultant Goods proceeds (less any Additional Consultant Goods Fee), and Consultant is hereby authorized to file UCC financing statements and provide notifications to any prior secured parties, including, but not limited to, the Lender Agents.

9.4     The Company shall, at Consultant's sole cost and expense, insure the Additional Consultant Goods and, if required, promptly file any proofs of loss with regard to same with Company's insurers.  Consultant shall be responsible for payment of any deductible (but only in relation to the Additional Consultant Goods) under any such insurance in the event of any casualty affecting the Additional Consultant Goods.

18

## 10.   **Representation and Warranties**

10.1   Representations and Warranties of the Consultant.   Each entity comprising Consultant hereby represents, warrants and covenants in favor of Company as follows:

(a)   Consultant has taken all necessary action required to authorize the execution, performance and delivery of this Agreement, and to consummate the transactions contemplated hereby.

(b)   Upon execution by the parties hereto, this Agreement is a valid and binding obligation of Consultant enforceable in accordance with its terms, subject to the entry of the Approval Orders as and to the extent required to the effectiveness hereof.

(c)   No action or proceeding has been instituted or, to Consultant's knowledge, threatened, affecting the Consultant's ability to consummate this Agreement or the transactions contemplated herein.

(d)   Except as provided in the Approval Orders and the Sale Guidelines, Consultant will comply with and act in accordance with any and all applicable state and local laws, rules and regulations and other legal obligations of all governmental authorities and the terms/restrictions of the underlying Stores' leases.

10.2   Representations and Warranties of the Company: the Company hereby represents, warrants and covenants in favor of Consultant as follows:

(a)   Subject to the entry of the Approval Orders as and to the extent required to the effectiveness hereof, the Company has taken all necessary action required to authorize its execution, performance and delivery of this Agreement, and to consummate the transactions contemplated hereby.

(b)   Subject to the entry of the Approval Orders as and to the extent required to the effectiveness hereof, upon execution by the Company, this Agreement is a valid and binding obligation of the Company enforceable in accordance with its terms, subject only to any applicable bankruptcy, insolvency or similar laws affecting the rights of creditors generally and the availability of equitable remedies.

(c)   Except as may be affected by the Company's commencement of the Bankruptcy Case, no court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for the Company's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor.

(d)   The Company has all requisite authority to grant the License to Consultant to utilize the Properties and the Intellectual Property, including, without limitation, the tradenames "Art Van Furniture", "Wolf Furniture", "Levin Furniture",  and similar derivations thereof as provided for under this Agreement.

19

(e)    The Company has maintained its pricing files in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files for the periods indicated therein, and all pricing files, records, and information received by Consultant are true and accurate in all material respects.

(f)    Except for the liens of the ABL Lenders and Term Loan Lenders, all Assets are, or will be as of the Sale Commencement Date free and clear of all liens, claims and encumbrances of any kind whatsoever.

**11.    Bankruptcy Matters**.  If the Company commences a case under Chapter 11 of title 11, United States Code (the "Bankruptcy Code"), in the Bankruptcy Court, the Company shall promptly file an expedited motion (a) seeking authorization to conduct the Sale and sell or otherwise dispose of the Assets, and (b) to assume this Agreement under section 365 of the Bankruptcy Code, and utilize its reasonable best efforts to ensure that such motion is approved by the Interim Order, and thereafter the Final Order (together with the Interim Order, the "Approval Orders").  The Approval Orders shall be reasonably acceptable in form and substance to the Consultant, the Company and the Lender Agents, and provide for, among other things, the following:

(a)    approval of the transactions contemplated by this Agreement, including, without limitation, the company's conduct of the Sale and the sale of the other Assets;

(b)    approving the Company's retention and employment of Consultant to perform the Services contemplated by this Agreement;

(c)    approving the Sale Guidelines;

(d)    authorizing the Company's reimbursement to Consultant of all Sale Expenses advanced by the Consultant, including Consultant Incurred Expenses, together with any additional expenses incurred pursuant to any Supplemental Budget(s), such reimbursements to be made on a weekly basis and otherwise in accordance with this Agreement, from the Expense Deposit, and thereafter from gross receipts from the sale or other disposition of the Assets (or retained by the Consultant from such receipts) without further order of the Bankruptcy Court and otherwise in accordance with this Agreement, in each case without further order of the Bankruptcy Court, and any such payment(s)/reimbursement(s) shall be free and clear of all liens, claims and encumbrances;

(e)    providing that the authority granted herein for the reimbursement of Sale Expenses, including Consultant Incurred Expenses, and any other expenses incurred or advanced by Consultant pursuant to any Supplemental Budget(s), shall be subject to the provisions of (i) that certain proposed Interim Order authorizing the Company Use of Cash Collateral" (the "Interim Cash Collateral Order") to be filed and entered in the Bankruptcy Case, and shall be made strictly in accordance with the Cash Collateral Budget (as defined in the Interim Cash Collateral Order), subject to such variances as permitted by the Cash Collateral Order; provided, however, that neither the Interim Cash Collateral Order shall not require or impose a cap or reduction on amounts due to the Consultant under this

Agreement, other than any such cap or reduction resulting from the Company's required compliance with the Cash Collateral Budget;

(f)     not later than two (2) business days after entry of the Interim Order the Company shall deliver to the Consultant the Expense Deposit as set forth in the Sale Budget as security for payment or reimbursement to Consultant of Sale Expenses incurred by Consultant on account of which it is entitled to be reimbursed;

(e)     any remaining balance of Expense Deposit being held by Consultant upon completion of the Final Settlement shall (i) be applied by Consultant as shall be set forth in the Final Settlement, and (ii) be subject to all provisions relating to Cash Collateral set forth in the Interim Cash Collateral Order;

(f)     authorizing the Company's conduct of the Sale without the necessity of complying with state and local rules, laws, ordinances and regulations, including, without limitation, permitting and licensing requirements, that could otherwise govern the Sale;

(g)     authorizing the Company's conduct of the Sale notwithstanding restrictions in leases, reciprocal easement agreements or other contracts that purport to restrict the Sale or the necessity of obtaining any third party consents;

(h)     approving the sale of Additional Consultant Goods in accordance with the terms and conditions hereof; and

(i)     authorizing the Consultant and the Company to take all further actions as are necessary or appropriate to carry out the terms and conditions of this Agreement.

Upon the commencement of the Bankruptcy Case, any legal action, suit or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Bankruptcy Court having jurisdiction over the Company's Bankruptcy Case, and each Party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum *non conveniens*. From and after entry of the Approval Orders, Consultant shall conduct the Sale in accordance with the terms of the Approval Orders in all material respects.

## 12.   <u>Insurance; Risk of Loss</u>

12.1    Company shall maintain throughout the Sale Term, (i) insurance with respect to the Assets in amounts and on such terms and conditions as are consistent with the Company's ordinary course operations and (ii) casualty and liability insurance policies (including, but not limited to, product liability, comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the operation of the Stores, and shall cause Consultant to be listed as an additional insured with respect to all such policies, and as loss payee for the property insurance. Company shall be responsible for the payment of all deductibles, self-insurance and other amounts payable in connection with any claim asserted under such policies, except for any claims arising directly from the negligence or willful misconduct of Consultant, or its employees, representatives, agents or Supervisors.

12.2     Consultant shall maintain, throughout the Sale Term, liability insurance policies (including, but not limited to, comprehensive general liability and auto liability insurance) covering injuries to persons and property in or in connection with Consultant's provision of Services at the Stores, and shall cause Company to be named an additional insured with respect to such policies.

12.3     Notwithstanding any other provision of this Agreement, the Company and the Consultant agree that Company shall bear all responsibility for liability claims (product liability and otherwise) of customers, employees and other persons arising from events occurring at the Stores before, during and after the Sale Term, except to the extent any such claim arises from the negligence, willful misconduct, or unlawful acts of the Consultant or any Supervisor engaged by Consultant under the terms of this Agreement.

## 13.     **Miscellaneous**

13.1     Any notice or other communication under this Agreement shall be in writing and may be delivered personally or sent by facsimile or by prepaid registered or certified mail, addressed as follows:

| | |
|---|---|
| If to the Company: | c/o AVF HOLDING COMPANY, INC.<br>6500 East Fourteen Mile Road<br>Warren, MI  48092<br>Attn: David Ladd<br>Email: dladd@artvan.com |
| | With copies to: |
| | MONTGOMERY MCCRACKEN WALKER & RHOADS, LLP<br>437 Madison Avenue<br>New York, NY 10022<br>Attn:  Maura I. Russell<br>Email:  mrussell@mmwr.com |
| | ALVAREZ & MARSAL, LLP<br>600 Madison Avenue – 7th Floor<br>New York, NY 10022<br>Attn:   Dennis Stogsdill<br>           Matthew Davidson<br>Email: DStogsdill@alvarezandmarsal.com<br>           matthew.davidson@alvarezandmarsal.com |

If to the Consultant:          HILCO MERCHANT RESOURCES, LLC, HILCO
IP SERVICES, LLC D/B/A HILCO STREAMBANK,
HILCO REAL ESTATE, LLC, AND HILCO
RECEIVABLES, LLC
5 Revere Drive, Suite 206
Northbrook, IL 60062
Attention: Ian S. Fredericks
Tel: (847) 418-2075
Email: ifredericks@hilcotrading.com

-and-

GORDON BROTHERS RETAIL PARTNERS, LLC,
DJM REALTY SERVICES, LLC D/B/A GORDON
BROTHERS REAL ESTATE, GORDON
BROTHERS COMMERCIAL & INDUSTRIAL, LLC
AND GORDON BROTHERS BRANDS, LLC
Prudential Tower
800 Boylston Street
Boston, MA 02119
Attn: Mackenzie L. Shea
Tel: (617) 210-7116
Email: mshea@gordonbrothers.com

With a copy to (which shall not constitute notice):

RIEMER & BRAUNSTEIN LLP
Times Square Tower
Seven Times Square, Suite 2506
New York, NY 10036
Attn:  Steven E. Fox
Email:  sfox@riemerlaw.com

If to the ABL Lenders:      WELLS FARGO BANK, NATIONAL
ASSOCIATION
125 High Street, 11th Floor
Boston, MA 02110
Attn: Danielle Baldinelli
Email:  Danielle.M.Baldinelli@wellsfargo.com

MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110-1726
Attn:  Marjorie B. Crider
Email: marjorie.crider@morganlewis.com

If to the Term Lenders:      King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036
Attn:  W. Todd Holleman
Email:  tholleman@kslaw.com

13.2    <u>Governing Law</u>.  This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of New York, without reference to any conflict of laws provisions.

13.3    <u>Severability</u>.  In the event any term or provision contained within this Agreement shall be deemed illegal or unenforceable, then such offending term or provision shall be considered deleted from this Agreement and the remaining terms shall continue to be in full force and effect.

13.4    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties with respect of the subject matter hereof and supersedes all prior negotiations and understandings, and can only be modified by a writing signed by the Company (with the consent of the Lender Agents, which consent shall not be unreasonably withheld, delayed or conditioned) and the Consultant.

13.5    <u>Assignment</u>.  Neither Company nor Consultant shall assign this Agreement without the express written consent of the other; <u>provided</u>, <u>however</u>, notwithstanding the foregoing, the Consultant may delegate and assign its rights and obligations under this Agreement to one or more affiliates with subject matter experience with applicable Assets without the consent of the Company.  This Agreement shall inure to the benefit of, and be binding upon, the parties and their respective successors and permitted assigns.

13.6    <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which when so executed shall be deemed to be an original and such counterparts, together, shall constitute one and the same instrument.  Delivery by facsimile of this Agreement or an executed counterpart hereof shall be deemed a good and valid execution and delivery hereof or thereof.

13.7    <u>Independent Contractor</u>.  Nothing contained herein shall be deemed to create any relationship between the Company and the Consultant other than that of an independent contractor. It is stipulated that the parties are not partners or joint venturers.

13.8    <u>Termination</u>.  This Agreement shall terminate upon the earlier to occur (a) in the event the Bankruptcy Court does not enter the Interim Order on or before March 10, 2020, (b) in the event the Sale Commencement Date does not occur on or prior to March 7, 2020, (c) in the event the Bankruptcy Court does not enter the Final Order on or before March 31, 2020, (d) the mutual agreement of the Parties, or (e) upon the completion and approval of the Final Settlement; <u>provided</u>, <u>however</u>, that either party may terminate this Agreement in the event that the other commits a material breach or material failure of its obligations hereunder.  If either party seeks to terminate this Agreement by reason of a claim of a material breach or material failure, such party shall provide the other party with not less than five (5) days' prior written notice stating with specificity the nature of the claimed material breach or material failure, and the party receiving

such notice shall have five (5) business days in which to cure such material breach or material failure, failing which this Agreement shall be deemed terminated. In the event this Agreement is terminated by Consultant on account of a material breach or material failure by the Company, Consultant shall be entitled to be reimbursed any Sale Expenses, including Consultant Incurred Expenses and any other expenses incurred in conformity with the Sale Budget or any Supplemental Budget(s) through the date of such termination.

13.8    Confidentiality.  Except for such disclosure as may be required and/or incident to Asset sale-related activities and Services provided for herein, all information of a business nature relating to the pricing, sales, promotions, marketing, assets, liabilities or other business affairs of Company, its customers, parent, subsidiary or other affiliated entities (for purposes of this provision, all such entities are included within each reference to "Company") is Company's confidential, trade secret information ("Company Confidential Information"), which is and shall remain the exclusive intellectual property of Company.  Consultant shall not divulge, furnish, make available or in any other manner disclose such information to any third party other than Consultant's officers, employees, representatives and agents.  Consultant shall take and shall cause its officers, employees, representatives and agents to take such action as shall be reasonably necessary or advisable to preserve and protect the confidentiality of Company Confidential Information.  Consultant agrees to maintain strict confidentiality and agrees that it may use Company Confidential Information only as reasonably necessary to the performance of its obligations related to the sale of the Assets as contemplated hereby.  Notwithstanding the foregoing, Company hereby agrees that Consultant may identify Company as a Consultant customer for which Consultant has provided services for purposes of promoting its business.

13.9    Force Majeure. If any casualty or act of God, war, or terrorism prevents or substantially inhibits the conduct of business in the ordinary course at any Store(s), or results in a material loss or impairment of the Assets, then the subject location(s) and the remaining Merchandise located thereat shall be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Consultant and shall have no further rights or obligations hereunder with respect thereto; provided, however, that the proceeds of any insurance attributable to impacted Assets or proceeds from business interruption insurance shall constitute Gross Proceeds hereunder.

13.10    By executing or otherwise accepting this Agreement, the Company and Consultant acknowledge and represent that they are represented by and have consulted with independent legal counsel with respect to the terms and conditions contained herein.

13.11   This Agreement shall be deemed drafted by both parties hereto, and there shall be no presumption against either party in the interpretation of this Agreement.

[Remainder of Page Intentionally Left Blank]
[Signatures Appear On Next Page]

IN WITNESS WHEREOF, the Company and the Consultant have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

AVF HOLDING COMPANY, INC.
AVF HOLDING COMPANY, INC.

By: _David Ladd_

Name:   DAVID LADD

Its:      3/4/2020

[Signatures Continue Next Page]

**HILCO MERCHANT RESOURCES, LLC,
HILCO IP SERVICES, LLC D/B/A HILCO
STREAMBANK, HILCO REAL ESTATE, LLC, AND
HILCO RECEIVABLES, LLC**

By:_____

    Name:    Sarah Baker
    Title:     Assistant General Counsel

            - and –

**GORDON BROTHERS RETAIL PARTNERS, LLC,**

By:_____

    Name:    _____
    Its:     _____

**DJM REALTY SERVICES, LLC D/B/A GORDON
BROTHERS REAL ESTATE**

By:_____

    Name:    _____
    Its:     _____

**GORDON BROTHERS COMMERCIAL &
INDUSTRIAL, LLC**

By:_____

    Name:    _____
    Its:     _____

**HILCO MERCHANT RESOURCES, LLC, HILCO IP SERVICES, LLC D/B/A HILCO STREAMBANK, HILCO REAL ESTATE, LLC, AND HILCO RECEIVABLES, LLC**


By:_____
    Name:    Sarah Baker
    Title:     Assistant General Counsel

          - and –

**GORDON BROTHERS RETAIL PARTNERS, LLC,**

By:_____
    Name:   _____
    Its:     _____


**DJM REALTY SERVICES, LLC D/B/A GORDON BROTHERS REAL ESTATE**


By:_____
    Name:   _____
    Its:     _____


**GORDON BROTHERS COMMERCIAL & INDUSTRIAL, LLC**


By:_____
    Name:   _____
    Its:     _____

**HILCO MERCHANT RESOURCES, LLC,
HILCO IP SERVICES, LLC D/B/A HILCO
STREAMBANK, HILCO REAL ESTATE, LLC, AND
HILCO RECEIVABLES, LLC**

By:_____

    Name:    Sarah Baker
    Title:     Assistant General Counsel

            - and –

**GORDON BROTHERS RETAIL PARTNERS, LLC,**

By:_____

    Name:    _____
    Its:      _____

**DJM REALTY SERVICES, LLC D/B/A GORDON
BROTHERS REAL ESTATE**

By:_____

    Name:    Mark T. Dufton
    Its:      Chief Executive Officer , Real Estate

**GORDON BROTHERS COMMERCIAL &
INDUSTRIAL, LLC**

By:_____

    Name:    _____
    Its:      _____

28

**HILCO MERCHANT RESOURCES, LLC,
HILCO IP SERVICES, LLC D/B/A HILCO
STREAMBANK, HILCO REAL ESTATE, LLC, AND
HILCO RECEIVABLES, LLC**


By:_____
      Name:    Sarah Baker
      Title:     Assistant General Counsel

              - and –

**GORDON BROTHERS RETAIL PARTNERS, LLC,**


By:_____
   Name:    _____
   Its:       _____



**DJM REALTY SERVICES, LLC D/B/A GORDON
BROTHERS REAL ESTATE**



By:_____
   Name:    _____
   Its:       _____



**GORDON BROTHERS COMMERCIAL &
INDUSTRIAL, LLC**


By: *Robert J Maroney*_____
   Name:    Robert J. Maroney
   Its:       President

**GORDON BROTHERS BRANDS, LLC**

By: _____
    Name:     RAMEZ TOUBASSY
    Its:       PRESIDENT

[Signatures Continue Next Page]

29

ACKNOWLEDGED AND AGREED
TO THIS ___DAY OF MARCH, 2020:

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
As Administrative Agent and Collateral Agent

By: _____
　　Name: _Lauren Murphy_____
　　Its: _Director_____

[Signatures Continue Next Page]

**VIRTUS GROUP, LP,**
As Administrative Agent and Collateral Agent
For Itself and the Other Term Loan Lenders

VIRTUS GROUP, LP,
as Administrative Agent

By: _____

Name:

Title: SNR DIR

**Art Van Furniture**
Results - Store Count Strategy by Location

| | |
|---|---|
| 169 # Stores included in liquidation | Yes |
| # stores closed prior to sale commencement | No |

**Financial Information as ($000's)**

| | | Location Information | | | | | | | | | | | | Location Space Details | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Store # | Store Name | Original Store Name | Include In Liquidation | Direct Marketing Area | Store Type | Company Affiliation | Gross Sq. Ft. | Selling Sq. Ft. | Lease Beginning Date | Lease Expires | Months Remaining | SLB Property | Landlord | Master Lease | Address |
| 1 | Bel Air, MD (1) | BEL AIR (#65) | Yes | Baltimore | Standard | WLF | 74,400 | 62,000 | 5/15/2015 | 12/31/2025 | 70 | No | CAMPUS HILLS MARYLAND ASSOCIATES, L.P. | None | 2400 E Churchville Rd, Bel Air, MD, 21015, USA |
| 2 | Pasadena, MD (2) | PASADENA (#61) | Yes | Baltimore | Standard | WLF | 61,646 | 54,000 | 5/15/2015 | 8/31/2025 | 66 | No | ARUNDEL PROPERTY INVESTORS LP | None | 8038 Ritchie Hwy, Pasadena, MD, 21122, USA |
| 3 | Westminster, MD (3) | WESTMINSTER (#64) | Yes | Baltimore | Standard | WLF | 40,550 | 38,000 | 5/15/2015 | 8/31/2025 | 18 | No | WESTMINSTER GATEWAY, LLC | None | 1030 Baltimore Blvd Suite 110, Westminster, MD, 21157, USA |
| 4 | Towson, MD (4) | TOWSON (#63) | Yes | Baltimore | Standard | WLF | 54,000 | 46,000 | 5/15/2015 | 4/30/2038 | 218 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 1530 E Joppa Rd, Towson, MD, 21286, USA |
| 5 | Catonsville, MD (5) | CATONSVILLE (#62) | Yes | Baltimore | Standard | WLF | 115,300 | 40,000 | 5/15/2015 | 8/31/2025 | 66 | No | JMB JOINT VENTURE | None | 6415 Baltimore National Pike, Catonsville, MD, 21228, USA |
| 6 | Downers Grove, IL (6) | DOWNERS GROVE AVF & SSI (#199) | Yes | Chicago | Flagship | AVF | 100,000 | 92,428 | 8/1/2015 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 1021 BUTTERFIELD RD, DOWNERS GROVE, IL, 60515, USA |
| 7 | Merrillville, IN (7) | MERRILLVILLE AVF | Yes | Chicago | Standard | AVF | 50,000 | 43,130 | 8/24/2013 | 2/28/2023 | 36 | No | ACADIA MERRILLVILLE REALTY, L.P. | None | 1600 E 80TH AVE, MERRILLVILLE, IN, 46410, USA |
| 8 | Naperville, IL (8) | NAPERVILLE AVF | Yes | Chicago | Standard | AVF | 62,000 | 52,753 | 8/31/2015 | 8/31/2025 | 66 | No | BRIXMOR HERITAGE SQUARE, LLC | None | 404 SOUTH ROUTE 59, NAPERVILLE, IL, 60540, USA |
| 9 | Bedford Park, IL (9) | BEDFORD PK AVF | Yes | Chicago | Standard | AVF | 84,505 | 71,590 | 10/26/2013 | 4/30/2024 | 50 | No | SPIRIT SPE LOAN PORTFOLIO 2013-3, LLC | None | 7200 S CICERO AVE, BEDFORD PARK, IL, 60638, USA |
| 10 | Elston, IL (10) | ELSTON AVE AVF | Yes | Chicago | Standard | AVF | 48,000 | 40,660 | 10/26/2013 | 4/30/2024 | 50 | No | Fairlman Group | None | 2606 ELSTON AVE, CHICAGO, IL, 60647, USA |
| 11 | Batavia, IL (11) | BATAVIA AVF | Yes | Chicago | Standard | AVF | 42,500 | 37,055 | 9/14/2013 | 1/31/2024 | 47 | No | PARAGON BATAVIA, LLC | None | 165 N RANDALL RD, BATAVIA, IL, 60510, USA |
| 12 | Orland Park, IL (12) | ORLAND PARK AVF | Yes | Chicago | Standard | AVF | 65,523 | 53,329 | 7/13/2013 | 5/31/2024 | 51 | No | 55th & S. Kedzie, LLC | None | 15080 S LA GRANGE RD, ORLAND PARK, IL, 60462, USA |
| 13 | Algonquin, IL (13) | ALGONQUIN AVF | Yes | Chicago | Standard | AVF | 48,397 | 41,272 | 3/31/2016 | 7/31/2025 | 65 | No | c/o Mid America Asset Management, Inc. | None | 1500 S RANDALL ROAD, ALGONQUIN, IL, 60102, USA |
| 14 | Kildeer, IL (14) | KILDEER AVF | Yes | Chicago | Standard | AVF | 40,628 | 34,534 | 10/4/2017 | 9/30/2027 | 91 | No | Kildeer Village Square, LLC | None | 20393 N RAND RD, KILDEER, IL, 60074, USA |
| 15 | Glendale Heights, IL (15) | GLENDALE HEIGHTS AVF | Yes | Chicago | Standard | AVF | 60,820 | 37,044 | 2/26/2016 | 3/31/2026 | 73 | No | 125 W. Army Trail Road LLC | None | 125 ARMY TRAIL ROAD, GLENDALE HGTS, IL, 60139, USA |
| 16 | Deerfield, IL (16) | DEERFIELD AVF | Yes | Chicago | Standard | AVF | 41,966 | 35,671 | 12/13/2017 | 2/29/2028 | 96 | No | Gateway Fairview, Inc. | None | 120 S. WAUKEGAN, DEERFIELD, IL, 60015, USA |
| 17 | Schaumburg, IL (17) | SCHAUMBURG AVF& SSI (#303) | Yes | Chicago | Flagship | AVF | 71,400 | 61,990 | 10/29/2016 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 1293 E HIGGINS RD, SCHAUMBURG, IL, 60173, USA |
| 18 | Joliet, IL (18) | JOLIET PS | Yes | Chicago | Sleep | APS | 3,116 | 2,884 | 12/26/2017 | 12/31/2027 | 94 | No | GW Fidelity PH, LLC | None | 2901 PLAINFIELD, JOLIET, IL, 60435, USA |
| 19 | Burbank, IL (19) | BURBANK PS | Yes | Chicago | Sleep | APS | 3,994 | 3,476 | 3/21/2015 | 3/31/2025 | 61 | No | WM 73 RE, LLC | None | 7712 CICERO AVENUE, BURBANK, IL, 60459, USA |
| 20 | Woodridge, IL (20) | WOODRIDGE AVF | Yes | Chicago | Sleep | APS | 68,400 | 59,687 | 3/27/2014 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 900 E BOUGHTON RD, WOODRIDGE, IL, 60517, USA |
| 21 | Gurnee, IL (21) | GURNEE AVF | Yes | Chicago | Standard | AVF | 34,000 | 28,900 | 6/26/2018 | 12/31/2028 | 104 | No | 3503 RP Gurnee, L.L.C. | None | 6911 W. GRAND AVE, GURNEE, IL, 60031, USA |
| 22 | Plainfield, IL (22) | PLAINFIELD PS | Yes | Chicago | Sleep | APS | 3,600 | 3,290 | 2/11/2017 | 2/28/2027 | 84 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 13511 S ROUTE 59, PLAINFIELD, IL, 60544, USA |
| 23 | Willowbrook, IL (23) | WILLOWBROOK PS | Yes | Chicago | Sleep | APS | 3,834 | 3,400 | 12/3/2016 | 1/31/2027 | 83 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 6938 KINGERY HIGHWAY, WILLOWBROOK, IL, 60527, USA |
| 24 | Chicago, IL (24) | ASHLAND PS | Yes | Chicago | Sleep | APS | 3,000 | 2,600 | 9/10/2016 | 9/30/2026 | 79 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 2911 N. ASHLAND AVENUE, CHICAGO, IL, 60657, USA |
| 25 | Bloomingdale, IL (25) | BLOOMINGDALE PS | Yes | Chicago | Sleep | APS | 4,798 | 4,370 | 5/26/2017 | 4/30/2027 | 86 | No | Bloomingdale Square, LP | None | 398 W ARMY TRAIL RD #102, BLOOMINGDALE, IL, 60108, USA |
| 26 | Harwood Heights, IL (26) | HARWOOD HEIGHTS AVF | Yes | Chicago | Standard | AVF | 60,000 | 51,000 | 11/15/2017 | 12/31/2038 | 226 | No | DBO AVF | None | 7304 WEST LAWRENCE AVE, HARWOOD HEIGHTS, IL, 60706, USA |
| 27 | Avon, OH (27) | AVON (#45, 46 CC) | Yes | Cleveland | Standard | LVF | 77,000 | 72,380 | 7/1/2011 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 1801 NAGEL ROAD, AVON, OH, 44011, USA |
| 28 | North Canton, OH (28) | CANTON (#14, 25, 26 CC) | Yes | Cleveland | Standard | LVF | 65,765 | 60,199 | 3/1/2008 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 6229 PROMLER AVENUE NW, NORTH CANTON, OH, 44720, USA |
| 29 | Akron, OH (29) | AKRON (#23, 24 CC) | Yes | Cleveland | Standard | LVF | 69,422 | 65,257 | 10/1/2005 | 9/30/2030 | 127 | No | TABANI AKRON, LP | None | 3742 BROOKWALL DRIVE, AKRON, OH, 44333, USA |
| 30 | Middleburg Heights, OH (30) | MIDDLEBURG (#11, 31 CC) | Yes | Cleveland | Standard | LVF | 50,000 | 45,172 | 7/1/1993 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 16960 SPRAGUE ROAD, MIDDLEBURG HEIGHTS, OH, 44130, USA |
| 31 | Mentor, OH (31) | MENTOR (#9, 27, 28 CC) | Yes | Cleveland | Standard | LVF | 75,600 | 70,712 | 7/1/2009 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 7799 MENTOR AVE, MENTOR, OH, 44060, USA |
| 32 | Oakwood Village, OH (32) | OAKWOOD VILLAGE (#18, 19 CC) | Yes | Cleveland | Standard | LVF | 89,723 | 67,723 | 8/1/2002 | 11/30/2027 | 93 | No | FIRST INERNATIONAL HAWTHORNE LLC | None | 23100 BROADWAY AVE, OAKWOOD VILLAGE, OH, 44146, USA |
| 33 | North Olmsted, OH (33) | NORTH OLMSTED (#12, 34 CC) | Yes | Cleveland | Standard | LVF | 46,000 | 41,270 | 8/1/1996 | 1/31/2027 | 83 | No | GLITZ AND ASSOCIATES INC | None | 23250 LORAIN ROAD, NORTH OLMSTED, OH, 44070, USA |
| 34 | Strongsville, OH (34) | STRONGSVILLE (#74) | Yes | Cleveland | Standard | LM | 5,000 | 4,400 | 11/5/2015 | 10/31/2025 | 68 | No | ECHO STRONGSVILLE LLC | None | 16105 PEARL ROAD, STRONGSVILLE, OH, 44136, USA |
| 35 | Mayfield Heights, OH (35) | MAYFIELD (#65) | Yes | Cleveland | Standard | LM | 4,620 | 4,120 | 5/1/2012 | n/a | n/a | No | JACK H SCHWARTZ, TRUSTEE OF THE JACK H | None | 6061 Mayfield Rd, Mayfield Heights, OH, 44124, USA |
| 36 | Stow, OH (36) | STOW (#68) | Yes | Cleveland | Sleep | LM | 4,160 | 3,660 | 10/25/2013 | 1/31/2024 | 47 | No | DEVILLE DEVELOPMENTS LLC | None | 1061 GRAHAM RD, STOW, OH, 44224, USA |
| 37 | Medina, OH (37) | MEDINA (#76) | Yes | Cleveland | Sleep | LM | 4,500 | 4,000 | 8/26/2016 | 9/30/2021 | 19 | No | GOWE LEASING LIMITED | None | 3823 PEARL RD, MEDINA, OH, 44256, USA |
| 38 | Sandusky, OH (38) | SANDUSKY (#73) | Yes | Cleveland | Sleep | LM | 5,400 | 4,900 | 11/14/2014 | 2/28/2025 | 60 | No | PLI II LTD | None | 4917 MILAN RD PLAZA, SANDUSKY, OH, 44870, USA |
| 39 | Elyria, OH (39) | ELYRIA (#72) | Yes | Cleveland | Sleep | LM | 6,400 | 5,800 | 6/19/2015 | 6/30/2026 | 76 | No | ELYRIA-CHESTNUT, LLC / NICKLEPLATE REALTY | None | 510 CHESTNUT COMMONS DR, ELYRIA, OH, 44035, USA |
| 40 | Solon, OH (40) | SOLON (#67) | Yes | Cleveland | Sleep | LM | 3,788 | 3,288 | 2/22/2013 | 5/31/2023 | 39 | No | L & J PROPERTIES - SOLON, LLC | None | 6130 KRUSE DRIVE, SOLON, OH, 44139, USA |
| 41 | Canton, OH (41) | MASSILLON (#71) | Yes | Cleveland | Sleep | LM | 5,650 | 5,150 | 6/27/2014 | 11/30/2024 | 57 | No | PERRY TOWN CENTER LLC | None | 5119 WEST TUSCARAWAS ST, CANTON, OH, 44708, USA |
| 42 | Polaris, OH (42) | POLARIS AVF | Yes | Columbus | Flagship | AVF | 70,000 | 59,500 | 3/16/2019 | 10/31/2037 | 212 | Yes | STORE CAPITAL | Other | 1551 GEMINI PLACE, COLUMBUS, OH, 43240, USA |
| 43 | Novi, MI (43) | NOVI AVF | Yes | Detroit | Flagship | AVF | 102,520 | 88,958 | 1/1/1985 | 2/28/2037 | 204 | No | BROADSTONE | None | 27775 NOVI RD, NOVI, MI, 48377, USA |
| 44 | Warren, MI (44) | TECH PLAZA AVF | Yes | Detroit | Standard | AVF | 109,980 | 87,859 | 11/26/1982 | 2/28/2037 | 204 | No | LCN PARTNERS | None | 6500 E 14 MILE RD, WARREN, MI, 48092, USA |
| 45 | Shelby Township, MI (45) | LAKESIDE AVF | Yes | Detroit | Flagship | AVF | 68,104 | 72,336 | 8/14/1992 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 14055 HALL RD, SHELBY TOWNSHIP, MI, 48315, USA |
| 46 | Canton, MI (46) | CANTON AVF | Yes | Detroit | Flagship | AVF | 69,929 | 58,740 | 1/3/2018 | 12/31/2038 | 226 | No | Agree Limited Partnership | None | 41801 FORD ROAD, CANTON, MI, 48187, USA |
| 47 | Taylor, MI (47) | TAYLOR AVF | Yes | Detroit | Flagship | AVF | 91,720 | 79,294 | 3/6/1978 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 22035 EUREKA RD, TAYLOR, MI, 48180, USA |
| 48 | Ann Arbor, MI (48) | ANN ARBOR AVF | Yes | Detroit | Flagship | AVF | 70,000 | 60,912 | 7/2/1993 | 2/28/2037 | 204 | No | STONEBRIAR | SCF RC Funding III, LLC | 425 E EISENHOWER PKWY, ANN ARBOR, MI, 48108, USA |
| 49 | Southfield, MI (49) | SOUTHFIELD AVF | Yes | Detroit | Standard | AVF | 64,584 | 52,094 | 11/1/2000 | 7/31/2023 | 41 | No | GREENLEAF PLAZA LLC | None | 22555 GREENFIELD RD, SOUTHFIELD, MI, 48075, USA |
| 50 | Royal Oak, MI (50) | WOODWARD AVF & SSI (#174) | Yes | Detroit | Standard | AVF | 56,520 | 54,943 | 11/14/1997 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 32301 WOODWARD AVE, ROYAL OAK, MI, 48073, USA |
| 51 | Clinton Twp, MI (51) | CLINTON AVF | Yes | Detroit | Flagship | AVF | 69,720 | 60,128 | 1/1/1988 | 2/28/2037 | 204 | No | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 33801 S GRATIOT AVE, CLINTON TWP, MI, 48035, USA |
| 52 | Chesterfield, MI (52) | CHESTERFIELD AVF | Yes | Detroit | Standard | AVF | 73,152 | 58,029 | 12/26/2003 | 2/28/2037 | 204 | No | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 50400 GRATIOT AVE, CHESTERFIELD, MI, 48051, USA |
| 53 | Howell, MI (53) | HOWELL AVF | Yes | Detroit | Standard | AVF | 51,075 | 45,721 | 11/1/1997 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 4101 E GRAND RIVER AVE, HOWELL, MI, 48843, USA |
| 54 | Waterford, MI (54) | DRAYTON PLAINS AVF | Yes | Detroit | Standard | AVF | 53,188 | 57,435 | 6/30/1971 | 3/31/2037 | 205 | Yes | STORE CAPITAL | CAPITAL PARTNERS, LLC | 5053 DIXIE HWY, WATERFORD, MI, 48329, USA |
| 55 | Dearborn, MI (55) | DEARBORN AVF | Yes | Detroit | Flagship | AVF | 57,633 | 58,164 | 7/1/1997 | 2/28/2037 | 204 | No | STORE CAPITAL | | 15701 MARKET DR, DEARBORN, MI, 48126, USA |
| 56 | Auburn Hills, MI (56) | GREAT LAKES AVF | Yes | Detroit | Standard | AVF | 43,319 | 37,276 | 1/1/2011 | 3/31/2021 | 11 | No | Taubman Auburn Hills Associates Limited Partnership | None | 4612 BALDWIN RD, AUBURN HILLS, MI, 48326, USA |
| 57 | Port Huron, MI (57) | PORT HURON AVF | Yes | Detroit | Standard | AVF | 74,800 | 59,123 | 9/20/2002 | 3/31/2037 | 205 | No | STORE CAPITAL | | 1234 32ND ST, PORT HURON, MI, 48060, USA |
| 58 | Rochester Hills, MI (58) | ROCHESTER AVF | Yes | Detroit | Standard | AVF | 48,621 | 41,328 | 5/16/2019 | 11/30/2023 | 165 | No | Rochester KM Partners, LLC | | 1032 SOUTH ROCHESTER ROAD, ROCHESTER, MI, 48307, USA |
| 59 | Livonia, MI (59) | 7 MILE AVF | Yes | Detroit | Standard | AVF | 61,752 | 53,795 | 1/1/1985 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 29905 7 MILE RD, LIVONIA, MI, 48152, USA |
| 60 | Warren, MI (60) | SCHOENHERR AVF | Yes | Detroit | Standard | AVF | 41,900 | 41,520 | 11/9/1972 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 13855 SCHOENHERR, WARREN, MI, 48089, USA |
| 61 | Westland, MI (61) | WESTLAND AVF | Yes | Detroit | Standard | AVF | 79,773 | 70,723 | 4/14/1987 | 2/28/2037 | 204 | No | STONEBRIAR | SCF RC Funding III, LLC | 8300 N WAYNE RD, WESTLAND, MI, 48185, USA |
| 62 | Ann Arbor, MI (62) | ANN ARBOR W PS | Yes | Detroit | Sleep | APS | 4,000 | 4,079 | 9/1/2014 | 8/31/2021 | 18 | No | 2570 JACKSON INC | None | 2570 JACKSON AVE, ANN ARBOR, MI, 48103, USA |
| 63 | Rochester Hills, MI (63) | ROCHESTER PS | Yes | Detroit | Sleep | APS | 5,000 | 4,414 | 6/1/2010 | 5/31/2020 | 5 | No | McKnight South East, LP c/o McKnight Property Management, Inc | None | 1856 S ROCHESTER RD, ROCHESTER, MI, 48307, USA |
| 64 | Grosse Pointe Woods, MI (64) | GROSSE POINTE SOUTH PS | Yes | Detroit | Sleep | APS | 2,000 | 2,668 | 3/1/2016 | 2/29/2028 | 96 | No | GRYPHON MG-I, LLC | None | 19387 MACK AVE, GROSSE POINTE, MI, 48236, USA |
| 65 | Warren, MI (65) | WARREN E PS | Yes | Detroit | Sleep | APS | 5,072 | 4,507 | 5/16/2011 | 6/30/2022 | 28 | No | WILLAGE, LLC | None | 6400 14 MILE RD, WARREN, MI, 48092, USA |
| 66 | Sterling Hts, MI (66) | STERLING HTS PS | Yes | Detroit | Sleep | APS | 4,014 | 4,672 | 2/1/2014 | 1/31/2024 | 47 | No | MARAPHIL, LLC | None | 44975 HAYES ROAD, STERLING HTS, MI, 48313, USA |
| 67 | Washington, MI (67) | WASHINGTON PS | Yes | Detroit | Sleep | APS | 4,000 | 3,425 | 3/16/2015 | 10/31/2021 | 20 | No | Agree Commerce LLC | None | 7887 26 MILE ROAD, WASHINGTON, MI, 48094, USA |
| 68 | Southgate, MI (68) | SOUTHGATE PS | Yes | Detroit | Sleep | APS | 5,117 | 4,768 | 9/1/2015 | 1/31/2024 | 47 | No | GGH Associates Southgate, LLC | None | 15060 DIX TOLEDO RD, SOUTHGATE, MI, 48195, USA |
| 69 | Canton, MI (69) | CANTON PS | Yes | Detroit | Sleep | APS | 4,600 | 4,280 | 7/1/2012 | 6/30/2024 | 52 | No | Ford Road Investors, LLC | None | 41915 FORD RD, CANTON, MI, 48187, USA |
| 70 | Monroe, MI (70) | MONROE PS | Yes | Detroit | Sleep | APS | 4,780 | 4,240 | 3/1/2015 | 3/31/2025 | 61 | No | RPM I, LLC | None | 1570 N TELEGRAPH ROAD, MONROE, MI, 48162, USA |
| 71 | Troy, MI (71) | TROY N PS | Yes | Detroit | Sleep | APS | 4,000 | 4,059 | 7/16/2011 | 7/31/2021 | 17 | No | Universal Mall Properties LLC | None | 1735 BIG BEAVER RD, TROY, MI, 48083, USA |
| 72 | West Bloomfield, MI (72) | W BLOOMFIELD PS | Yes | Detroit | Sleep | APS | 4,000 | 3,569 | 8/1/2014 | 7/31/2021 | 17 | No | MAPLE ORCHARD ASSOCIATES, LLC | None | 6470 ORCHARD LAKE ROAD, WEST BLOOMFIELD, MI, 48322, USA |
| 73 | Chesterfield, MI (73) | CHESTERFIELD PS | Yes | Detroit | Sleep | APS | 4,000 | 3,572 | 8/1/2017 | 11/30/2027 | 93 | No | CHESTERFIELD COMMONS ASSOCIATES, LLC | None | 50938 GRATIOT AVE, CHESTERFIELD, MI, 48051, USA |
| 74 | Woodhaven, MI (74) | WOODHAVEN PS | Yes | Detroit | Sleep | APS | 5,800 | 5,271 | 3/1/2015 | 3/31/2025 | 61 | No | THE ALLEN-BRIDGE GROUP, LLC | None | 22099 Westbrook, Woodhaven, MI, 48183, USA |
| 75 | Brighton, MI (75) | BRIGHTON E PS | Yes | Detroit | Sleep | APS | 4,248 | 3,218 | 5/1/2011 | 9/30/2022 | 31 | No | BRIGHTON GATE COMMONS, LLC | None | 9999 E GRAND RIVER AVE, BRIGHTON, MI, 48116, USA |
| 76 | Bloomfield Twp, MI (76) | BLOOMFIELD TWP PS | Yes | Detroit | Sleep | APS | 4,120 | 3,139 | 7/1/2015 | 9/30/2025 | 65 | No | BP 6650, LLC | None | 6650 TELEGRAPH ROAD, BLOOMFIELD HILLS, MI, 48301, USA |
| 77 | New Hudson, MI (77) | NEW HUDSON PS | Yes | Detroit | Sleep | APS | 4,106 | 3,655 | 4/1/2012 | 3/31/2022 | 23 | No | Milford Road Plaza, LLC | None | 30821 MILFORD ROAD, NEW HUDSON, MI, 48165, USA |
| 78 | Lapeer, MI (78) | LAPEER PS | Yes | Detroit | Sleep | APS | 4,500 | 3,864 | 8/1/2016 | 3/31/2027 | 83 | No | JKL REAL ESTATE CO, LLC | None | 806 S MAIN ST #100, LAPEER, MI, 48446, USA |
| 79 | Royal Oak, MI (79) | ROYAL OAK PS | Yes | Detroit | Sleep | APS | 4,000 | 4,000 | 8/1/2009 | 8/31/2022 | 30 | No | Royal Oak I, LLC | None | 32500 WOODWARD AVE, ROYAL OAK, MI, 48073, USA |
| 80 | White Lake, MI (80) | WHITE LAKE PS | Yes | Detroit | Sleep | APS | 3,680 | 2,995 | 1/1/2014 | 12/31/2023 | 46 | No | Pioneer Development, LLC | None | 9360 HIGHLAND RD, WHITE LAKE, MI, 48386, USA |
| 81 | Troy, MI (81) | TROY S PS | Yes | Detroit | Sleep | APS | 4,000 | 3,464 | 2/1/2013 | 1/31/2025 | 59 | No | URBAN ONE, OAKLAND PLAZA, LLC | None | 272 E BIG BEAVER, TROY, MI, 48083, USA |
| 82 | Waterford, MI (82) | WATERFORD PS | Yes | Detroit | Sleep | APS | 6,008 | 5,055 | 10/1/2010 | 3/31/2023 | 39 | No | THE WATERFORD GROUP, LLC | None | 4497 DIXIE HWY, WATERFORD, MI, 48329, USA |
| 83 | Novi, MI (83) | NOVI PS | No | Detroit | Sleep | APS | 2,000 | 2,073 | 5/16/2016 | 1/31/2027 | n/a | No | NAMCO WEST OAKS II LLC | None | 43420 W OAKS DR, NOVI, MI, 48377, USA |
| 84 | Brighton, MI (84) | BRIGHTON W PS | Yes | Detroit | Sleep | APS | 4,100 | 3,603 | 7/1/2014 | 3/31/2021 | 11 | No | ML CROSS GRAND PLAZA, LLC | None | 8709 WEST GRAND RIVER, BRIGHTON, MI, 48116, USA |
| 85 | Ann Arbor, MI (85) | ANN ARBOR E PS | Yes | Detroit | Sleep | APS | 4,274 | 3,062 | 3/1/2013 | 2/28/2023 | 35 | No | AF Jonna Development & Management Co | None | 3550 WASHTENAW, ANN ARBOR, MI, 48104, USA |
| 86 | Lake Orion, MI (86) | LAKE ORION PS | Yes | Detroit | Sleep | APS | 4,350 | 3,775 | 7/1/2013 | 2/28/2023 | 35 | No | Broadway Development | None | 675 S. LAPEER RD, LAKE ORION, MI, 48362, USA |
| 87 | Ferndale, MI (87) | FERNDALE PS | Yes | Detroit | Sleep | APS | 4,000 | 3,599 | 6/16/2016 | 6/30/2026 | 76 | No | B & T Realty LLC | None | 23100 WOODWARD AVE, FERNDALE, MI, 48220, USA |
| 88 | Utica, MI (88) | UTICA E PS | Yes | Detroit | Sleep | APS | 3,900 | 3,507 | 8/1/2011 | 7/31/2021 | 17 | No | Van Dyke-18 Plaza, LLC | None | 45040 NORTHPOINTE BLVD, UTICA, MI, 48315, USA |
| 89 | Howell, MI (89) | HOWELL PS | Yes | Detroit | Sleep | APS | 4,000 | 3,600 | 4/1/2012 | 3/31/2022 | 23 | No | COUNTRYCORNERS SHOPPING CENTER, LLC | None | 4090 E GRAND RIVER AVE, HOWELL, MI, 48843, USA |
| 90 | Westland, MI (90) | WESTLAND PS | Yes | Detroit | Sleep | APS | 4,288 | 3,976 | 5/16/2015 | 3/31/2025 | 61 | No | WESTLAND MACK LLC | None | 35730 WARREN RD, WESTLAND, MI, 48185, USA |
| 91 | Grosse Pointe Woods, MI (91) | GROSSE POINTE PS | Yes | Detroit | Sleep | APS | 3,800 | 3,454 | 9/1/2017 | 9/30/2028 | 102 | No | GROSSE POINTE LAND CO LLC | None | 19435 MACK AVENUE, GROSSE POINTE WOODS, MI, 48236, USA |
| 92 | Plymouth, MI (92) | PLYMOUTH PS | Yes | Detroit | Sleep | APS | 4,000 | 3,580 | 3/24/2016 | 12/31/2028 | 104 | No | PLYMOUTH HAGGERTY UNIT 6 | None | 41512 ANN ARBOR RD, PLYMOUTH, MI, 48170, USA |
| 93 | Shelby Twp, MI (93) | SHELBY TWP PS | Yes | Detroit | Sleep | APS | 4,000 | 3,714 | 1/1/2016 | 12/31/2025 | 70 | No | LIGHTHOUSE INVESTMENT GROUP | None | 51385 VAN DYKE AVE, SHELBY TWP, MI, 48316, USA |
| 94 | Roseville, MI (94) | ROSEVILLE PS | Yes | Detroit | Sleep | APS | 4,000 | 3,530 | 5/1/2013 | 4/30/2023 | 37 | No | ROSEVILLE VILLAGE, L.L.C. | None | 31851 GRATIOT AVE, ROSEVILLE, MI, 48066, USA |
| 95 | Taylor, MI (95) | TAYLOR PS | Yes | Detroit | Sleep | APS | 4,000 | 3,577 | 2/1/2012 | 3/31/2022 | 23 | No | Taylor Plaza, L.L.C. | None | 23423 EUREKA RD, TAYLOR, MI, 48180, USA |
| 96 | Dearborn, MI (96) | DEARBORN PS | Yes | Detroit | Sleep | APS | 5,828 | 5,309 | 9/1/2016 | 8/31/2027 | 88 | No | AMG, LLC | None | 22731 MICHIGAN AVE, DEARBORN, MI, 48124, USA |
| 97 | Livonia, MI (97) | LIVONIA PS | Yes | Detroit | Sleep | APS | 3,900 | 3,612 | 4/1/2014 | 3/31/2024 | 47 | No | 1-96 / HAGGERTY PARTNERS, LLC | None | 29611 PLYMOUTH ROAD, LIVONIA, MI, 48150, USA |
| 98 | Southfield, MI (98) | SOUTHFIELD PS | Yes | Detroit | Sleep | APS | 4,000 | 3,605 | 8/1/2013 | 7/31/2023 | 41 | No | Telegraph-12 Associates LLC | None | 29119 TELEGRAPH RD, SOUTHFIELD, MI, 48034, USA |
| 99 | Novi, MI (99) | NOVI PS | Yes | Detroit | Sleep | APS | 4,000 | 3,470 | 2/1/2017 | 1/31/2028 | 94 | No | BROADSTONE | None | 43420 W OAKS DR, NOVI, MI, 48377, USA |
| 100 | Saginaw, MI (100) | SAGINAW AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 78,827 | 67,000 | 1/1/1989 | 2/28/2037 | 204 | No | STONEBRIAR | SCF RC Funding III, LLC | 2660 TITTABAWASSEE RD, SAGINAW, MI, 48604, USA |
| 101 | Flint, MI (101) | FLINT AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 46,177 | 40,000 | 9/1/2002 | 2/28/2037 | 204 | No | STONEBRIAR | SCF RC Funding III, LLC | 4577 MILLER RD, FLINT, MI, 48507, USA |
| 102 | Burton, MI (102) | BURTON AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 45,000 | 45,000 | 9/1/2002 | 2/28/2037 | 204 | No | STONEBRIAR | SCF RC Funding III, LLC | 4095 E COURT ST, BURTON, MI, 48509, USA |
| 103 | Bay City, MI (103) | BAY CITY AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 34,000 | 30,000 | 2/1/2002 | 2/28/2037 | 204 | No | STONEBRIAR | SCF RC Funding III, LLC | 4150 WILDER RD, BAY CITY, MI, 48706, USA |
| 104 | Grand Blanc, MI (104) | GRAND BLANC PS | Yes | Flint-Saginaw-Bay City | Sleep | APS | 4,000 | 3,580 | 8/1/2014 | 7/31/2024 | 52 | No | GRAND SAGINAW PLAZA, L.L.C. | None | 11501 SOUTH SAGINAW - GRAND BLANC, MI, 48439, USA |
| 105 | Flint, MI (105) | FLINT TWP PS | Yes | Flint-Saginaw-Bay City | Sleep | APS | 4,000 | 3,600 | 4/1/2013 | 3/31/2023 | 35 | No | Jonna Associates Management Company | None | 4002 MILLER RD, FLINT, MI, 48507, USA |
| 106 | Saginaw, MI (106) | SAGINAW PS | Yes | Flint-Saginaw-Bay City | Sleep | APS | 4,000 | 3,647 | 1/1/2016 | 3/31/2026 | 73 | No | KMS Investments, LLC | None | 4605 BAY RD, SAGINAW, MI, 48604, USA |
| 107 | Fort Wayne, IN (107) | FORT WAYNE AVF | Yes | Fort Wayne | Standard | AVF | 34,982 | 34,982 | 2/5/2019 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 311 E COLISEUM BLVD, FORT WAYNE, IN, 46805, USA |
| 108 | Grand Rapids, MI (108) | KNAPP AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 79,400 | 69,174 | 7/30/1987 | 2/28/2037 | 204 | No | STONEBRIAR | None | 4375 28TH ST SE, GRAND RAPIDS, MI, 49512, USA |
| 109 | Portage, MI (109) | KALAMAZOO AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 73,990 | 63,270 | 8/1/1989 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 550 RING ROAD, PORTAGE, MI, 49024, USA |
| 110 | Muskegon, MI (110) | MUSKEGON AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 41,500 | 35,000 | 9/1/2002 | 2/28/2037 | 204 | No | STONEBRIAR | SCF RC Funding III, LLC | 4625 HARVEY ST, MUSKEGON, MI, 49444, USA |
| 111 | Grandville, MI (111) | GRANDVILLE AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 45,000 | 38,250 | 9/1/2000 | 2/28/2037 | 204 | No | STONEBRIAR | None | 4025 WILSON AVE SW, GRANDVILLE, MI, 49418, USA |
| 112 | Battle Creek, MI (112) | BATTLE CREEK AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 50,220 | 43,411 | 9/1/2002 | 2/28/2037 | 204 | No | STONEBRIAR | None | 6100 B DR N, BATTLE CREEK, MI, 49014, USA |

| Store # | Store Name | Original Store Name | Include In Liquidation | Marketing Area | Format | Type | | | Opening Date | | | Property | Master | Lease | Address |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 113 | Comstock Park, MI (113) | ALPINE AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Flagship | AVF | 111,077 | 63,525 | 11/09/1999 | 2/28/2037 | 204 | Yes | LCN PARTNERS | LCN AVF WARREN (MI) LLC | 4273 ALPINE AVE NW STE B, COMSTOCK PARK, MI, 49321, USA |
| 114 | Holland, MI (114) | HOLLAND AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 39,950 | 38,443 | 8/18/1993 | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 12610 FELCH ST STE 100, HOLLAND, MI, 49424, USA |
| 115 | Muskegon, MI (115) | MUSKEGON PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | APS | 4,000 | 3,519 | 5/28/2016 | 10/31/2021 | 20 | No | SVH PROPERTIES, LLC | None | 1664 E STERNBERG RD, MUSKEGON, MI, 49444, USA |
| 116 | Portage, MI (116) | PORTAGE PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,018 | 3,632 | 5/24/2014 | 5/31/2024 | 51 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 6947 SOUTH WESTNEDGE AVE, PORTAGE, MI, 49002, USA |
| 117 | Grandville, MI (117) | GRANDVILLE PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,229 | 3,773 | 3/1/2015 | 5/31/2024 | 51 | No | CWD Grandville 1, LLC | None | 4560 IVANREST AVE SW, GRANDVILLE, MI, 49418, USA |
| 118 | Kalamazoo, MI (118) | KALAMAZOO PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 3,481 | 3,186 | 3/8/2013 | 3/31/2023 | 37 | No | Kalamazoo Mall LLC | None | 338 N DRAKE RD, KALAMAZOO, MI, 49009, USA |
| 119 | Grand Rapids, MI (119) | GRAND RAPIDS PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 5,562 | 4,903 | 10/15/2014 | 2/28/2037 | 204 | Yes | Broadstone | BROADSTONE AVF MICHIGAN, LLC | 3500 28TH ST SE, GRAND RAPIDS, MI, 49512, USA |
| 120 | Grand Rapids, MI (120) | GRAND RAPIDS N PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,000 | 3,687 | 9/12/2016 | 8/31/2026 | 78 | No | EAST BELTLINE DEVELOPMENT, LLC | None | 2036 EAST BELTLINE AVE, GRAND RAPIDS, MI, 49525, USA |
| 121 | Comstock Park, MI (121) | ALPINE N PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,300 | 3,797 | 5/16/2011 | 10/31/2022 | 32 | No | ALPINE VALLEY, L.L.C. | None | 4174 ALPINE AVE NW STE A, COMSTOCK PARK, MI, 49321, USA |
| 122 | Lancaster, PA (122) | LANCASTER (#46) | Yes | Harrisburg | Standard | WLF | 60,000 | 52,500 | 9/1/2002 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 2040 Bennett Avenue, Lancaster, PA, 17601, USA |
| 123 | York, PA (123) | YORK (#44) | Yes | Harrisburg | Standard | WLF | 60,000 | 52,500 | 1/1/2002 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | COLE AV PORTFOLIO | 380 North Northern Way, York, PA, 17402, USA |
| 124 | Harrisburg, PA (124) | HARRISBURG (#42) | Yes | Harrisburg | Standard | WLF | 61,900 | 51,900 | 1/19/1999 | 11/30/2037 | 213 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 4661 Lindle Road, Harrisburg, PA, 17111, USA |
| 125 | Hanover, PA (125) | HANOVER (#50) | Yes | Harrisburg | Standard | WLF | 34,600 | 30,600 | 5/19/2008 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 371 Eisenhower Drive, Hanover, PA, 17331, USA |
| 126 | Mechanicsburg, PA (126) | MECHANICSBURG (#43) | Yes | Harrisburg | Standard | WLF | 45,567 | 42,567 | 8/22/2010 | 7/31/2020 | 5 | No | LESTER ASSOCIATES | None | 75 Gateway Drive, Mechanicsburg, PA, 17055, USA |
| 127 | Chambersburg, PA (127) | CHAMBERSBURG (#51) | Yes | Harrisburg | Standard | WLF | 27,262 | 25,762 | 1/1/2009 | 12/27/2038 | 226 | No | BRITM, LLC | None | 480 Gateway Avenue, Chambersburg, PA, 17201, USA |
| 128 | Altoona, PA (128) | ALTOONA (#28) | Yes | Johnstown | Standard | WLF | 53,136 | 43,176 | 1/1/1978 | 4/30/2038 | 218 | Yes | VEREIT REAL ESTATE LP | Store Master Funding XII, LLC | 4 Sellers DriveAltoona, Altoona, PA, 16601, USA |
| 129 | Johnstown, PA (129) | JOHNSTOWN (#32) | Yes | Johnstown | Standard | WLF | 40,258 | 37,258 | 9/1/1995 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 1130 Scalp Avenue, Johnstown, PA, 15904, USA |
| 130 | State College, PA (130) | STATE COLLEGE (#40) | Yes | Johnstown | Standard | WLF | 50,000 | 51,402 | 5/1/2007 | 11/21/2037 | 213 | Yes | PATTON CENTER ASSOCIATES LP | None | 138 Valley Vista Drive, State College, PA, 16803, USA |
| 131 | Lansing, MI (131) | LANSING AVF | Yes | Lansing | Flagship | AVF | 71,581 | 77,379 | 10/25/2000 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 8749 W SAGINAW HWY, LANSING, MI, 48917, USA |
| 132 | Jackson, MI (132) | JACKSON AVF | Yes | Lansing | Standard | AVF | 33,214 | 30,012 | 8/9/1992 | 7/31/2024 | 53 | No | ARGYLE ACRES MALL, LLC | None | 950 N WEST AVE, JACKSON, MI, 49202, USA |
| 133 | E Lansing, MI (133) | OKEMOS PS | Yes | Lansing | Sleep | APS | 5,855 | 4,457 | 5/16/2011 | 8/31/2023 | 42 | No | RICHARD AND MICHELLE BROWN | None | 2660 E. GRAND RIVER, EAST LANSING, MI, 48823, USA |
| 134 | East Lansing, MI (134) | EAST LANSING PS | Yes | Lansing | Sleep | APS | 3,974 | 3,495 | 7/16/2016 | 7/31/2021 | 17 | No | River Castle Development, LLC | None | 1595 LAKE LANSING ROAD, EAST LANSING, MI, 48823, USA |
| 135 | Lansing, MI (135) | LANSING PS | Yes | Lansing | Sleep | APS | 4,590 | 3,689 | 5/16/2011 | 12/31/2021 | 22 | No | John Doezema Real Estate | None | 6007 W SAGINAW HWY, LANSING, MI, 48917, USA |
| 136 | Wexford, PA (136) | WEXFORD (#4, 29, 30 CC) | Yes | Pittsburgh | Standard | LVF | 53,000 | 48,823 | 10/1/2009 | 2/28/2038 | 216 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 10688 PERRY HIGHWAY, WEXFORD, PA, 15090, USA |
| 137 | Monroeville, PA (137) | MONROEVILLE (#3 CC, 20, 21 CC) | Yes | Pittsburgh | Standard | LVF | 74,600 | 67,545 | 7/1/2004 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | COLE AV PORTFOLIO / LEVIN FAMILY P | 124 LEVIN WAY, MONROEVILLE, PA, 15146, USA |
| 138 | Mcmurray, PA (138) | SOUTH HILLS (#2, 32 CC) | Yes | Pittsburgh | Standard | LVF | 74,600 | 67,964 | 1/1/2005 | 11/30/2037 | 213 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 3664 WASHINGTON ROAD, MCMURRAY, PA, 15317, USA |
| 139 | Greensburg, PA (139) | GREENSBURG (#40, 41 CC) | Yes | Pittsburgh | Standard | LVF | 55,314 | 50,637 | 8/1/2011 | 10/31/2021 | 20 | No | CBLIWESTMORELAND, LP | None | 5280 ROUTE 30, GREENSBURG, PA, 15601, USA |
| 140 | Pittsburgh, PA (140) | THE POINTE (#15, 35 CC) | Yes | Pittsburgh | Standard | LVF | 68,730 | 61,886 | 7/1/1999 | 11/30/2037 | 213 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 400 CHALVEST DRIVE, PITTSBURGH, PA, 15275, USA |
| 141 | Pleasant Hills, PA (141) | CURRY HOLLOW (#47, 48 CC) | Yes | Pittsburgh | Standard | LVF | 90,500 | 87,500 | 7/1/1991 | 9/30/2026 | 79 | No | PAUL PROPERTY MANAGEMENT, LP | None | 292 CURRY HOLLOW RD, PLEASANT HILLS, PA, 15236, USA |
| 142 | Mount Pleasant, PA (142) | MOUNT PLEASANT (#1, 22 CC) | Yes | Pittsburgh | Standard | LVF | 34,500 | 30,766 | 1/1/1924 | 4/30/2038 | 218 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 600 MAIN STREET, MT. PLEASANT, PA, 15666, USA |
| 143 | Cranberry Township, PA (143) | CRANBERRY (#60) | Yes | Pittsburgh | Sleep | LM | 5,000 | 4,500 | 5/1/2012 | 4/30/2022 | 26 | No | WALNUT CAPITAL PARTNERS - CRANBERRY SC | None | 20012 ROUTE 19, CRANBERRY, PA, 16066, USA |
| 144 | Mount Lebanon, PA (144) | MOUNT LEBANON (#36) | Yes | Pittsburgh | Sleep | LM | 3,990 | 3,490 | 6/28/2013 | 7/31/2023 | 41 | No | RELIANCE PITTSBURGH LLC | None | 1600 WASHINGTON RD, MT LEBANON, PA, 15228, USA |
| 145 | Butler, PA (145) | BUTLER (#75) | Yes | Pittsburgh | Sleep | LM | 5,010 | 5,010 | 11/18/2016 | 2/28/2027 | 84 | No | BUTLER SITEWORK ASSOCIATES LLC | None | 620 Butler Crossing Suite 5, BUTLER, PA, 16001, USA |
| 146 | Pittsburgh, PA (146) | SHADYSIDE (#70) | Yes | Pittsburgh | Sleep | LM | 7,145 | 6,645 | 10/10/2014 | 4/30/2024 | 50 | No | MCKNIGHT SOUTH EAST LP | None | 5438 BAUM BLVD, PITTSBURGH, PA, 15232, USA |
| 147 | Washington, PA (147) | WASHINGTON (#63) | Yes | Pittsburgh | Sleep | LM | 7,800 | 7,300 | 3/29/2013 | 4/30/2023 | 38 | No | WASHINGTON MALL - JCP ASSOCIATES, LTD | None | 56 TRINITY POINT DR, WASHINGTON, PA, 15301, USA |
| 148 | Pittsburgh, PA (148) | FOX CHAPEL (#61) | Yes | Pittsburgh | Sleep | LM | 4,000 | 3,500 | 5/1/2012 | 4/30/2022 | 26 | No | WATERWORKS PHASE II | None | 956 FREEPORT ROAD, PITTSBURGH, PA, 15238, USA |
| 149 | Pittsburgh, PA (149) | ROBINSON (#64) | Yes | Pittsburgh | Sleep | LM | 5,593 | 5,093 | 8/30/2013 | 12/31/2023 | 46 | No | MCROBIN LTC AND MOSITES FAMILY GST TRUST | None | 6528 STEUBENVILLE PIKE, PITTSBURGH, PA, 15205, USA |
| 150 | Indiana, PA (150) | INDIANA (#33) | Yes | Pittsburgh | Sleep | LM | 4,800 | 4,300 | 6/7/2013 | 9/30/2023 | 43 | No | LIBBY REGENCY ASSOCIATES LP | None | 1570 OAKLAND AVE, INDIANA, PA, 15701, USA |
| 151 | Monroeville, PA (151) | MONROEVILLE (#62) | Yes | Pittsburgh | Sleep | LM | 4,319 | 4,000 | 6/1/2012 | 6/30/2022 | 28 | No | CE-MONROEVILLE 3820 WM PENN LP | None | 3820 WILLIAM PENN HIGHWAY, MONROEVILLE, PA, 15146, USA |
| 152 | St. Louis, MO (152) | AFFTON | Yes | St. Louis | Standard | AVF | 41,352 | 32,759 | 1/1/1978 | 12/31/2023 | 46 | No | South Lindbergh Property LLC | None | 5711 S LINDBERGH BLVD, SAINT LOUIS, MO, 63123, USA |
| 153 | O'fallon, IL (153) | FAIRVIEW | Yes | St. Louis | Standard | AVF | 39,676 | 32,627 | 1/17/2018 | 12/31/2023 | 46 | No | Rothman-O'Fallon LLC | None | 1776 WEST US 50, O FALLON, IL, 62269, USA |
| 154 | O'fallon, MO (154) | O FALLON | Yes | St. Louis | Standard | AVF | 40,884 | 31,674 | 1/16/2018 | 12/31/2023 | 46 | No | O'Fallon Missouri Properties, LLC | None | 2101 E TERRA LN, O FALLON, MO, 63366, USA |
| 155 | Bridgeton, MO (155) | BRIDGETON | Yes | St. Louis | Standard | AVF | 45,314 | 35,975 | 11/7/2018 | 12/31/2023 | 46 | No | JS Wiesflo, LLC | None | 925 NORTHWEST PLAZA, SAINT ANN, MO, 63074, USA |
| 156 | Richmond Heights, MO (156) | RICHMOND (DESIGN STUDIO) | Yes | St. Louis | Design | AVF | 3,670 | 3,343 | 11/15/2017 | 7/31/2024 | 53 | No | Hanley LM Properties, LLC | None | 1516 S HANLEY RD, SAINT LOUIS, MO, 63144, USA |
| 157 | Holland, OH (157) | TOLEDO AVF | Yes | Toledo | Flagship | AVF | 91,000 | 80,731 | 8/27/2013 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 1301 E MALL DR, HOLLAND, OH, 43528, USA |
| 158 | Toledo, OH (158) | TOLEDO PS | Yes | Toledo | Sleep | APS | 4,500 | 4,045 | 5/24/2013 | 11/30/2023 | 45 | No | REED HOLDING-TALMADGE, LLC | None | 4600 TALMADGE RD, TOLEDO, OH, 43623, USA |
| 159 | Holland, OH (159) | HOLLAND PS (TOLEDO) | Yes | Toledo | Sleep | APS | 3,465 | 3,135 | 7/13/2018 | 8/31/2028 | 102 | No | Kiez Properties BG, LLC | None | 6760 AIRPORT HWY SUITE B, HOLLAND, OH, 43528, USA |
| 160 | Perrysburg Township, OH (160) | PERRYSBURGH (FREEMONT) | Yes | Toledo | Sleep | APS | 3,500 | n/a | 2/8/2019 | 4/30/2029 | 110 | No | 10411 Fremont Pike, LLC | None | 10411 FREMONT PIKE, PERRYSBURG, OH, 43551, USA |
| 161 | Traverse City, MI (161) | TRAVERSE CITY AVF | Yes | Traverse City-Cadillac | Standard | AVF | 63,120 | 49,903 | 11/21/1998 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 1775 OAK HOLLOW DR, TRAVERSE CITY, MI, 49686, USA |
| 162 | Petoskey, MI (162) | PETOSKEY AVF | Yes | Traverse City-Cadillac | Standard | AVF | 48,115 | 49,765 | 10/5/2002 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 1619 ANDERSON ROAD, PETOSKEY, MI, 49770, USA |
| 163 | Traverse City, MI (163) | TRAVERSE CITY PS | Yes | Traverse City-Cadillac | Sleep | APS | 4,509 | 4,104 | 6/30/2016 | 6/30/2026 | 76 | No | ANCHOR MANISTEE | None | 3675 N US 31 S SUITE B, TRAVERSE CITY, MI, 49684, USA |
| 164 | Frederick, MD (164) | FREDERICK (#7) | Yes | Washington DC | Standard | WLF | 60,000 | 52,500 | 7/1/2003 | 1/31/2024 | 47 | No | Frederick-BILCO, LLP | None | 1215 West Patrick Street, Frederick, MD, 21702, USA |
| 165 | Hagerstown, MD (165) | HAGERSTOWN (#9) | Yes | Washington DC | Standard | WLF | 66,829 | 60,000 | 2/1/2004 | 5/23/2029 | 111 | No | OUTLET VILLAGE OF HAGERSTOWN LLP | None | 900 Premium Outlets Boulevard, Hagerstown, MD, 21740, USA |
| 166 | Leesburg, VA (166) | LEESBURG (#48) | Yes | Washington DC | Standard | WLF | 46,030 | 41,430 | 8/24/2012 | 11/30/2037 | 213 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 131 Fort Evans Road NE, Leesburg, VA, 20176, USA |
| 167 | Frederick, MD (167) | FREDERICK OUTLET (#52) | No | Washington DC | Standard | WLF | 40,484 | 30,484 | 9/17/2014 | 1/31/2020 | n/a | No | RAVID FREDERICK, LLC | None | 5830 Ballenger Creek Pike, Frederick, MD, 21703, USA |
| 168 | Saint Clairsville, OH (168) | SAINT CLAIRSVILLE (#50) | Yes | Wheeling | Standard | LVF | 24,908 | 21,000 | 9/29/2017 | 10/31/2022 | 32 | No | OHIO VALLEY MALL, CO | None | 67661 MALL RING RD, SAINT CLAIRSVILLE, OH, 43950, USA |
| 169 | Boardman, OH (169) | BOARDMAN (#52) | Yes | Youngstown | Standard | LVF | 52,000 | n/a | 8/31/2018 | 8/31/2028 | 102 | No | A&R Properties | None | 300 BOARDMAN POLAND ROAD, BOARDMAN, OH, 44512, USA |
| 170 | Hermitage, PA (170) | HERMITAGE (#62) | Yes | Youngstown | Standard | LVF | 42,000 | n/a | 9/21/2018 | 9/30/2023 | 43 | No | A&R Properties | None | 1340 N. Hermitage Road Suite 1 Route 18, Hermitage, PA, 16148, USA |
| 171 | Niles, OH (171) | NILES (#56) | Yes | Youngstown | Standard | LVF | 52,000 | n/a | 10/31/2018 | 10/31/2028 | 104 | No | A&R Properties | None | 836 YOUNGSTOWN-WARREN RD, NILES, OH, 44446, USA |
| **Totals** | | | | | | | **5,879,611** | **4,932,964** | | | | | | | |

# AVF Holding Company, Inc.
## Exhibit B

| Expense Budget (1) |
|---|

**Advertising**

| | |
|---|---:|
| Media (2) | 2,097,000 |
| Signs (3) | 1,236,760 |
| Sign Walkers | 566,588 |
| Subtotal Advertising | 3,900,348 |

**Supervision**

| | |
|---|---:|
| Fees / Wages / Expenses (4) | 2,160,913 |
| Subtotal Supervision | 2,160,913 |

| | |
|---|---:|
| Miscellaneous /Legal (5) | 35,000 |

| | |
|---|---:|
| Total Expenses | 6,096,261 |

*Note(s):*
*1. This Expense Budget contemplates a sale term of March, 5, 2020 through April 26, 2020.  The Expense Budget remains subject to modification in the event that this term is extended, or as otherwise agreed to by the parties.*
*2. Amounts attributable to media shall only be spent in consultation with the Company.*
*3. Includes Sales Tax.*
*4. Includes Deferred Compensation and Insurance.*
*5. Any legal expenses associated with issues raised by or disputes with landlords, including (without limitation) negotiations in respect of landlord side letters, shall be in addition to and not part of the budgeted legal expenses.*

## Store Closing Procedures[1]

1.      The Sales shall be conducted so that the Stores in which Sales are to occur will remain open no longer than during the normal hours of operation or such hours as otherwise provided for in the respective leases for the Stores.

2.      The Store Closing Sales shall be conducted in accordance with applicable state and local "Blue Laws," where applicable, so that no Store Closing Sale shall be conducted on Sunday unless the Debtors had been operating such Stores on a Sunday prior to the commencement of the Store Closing Sales.

3.      On "shopping center" property, the Consultant shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or if distribution is customary in the "shopping center" in which such Stores is located; *provided* that the Consultant may solicit customers in the Stores themselves. On "shopping center" property, the Consultant shall not use any flashing lights or amplified sound to advertise the Store Closing Sales or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.      At the conclusion of the Store Closing Sales, the Consultant shall, subject to the Consulting Agreement, vacate the Stores and the Distribution Centers in broom clean condition; *provided* that Consultant may abandon any M&E not sold in the Store Closing Sales at the conclusion of the Store Closing Sales, without cost or liability of any kind to the Consultant. The Debtors will have the option to remove the M&E at their own cost prior to the termination date. Any abandoned M&E left in a Stores after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Debtors. For the avoidance of doubt, as of the Sale Termination Date, the Consultant may abandon, in place and without further responsibility or liability of any kind, any M&E.

5.      The Consultant and the Debtors may advertise each Store Closing Sale as a "store closing," "sale on everything," "everything must go," or similar themed sale, and to the extent permitted in the Approval Orders, "going out of business". The Consultant and the Debtors may also have "countdown to closing" signs prominently displayed in a manner consistent with these Store Closing Procedures. All signs, banners, ads and other advertising collateral, promotions, and campaigns will be approved by the Debtors in accordance with these Store Closing Procedures.

6.      The Consultant shall be permitted to utilize sign walkers, display, hanging signs, and interior banners in connection with the Sales; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Debtors and the Consultant shall not use neon or day-glo on its sign walkers, display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs

---

[1]      Capitalized terms used but not defined in these Store Closing Procedures have the meanings given to them in the Interim Order to which these Store Closing Procedures are attached as **Exhibit 1** or the Motion to which the Interim Order is attached as **Exhibit A**, as applicable.

or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Store Closing Procedures.  In addition, the Debtors and the Consultant shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Stores does not require entry into the enclosed mall common area; *provided*, however, that such banners shall be located or hung so as to make clear that the Store Closing Sales are being conducted only at the affected Stores, and shall not be wider than the storefront of the Closing Stores.  In addition, the Debtors and the Consultant shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Order.  Nothing contained in these Store Closing Procedures shall be construed to create or impose upon the Debtors or the Consultant any additional restrictions not contained in the applicable lease agreement.

7.	The purchasers of any Merchandise sold during the Store Closing Sales shall be permitted to remove the Merchandise through the front of the Closing Stores, or through the back or alternative shipping areas at any time.

8.	Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

9.	Except with respect to the hanging of exterior banners, the Consultant shall not make any alterations to the storefront or exterior walls of any Stores, except as authorized by the applicable lease.

10.	The Consultant shall not make any alterations to interior or exterior Stores lighting, except as authorized by the applicable lease.  No property of the landlord of a Stores shall be removed or sold during the Store Closing Sales.  The hanging of exterior banners or in-store signage and banners shall not constitute an alteration to a Stores.

11.	The Consultant shall keep Stores premises and surrounding areas clean and orderly consistent with present practices.

12.	Subject to the provisions of the Consulting Agreement, the Consultant shall have the right to use and sell all M&E.  The Consultant may advertise the sale of the M&E in a manner consistent with these guidelines.  The purchasers of any M&E sold during the Store Closing Sales shall be permitted to remove the M&E either through the back or alternative shipping areas at any time, or through other areas after applicable business hours, *provided, however* that the foregoing shall not apply to *de minimis* M&E sales made whereby the item can be carried out of the Closing Stores in a shopping bag.  For the avoidance of doubt, as of the Sale Termination Date, the Consultant and the Debtors may abandon, in place and without further responsibility, any M&E.

13.	At the conclusion of the Store Closing Sales at each Stores, pending assumption or rejection of applicable leases, the landlords of the Closing Stores shall have reasonable access to the Closing Stores' premises as set forth in the applicable leases.  The Debtors, the Consultant, and their representatives and agents shall continue to have access to the Closing Stores as provided for in the Consulting Agreement.

14.	The rights of landlords against the Debtors for any damages to a Stores shall be reserved in accordance with the provisions of the applicable lease.

15.     If and to the extent that the landlord of any Stores affected hereby contends that the Debtors or the Consultant is in breach of or default under these Store Closing Procedures, such landlord shall email or deliver written notice by overnight delivery to the Debtors and the Consultant as follows:

> If to the Debtors:
>
> Art Van Furniture, LLC
> 6500 14 Mile Road
> Warren, MI 48092
> Attention: Michael Zambricki
>
> with copies (which shall not constitute notice) to:
>
> Benesch, Friedlander, Coplan & Aronoff LLP
> 222 Delaware Avenue, Suite 801
> Wilmington, Delaware 19801
> Attn: Gregory Werkheiser & Michael J. Barrie
>
> -and-
>
> Montgomery McCracken Walker & Rhoads LLP
> 437 Madison Avenue
> New York, NY 10022
> Attn. Maura I. Russell

If the parties are unable to resolve the dispute, either the landlord or the Debtors shall have the right to schedule a hearing before the Court on no less than five (5) days' written notice to the other party, served by email or overnight delivery.