# **<u>EXHIBIT S</u>**

**EXECUTIVE ORDER IN RESPONSE TO COVID-19**
**(COVID-19 EXECUTIVE ORDER NO. 8)**

**WHEREAS**, I, JB Pritzker, Governor of Illinois, declared all counties in the State of Illinois as a disaster area on March 9, 2020 (Gubernatorial Disaster Proclamation) in response to the outbreak of Coronavirus Disease 2019 (COVID-19); and,

**WHEREAS**, in a short period of time, COVID-19 has rapidly spread throughout Illinois, necessitating updated and more stringent guidance from federal, state, and local public health officials; and,

**WHEREAS**, for the preservation of public health and safety throughout the entire State of Illinois, and to ensure that our healthcare delivery system is capable of serving those who are sick, I find it necessary to take additional measures consistent with public health guidance to slow and stop the spread of COVID-19;

**WHEREAS**, COVID-19 has resulted in significant economic impact, including loss of income and wages, that threaten to undermine housing security and stability;

**WHEREAS**, the enforcement of eviction orders for residential premises is contrary to the interest of preserving public health and ensuring that individuals remain in their homes during this public health emergency;

**THEREFORE**, by the powers vested in me as the Governor of the State of Illinois, and pursuant to Sections 7(1), 7(2), 7(8), 7(10), and 7(12) of the Illinois Emergency Management Agency Act, 20 ILCS 3305, and consistent with the powers in public health laws, I hereby order the following, effective March 21, 2020 at 5:00 pm and for the remainder of the duration of the Gubernatorial Disaster Proclamation, which currently extends through April 7, 2020:

**Section 1. Stay at Home; Social Distancing Requirements; and Essential Businesses and Operations**

1. **Stay at home or place of residence.**  With exceptions as outlined below, all individuals currently living within the State of Illinois are ordered to stay at home or at their place of residence except as allowed in this Executive Order.  To the extent individuals are using shared or outdoor spaces when outside their residence, they must at all times and as much as reasonably possible maintain social distancing of at least six feet from any other person, consistent with the Social Distancing Requirements set forth in this Executive Order.  All persons may leave their homes or place of residence only for Essential Activities, Essential Governmental Functions, or to operate Essential Businesses and Operations, all as defined below.

   Individuals experiencing homelessness are exempt from this directive, but are strongly urged to obtain shelter, and governmental and other entities are strongly urged to make such shelter available as soon as possible and to the maximum extent practicable (and to use in their operation COVID-19 risk mitigation practices recommended by the U.S. Centers for Disease Control and Prevention (CDC) and the Illinois Department of Public

Health (IDPH)).  Individuals whose residences are unsafe or become unsafe, such as victims of domestic violence, are permitted and urged to leave their home and stay at a safe alternative location.  For purposes of this Executive Order, homes or residences include hotels, motels, shared rental units, shelters, and similar facilities.

2. **Non-essential business and operations must cease.**  All businesses and operations in the State, except Essential Businesses and Operations as defined below, are required to cease all activities within the State except Minimum Basic Operations, as defined below. For clarity, businesses may also continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e., working from home).

   All Essential Businesses and Operations are encouraged to remain open.  To the greatest extent feasible, Essential Businesses and Operations shall comply with Social Distancing Requirements as defined in this Executive Order, including by maintaining six-foot social distancing for both employees and members of the public at all times, including, but not limited to, when any customers are standing in line.

3. **Prohibited activities.**  All public and private gatherings of any number of people occurring outside a single household or living unit are prohibited, except for the limited purposes permitted by this Executive Order.  Pursuant to current guidance from the CDC, any gathering of more than **ten** people is prohibited unless exempted by this Executive Order.  Nothing in this Executive Order prohibits the gathering of members of a household or residence.

   All places of public amusement, whether indoors or outdoors, including but not limited to, locations with amusement rides, carnivals, amusement parks, water parks, aquariums, zoos, museums, arcades, fairs, children's play centers, playgrounds, funplexes, theme parks, bowling alleys, movie and other theaters, concert and music halls, and country clubs or social clubs shall be closed to the public.

   This Executive Order supersedes Section 2 of Executive Order 2020-07 (COVID-19 Executive Order No. 5), which prohibited gatherings of 50 people or more.

4. **Prohibited and permitted travel.**  All travel, including, but not limited to, travel by automobile, motorcycle, scooter, bicycle, train, plane, or public transit, except Essential Travel and Essential Activities as defined herein, is prohibited.  People riding on public transit must comply with Social Distancing Requirements to the greatest extent feasible. This Executive Order allows travel into or out of the State to maintain Essential Businesses and Operations and Minimum Basic Operations.

5. **Leaving the home for essential activities is permitted.**  For purposes of this Executive Order, individuals may leave their residence only to perform any of the following Essential Activities:

a. **For health and safety.**  To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (including, but not limited to, pets), such as, by way of example only and without limitation, seeking emergency services, obtaining medical supplies or medication, or visiting a health care professional.

b. **For necessary supplies and services**.  To obtain necessary services or supplies for themselves and their family or household members, or to deliver those services or supplies to others, such as, by way of example only and without limitation, groceries and food, household consumer products, supplies they need to work from home, and products necessary to maintain the safety, sanitation, and essential operation of residences.

c. **For outdoor activity.**  To engage in outdoor activity, provided the individuals comply with Social Distancing Requirements, as defined below, such as, by way of example and without limitation, walking, hiking, running, or biking. Individuals may go to public parks and open outdoor recreation areas.  However, playgrounds may increase spread of COVID-19, and therefore shall be closed.

d. **For certain types of work**.  To perform work providing essential products and services at Essential Businesses or Operations (which, as defined below, includes Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure) or to otherwise carry out activities specifically permitted in this Executive Order, including Minimum Basic Operations.

e. **To take care of others**.  To care for a family member, friend, or pet in another household, and to transport family members, friends, or pets as allowed by this Executive Order.

6. **Elderly people and those who are vulnerable as a result of illness should take additional precautions.**  People at high risk of severe illness from COVID-19, including elderly people and those who are sick, are urged to stay in their residence to the extent possible except as necessary to seek medical care.  Nothing in this Executive Order prevents the Illinois Department of Public Health or local public health departments from issuing and enforcing isolation and quarantine orders pursuant to the Department of Public Health Act, 20 ILCS 2305.

7. **Healthcare and Public Health Operations.**  For purposes of this Executive Order, individuals may leave their residence to work for or obtain services through Healthcare and Public Health Operations.

Healthcare and Public Health Operations includes, but is not limited to: hospitals; clinics; dental offices; pharmacies; public health entities, including those that compile, model, analyze and communicate public health information; pharmaceutical, pharmacy, medical device and equipment, and biotechnology companies (including operations, research and development, manufacture, and supply chain); organizations collecting blood, platelets, plasma, and other necessary materials; licensed medical cannabis dispensaries and licensed cannabis cultivation centers; reproductive health care providers; eye care centers, including those that sell glasses and contact lenses; home healthcare services providers; mental health and substance use providers; other healthcare facilities and suppliers and providers of any related and/or ancillary healthcare services; and entities that transport and dispose of medical materials and remains.

Specifically included in Healthcare and Public Health Operations are manufacturers, technicians, logistics, and warehouse operators and distributors of medical equipment, personal protective equipment (PPE), medical gases, pharmaceuticals, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies, and tissue and paper towel products.

Healthcare and Public Health Operations also includes veterinary care and all healthcare services provided to animals.

Healthcare and Public Health Operations shall be construed broadly to avoid any impacts to the delivery of healthcare, broadly defined.  Healthcare and Public Health Operations does not include fitness and exercise gyms, spas, salons, barber shops, tattoo parlors, and similar facilities.

8. **Human Services Operations.**  For purposes of this Executive Order, individuals may leave their residence to work for or obtain services at any Human Services Operations, including any provider funded by the Illinois Department of Human Services, Illinois Department of Children and Family Services, or Medicaid that is providing services to the public and including state-operated, institutional, or community-based settings providing human services to the public.

Human Services Operations includes, but is not limited to: long-term care facilities; all entities licensed pursuant to the Child Care Act, 225 ILCS 10, except for day care centers, day care homes, group day care homes, and day care centers licensed as specified in Section 12(s) of this Executive Order; residential settings and shelters for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness;  transitional facilities; home-based settings to provide services to individuals with physical, intellectual, and/or developmental disabilities, seniors, adults, and children; field offices that provide and help to determine eligibility for basic needs including food, cash assistance, medical coverage, child care, vocational services, rehabilitation services; developmental centers; adoption agencies;

businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged individuals, individuals with physical, intellectual, and/or developmental disabilities, or otherwise needy individuals.

Human Services Operations shall be construed broadly to avoid any impacts to the delivery of human services, broadly defined.

9.  **Essential Infrastructure.**  For purposes of this Executive Order, individuals may leave their residence to provide any services or perform any work necessary to offer, provision, operate, maintain and repair Essential Infrastructure.

    Essential Infrastructure includes, but is not limited to: food production, distribution, and sale; construction (including, but not limited to, construction required in response to this public health emergency, hospital construction, construction of long-term care facilities, public works construction, and housing construction); building management and maintenance; airport operations; operation and maintenance of utilities, including water, sewer, and gas; electrical (including power generation, distribution, and production of raw materials); distribution centers; oil and biofuel refining; roads, highways, railroads, and public transportation; ports; cybersecurity operations; flood control; solid waste and recycling collection and removal; and internet, video, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services).

    Essential Infrastructure shall be construed broadly to avoid any impacts to essential infrastructure, broadly defined.

10. **Essential Governmental Functions.**  For purposes of this Executive Order, all first responders, emergency management personnel, emergency dispatchers, court personnel, law enforcement and corrections personnel, hazardous materials responders, child protection and child welfare personnel, housing and shelter personnel, military, and other governmental employees working for or to support Essential Businesses and Operations are categorically exempt from this Executive Order.

    Essential Government Functions means all services provided by the State or any municipal, township, county, subdivision or agency of government and needed to ensure the continuing operation of the government agencies or to provide for or support the health, safety and welfare of the public, and including contractors performing Essential Government Functions.  Each government body shall determine its Essential Governmental Functions and identify employees and/or contractors necessary to the performance of those functions.

This Executive Order does not apply to the United States government. Nothing in this Executive Order shall prohibit any individual from performing or accessing Essential Governmental Functions.

11. **Businesses covered by this Executive Order**. For the purposes of this Executive Order, covered businesses include any for-profit, non-profit, or educational entities, regardless of the nature of the service, the function it performs, or its corporate or entity structure.

12. **Essential Businesses and Operations**. For the purposes of this Executive Order, Essential Businesses and Operations means Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure, and the following:[1]

   a. **Stores that sell groceries and medicine.** Grocery stores, pharmacies, certified farmers' markets, farm and produce stands, supermarkets, convenience stores, and other establishments engaged in the retail sale of groceries, canned food, dry goods, frozen foods, fresh fruits and vegetables, pet supplies, fresh meats, fish, and poultry, alcoholic and non-alcoholic beverages, and any other household consumer products (such as cleaning and personal care products). This includes stores that sell groceries, medicine, including medication not requiring a medical prescription, and also that sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences and Essential Businesses and Operations;

   b. **Food, beverage, and cannabis production and agriculture**. Food and beverage manufacturing, production, processing, and cultivation, including farming, livestock, fishing, baking, and other production agriculture, including cultivation, marketing, production, and distribution of animals and goods for consumption; licensed medical and adult use cannabis dispensaries and licensed cannabis cultivation centers; and businesses that provide food, shelter, and other necessities of life for animals, including animal shelters, rescues, shelters, kennels, and adoption facilities;

   c. **Organizations that provide charitable and social services**. Businesses and religious and secular nonprofit organizations, including food banks, when providing food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals, individuals who need assistance as a result of this emergency, and people with disabilities;

[1] On March 19, 2020, the U.S. Department of Homeland Security, Cybersecurity & Infrastructure Security Agency, issued a *Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response*. The definition of Essential Businesses and Operations in this Order is meant to encompass the workers identified in that Memorandum.

d. **Media**.  Newspapers, television, radio, and other media services;

e. **Gas stations and businesses needed for transportation.** Gas stations and auto-supply, auto-repair, and related facilities and bicycle shops and related facilities;

f. **Financial institutions**.  Banks, currency exchanges, consumer lenders, including but not limited, to payday lenders, pawnbrokers, consumer installment lenders and sales finance lenders, credit unions, appraisers, title companies, financial markets, trading and futures exchanges, affiliates of financial institutions, entities that issue bonds, related financial institutions, and institutions selling financial products;

g. **Hardware and supply stores**.  Hardware stores and businesses that sell electrical, plumbing, and heating material;

h. **Critical trades.**  Building and Construction Tradesmen and Tradeswomen, and other trades including but not limited to plumbers, electricians, exterminators, cleaning and janitorial staff for commercial and governmental properties, security staff, operating engineers, HVAC, painting, moving and relocation services, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, Essential Activities, and Essential Businesses and Operations;

i. **Mail, post, shipping, logistics, delivery, and pick-up services**.  Post offices and other businesses that provide shipping and delivery services, and businesses that ship or deliver groceries, food, alcoholic and non-alcoholic beverages, goods or services to end users or through commercial channels;

j. **Educational institutions**.  Educational institutions—including public and private pre-K-12 schools, colleges, and universities—for purposes of facilitating distance learning, performing critical research, or performing essential functions, provided that social distancing of six-feet per person is maintained to the greatest extent possible.  This Executive Order is consistent with and does not amend or supersede Executive Order 2020-05 (COVID-19 Executive Order No. 3) or Executive Order 2020-06 (COVID-19 Executive Order No. 4) except that affected schools are ordered closed through April 7, 2020;

k. **Laundry services**.  Laundromats, dry cleaners, industrial laundry services, and laundry service providers;

l. **Restaurants for consumption off-premises.**  Restaurants and other facilities that prepare and serve food, but only for consumption off-premises, through such means as in-house delivery, third-party delivery, drive-through, curbside pick-up,

and carry-out.  Schools and other entities that typically provide food services to students or members of the public may continue to do so under this Executive Order on the condition that the food is provided to students or members of the public on a pick-up and takeaway basis only.  Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site due to the virus's propensity to physically impact surfaces and personal property.  This Executive Order is consistent with and does not amend or supersede Section 1 of Executive Order 2020-07 (COVID-19 Executive Order No. 5) except that Section 1 is ordered to be extended through April 7, 2020;

m.  **Supplies to work from home**.  Businesses that sell, manufacture, or supply products needed for people to work from home;

n.  **Supplies for Essential Businesses and Operations**.  Businesses that sell, manufacture, or supply other Essential Businesses and Operations with the support or materials necessary to operate, including computers, audio and video electronics, household appliances; IT and telecommunication equipment; hardware, paint, flat glass; electrical, plumbing and heating material; sanitary equipment; personal hygiene products; food, food additives, ingredients and components; medical and orthopedic equipment; optics and photography equipment; diagnostics, food and beverages, chemicals, soaps and detergent; and firearm and ammunition suppliers and retailers for purposes of safety and security;

o.  **Transportation.**  Airlines, taxis, transportation network providers (such as Uber and Lyft), vehicle rental services, paratransit, and other private, public, and commercial transportation and logistics providers necessary for Essential Activities and other purposes expressly authorized in this Executive Order;

p.  **Home-based care and services**.  Home-based care for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness, including caregivers such as nannies who may travel to the child's home to provide care, and other in-home services including meal delivery;

q.  **Residential facilities and shelters**.  Residential facilities and shelters for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness;

r.  **Professional services**.  Professional services, such as legal services, accounting services, insurance services, real estate services (including appraisal and title services);

s. **Day care centers for employees exempted by this Executive Order**.  Day care centers granted an emergency license pursuant to Title 89, Section 407.400 of the Illinois Administrative Code, governing Emergency Day Care Programs for children of employees exempted by this Executive Order to work as permitted. The licensing requirements for day care homes pursuant to Section 4 of the Child Care Act, 225 ILCS 10/4, are hereby suspended for family homes that receive up to 6 children for the duration of the Gubernatorial Disaster Proclamation.

t. **Manufacture, distribution, and supply chain for critical products and industries**.  Manufacturing companies, distributors, and supply chain companies producing and supplying essential products and services in and for industries such as pharmaceutical, technology, biotechnology, healthcare, chemicals and sanitization, waste pickup and disposal, agriculture, food and beverage, transportation, energy, steel and steel products, petroleum and fuel, mining, construction, national defense, communications, as well as products used by other Essential Businesses and Operations.

u. **Critical labor union functions**.  Labor Union essential activities including the administration of health and welfare funds and personnel checking on the well-being and safety of members providing services in Essential Businesses and Operations – provided that these checks should be done by telephone or remotely where possible.

v. **Hotels and motels**.  Hotels and motels, to the extent used for lodging and delivery or carry-out food services.

w. **Funeral services**.  Funeral, mortuary, cremation, burial, cemetery, and related services.

13. **Minimum Basic Operations**.  For the purposes of this Executive Order, Minimum Basic Operations include the following, provided that employees comply with Social Distancing Requirements, to the extent possible, while carrying out such operations:

a. The minimum necessary activities to maintain the value of the business's inventory, preserve the condition of the business's physical plant and equipment, ensure security, process payroll and employee benefits, or for related functions.

b. The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.

14. **Essential Travel.**  For the purposes of this Executive Order, Essential Travel includes travel for any of the following purposes. Individuals engaged in any Essential Travel must comply with all Social Distancing Requirements as defined in this Section.

   a.  Any travel related to the provision of or access to Essential Activities, Essential Governmental Functions, Essential Businesses and Operations, or Minimum Basic Operations.

   b.  Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons.

   c.  Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.

   d.  Travel to return to a place of residence from outside the jurisdiction.

   e.  Travel required by law enforcement or court order, including to transport children pursuant to a custody agreement.

   f.  Travel required for non-residents to return to their place of residence outside the State. Individuals are strongly encouraged to verify that their transportation out of the State remains available and functional prior to commencing such travel.

15. **Social Distancing Requirements**.  For purposes of this Executive Order, Social Distancing Requirements includes maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces, and not shaking hands.

   a.  **Required measures.**  Essential Businesses and Operations and businesses engaged in Minimum Basic Operations must take proactive measures to ensure compliance with Social Distancing Requirements, including where possible:

      i.  **Designate six-foot distances**.  Designating with signage, tape, or by other means six-foot spacing for employees and customers in line to maintain appropriate distance;

      ii.  **Hand sanitizer and sanitizing products.**  Having hand sanitizer and sanitizing products readily available for employees and customers;

      iii.  **Separate operating hours for vulnerable populations**.  Implementing separate operating hours for elderly and vulnerable customers; and

    iv. **Online and remote access**.  Posting online whether a facility is open and how best to reach the facility and continue services by phone or remotely.

16. **Intent of this Executive Order**.  The intent of this Executive Order is to ensure that the maximum number of people self-isolate in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the greatest extent possible. When people need to leave their places of residence, whether to perform Essential Activities, or to otherwise facilitate authorized activities necessary for continuity of social and commercial life, they should at all times and as much as reasonably possible comply with Social Distancing Requirements.  All provisions of this Executive Order should be interpreted to effectuate this intent.

17. **Enforcement**.  This Executive Order may be enforced by State and local law enforcement pursuant to, *inter alia*, Section 7, Section 18, and Section 19 of the Illinois Emergency Management Agency Act, 20 ILCS 3305.

18. **No limitation on authority**.  Nothing in this Executive Order shall, in any way, alter or modify any existing legal authority allowing the State or any county, or local government body from ordering (1) any quarantine or isolation that may require an individual to remain inside a particular residential property or medical facility for a limited period of time, including the duration of this public health emergency, or (2) any closer of a specific location for a limited period of time, including the duration of this public health emergency.  Nothing in this Executive Order shall, in any way, alter or modify any existing legal authority allowing a county or local government body to enact provisions that are stricter than those in this Executive Order.

## Section 2. Order ceasing evictions.

Pursuant to the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(2), (8), and (10), all state, county, and local law enforcement officers in the State of Illinois are instructed to cease enforcement of orders of eviction for residential premises for the duration of the Gubernatorial Disaster Proclamation.  No provision contained in this Executive Order shall be construed as relieving any individual of the obligation to pay rent, to make mortgage payments, or to comply with any other obligation that an individual may have under tenancy or mortgage.

## Section 3. Savings clause.

If any provision of this Executive Order or its application to any person or circumstance is held invalid by any court of competent jurisdiction, this invalidity does not affect any other provision or application of this Executive Order, which can be given effect without the invalid provision or application. To achieve this purpose, the provisions of this Executive Order are declared to be severable.

# **EXHIBIT T**



# **MEMORANDUM**

**TO:**  Employees Affected By Closing of Art Van Furniture Stores located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321; and 1021 Butterfield Rd. Downers Grove, Ilinois, 60515.

**FROM:**  Cathrine Wenger, Senior Counsel

**SUBJECT:**  WARN Act Notice (revised)

**DATE:**  March 19, 2020

On March 5, 2020, Art Van Furniture, LLC (the "Company") informed employees that it had made the difficult decision to wind-down its operations, to include the closure of its retail facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, which would in the permanent termination the employment of all employees at these locations.

Since initial notice, the Company has been impacted by the novel COVID-19 virus and the resulting, and sudden, negative economic impact. Due to these unforeseen events, the Company can no longer support the wind-down of its retail operations through the originally projected termination date. The Company, therefore, submits this revised notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act").

All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). The employment of Art Van's sales associates and other commissioned employees, visuals, housekeepers, drivers, helpers, and other hub warehouse staff, Selling Managers and Outlet Managers as well as any Sales or Store Manager who is not scheduled to perform services on March 21, 2020 or March 22, 2020, will be terminated on March 20, 2020. All CPU's and office staff, along with the Store Manager and/or Sales Manager scheduled to work on March 21, 2020 or March 22, 2020 will be terminated at the end of the business day on March 22, 2020. Nothing in this letter alters your at-will employment status with the Company. You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

I will be acting as the Company's representative with regard to these matters. Should you have any questions, please contact me for further information at Cathrine Wenger, Senior Counsel, cwenger@artvan.com, (586) 983-2000. My address is 6500 E 14 Mile Rd, Warren, MI 48092.

13234411 v1

# **EXHIBIT U**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | . | Chapter 11 |
| IN RE: | . | |
| | . | Case No. 20-10553(CSS) |
| ART VAN FURNITURE, et al, | . | |
| | . | |
| | . | 824 Market Street |
| | . | Wilmington, Delaware 19801 |
| Debtors. | . | |
| . . . . . . . . . . . . . . . | . | Thursday, March 19, 2020 |

TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
CHIEF UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA TELEPHONE:

For the Debtors:          Gregory Werkheiser, Esq.
                          Michael J. Barrie, Esq.
                          Kevin M. Capuzzi, Esq.
                          John Gentile, Esq.
                          Kate Harmon, Esq.
                          Jennifer Hoover, Esq.
                          BENESCH, FRIEDLANDER, COPLAN
                           & ARONOFF, LLP

                          Maura Russell, Esq.
                          MONTGOMERY, MCCRACKEN, WALKER
                           & RHOADS, LLP

For the U.S. Trustee:     Linda Richenderfer, Esq.
                          OFFICE OF THE U.S. TRUSTEE

(Appearances Continued)

Audio Operator:           Electronically Recorded
                          by CourtCall/Court Personnel

Transcription Company:    Reliable
                          1007 N. Orange Street
                          Wilmington, Delaware 19801
                          (302)654-8080
                          Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES VIA TELEPHONE:   (Continued)

For the Official Committee
of Unsecured Creditors:       Robert J. Feinstein, Esq.
                              Bradford J. Sandler, Esq.
                              PACHULSKI, STANG, ZIEHL
                               & JONES, LLP


For Wells Fargo Bank:         J. Cory Falgowski, Esq.
                              BURR & FORMAN, LLP


For Wells Fargo
Capital Finance:              Jennifer Feldsher, Esq.
                              MORGAN, LEWIS & BOCKIUS, LLP


For Hilco Merchant
Resources, LLC, et al:        Douglas Hermann, Esq.
                              PEPPER HAMILTON, LLP


                              Steven Fox, Esq.
                              RIEMER & BRAUNSTEIN, LLP


For HGB AVF Lending:          Dennis A. Meloro, Esq.
                              Jeffrey Wolf, Esq.
                              GREENBERG TRAURIG, LLP



ALSO APPEARING VIA TELEPHONE:


                              Dennis Stogsdill
                              ALVAREZ & MARSAL

INDEX

|                                    | Page |
| ---------------------------------- | ---- |
| STATUS BY MR. WERKHEISER           | 7    |
| COMMENTS BY MS. FELDSHER           | 14   |
| COMMENTS BY MR. WERKHEISER         | 16   |
| COMMENTS BY MR. FOX                | 18   |
| COMMENTS BY MR. SANDLER            | 20   |
| COMMENTS BY MR. BARRIE             | 22   |
| SCHEDULING                         | 25   |

4

1      (Proceedings commence at 2:01 p.m.)

2              THE COURT:  Good afternoon, everyone.  This is

3      Judge Sontchi.  I hope all can hear me.  You can't see me,

4      however.  You might -- for many of you, that's an advantage

5      that you are soon going to lose.

6              UNIDENTIFIED:  Your Honor, I think we have to shut

7      down either the audio in the Skype because we're hearing some

8      feedback.

9              THE COURT:  Well, everybody that I have that is on

10     Skype is on mute, except for Mr. Sandler.  There we go.

11             UNIDENTIFIED:  That's better, Your Honor.

12             THE COURT:  And --

13             MR. SANDLER:  (Not identified) My apologies, Your

14     Honor.  I've never used Skype before.

15             THE COURT:  Me neither.  Somehow -- wait a minute.

16     We're doing our best here, some new technology.

17             Let me ask because, apparently, I've disappeared.

18     Can you see me on your displays?

19             UNIDENTIFIED:  No.

20             UNIDENTIFIED:  No.

21             UNIDENTIFIED:  We can see your name, but there's no

22     picture.

23         (Participants confer)

24             UNIDENTIFIED:  There you are.  That works.

25             THE COURT:  Oh, I can tell by the happy faces that

1    I have arrived.

2              UNIDENTIFIED:  You can look at everybody's houses

3    now.

4              THE COURT:  All right.  Well, thank you very much.

5    The Bankruptcy Court remains open for business, but it is not

6    business as normal, as you can tell.  We are dealing with

7    everything you are dealing -- I'm seeing many of you who are

8    clearly at home.  I'm in the office, but I'm about the only

9    person here, and we are operating remotely at the Bankruptcy

10   Court now.

11             So we're going to be, as you know from my previous

12   order -- maybe you've seen it -- we are going to be operating

13   at -- with regard to only time-sensitive matters only.  All

14   other matters are being cleared until, at this point, April

15   15th.  That, of course, is subject to further extension, if

16   necessary.  Our primary concern is the health and safety of

17   our employees and the public, doing our civic duty to help

18   stop the spread of this virus, and to promote and fulfill our

19   mission of running the bankruptcy system.  And those are hard

20   -- four hard things to try to get to work at the same time,

21   but we're doing the very best we can.

22             As you know, we're doing telephonic appearances for

23   most everything.  We are using -- we have this ability to use

24   video to a limited extent, when we have to deal with

25   witnesses.  Our interpretation of the law -- which could be

6

1  wrong, but it's our interpretation -- is that, if you have a

2  contested evidentiary matter, it is not sufficient to have

3  the witness available by telephone, but that there has to be

4  a video connection, so that the Court can discern the

5  demeanor of the witness, so that parties cross-examining that

6  witness can see the witness, and so the witness can see the

7  people cross-examining him or her.  And of course, there has

8  to be the ability to look at documents.  So this is a

9  complication.

10  And the reason I have this hearing today -- this

11  conference today, is to prepare for tomorrow's hearing, which

12  may be -- well, I think is going to be contested, and it may

13  involve contested evidence.  I'm not sure about that, and

14  that's one of the reasons I asked you all to be on the phone

15  today, so we could flesh that out.

16  So what I'd like to do, first of all, is welcome

17  Mr. Sandler to the case, who I understand represents the

18  Official Committee of Unsecured Creditors that was appointed

19  yesterday.

20  Mr. Barrie, if I could turn to your first, as

21  counsel for the debtors, to give me a general report on

22  what's going on with the debtor and what you -- how you

23  foresee tomorrow going forward.

24  MR. BARRIE:  Thank you, Your Honor.  I'm actually

25  going to defer to Mr. Werkheiser, who is on CourtCall.  As

1   you can imagine, this global pandemic has kind of thrown a

2   wrench into everybody's business everywhere, and the debtors

3   having retail going-out-of-business sales in the Midwest and

4   the Northeast is certainly not excused from that.  So I want

5   to kind of pitch it over to Greg, who can give the Court a

6   general status update as to all the matters that are

7   happening and the status of what the debtors are doing.

8           MR. WERKHEISER:  Yes.  Thank you, Mr. Barrie.

9           Your Honor, Greg Werkheiser of Benesch for the

10  record, for the debtors.  And it seems like a lifetime ago,

11  but I think, with the exception of the hearing we had on

12  Monday on the TRO on the (indiscernible) matter, we were last

13  before Your Honor on March 12th.

14          And this situation has evolved with a rapidity and

15  severity over the last week that I don't think anybody could

16  have predicted, and in a way that sort of uniquely makes life

17  challenging for a furniture retailer especially.  And you

18  know, so, obviously, as Your Honor is aware, this coronavirus

19  epidemic has been sweeping through the country since early --

20  I think it was late February or early March.  But really, you

21  know, we started getting, you know, significant feedback

22  about this shortly after the case was filed.  You know, as I

23  look through the time lines of everything that has gone on

24  relative to the coronavirus epidemic, you know, it's really

25  just been in the last week that things have really ramped up.

8

1    And you know, from the debtors' experience and

2    their operations, you know, what we've seen transpiring in

3    the states and localities where the debtors operate is -- you

4    know, obviously, we have now federal state of emergency

5    declared on account of this, and you know, all of the sort of

6    reliable sources and information is urging everyone to stay

7    home to the greatest extent to possible and to -- you know,

8    no nonessential activities out of their homes.

9    And then a number of places where the company has

10   operated in its core markets, such as Ohio and Pennsylvania

11   and Michigan, the, you know, state and local governments have

12   either issued strong guidance or outright directives for

13   nonessential retail to not be operating over the last several

14   days.  And this has had, you know, a devastating effect on

15   the debtors' ability to operate, you know, both the store

16   closing sales that had gotten underway just before the filing

17   and for the quotations that were contemplated to be part of

18   the Levin-Wolf going concern sale, which are 44 stores,

19   primarily located in Pennsylvania and Ohio, those locations,

20   as well.

21   Not to put too fine of a point on it, but you know,

22   I think, for at least the last several days, you know, the

23   company has been unable to meet, even at the store closing

24   locations, you know, the operating expenses that are incurred

25   just by keeping the doors open and the lights on and staff in

1   place to run those sales.  It's just not getting -- it wasn't

2   getting volume into the stores, in terms of customer traffic.

3   And obviously, people, out of health concerns and economic

4   concerns, are reluctant to make these types of bigger ticket

5   expenditures that are involved in committing to purchase a

6   piece of furniture.

7           So we are in a place now that I think we never

8   hoped or expected to be when, you know, planning for this

9   Chapter 11 was underway, certainly not any -- what anybody

10  expected in negotiating a cash collateral budget or orders.

11  And you know, everybody is doing the best they can under

12  these extraordinary -- extraordinarily different

13  circumstances to -- you know, obviously, paramount is the

14  health and safety of everyone involved, but -- and then, you

15  know, to treat all of our constituents, especially, you know,

16  our employees and customers, as fairly as possible under the

17  circumstances, but also to preserve and maximize value to the

18  greatest extent possible.

19          And so this -- where this has left us is in a

20  position where we've had to make some very, very hard

21  decisions over the last several days.  And just so the -- to

22  preview it for Your Honor, we've got a few different buckets

23  of stores that the company has operated.  There were, you

24  know, Art Van (indiscernible) branded mattress stores that

25  were the subject of going concern sales that were largely

1   completed as of mid March.  There's another bucket of stores

2   that are the, you know, Art Van stores, and the eight

3   Maryland and Virginia-based Wolf stores that had been the

4   subject of the closing -- the store closing sales that had

5   begun just before the filing.  And then thirdly, we have the

6   -- you know, what were going to be the Levin-Wolf going

7   concern stores.

8           And you know, as to the ones where we still had

9   ongoing GOBs and -- or were attempting to operate as much as

10  possible in the ordinary course, the company has made the --

11  you know, the difficult decision, effective as of today, to

12  tell employees not to report to work at those locations.  We

13  hope that -- and has, at least temporarily, shuttered these

14  locations.  You know, we hope this is not forever, but the

15  situation is extraordinarily difficult and very fluid.  And

16  so, you know, we have to adapt consistent with our

17  obligations and fiduciary duties to the facts as they

18  (indiscernible)

19          THE COURT:  So I'm confused.  I apologize, Mr.

20  Werkheiser.  So what stores are you not going -- or what

21  stores is it that you're telling employees not to show up to,

22  the store closing sale stores or all stores?

23          MR. WERKHEISER:  Effectively, all of the ones that

24  we still have ongoing store closing sales or that we're

25  operating in the ordinary course, which is basically the

1    Levin-Wolf sale, so (indiscernible)

2              THE COURT:  So the Wolf and -- so the Wolf and

3    Levin stores are closed, as well?

4              MR. WERKHEISER:  At least temporarily, Your Honor,

5    yes.  And --

6              THE COURT:  What about the mattress stores?

7              MR. WERKHEISER:  Your Honor, the mattress stores,

8    with the exception, I believe, of the Levin Mattress stores -

9    - so all of the Art Van or -- I think the brand was Pure

10   Sleep branded mattress stores were already, to my knowledge,

11   involved in store closing sales.  And as I understand it, the

12   nature of that inventory is such that they tend to sell down

13   quite quickly in a store closing sale context.  And so most

14   of those, if not all of them, were already through their

15   process as of last week.

16             THE COURT:  All right.

17             MR. WERKHEISER:  (Indiscernible)

18             THE COURT:  So, as of tomorrow, you will be not

19   operating business.

20             MR. WERKHEISER:  With the exception of --

21             THE COURT:  Online?

22             MR. WERKHEISER:  -- some back office functions and

23   distribution center functions and the headquarters.  And then

24   the sort of fulfillment side of the retail stores, I believe,

25   for a few days is contemplated to continue open -- operating

1    to try to, you know, allow customers to pick up have

2    delivered product that they've recently ordered.

3              THE COURT:  Okay.  So I guess the -- well, to cut

4    to the chase, that means we're not having a hearing tomorrow.

5              MR. WERKHEISER:  I don't want to speak for

6    everybody, Your Honor, on the phone.  But I think that is the

7    debtor's view, and Mr. Barrie can speak more to that.

8              I guess, before we sort of segue into talking about

9    tomorrow's hearing, Your Honor, I just -- I do want to make

10   clear that, you know, we are trying to explore with our

11   lenders and our other stakeholders, you know, other options,

12   short of outright (indiscernible) liquidation.  And you know,

13   we're aware, for example, that in a -- in the Craftworks

14   case, currently pending before Judge Shannon, they've --

15             THE COURT:  I think that's --

16             MR. WERKHEISER:  -- (indiscernible)

17             THE COURT:  Actually, I think that's confidential

18   information, Mr. Werkheiser.

19             MR. WERKHEISER:  Oh --

20             THE COURT:  That call was not on the record today.

21             MR. WERKHEISER:  I was not aware of that, I'm

22   sorry, Your Honor.

23             So let me just say then, conceptually, we are

24   looking at the possibility of a -- you know, going idle or

25   going into a state of dormancy for a period of time, and the

1    possibility then of either, you know, reopening stores, some

2    subset of stores as -- either in furtherance of the going

3    concern transaction, if there's still one to be had at that

4    point, or -- you know, or closing sales and an orderly

5    liquidation, you know, essentially, once the economic and the

6    retail environment and the safety environment have improved

7    to a degree that we can do that.

8         It is, you know, a number -- there are a number of

9    scenarios under consideration.  I think, of every available

10   scenario, that is probably the, you know, most attractive one

11   that we have.  And we are, right now, engaging in a dialogue

12   with Wells Fargo and our term loan lenders to see if there's

13   a way to pursue that alternative.  The -- you know, but the

14   reality of the situation is that we cannot continue to burn

15   cash at the rate that we've been, given that there's

16   virtually no revenue coming into the company right now.

17        And you know, we -- of course -- and of course, for

18   us to be able to do that, we need cooperation from the ABL

19   agent and the term loan lenders and, you know, need

20   everyone's assurances that, while we are having these

21   dialogues, that, you know, they'll take no precipitous action

22   to make that -- an already difficult situation worse by, you

23   know, sweeping all of the cash, for example, that are in the

24   debtors' cash collection accounts and leaving us without even

25   the cash necessary to fund those operating and restructuring

14

1    expenses already incurred or that might be incurred

2    imminently, as we're, you know, trying to navigate this

3    situation.

4             THE COURT:  All right.  Thank you, Mr. Werkheiser.

5             MR. WERKHEISER:  Thank you, Your Honor.

6             THE COURT:  Obviously distressing news, but I

7    appreciate the update.

8             Would anyone like to be heard in connection with

9    Mr. Werkheiser's report?  The lenders, the committee, the

10   liquidator, anybody?

11            MS. FELDSHER:  Your Honor --

12            MR. FOX:  Your Honor --

13            MS. FELDSHER:  -- this is Jennifer --

14            MR. FOX:  -- Steve Fox -- go ahead, Jennifer.

15            THE COURT:  Ms. Feldsher?

16            MS. FELDSHER:  Your Honor, this is Jennifer

17   Feldsher from Morgan Lewis on behalf of Wells Fargo, the ABL

18   lender.

19            Your Honor, these are unprecedented times, and

20   we're -- I personally was on, you know, calls that aren't of

21   public record earlier today.  This has hit retail, it has hit

22   restaurants and other industries very hard.  And it has hit,

23   you know, a lot of cases and a lot of people, and we are

24   mindful of that.

25            Your Honor, a lot of this information and the

1     debtors' decisions, unfortunately, are coming at us minutes

2     before the -- before these hearings.  These are not

3     discussions that -- you know, I would say that where the

4     debtors are, as opposed to other cases, is they haven't fully

5     come to their creditors, other than to say this is somebody

6     else's problem and, you know, put -- you know, fix it for us

7     or don't sweep or do these things.

8           I think that we are certainly discussing with the

9     debtors -- we want to try to find a path forward.  We would

10    like to find a path that makes sense for all stakeholders

11    here, but it's going to require extraordinary measures

12    because we are living through extraordinary times, to try to

13    figure out what is the path forward, what's the path that

14    preserves, you know, value, that provides as much value as

15    possible to those that are impacted by these decisions.

16          And unfortunately, we haven't gotten the

17    information that we need from the company to be able to even

18    consider a full wind-down plan.  So, you know, you heard Mr.

19    Werkheiser, I think asking for an advisory opinion on

20    remedies that the lenders can take.  We're not -- you know,

21    we're in fact-finding mode and, you know, they're asking for

22    advisory opinions.  I mean, I -- they're in default today

23    under their cash collateral budget, they understand that.  We

24    are trying to work with them productively.  There are a

25    number of outstanding items.

1     That's all I can say to you at this time because

2 that is truthful in where we are with the parties.  And you

3 know, we're trying to cope and we're trying to absorb all of

4 this in the best way that we can.  So I'm happy to take any

5 questions that Your Honor has, but a lot what was said on the

6 call has -- is complete news and -- just to the ABL lenders.

7     THE COURT:  Okay.  Yeah, it's news to me, too, of

8 course.  Have you actually issued a notice of default,

9 though?

10     MS. FELDSHER:  We have not yet, Your Honor.

11     THE COURT:  Okay.  Thank you.

12     Anyone else?

13     MR. WERKHEISER:  Your Honor, it's Mr. Werkheiser.

14 If I could respond briefly?

15     THE COURT:  Yes, Mr. Werkheiser.

16     MR. WERKHEISER:  So, Your Honor, I think we have a

17 -- obviously, somewhat of a difference of opinion about

18 information flow, but -- and I don't think we need to belabor

19 that point.  We are committed to -- and I think we have been

20 giving as much information as possible to the lenders.  It's

21 just, you know, the rapidity and severity of the

22 circumstances, you know, have limited how much useful

23 information we have, and therefore we can share at any given

24 moment in time.  But we're committed to making that

25 information available.

17

1          But -- and I also want to be clear.  I was not

2    asking Your Honor to limit their remedies or prevent the

3    lenders from having whatever rights are available to them

4    under the Code and the interim cash collateral order today.

5    But we are concerned that we are in a situation that nobody

6    could have anticipated.  And because there has been a lack of

7    communication, we want to make sure that the debtors are not

8    left in a position where they're not able to meet those

9    committed expenses that have been incurred or cannot be

10   avoided to be incurred in the near term.

11          And my point was simply that we need to have that

12   communication going forward.  But then we absolutely reserve

13   our rights to come before the Court if we need to, to address

14   those sorts of issues.  And you know, we wanted to preview

15   that we had concerns, but not asking for Your Honor to do

16   anything or to grant any relief today.

17          THE COURT:  Well, you're not going to get anything,

18   so that's good.  Obviously --

19          MR. FOX:  Your Honor --

20          THE COURT:  -- the cash collateral --

21          MR. FOX:  -- if I --

22          THE COURT:  -- order --

23          MR. FOX:  If I may?

24          THE COURT:  Just a second.

25          Actually, you know, the cash collateral says what

1    it says, and if there's a default that's called, there are

2    certain things that occur.  I think that all the lenders and

3    creditors probably understand that this is a difficult

4    situation, but I'm sure they're all still focused on

5    maximizing their recoveries, even though what "maximizing"

6    means today may not be what "maximizing" meant on Monday, and

7    it is what it is.

8            But I -- what's important, I'm -- I -- like Ms.

9    Feldsher, I'm in information-gathering mode at this point,

10   and this is just a status conference; it's not a hearing.

11   But all of this is very important and I appreciate the

12   information.

13           And I interrupted someone, and I don't know who it

14   was.

15           MR. FOX:  Your Honor, thank you.  This is Steven

16   Fox from Riemer & Braunstein.  As Your Honor will recall, we

17   represent the proposed consultant Hilco and Gordon Brothers.

18   We, too, share everybody's disappointment in the necessity,

19   from the debtors' standpoint, of making this difficult

20   decision.

21           We, too, were a bit in the dark up until minutes

22   before this hearing, when Mr. Barrie sent me an email that

23   the debtors had made this decision and were not planning on

24   going forward tomorrow.  Your Honor probably is aware we did

25   file a declaration in support of the motion earlier today,

1   with the expectation that we were going forward tomorrow.  So

2   this came quite as a shock to us, shortly before the hearing

3   this afternoon.

4        We do have more than 40 people out in the field,

5   who have been continuing to perform services in anticipation

6   of going forward tomorrow.  We've been incurring expenses to

7   support the debtors' efforts in keeping the store closing

8   sales going for the benefit of the estate and the creditors,

9   with the expectation that the debtors were going to conduct

10  themselves in good faith and move forward in connection with

11  the motion.

12       We continue to provide these services at the

13  request of the debtors, as well as the ABL lenders.  And we

14  will continue to stand by to support the estates' efforts,

15  whatever decisions are ultimately made, in terms of what the

16  path forward will be.

17       And we, too, will commit to work with the ABL

18  lenders, the term lenders, and the debtors, and now the

19  committee, having recently been appointed, to find the

20  optimal path forward to maximize value because, as Your Honor

21  will recall, we also, through an affiliate, hold pre-petition

22  term debt, so our interests are aligned with the rest of the

23  constituents within the estate to maximize recovery here for,

24  not only the benefit of ourselves, but for the benefit of

25  others involved.  And we look forward to having an

1   opportunity to come back and resolve these issues when a path

2   forward is ultimately resolved.  Thank you, Your Honor.

3             THE COURT:  Thank you, Mr. Fox.

4             Mr. Wolf?

5             UNIDENTIFIED:  Your Honor, this --

6             MR. SANDLER:  Your Honor, it's Brad Sandler.  If I

7   may be heard.

8             THE COURT:  Yes, you may, Mr. Sandler.

9             MR. SANDLER:  Thank you, Your Honor.  And as you

10  noted, just for the record, Brad Sandler, Pachulski Stang,

11  for the committee.

12            Your Honor, you know, the committee, having only

13  selected us as counsel yesterday, having been informed

14  yesterday, this is all new to us, but none of it really

15  surprising.  The committee's overarching goal was to, I'll

16  just say maximize value, like everybody else.  But there are

17  other things besides, you know, dollar recoveries.

18            For example, with the Wolf Levin going concern

19  sale, we were hoping that 44 stores would be saved, thousands

20  of jobs would be saved.  Maybe that will happen down the

21  road.  But as -- you know, certainly, with the coronavirus,

22  this unprecedented shutdown throughout the country that

23  certainly we have never seen, and hopefully never will see

24  again, Simon Properties closing their malls, L Brands,

25  JCPenney, you know, the Gap, you know, many, many retailers

1   around the country are starting to shut down.  And to have

2   the debtor do that at this time, frankly, from our

3   perspective, makes a lot of sense, to put everything on ice.

4           First of all, it's important for the employees, to

5   make sure that they're not exposed potentially to the virus.

6   It's also something that -- right?  We're talking about

7   something that is not perishable.  You know, furniture,

8   whether, you know, it's in the store today or in the store,

9   you know, a month from now or two months from now, it's still

10  the same furniture.  So it should be relatively easy to shut

11  the debtor down without any value that would dissipate

12  because of the furniture somehow, you know, getting destroyed

13  or damaged.

14          You know, it seems to me, Your Honor, that, in

15  these times -- right?  Restructuring professionals are, in

16  part, supposed to come up with creative solutions to very,

17  very tough problems.  And it may be easy to look at this

18  situation and pull the plug and say let's convert the case to

19  a Chapter 7.  I'm not really sure what that gets you.  If

20  people aren't shopping right now because everybody is shut in

21  their, you know, respective abodes, Chapter 7 isn't going to

22  generate any more value.

23          And it seems to me that this is a creative approach

24  to put everything on ice.  And hopefully, you know, at some

25  time period, whether it's 30 days, 60 days, 90 days, whatever

1    that time period may be, to, you know, turn the lights back

2    on and resume the liquidation of the stores and hopefully

3    find a going concern for the Wolf Levin properties.

4          And whether, you know, Robert Levin is the

5    purchaser at that time, whether he's still interested, we

6    don't know.  But the best chance in certainly the committee's

7    mind right now, to preserve value, is to put everything on

8    ice and let's come back to in, you know, a month or two and

9    see where we are.

10          MR. BARRIE:  Your Honor (indiscernible)

11          THE COURT:  Thank you, Mr. Sandler.

12          MR. BARRIE:  This is Michael Barrie.  If I could

13    just add a lit bit more color to what Mr. Sandler has just

14    spoken about.

15          THE COURT:  Yes.

16          MR. BARRIE:  So mister (indiscernible) did a

17    (indiscernible) explain (indiscernible) where we are and how

18    we got there, and I appreciate all of the constituents', you

19    know, requests and, to some extent, a little bit of

20    frustration about getting information.  But again, this is a

21    fluid -- this is a fluid time where no one had any

22    expectation that the entire world would come to a screeching

23    halt.

24          We are working with Wells, we have given them

25    information about 48 hours ago.  We're starting to get some

23

1    comments and feedback on that information now.  But as Mr.

2    Sandler said, the thought process would be kind of -- and

3    we've set this forth in a more fulsome motion that the Court

4    can hear.  But main -- find a way to maintain a -- almost a

5    status quo going forward, ensure that the employees who have

6    worked to realize a return for the inventory for the benefit

7    of Wells, make sure they're compensated.

8          Make sure our consumers know that -- who have gift

9    cards or who have creditors, you know, make sure that they're

10   aware of how -- you know, through communications on the

11   website, emails, whatever, how they -- you know, they will be

12   treated.  But the idea is let's not make this a

13   (indiscernible) thing.  But the reality of the situation is,

14   is that we can't have a going out of business sale if there's

15   no one to come and buy the merchandise.

16         On the Levin side -- on the Levin side, one of the

17   bigger issues that we're faced with are half of those stores

18   are in Pennsylvania, I think 27 of them.  The Commonwealth of

19   Pennsylvania closed all those stores by order of the

20   Governor.  So they -- being open is not even an option for

21   any of them.

22         So the thought is let's put this thing in a coma

23   for a little bit, let's skinny down this budget.  Let's work

24   with Wells to make sure that the people who are working hard

25   to maximize recovery so far are being taken care of, and then

1    make sure that consumers know how they can be taken care of.

2    And then let's -- let us work with Wells to figure out how

3    this works in the near term.  Let us -- knowing full well

4    that we can use this time to work out if there are bulk

5    inventory sale opportunities; use this time to further

6    discuss the Levin sale, keep that going because that's mostly

7    an attorney-driven piece; discuss potential lease disposition

8    options under 365(d) and discuss with our credit card

9    processors returning monies for the increased reserves they

10   had taken during the preference period, which all can be done

11   in the context of during this temporary -- during this

12   temporary -- for lack of a better word -- coma, and then have

13   some sort of procedure going forward -- again, we'll do this

14   by motion -- that truly puts those emergent needs that have

15   to be decided because of destruction of proper threats or

16   threats to life and safety, putting those needs on an

17   emergent basis that have to be heard, but holding all other

18   non-emergent, monetary-type relief until such point that the

19   parties can really deal with it as it comes down.

20           And we just felt that this is a better framework

21   for preserving the value of what's there, as opposed to

22   simply just pulling the plug and walking way from everything.

23   So --

24           THE COURT:  All right.

25           MR. BARRIE:  -- you know, in that context, with

1    respect to the Hilco retention, Your Honor, in that context,

2    we just don't feel it's appropriate to go forward on a

3    retention hearing for something that hopefully will happen

4    eventually, but is not going to be happening in the next

5    couple of days.

6         THE COURT:  All right.  Now I'm confused.  So you

7    do want to go forward tomorrow?

8         MR. BARRIE:  No, no, no.  We don't want to go

9    forward.  We don't think it's necessary to go forward on that

10   because there's not going to be a going out of business sale

11   right now, so we don't think that it's necessary to go

12   forward on that until that issue materializes.  We just think

13   it's a -- we do think Hilco's partnership is very important

14   and we do intend to go forward with it at some point, just

15   tomorrow is not the day to do it.

16        THE COURT:  All right.  And you don't want to set a

17   date for that at this time?

18        MR. BARRIE:  We can set a date.  I don't have a

19   problem setting a date just to keep it on the calendar.  But

20   I would suspect that that date would be probably mid to later

21   April.

22        THE COURT:  All right.  Well, we have a hearing on

23   April 6th, so we can continue it to then, at least for now.

24        Any objection to continuing that until April 6th?

25        (No verbal response)

1            THE COURT:  Okay.  I don't hear any.

2            We'll obviously not go forward tomorrow, and that's

3     a shame, mainly because it's a shame for the business; and,

4     second, it's a shame because we were hoping to see if we

5     could figure out how to do this, and this was going to be one

6     of the first opportunities.  But that's nothing compared to

7     the loss of productivity and recovery to the employees and

8     the creditors as a result of these developments, which are

9     clearly outside the control of anybody on this call, that's

10    for sure.

11           So this has been very helpful.  We'll cancel

12    tomorrow's hearing.  Is there anything anybody else would

13    like to offer to the Court?

14           MR. WERKHEISER:  Your Honor, this is Greg

15    Werkheiser.

16           UNIDENTIFIED:  Your Honor --

17           MR. WERKHEISER:  I just wanted to mention that we

18    do have a -- I think a March 31st hearing scheduled with the

19    Court that we are trying to keep on the calendar, if at all

20    possible.  I mentioned that there were some 60 odd locations

21    that the debtors are --

22           THE COURT:  Yeah, I have that --

23           MR. WERKHEISER:  -- (indiscernible)

24           THE COURT:  I have that on my -- yes, I have that

25    on my calendar.  But that's a special hearing, that's not an

1  omnibus, so that's why I didn't mention it.  The April 6th

2  hearing is the second day hearing for the case, so that's why

3  I mentioned that hearing.  But now, you still have the March

4  --

5          MR. WERKHEISER:  Okay (indiscernible)

6          THE COURT:  -- you still have the March 31st

7  hearing.

8          MR. WERKHEISER:  All right.  Thank you, Your Honor.

9          THE COURT:  Anyone else?

10          MR. BARRIE:  The only other -- the only other

11  request, given that things are so fluid, Your Honor, and

12  things are ever development, I don't think it's needed for

13  tomorrow.  But maybe perhaps early next week we could just

14  have one further status conference, so, if there are any

15  issues that the Court can help the parties resolve on a

16  little more of an informal basis, and also to update the

17  parties and the Court as to what's going on with the matters,

18  maybe earlier next week might be a good time to have a status

19  conference?

20          THE COURT:  Sure.  I'm available.  It's a very

21  empty calendar, and this is clearly an important and time-

22  sensitive matter.  So I'm available pretty much every -- I

23  have a hearing Wednesday at 2, and I have -- I'm not free

24  Thursday morning, and I have a lunch conference on Friday.

25  Other than that, I'm wide open.  Monday seems early.  How

28

1    about Tuesday?

2            MR. BARRIE:  Yeah.  Yeah.  Tuesday would be fine

3    with us, Your Honor.

4            THE COURT:  Do we have -- can we do 10 a.m., or

5    does that inconvenience people?  I don't know if we have

6    people on the west coast or not.

7            MR. BARRIE:  I don't believe we do.

8            THE COURT:  All right.

9            MR. BARRIE:  10 a.m. works for the debtors.

10           THE COURT:  All right.  That will be a --

11           MR. SANDLER:  Works for the committee.

12           THE COURT:  Okay.  That will just be a telephonic,

13   no fancy Skype for Business, that will just be a telephonic

14   status conference.

15           MR. WERKHEISER:  Thank you, Your Honor.  We'll get

16   that notice out.

17           UNIDENTIFIED:  (Indiscernible)

18           THE COURT:  Great.  All right.  And Mr. Barrie or

19   Mr. Werkheiser, if you could just issue a notice of

20   continuation of the hearing for tomorrow until April 6th on

21   the docket, that would be great.

22           MR. BARRIE:  Will do.

23           MR. WERKHEISER:  Yes, Your Honor.

24           THE COURT:  All right.  Anything further?

25       (No verbal response)

29

1          THE COURT:  All right.  Well, thank you everyone.

2          UNIDENTIFIED:  That's it, Your Honor.

3          THE COURT:  Bad news, but good to --

4     (Proceedings concluded at 2:37 p.m.)

5                    *****

1               CERTIFICATION

2          I certify that the foregoing is a correct

3     transcript from the electronic sound recording of the

4     proceedings in the above-entitled matter to the best of my

5     knowledge and ability.

6

7

8

9

10    _____        March 26, 2020

11    Coleen Rand, AAERT Cert. No. 341

12    Certified Court Transcriptionist

13    For Reliable

# **<u>EXHIBIT V</u>**

```
1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
2

3                                    .   Chapter 11
     IN RE:                          .
4                                    .   Case No. 20-10553 (CSS)
     ART VAN FURNITURE, LLC, et al., .
5                                    .   Courtroom No. 6
                                     .   824 North Market Street
6                                    .   Wilmington, Delaware 19801
                                     .
7                      Debtors.      .   March 31, 2020
     . . . . . . . . . . . . . . . . .   1:00 P.M.
8

9                      TRANSCRIPT OF STATUS HEARING
             BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
10                  UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Gregory G. Werkheiser, Esquire
                               Michael J. Barrie, Esquire
13                             Jennifer Hoover, Esquire
                               Kevin Capuzzi, Esquire
14                             John C. Gentile, Esquire
                               BENESCH, FRIEDLANDER, COPLAN
15                                & ARONOFF LLP
                               222 Delaware Avenue, Suite 801
16                             Wilmington, Delaware 19801

17

18   Audio Operator:          Leslie Murin

19   Transcription Company:   Reliable
                               1007 N. Orange Street
20                             Wilmington, Delaware 19801
                               (302)654-8080
21                             Email:  gmatthews@reliable-co.com

22   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
23

24

25
```

2

```
 1   APPEARANCES (Continued):

 2   For the Debtors:          Marua I. Russell, Esquire
                               MONTGOMERY MCCRACKEN WALKER
 3                                & RHOADS LLP
                               437 Madison Avenue, 24th Floor
 4                             New York, New York 10022

 5
     For U.S. Trustee:         Linda Richenderfer, Esquire
 6                             David Buchbinder, Esquire
                               UNITED STATES DEPARTMENT OF JUSTICE
 7                             OFFICE OF UNITED STATES TRUSTEE
                               844 King Street, Suite 2207
 8                             Lockbox 35
                               Wilmington, Delaware 19801
 9
     For Wells Fargo Bank:     Jennifer Feldsher, Esquire
10                             MORGAN LEWIS & BOCKIUS LLP
                               101 Park Avenue
11                             New York, New York 10178

12
     For Brixmor and Various   Craig Ganz, Esquire
13   Landlords:                BALLARD SPAHR LLP
                               1 East Washington Street, Suite 2300
14                             Phoenix, Arizona

15   For the Committee:        Bradford Sandler, Esquire
                               PACHULSKI STANG ZIEHL & JONES LLP
16                             780 Third Avenue
                               New York, New York 10017
17
     For HGB AVF Lending:      Jeffrey Wolf, Esquire
18                             GREENBERG TRAURIG LLP
                               One International Place, Suite 2000
19                             Boston, Massachusetts 02110

20
     For Jennifer Sawle:       Rene Roupinian, Esquire
21                             RAISNER ROUPINIAN LLP
                               500 5th Avenue, Suite 1600
22                             New York, New York 10110

23
     For State of              Saverio Mirarchi, Esquire
24   Pennsylvania, Office      STATE OF PENNSYLVANIA
     Of the Attorney General:  OFFICE OF THE ATTORNEY GENERAL
25                             Strawberry Square
                               Harrisburg, Pennsylvania 17120
```

1    (Proceedings commence at 1:01 p.m.)

2         THE COURT:  Good afternoon everybody.  This is

3    Judge Sontchi.  This is the Art Van hearing.  I know we're

4    all appearing remotely.  Obviously, if you could please make

5    sure you mute your phones unless you're speaking.  It's

6    particularly important if you're working from home with

7    background noise or if you're using a cell phone.  So, thank

8    you very much for your courtesy.

9         I did sign the only matter that was listed on the

10   agenda as going forward.  I signed that order just a little

11   while ago under certification of counsel, but I'd like to

12   turn it over to the debtors, if I may, for a update on the

13   current situation with the case and any scheduling matters

14   that might be related to that and then, of course, once the

15   debtors have made their report I would welcome any

16   contributions from any other parties in interest who wish to

17   be heard.

18        MR. WERKHEISER:  Good afternoon, Your Honor.  It's

19   Gregory Werkheiser of Benesch, proposed counsel for the

20   debtors.  Thank you for making this time available to us.

21        Before we get into this contemplated status

22   conference, Your Honor, I do have to go back to the rejection

23   motion because we were apprised by Ms. Heilman a short time

24   ago that one of her clients has an unresolved issue with the

25   form of issue that we were not aware until after the

1  certification had been submitted this morning.  And so we

2  have been communicating with her to try to resolve that.  I

3  don't know whether that issue is or is not resolved at this

4  point.  And I apologize, we did not have the opportunity in

5  the short amount of time available after hearing from Ms.

6  Heilman before the hearing to communicate with Chambers, to

7  notify Chambers that that response from Ms. Heilman had been

8  received.

9          The issue, as I understand it -- well, if I could

10 just generally, for the benefit of the parties on the phone

11 and the court, a number of parties had sought, and I think we

12 had provided, confirmation that as to all of the rejected

13 locations that are incorporated in the proposed order that

14 was submitted to the court this morning the debtors believe

15 that all of the salable inventory in those locations, which

16 was primarily mattresses, these were Art Van Pure Sleep

17 stores, has been removed from those locations or would be

18 removed by the end of the day today, March 31st.  All of the

19 surrendering notices that were contemplated by the motion did

20 go out to the counterparties to the leases last Friday and

21 should have been received by those parties yesterday or at

22 the very latest today by overnight courier.

23         So, putting that issue aside I just don't know,

24 there might be a language issue that Ms. Heilman has still on

25 the order and so if I could pause momentarily and let her

1  have an opportunity or her co-counsel have an opportunity to

2  respond we can try to see if this is something that is easily

3  resolvable or where we stand.

4          THE COURT:  Okay.

5          MR. GANZ:  Good afternoon, Your Honor.  Craig

6  Ganz, Ballard Spahr on behalf of Brixmor and various other

7  landlords.

8          This kind of informal objection that we were

9  working through specifically related to Brixmor.  And as I

10 understand, and I have been cc'd on the emails that have gone

11 back and forth between Mr. Werkheiser and Ms. Heilman, that I

12 think we largely have worked out everything as far as the

13 language.  Just making sure that there's a representation on

14 the record here that the debtors are, in fact, out of the

15 locations notwithstanding anything in the order and if they

16 are out just preserving all rights to any asserted claims

17 that we may have to the extent that there are other issues

18 relating to that abandonment of property and whether that was

19 accomplished or not.

20         The short answer is I think we're resolved on

21 those issues.

22         THE COURT:  Okay.  So it sounds like your resolved

23 and simply based on the representations of Mr. Werkheiser

24 and his client with regard to the fact that they've exited the

25 location and you're reserving all your rights with regard to

1 | whether they have executed it correctly or completely.  We
2 | will deal with that going forward if we have to.
3 |         MR. GANZ:  Exactly, Your Honor.  Thank you.
4 |         THE COURT:  All right.
5 |         MR. WERKHEISER:  Thank you, Your Honor.
6 |         I think we should move forward to the status
7 | update.  So, Your Honor, when we were last before the court,
8 | I believe it was last Thursday, March 26th, at that time the
9 | debtors reported that they believed they had, at least, an
10 | agreement in principal with Wells Fargo, the prepetition ABL
11 | agent and on a path forward for a mothball motion or a
12 | suspension motion, you know, very short hands for these
13 | things.  The concept was that we would reduce the company's
14 | remaining operations to the bare minimum and to suspend, to
15 | the greatest extent possible, activity in the bankruptcy case
16 | over the next short period of time to better assess the
17 | outcome of the Coronavirus situation and most viable
18 | alternatives to the company going forward to maximize value.
19 |         So, despite that conceptual agreement there are,
20 | obviously, important details that still needed to be worked
21 | out related to the budget and other details of that
22 | arrangement.  I think what we found, as the parties were
23 | working round the clock on these issues since before we were
24 | in court last Thursday and throughout the weekend, was that
25 | due to a number of facts that are somewhat unique to these

1  debtors and this case we were not able to get to a point
2  where we had the agent support and consent for the mothball
3  arrangement primarily because of the company's liquidity
4  issues and cash needs, both as they exist today based on
5  obligations that have accrued thus far since the filing and
6  the expected obligations that would be incurred going forward
7  even with reducing and deferring obligations for, you know,
8  rent and reducing other activities to the bare minimum.

9       THE COURT:  Mr. Werkheiser, could you keep your
10 voice up, please, I can't hear you.

11      MR. WERKHEISER:  Yes.  I'm sorry.

12      Just by way of example, Your Honor, as is somewhat
13 unique to this debtor as opposed to some others the debtor
14 had a large number of employees, I think in excess of 4,000,
15 as of the petition date.  A lot of those employees are sales
16 personnel who earn commissions on furniture only when it
17 actually delivers, which means there is a long tail on
18 employee compensation.  And so, there was a large portion of
19 employee compensation that still remains outstanding right
20 now from the couple of weeks that the debtors were operating
21 during teh bankruptcy.

22      In addition, this company as a partially self-
23 funded health insurance plan which, again, means that for
24 those employee benefits there are fairly substantial -- there
25 is a fairly substantial tail.  And so the all-in number for

1    those types of obligations is something approaching $10

2    million dollars based on our best estimates of what is owed

3    right now and the company has, you know, cash in the

4    neighborhood of, I believe, $12 to $13 million dollars now

5    just to put, you know, a high level -- just to paint a high

6    level picture of where things stand financially for the

7    company.

8          And so I can't -- you know, we cannot speak for

9    Wells Fargo's decision making process, but, you know, we do

10   understand that as we attempt to model the various scenarios

11   for mothballing the company over the next six, seven, eight

12   weeks as appropriate the challenge always became how to

13   achieve a liquidity event on the backend of that period.

14   That was generating sufficient value both to satisfy any

15   deferred obligations and to provide a recovery to the senior

16   secured lenders at a level that was acceptable to them.

17   Also, how to manage liquidity during that period under

18   certain of the scenarios that we considered.

19          Those scenarios have included, you know, among

20   other things the resumption of GOB sales, various bulk sale

21   scenarios for inventory, consignment arrangements and other

22   potential transactions with parties that have been under

23   discussion for, you know, the last ten days or more

24   including, as we heard at the last status conference, the

25   possibility of resuming a transaction with the Levin Partners

1  for, at least, a subset of those assets.

2        And, you know, all those various alternatives,

3  given the circumstances, the uncertainty surrounding the

4  Coronavirus impact on the business and on the world in

5  general, you know, creates a lot of uncertainty both as to

6  timing and eventual recoveries.  And then some of those

7  alternatives such as GOB sales require the company to ramp-up

8  in advance and incur, you know, fairly substantial expenses

9  in advance to bring employees back on, to incur advertising

10  expense, to spruce up the stores as necessary to resume, you

11  know, store closing sales at those locations.  The numbers

12  are just not rosy from the debtor's perspective and we gather

13  from our lenders' perspective given their unwillingness to go

14  forward on that basis.

15        Your Honor, I think where that leaves us at this

16  time is with few options none of which are particularly

17  attractive for anyone here.  We are operating subject to an

18  alleged termination declaration that was issued by Wells

19  Fargo as the agent on March 19th.  The so-called notice --

20  remedies notice period under the cash collateral order was

21  extended, but only through the end of the day today.  We do

22  not know at this time whether Wells Fargo is prepared to

23  further extend that beyond today and absent that or absent

24  some extraordinary relief from the court the debtors would no

25  longer have access to cash collateral at the close of

1 business -- excuse me, at the end of the day today.

2         The other issues, I think, Your Honor, that are

3 still being worked through at this time relate to funding

4 obligations that may exist under the cash collateral order

5 during this remedies notice period.  Paragraph 2 of the cash

6 collateral order does require funding for employee payroll,

7 certain other emergency expenses and other obligations that

8 would be approved by the agent.

9         The company does have outstanding funding requests

10 to the agent related to those obligations that have not yet

11 been acted upon.  Finally, the order does contemplate the

12 establishment of carve-out reserves and a carve-out trigger

13 notice has been issued.  We have to confirm that those

14 arrangements are in place.

15         So, given all of that, Your Honor, I think while

16 no final decision has been made by the debtors, you know,

17 absent a significant change in the trajectory of these cases

18 over the next, you know, twelve hours or several days, if we

19 can get beyond the next twelve hours, we are looking at a

20 scenario where the debtors will likely have no choice but to

21 move forward with seeking conversion of these cases to a

22 Chapter 7 liquidation.

23         It is our hope and our intention to accomplish

24 that in coordination with our lenders, the committee and our

25 other stakeholders, and to do as orderly and as soft as

1  possible a conversion if, in fact, there is no other choice

2  at this point.  That provides to the fullest extent possible

3  to satisfy the employee obligations and the other accrued

4  obligations that are required to be summoned under the cash

5  collateral order, but we are not there yet.  You know, we do

6  not have a clear indication from the agent where we will end

7  up on those issues.

8          I think, Your Honor, I've been talking quite a

9  while and I will pause here and I'm happy to answer Your

10 Honor's questions or respond to questions or comments from

11 any of the other parties on the phone.

12         THE COURT:  No.  I don't have any questions.

13         Does anyone else wish to be heard?

14         MS. FELDSHER:  Your Honor, this is Jennifer

15 Feldsher from Morgan Lewis on behalf of Wells Fargo.  If it

16 would be helpful for Your Honor I can, kind of, weigh in a

17 little bit where Mr. Werkheiser left pauses, I think, in his

18 presentation on where the ABL lenders thinking is at and to

19 correct a couple of, you know, what I think are, at least,

20 misunderstandings in our view with respect to what is or

21 isn't' required of the ABL lender in this case.

22         Your Honor, I want to start by saying that Wells

23 Fargo, as Your Honor has heard from status conference after

24 status conference in this case, you know, we, like everybody

25 else has had to adopt to the new normal or, you know, current

1  circumstances which were completely unforeseen.  And one of

2  the things that we're seeing across these industries that

3  have been so terribly hit by the pandemic and the, you know,

4  shut down orders and things like that is in order for these

5  Chapter 11 cases to continue or to have any chance of

6  success, and we've told this to Your Honor previously so I

7  won't dwell on it or take up a lot of time, but they require

8  creative solutions,

9        Most importantly, a willing partnership between

10  the debtors and their stakeholders, and a fair amount of

11  cooperation from everybody because we're all dealing with

12  this together and in these unforeseen circumstances they are

13  cataclysmic from a top-line number.  The debtor has

14  absolutely no revenue coming in and so we are left to deal

15  with how to get from point a to point b, and all of the

16  costs, and all of the stakeholders that are implicated

17  including employees, including landlords, including lenders

18  with a finite amount of cash and a totally uncertain path

19  forward, at least, in the near term.

20        Within that Wells Fargo has funded every single

21  payroll request that the debtors have made for current pay,

22  for employees that have worked and for payroll requests that

23  has come in.  What has occurred, and Your Honor might recall

24  from a prior status conference where I was notified right

25  before coming into court, I believe, on the 20th, on a status

1  conference that the debtors had determined to suspend all of

2  their operations even though they were still operating in

3  some locations and there were not necessarily shutdown orders

4  in place at that time.

5       They had determined to suspend all operations

6  immediately, to terminate all employees; not all, but

7  significantly all of their employees, certainly all of the

8  store levels.  That was not something that was done in

9  coordination with the lenders, either the ABL lender or the

10  term lender, or even the consultant as far as we know who, as

11  Your Honor remembers, had remained even though their

12  retention was still up in the air had remained to support the

13  debtor's efforts to try to continue a GOB sale.

14       So, as a result of terminating their employees, as

15  Mr. Werkheiser described, the debtors now have significant

16  accrued PTO commissions, other benefits related to the

17  terminated employees as well as healthcare obligations.  Most

18  of these were not included in any budget and certainly in the

19  cash collateral budget because there was no contemplation of

20  a wholesale mass termination of employees.  Could these have

21  been mitigated if employees had been furloughed, could these

22  have been mitigated by a, you know, less drastic more spaced

23  out termination we will never know.  We weren't part of the

24  terminations to begin with.  We will never know, but now

25  these expenses, as Mr. Werkheiser explained, exist.

1    Just the employee obligations alone, Your Honor,

2  just because I think it's really important given what Mr.

3  Werkheiser disclosed as the cash position, total over $14

4  million dollars.  So, if the debtors have cash, as Mr.

5  Werkheiser said --

6        THE COURT:  I'm sorry, 14?

7        MS. FELDSHER:  14, Your Honor, correct.  That is

8  an estimate on the healthcare costs and that's using an

9  estimate, Your Honor, that's a little bit lower than what Mr.

10 Werkheiser just told you.  In materials that they have

11 provided to the ABL lender we're looking at a number for

12 anticipated healthcare obligations of $8.5 and change million

13 dollars and Mr. Werkheiser, I believe, just told the court

14 that he's now using a $10 million dollar number.

15    Your Honor, that's part of the problem here to is

16 there are lots of demands, including one last night, that all

17 of these amounts need to be paid despite the fact that there

18 just isn't enough cash to pay them, but the numbers detailed

19 on the numbers, we asked for this detail, we don't have the

20 information on it, but we can tell you in the aggregate these

21 numbers are far in excess of what the debtors have in cash

22 today.  And then if you take into account, as Mr. Werkheiser

23 said, the fee carve-out that is required to be funded, and

24 they had demanded as well, that is in excess of, I believe,

25 another $2 and a half million dollars.

1    So, again, 14, two and a half, and that's not even

2  taking into account any other expenses that might result.

3  So, our concern is that, yes, the parties are moving forward.

4  There hasn't been a proposal that's been presented to the

5  lenders that shows a market improvement in outcomes in a

6  Chapter 11 then in a Chapter 7, and the expenses associated

7  with the Chapter 11 are typically illustratively much higher.

8  There is also no scenario that the debtors have put forth

9  that they believe provides the ABL lenders with payment in

10  full.

11    At the end of the day whether that's a resumption

12  of the GOB process or a bulk sale, as the debtors have

13  suggested, they might be forced into because they won't have

14  enough cash by their own budget to get through to a GOB

15  process.  There is no scenario under which the debtors

16  believe that Wells Fargo will be paid in full let alone other

17  creditors.  And yet what we have are demands to today to take

18  all of the remaining cash that exists in the debtors account,

19  use that cash, this is the debtor's request, to pay employee

20  obligations that have accrued.  Again, not current employee

21  obligations going forward.  We have no issue paying for

22  employee wages that are coming due, but to pay the employee

23  obligations as much as they can to fund the professional fee

24  carve-out and then they have asked for Wells Fargo to provide

25  some type of an assurance that out of any proceeds that Wells

1   Fargo is to receive they will fund the remaining employee

2   obligations no matter what that recovery is going to be to

3   Wells Fargo, but they will fund the remaining obligations to

4   employees.

5          Now, Your Honor, we're talking about employees and

6   I'm mindful of that, obviously.  Nobody in entering this case

7   and even as we sit here today had any intention of incurring

8   obligations to employees that were not going to be met.  The

9   budgets originally for, you know, the Chapter 11 case took

10  into account the anticipated employee obligations and, you

11  know, everybody had always hoped and expected that employee

12  obligations could be paid in full through the process and

13  certainly through the GOB sales.

14         The debtors currently don't anticipate being able

15  to make it to a GOB sale and I don't think they believe that

16  even a Chapter 7 Trustee may make it through a GOB sale

17  without further financing.  Yet when it comes to obligations

18  for which they perceive that there might be D&O liability we

19  are getting demands for those.  On anything else they're

20  willing to talk to us, but as to our recoveries, as to other

21  stakeholder recoveries, as to what's in the best interest of

22  all other stakeholders unfortunately, Your Honor, we haven't

23  been as cooperative.

24         So, on the one hand we very much like to say to

25  the debtors let's do this cooperatively.  That is our

1  preference that is what we asked the debtors to do.  We'd

2  like to have a smooth transition to a Chapter 7 process in

3  which we can account for, you know, make sure the inventory

4  is safeguarded, make sure the information is available for

5  the Chapter 7 Trustee so that the Chapter 7 Trustee can get

6  up to speed as quickly as possible, make sure key employees

7  are available and their information is available so that the

8  Chapter 7 Trustee can reach out to them.  Hopefully, if he or

9  she determines that this is the way that we would go so that

10  all of the inventory and the assets can be safeguarded, can

11  be put together.

12       Unfortunately, that is not what is happening and

13  as I started the presentation what I said was that in these

14  times, especially when we're dealing with such unprecedented

15  disruption, the key is to have a willing partner.  And so,

16  Your Honor, we need those assurances from the debtors that

17  they will get their creditors the information they need and

18  the information that will be critical to have a soft landing,

19  but as a condition to that is that we have to gaurantee that

20  all potential liabilities for the directors and officers are

21  taken care of full stop we are not in a position to do that

22  today.  We simply can't.  The debtors do not have sufficient

23  cash today to pay for those things.  This is not a DIP, they

24  don't have availability or no additional cash other then what

25  they have on hand.

1      So, we're a little bit in a -- and I don't really

2    know because I'd prefer option A, Your Honor.  I'd prefer

3    that we did this consensually and that we were before the

4    court late in the week with respect to a voluntary

5    conversion, but I don't know because of demands that we

6    received very, very late last night.  As Mr. Werkheiser said,

7    everybody has been working round the clock to try to make

8    this work and to try to come up with a scenario that works.

9    Then, you know, late in the evening we're getting demands

10   that say you must pay what we believe are $16 and a half

11   million dollars of obligations and we'd like to take that

12   money today.

13      If the debtors were permitted to do what they're

14   asking to do, of course, there's no options for any creditors

15   in a Chapter 7 because you will turn over the case to a

16   Chapter 7 Trustee with no money and no funding.  So, where we

17   sit today our view is if this is likely to convert to a

18   Chapter 7 Trustee then we should turn over the funds that

19   remain in the estate to the Chapter 7 Trustee as well.  I

20   just would be remiss if I didn't mention that the debtors

21   are, as Your Honor can imagine, out of borrowing base

22   compliance.  So, the lenders have the right, under the

23   interim cash collateral order, to sweep cash, to put them

24   into compliance which would be in excess of $5 million

25   dollars.  We have not taken that action for exactly this

1  reason because our view and the view that we have shared with

2  the debtors is we appreciate that the estate today has more

3  obligations that they didn't have cash to pay.  They're going

4  to be tough decisions that need to be made going forward

5  undoubtedly.

6         There might be a scenario in which we have to fund

7  to an exit.  We just don't know, but if its likely to convert

8  to a Chapter 7 anyway then it makes sense for the Chapter 7

9  Trustee to have all of the available options and the cash to

10 make those tough decisions rather than a situation which is,

11 I believe, what the debtors are suggesting or requesting

12 today which is that they would take all of the cash, leave

13 the estate with zero money and soft convert it.  I don't know

14 what's soft about that, but convert it into a Chapter 7 case

15 and leave all of the creditors and the Chapter 7 Trustee with

16 absolutely no options but, you know, a zero for everybody.

17        We can't imagine that that's maximizing value.

18 Certainly not by our view and so, therefore, Your Honor, we

19 are where we are and, as I said, if the debtors want to work

20 cooperatively, we are here.  We want to do that, but we've

21 got to be working towards that conversion and, you know, we

22 will fund payroll expenses for employees that remain at the

23 company today and certain those that we need going forward.

24 But we cannot give the debtors assurances that we are going

25 to fund something to deal with D&O liabilities today.  It's

1   just not appropriate and we're not in a position to do so.

2                THE COURT:  Thank you.

3                MS. FELDSHER:  Your Honor, unless you have any

4   questions thank you.

5                THE COURT:  Anyone else before I turn it back over

6   to Mr. Werkheiser?

7                MR. SANDLER:  Your Honor, very briefly.  Brad

8   Sandler, Pachulski Stang, for the committee.  May I be heard?

9                THE COURT:  Yes.

10               MR. SANDLER:  Your Honor, as I think I said when

11  we had our first hearing that the committee was involved in

12  the overarching goal of this committee was to see one or more

13  going concerns because, obviously, that would be good for the

14  employees, for the landlords and the vendors.

15               You know, you've heard two very different

16  presentations over the last, I guess, about 30 minutes or so

17  that I think you can sense what is going on within the case.

18  The committee is, kind of, caught in the middle.  The one

19  thing from the committee's perspective I don't think there is

20  really much of an operational difference right now with this

21  Chapter 11 in particular and what will likely occur in a

22  Chapter 7 given the state of the emergency.

23               And considering that the trustees in Delaware are,

24  for the most part, comfortable operating a business one of

25  the things that I do want Your Honor to know is that we have

1  been talking to our committee members, some of our committee

2  members, which consist of major vendors as well as major

3  landlords of the debtor.  And we have also had conversations

4  with Robert Levin's counsel and separately with Gary Van

5  Elslander's counsel.  And the committees goal still remains

6  to try to find a going concern transaction, one or more going

7  concern transactions that will hopefully save some portion of

8  the Wolf/Levin stores and the Art Van stores.

9          This, you know, ultimately may be done in a

10 Chapter 7 and it may be that some of us are not around in the

11 Chapter 7, although some of us may be around, and we intend

12 to continue to find a way to develop a value maximizing

13 transaction, one or more of them here because it really will

14 be critical to try to get a going concern to the extent

15 possible.

16         You know, in terms of where the case ultimately

17 goes its unfortunate.  A conversion is never a great thing

18 for a case.  We understand the disagreements between Wells

19 and the company.  We will, obviously, take a look at whatever

20 conversion motion is filed and we will weigh-in on that.  At

21 this time, though, we certainly understand the substantial

22 challenges confronting this debtor right now.

23         So, with that, Your Honor, I think I will just see

24 if you have any questions from the committee's perspective.

25         THE COURT:  No.  Thank you.

1        MS. RICHENDERFER:  Your Honor, if I may.  This I

2   Linda Richenderfer from the U.S. Trustees Office.

3        The one thing that strikes me is that we have a

4   cash collateral -- use of cash collateral that expires at

5   some point this evening.  And it doesn't sound like a motion

6   to convert would be filed sooner than a day or two and then

7   that still needs time for Your Honor to hear it.

8        I have a great concern about who is going to be

9   protecting the collateral in the meantime because it

10  certainly will not be under the control of the Chapter 7

11  Trustee.  And I don't know if the debtor has spoken to the

12  lender yet about any arrangements being made, but until that

13  order is signed and until the trustee is appointed a Chapter

14  7 Trustee is not responsible for what happens with the

15  collateral.  That is just a point I wanted to emphasize at

16  this point.

17        THE COURT:  Thank you.

18        MR. GANZ:  Your Honor, Craig Ganz.  May I be

19  heard?

20        THE COURT:  Yes.

21        MR. GANZ:  Craig Ganz, Ballard Spahr.  Again, Your

22  Honor, as you know, we represent a group of landlords

23  including Brixmor Store, Essential and Broadstone.

24        One of the issues that the Trustee brought up, its

25  one of the issues that we have as well, you know, once we

1  turn the page in April here we're not onto April rents and

2  essentially being a rent free storage facility for the

3  collateral.  It brings a lot of concerns.  We have had

4  multiple discussions with potential purchasers both on that

5  collateral that's inside our stores and also purchasers on

6  the leases as well.  We have tried to direct them many times

7  over to debtor's counsel.  We have not seen any of those

8  conversations bear any fruit.

9        The position that we are taking right now is we

10  just want to find a way here where we can remove ourselves

11  from this process and if it has to be go direct with these

12  potential purchasers of the leases or acquirers a we do have

13  potential new tenants lined up to take over here, but there

14  is no mechanism here to extract us.  And, you know, there

15  could be a situation where we're hopeful when we get into a

16  Chapter 7 that we'll have a trustee that is responsive to

17  removing the collateral from these locations or liquidating

18  the collateral to a potential acquirer of these leases so we

19  can have a new tenant, but as these days start to drag on

20  there's some significant implications here especially, like I

21  said, we're viewed somehow as a rent free storage facility

22  where, you know, those amounts are going to need to be paid

23  at some point and what the mechanism to do it is and whether

24  that is through the Chapter 11 process or through the Chapter

25  7 process.  We would like to see, you know, a mechanism to

1    move this along while at the same time, obviously, being

2    sympathetic to the situation that we're all facing.

3              Thank you.

4              MR. WOLF:  Your Honor, Jeff Wolf from Greenberg

5    Traurig on behalf of HGB AVF.  If I could be heard.

6              THE COURT:  Yes.

7              MR. WOLF:  Thank you.

8              We are the term lender and at this point now the

9    successor agent under the term loan facility.  I just wanted

10   to make sure that you and the other parties understood that,

11   first, we have not been involved in the back and forth on the

12   day to day of the discussions between the debtor and Wells

13   Fargo.  We have not been consulted on the continued use of

14   cash collateral.  We have not been a party to the development

15   of the mothball budgets.

16             That having been said I just wanted to let you and

17   the other parties understand that it would have been our

18   hope, like Wells Fargo, that the ABL agent and the debtors

19   would have worked out a mothball budget and continued with

20   consensual use of cash collateral and continued in Chapter

21   11.  And hopefully to find a way to get the stores back open

22   when the time is allowed and dispose of the collateral in an

23   orderly basis in the hope of getting recoveries for the term

24   loan term lenders.

25             Given what we understand to be the current

1 circumstances and demands of the debtor in terms of what

2 needs to get paid, and lack of cash and other resources we're

3 supportive of the ABL agent's position at this point to

4 terminate cash collateral.  We would echo their sentiment as

5 well as the U.S. Trustees and landlord's counsel about trying

6 to give this thing a soft landing in Chapter 7 with

7 safeguarding the collateral and paying attention to all the

8 niceties of trying to put the Chapter 7 Trustee in as good a

9 position as possible to maximize value for the benefit of all

10 stakeholders.

11          Thank you.

12          MS. ROUPINIAN:  Your Honor, this is Rene Roupinian

13 of Raisner Roupinian.  May I be heard?

14          THE COURT:  Yes.

15          MS. ROUPINIAN:  Thank you, Your Honor.

16          As everyone knows, this healthcare crisis

17 continues and we wanted to highlight to the court and to the

18 parties that irreparable harm to these employees continues

19 due to the lack of their health insurance.  And while the

20 estate exists, we implore the parties to make every effort to

21 relieve as much of this healthcare crisis as possible by

22 whatever means is available.  Even if it causes some

23 discomfort in the financial analysis here.

24          We're talking about human lives that are at stake.

25 And there would be goodwill towards the parties if some

1   accommodation could be made with respect to these employee

2   obligations.  And we think that goodwill is worth quite a

3   bit.  And unlike money, can't be regained.  So, we felt it

4   important to make a plea here for the employees who, you

5   know, have been terminated and have lost their health

6   insurance, and have serious medical issues as my colleague,

7   Jeff Raisner, pointed out at the last call.  Those issues

8   continue.

9            Our concern is that these medical bills aren't

10  going to be paid.  There is not going to be money there for

11  them and, obviously, the concern is that they have no

12  healthcare going forward and it sounds like that maybe their

13  payroll is not going to be paid as well.  So, that puts them

14  in an even worse position in terms of trying to pay any kind

15  of medical coverage.

16           Thank you, Your Honor.

17           THE COURT:  Anyone else before I turn it over to

18  Mr. Werkheiser for a brief rebuttal?

19           MR. MIRARCHI:  Your Honor?

20           THE COURT:  I'm sorry.  Yes, sir.

21           MR. MIRARCHI:  Your Honor, this is Sam Mirarchi

22  from the Commonwealth Pennsylvania Office of the Attorney

23  General.

24           We remain interested in this case.  We believe the

25  consumers -- there are many consumers who have been harmed by

1  making deposits who didn't get their furniture.  We're going

2  to stay committed to having any discussions that we believe

3  would be helpful to anybody or any of the parties.  Those

4  discussions we would like to be a part of that, but we will

5  be watching and monitoring the proceedings so that consumers

6  are treated fairly in this case.

7            Thank you.

8            THE COURT:  You're welcome.

9            All right, Mr. Werkheiser?

10            MR. WERKHEISER:  Your Honor, thank you for the

11  opportunity to address some of these statements.

12            Your Honor, first, I just want to direct the court

13  and everyone else to Paragraph 2 of the interim cash

14  collateral order which I think is the operative language

15  given where the case is at right now.  And that language

16  states:

17            "During the remedies notice period the debtors may

18  use cash collateral solely to meet payroll obligations and

19  pay expenses necessary or reasonably advisable to avoid

20  immediate and irreparable harm to the debtors' estates in

21  accordance with the budget, and as otherwise agreed to by the

22  prepetition ABL agent in its sole discretion."

23            So, Your Honor, the fairest reading of that is

24  that --

25            THE COURT:  Wait, wait, where is that?  I don't

1  see that?  That's not Paragraph 2.

2          MR. WERKHEISER:  Of the interim cash collateral

3  order, Your Honor?

4          THE COURT:  Yeah, I'm looking at it.

5          MR. WERKHEISER:  Where --

6          THE COURT:  Oh, I see it.  All right.  Hang on,

7  let me read it.

8          MR. WERKHEISER:  Okay.

9          THE COURT:  Not that I don't like being read to,

10 but I don't.  So, what are you -- nothing -- I didn't hear

11 anything other than the payroll obligations that were

12 necessary to avoid irreparable harm.

13         MR. WERKHEISER:  I think we are -- that is

14 primarily our focus at this point, Your Honor.  There are

15 approximately 4.8 million of payroll obligations, wages,

16 salary, and commissions for sales personnel who worked on a

17 post-petition basis to monetize Wells Fargo's collateral on

18 the collateral of the other secured lenders in these cases

19 that remain unpaid at this time.

20         The sales commissions, in particular, have a long

21 tail, Your Honor, because they do not become earned until the

22 furniture is actually delivered to the customer.  And so that

23 accounts for a large portion of those employee obligations

24 that at this point remain unfunded.

25         The second component of employee obligations that

1  was identified were the healthcare obligations, Your Honor,

2  that are part of the employee benefits and would normally be

3  part of payroll.

4         THE COURT:  Its not payroll.  Do they have a right

5  to -- if you cancel the healthcare, do they have a right to a

6  money payment from you?

7         MR. WERKHEISER:  The healthcare benefits?

8         THE COURT:  Are you required under state law to

9  continue to give them healthcare if you decide to voluntarily

10 get rid of it?

11        MR. WERKHEISER:  Your Honor, just to clarify what

12 we're talking about here are claims that were submitted by

13 employees under the debtors' healthcare plan prior to the

14 termination of their employment.  So, these are services

15 where an employee went to a physician or received medical

16 care prior to, in most cases, March 19th and had billed and

17 had been proceed through the insurance claims process or

18 system since then and its now going to get sent back to the

19 debtors to pay several weeks later.

20        So, the numbers that are believed to be the

21 obligations are those that are going to hit the debtors over

22 the next several weeks based on those claims that were made

23 by employees, we think, predominately during the post-

24 petition period and were part of their, you know, employee

25 compensation and benefits package with their wages.

1          THE COURT:  Let me back up a minute.  What

2  furniture have you delivered since you shut down?  None,

3  right?

4          MR. WERKHEISER:  I can't speak without, you know,

5  having the ability to talk to the client and get detail about

6  what that was, but I believe there's been some furniture

7  delivered since the petition date since March 8th through the

8  19th or so. I can't tell definitely whether there's anything

9  that's been delivered after the 19th.

10         THE COURT:  So, how often do you pay payroll?

11  When was the last payroll?

12         MR. WERKHEISER:  I think, Your Honor -- I know

13  this is a little unorthodox, but I believe Mr. Stogsdill is

14  on the line and I don't know if he has that information handy

15  for us.

16         MR. STOGSDILL:  I am Greg.  Payroll is made every

17  Friday at Art Van and those commissions cover the period of

18  March 1st through deliveries that were made up to late as

19  March 21st, I believe.

20         THE COURT:  So, you haven't paid for any March

21  deliveries?

22         MR. STOGSDILL:  Not for commissions.  Commissions

23  are made on a monthly basis.

24         THE COURT:  So when are they due generally?

25         MR. STOGSDILL:  This week.

1          THE COURT:  They're due this week, so the 3rd?

2          MR. STOGSDILL:  Well technically, Your Honor, they

3   would be paid if we were going concern, they would be paid in

4   April after the month concluded.  Because we terminated

5   everybody and shut down the operations, we moved them up to

6   be paid one to two weeks after the closing.

7          THE COURT:  Well the closing was the 19th, okay.

8   So, you have March commission earned due to March deliveries

9   that have not been paid.  How much is it?

10          MR. STOGSDILL:  It's a little over $2.2 million

11   dollars, I believe.

12          THE COURT:  And I'm hearing from Mr. Werkheiser

13   that there's payroll that would normally be due, I guess,

14   this Friday for people who are currently working that haven't

15   been paid, is that correct?

16          MR. STOGSDILL:  There's two components of the

17   amounts being paid this week.  It's for employees who were

18   laid off as part of the shutdown on the 19th and there's also

19   a small group of employees that have continued to support the

20   estates, and they're in there as well.  But the bigger piece

21   of it is for the preclosing payroll, just by virtue of

22   having, you know, several thousand people on that.

23          THE COURT:  Okay. So, it's people who are being

24   paid for work they did before you closed that haven't been

25   paid yet.  How much is that?

1    MR. STOGSDILL:  I don't have that number directly

2  in front of me but it's around $4 million dollars, high

3  three's probably.

4    THE COURT:  So, they normally would have been paid

5  on like the 20th or the 27th, but they weren't?

6    MR. STOGSDILL:  That's right.

7    THE COURT:  Okay.  And for people who have been

8  supporting the company post-closing which was the 19th, how

9  much is that payroll?

10    MR. STOGSDILL:  It's roughly about $250,000

11  dollars every two weeks.

12    THE COURT:  Okay.  And Mr. Werkheiser was giving

13  me some numbers about healthcare reimbursements. And it

14  sounded like there was a distinction between what you had

15  already received request for payment for and what you

16  expected in the future, is that right?

17    MR. STOGSDILL:  Yes, what's in the forecast which

18  has been in every forecast we've ever put out is a tail; I

19  think of it as like an actuarial tail for claims made

20  incurred in the prior period that because of paperwork and

21  bureaucracy take several months to be processed and presented

22  to the company for payment.  So, the $8 million dollars or so

23  that's in the forecast, that's always been in the forecast is

24  for claims that have been made over the last -- as far back

25  as six months ago.

1          THE COURT:  And you have a wage order, Mr.

2    Werkheiser, that allows you to pay those even though they're

3    prepetition claims?

4          MR. WERKHEISER:  We did. We did get authorization

5    from the court that are continued processing and honoring

6    healthcare reimbursement claims for the employees.

7          THE COURT:

8          MS. FELDSHER:  Your Honor, this is Ms. Feldsher.

9          THE COURT:  Yep.

10         MS. FELDSHER:  Can I be heard here?

11         THE COURT:  Of course.  I'm just trying to

12   understand --

13         MS. FELDSHER:  Yeah.

14         MR. WERKHEISER:  Your Honor, I'm sorry.  I'm happy

15   to have Ms. Feldsher be heard.  There were a number of

16   mischaracterizations of the record --

17         THE COURT:  Mr. Werkheiser, you'll --

18         MR. WERKHEISER:  -- in the presentation she made

19   to the court.

20         THE COURT:  Mr. Werkheiser --

21         MR. WERKHEISER:  Okay.  I just didn't want to not

22   address those points.

23         THE COURT:  You will get your opportunity -- stop

24   talking over me.  You will get your opportunity to speak.

25   I'm trying to figure out the facts and, frankly, I'm not

1  getting them very well from you where I have to ask your

2  client and others to tell me what's actually going on.

3          So, Ms. Feldsher.

4          MS. FELDSHER:  Thank you, Your Honor.

5          Your Honor, with respect to these healthcare

6  obligations my understanding and, again, at the risk of the

7  lawyer talking numbers, is that what was included in the

8  budget that was filed -- actually, Your Honor, if I may just

9  take a brief step back.

10         So, we view the language in two, to be as Your

11 Honor I think, you know, understands and has seen this

12 provision in virtually all DIP and cash collateral orders,

13 this is the debtors can keep the lights on, you know, the

14 stuff that's absolutely necessary they can pay it until they

15 can get back to court and seek some relief from the court.

16         And, you know, as you've heard these obligations

17 were obligations that the debtors incurred by virtue of

18 terminating of all of the employees.  Again, Your Honor, I

19 just want to be very clear --

20         MR. WERKHEISER:  Debtors do --

21         MS. FELDSHER:  -- all current payroll, all current

22 payroll that we are aware of that's been submitted to Wells

23 Fargo has been funded.  But on the issue of these healthcare

24 obligations my understanding is that, one, this is not -- if

25 you look at the budget it's not, there's no line item for

1 these obligations in the budget.

2        But from Clear Thinking Group, which is Wells

3 Fargo's financial advisor in this case, I am told that what

4 was included in the backup to the budget that went in with

5 the cash collateral order was accrued worker's comp and

6 medical of $6.2 million dollars.  There were no provisions

7 for unpaid PTO or vacation because the debtors understandably

8 did not anticipate terminating all of their workforce.

9        Again, we have asked all of these questions as

10 well, Your Honor, many many times.  We tried to get to exact

11 numbers.  Mr. (indiscernible) gives one number, the debtors

12 today submitted a funding request for these obligations that

13 were not the same as the numbers we received in a demand

14 email from the debtors' advisors yesterday evening.

15        So, there's always these discrepancies and, you

16 know, that's part, I think, of the issue here.  But any

17 payroll, actual, you know, payroll, right, people working

18 their salaries my understanding is that those have always

19 been honored and have all been paid.

20        THE COURT:  What about the commissions?

21        MS. FELDSHER:  So, the commissions, Your Honor,

22 have not been paid yet and they have not been paid because as

23 you heard from Mr. Werkheiser, these were delayed and they

24 were accelerated, as Mr. Stogsdill said.  They have been

25 accelerated unilaterally by the company to be payable now.

1  They wouldn't ordinarily be payable.

2       Your Honor, we have asked for and continue to ask

3  for details on the exact number of these obligations.  And in

4  and of themselves, again, Your Honor, we can work on one

5  issue and say, okay we absolutely agree that these should be

6  paid, and we can get them paid.  There's sufficient cash to

7  pay them.  The problem is there isn't sufficient cash to pay

8  all of the employee obligations, so how do you draw the line?

9  How do you draw the line on commission payments, but not PTO,

10  but not healthcare costs, but not this, but not that?

11       There has to be -- there's a fiduciary that's

12  supposed to be in place to make those decisions.  And if this

13  is going to convert to a Chapter 7, we think the right place

14  is for the Chapter 7 trustee to look at all of these, get to

15  the right, you know, final number and make, you know, and

16  look at those and decide if these obligations can be paid.

17       But as we currently sit here today, were the

18  debtors to pay everything that they want to pay, it would

19  exceed the amount of cash they have and that's even before

20  any sweep for cash that are permitted in the cash collateral

21  order for Wells Fargo which I'm not suggesting we would take.

22  I'm just saying even before you do any of that, you're in

23  excess of the amount that they have.

24       So where do you draw the line?  Why do employees

25  that submitted claims previously get their healthcare claims

1  paid?  The ones that submit them tomorrow aren't going to get

2  them paid because the debtors aren't going to have sufficient

3  month.  There's no way to easily peel this onion as far as we

4  can tell.  We've tried very very hard with the debtors. We're

5  happy to try some more, but we need definitive numbers, not

6  estimates.  We need actual numbers.  We need to know exactly

7  what is being requested.  And what we're doing in funding

8  that in terms of what will be possible in the Chapter 7 for

9  all other stakeholders.

10         THE COURT:  All right, thank you.

11         Mr. Werkheiser.

12         MR. WERKHEISER:  Yes, Your Honor.  Thank you.

13         Your Honor, and I'm sorry if my presentation has

14  not been as clear as would be idea.  We're, obviously, you

15  know, this is a developing situation.  We are doing this by

16  telephone.

17         If we were all in the same room, I would be able

18  to hand you cash forecasts going back to the beginning of the

19  case that have shown that these obligations were in the

20  forecast, in the budget they contemplated.  The numbers may

21  have changed somewhat over the course of the case, but they

22  were always known and always part of what needed to be paid

23  to pay the freight to be in Chapter 11 bankruptcy, this

24  lender and the other secured lenders.

25         And, Your Honor, I would just, again, we don't --

1  the version of the budget that is attached to the cash

2  collateral has minimal detail, you know, has become common,

3  unfortunately, in these cases.  But the backups to that

4  really shows, even at the very beginning of the case, for

5  example, that these healthcare obligations were contemplated

6  and prefunded and reflected as prefunded employee obligations

7  in excess of $6 million dollars, at that point in time.

8          Your Honor, I need to correct the factual record

9  too on a number of things that Mr. Feldsher said.  I will,

10 giving her the benefit of the doubt assume unintentional.

11         These lenders received daily reports of the

12 operations of the debtors during the bankruptcy case.  They

13 knew exactly what was going on with both the GOP stores and

14 the operating stores on a real-time basis.  There was

15 complete information flow all throughout these cases.

16         So, it is really disingenuous for her to say that

17 we somehow surprised them with the board having made a

18 responsible decision on March 19th to discontinue operations

19 when the coronavirus was already rousing throughout the

20 country at that point.  Pennsylvania, at that point, had

21 issued an order to stay in place where a large portion of the

22 debtors' stores are located.

23         And, Your Honor, I think we can take judicial

24 notice of the fact that Michigan, Ohio and Illinois, where

25 the bulk of the other operations of the debtors and the

1   debtors' headquarters are located in the case of Michigan,

2   have all since issued stay-in-place orders no later than

3   March 23rd.

4           So, maybe the board anticipated the formal

5   government action, at that point, but it was clear, the

6   writing was on the wall, and it was known to Wells Fargo and

7   to everyone else in this case that the operations at those

8   stores, at that point, were losing money on a daily basis

9   because the traffic in the stores, and this makes sense.  The

10  company that sells furniture, and this is a virus that are

11  reports indicating live on hard surfaces for a period of time

12  after somebody touches them who's infected.

13          The customer traffic in the stores was at very low

14  levels once it became known what this country was dealing

15  with in this virus.  So, the board did what it had to do both

16  for economic reasons and for the health and safety and

17  welfare of employees and customers in making the difficult

18  decision to discontinue operations on March 13th.

19          What did that do, Your Honor, at that point?  It

20  didn't change anything other than potential retriggering

21  obligations with respect to unused vacation time.  Unused

22  vacation time, Your Honor, is not part of any of the funding

23  request that we're talking about today.

24          The obligations we're talking about today are

25  salaries, wages, commissions, and healthcare obligations.

1  Does not include vacation pay.  It does not include PTO of

2  any other sort.  That's a red herring and that's

3  misdirection.

4          I also do want to, again, address the point of

5  whether these debtors have tried to cooperate with their

6  lenders. We have been trying throughout this case and before

7  to do that and especially since it became clear the original

8  contemplated going concern transaction and the GOP sales were

9  not going to be able to be implemented as parties that

10 originally intended.

11         Again, if we were all in the same room, I could

12 show you model after model after model of that.  Alvarez &

13 Marsal has shared with the lenders financial advisor and I

14 could show you email after email after email in which we

15 previewed that these issues existed.  We're trying to explain

16 to the lenders why, what challenges the company faced in this

17 situation and what obligations needed to be funded in

18 connection with these cases to pay the freight.

19         So there has been fulsome communication.  There

20 has been accurate communication.  Numbers changed because new

21 data comes in from time to time and new claims come in from

22 time to time.  But the information has always been provided

23 as soon as it was available.

24         Your Honor, what this comes down to, Your Honor,

25 is everybody -- it's a miserable situation.  The employees

1  have been hurt.  The customers have been hurt.  Everyone else
2  has been hurt in some fashion by the way this has developed.
3  Much of it is beyond anyone's control.  Some of it, in
4  particular, within the control of our secured lenders and
5  that is, you know, how do we do the least harm to the most
6  people, primarily the employees?

7          And that's why we are pressing for these
8  obligations that are baked into this cash collateral order --

9          THE COURT:  Well, listen, Mr. Werkheiser, you just
10  raised the point that's the problem.  You got a fixed amount
11  of money, insufficient to meet all this company's
12  obligations.  You want to do the least harm possible
13  particularly to the employees.  Particularly to the employees
14  is a choice.  You are choosing one creditor over another.
15  Those creditors will get paid, other creditors of equal
16  priority will not.

17          Now, generally speaking, a debtor-in-possession
18  has the ability to run his business or its business.  When
19  you start to make those kind of value judgments when you're
20  picking one administrative creditor over another that's
21  really the purview of the court.  And they're very very
22  difficult questions that have to be answered, consistent with
23  due process, an opportunity to be heard, and based on facts
24  and law, not just the debtors' board prefers to pay his
25  employees rather than his bank, rather than his landlords,

1 rather than his taxes, rather than any other administrative

2 obligations that are going to go unpaid.

3 And while I certainly understand and sympathize

4 with that desire of a company to want to take care of its

5 employees -- oh by the way, and the other then also includes

6 customers who are never, at this point, going to get their

7 deposits back.  That's a choice.  And, you know, frankly, I

8 don't think your client is in a position to make that choice

9 because reality has outstretched a previous life.

10 MR. WERKHEISER:  Your Honor, may I respond

11 briefly, just on that --

12 THE COURT:  Of course.

13 MR. WERKHEISER:  I do appreciate the difficult

14 situation and perhaps the impossible situation that the court

15 is in and everybody else is in.  But what I'm talking about

16 is enforcing a choice that not just the debtor but the

17 lenders made in the order that they agreed to and had Your

18 Honor enter.  That order explicitly says that the debtors had

19 the ability to use the cash collateral to meet the payroll

20 obligations.

21 They committed -- and I'm not standing -- asking

22 Your Honor today to order them to make additional funds

23 available.  If they committed to make the money available for

24 that purpose and those are obligations that are due now for

25 the most part.

1    THE COURT:  It says payroll obligations and

2 irreparable harm expenses.

3    MR. WERKHEISER:  Yes, Your Honor.

4    THE COURT:  And the only payroll obligations that

5 I've heard are salary, wages, and commissions that have been

6 (indiscernible) but unpaid through today.  That's all I've

7 heard.

8    The healthcare reimbursements are not payroll

9 obligations.  They're just not.  Under no reasonable

10 definition of what payroll obligations are would they include

11 healthcare reimbursements under a terminated healthcare

12 policy, many of which are prepetition.  And it's terrible and

13 it's ridiculous that in this country you have to have a job

14 to have health insurance, but that is the law.

15    MR. WERKHEISER:  Understood, Your Honor.  I

16 understand where the court is coming from.

17    Your Honor, again, despite us airing our

18 respective dirty laundry in front of the court today which is

19 not what we had set out to do this afternoon, you know, I

20 think the one thing that from the debtors' perspective, you

21 know, we would agree with our lenders on is that everyone is

22 better off if we can somehow come to an understanding as to

23 dealing with these obligations that is fair and honors the

24 bargain reflected in the cash collateral order, and you know,

25 the basis principles under which I think this court has

1 operated for some time which is, you know.

2           I know Judge Walsh always used to say I can't --

3 if a secure lender wants to be dumb and take, you know, make

4 a rational decision that's collateral at the end of the day,

5 I can't stop them, but so they're going to have to pay the

6 freight.

7           THE COURT:  Well, I think we can all agree a force

8 majeure has occurred between the decision making at the

9 beginning of this case and where we are today, for everyone.

10           MR. WERKHEISER:  Well, of course.  All I'm saying

11 is I think, you know, we are acknowledging as Judge Walsh did

12 that, you know, the secured lender has rights and has a

13 significant amount of control over its collateral.  And that

14 was my only point in raising that, Your Honor.

15           But, at the same time, there's a duty to pay the

16 freight.  And in this case, you know, the freight is -- the

17 largest chunk of that freight that needs to be addressed, you

18 know, sooner rather than later is the employee obligations.

19 And customer obligations which, you know, again, that the

20 (indiscernible) there's not a real opportunity to pay, at

21 least as to the prepetition.

22           You know, I cannot speak to and I do not know, at

23 this time, what ability there is for customers who bought

24 goods and paid in full for them on a post-petition basis

25 where the company was only selling inventory that was

1  actually in its possession at that time, not taking special

2  orders, that may actually sit someplace in a warehouse, at

3  this point, and could be delivered if the resources were

4  there to do it, and there was not government action

5  preventing that from happening.  But, again, you know, it's

6  paying the freight, doing what's right and fair and, you

7  know, not to the extent possible hurting individuals who have

8  no control over what transpired here.

9          Thank you, Your Honor.

10          THE COURT:  You're welcome.

11          All right --

12          MS. FELDSHER:  Your Honor, this is Jennifer

13  Feldsher.  I won't take up the time other than I didn't want

14  my silence to be perceived as acquiescence to Mr.

15  Werkheiser's statement that I somehow misrepresented to the

16  court.

17          What I said to the court is to the best of my

18  knowledge and I hope that Your Honor knows that we tried to

19  be very careful about the things we say to the court and that

20  we're not misrepresenting it.

21          THE COURT:  All right.  It's a very difficult

22  situation for everybody, to say the very least and,

23  hopefully, one that will never be put into again but I think

24  it's our reality probably for the next several months.

25          All right, so here's where we are.  What I would

1  like to do is have a hearing Friday at one o'clock.  I'd like

2  that by video in case we need testimony.  And Ms. Gatsun will

3  work with you on that.

4        In the interim, the debtor may not spend any

5  money; however, I believe that under the cash collateral

6  order, they have authority to pay salaries, wages, and

7  commissions that were earned but were unpaid through today,

8  the 31st.  But before I authorize that pay, I'm going to need

9  details of exact numbers and backup that can be shared both

10  with me and with Wells Fargo, and any other creditor.

11        Obviously, I don't need names of employees.  I

12  don't want any personal identifiable information.  Maybe

13  names are okay, but obviously but no social security numbers,

14  no addresses, no phone numbers, just pure names is fine, if

15  we have to get to that level of detail.  But I really want

16  detail.  I want to know what these numbers are.

17        Not healthcare, not severance, not PPO, not

18  expense reimbursement, no other fringe benefits.  Just good

19  old fashion wages, commissions and salary.  I think that's

20  fair under the cash collateral order that the debtors would

21  have normally the ability to simply pay that, even without

22  the agreement of the agent.  But in current circumstances

23  and, in particular, some disagreement as to what truly is

24  owed or not, I'm going to insert myself into that process and

25  make a decision on Friday of exactly what's going to get

1  paid.

2       I'd like to make a request of the debtors that

3  they make a decision very quickly as to whether to convert

4  the case or not.  I'm not going to allow anything other than

5  what I just discussed to be paid before conversion, allowing

6  the bank accounts to be emptied to zero and then converting

7  the case is a recipe for disaster and unfair to the

8  creditors, none of whom are going to get paid in full.  And

9  the Chapter 7 trustee has to have something to deal with,

10 some way to operate the estate.

11      So, I'm requesting that the debtors quickly decide

12 whether they're going to convert and do so -- if they decide

13 to do so, to do so quickly and to file a motion to shorten

14 and the court will hear it on shortened notice.

15      I'd also like to request Wells Fargo to indulge me

16 by agreeing to continue the stay relief date that ends today

17 through Monday, April 6th to give us an opportunity to figure

18 out what to do, hopefully, with some comfort that no money is

19 going out the door unless otherwise ordered by the court.

20 And the only money the court is considering are the wages,

21 salaries and commissions, and only after hearing detailed

22 evidence of same on Friday with an opportunity for the agent

23 to be heard.

24      This is an unfortunate situation.  It is nobody's

25 fault.  It is nobody's fault.  I know many people in my local

1  business community who are good business people who have

2  great businesses who are staring down the barrel of a gun

3  based on what's happened.  It's just -- it's extraordinary.

4  And I'm not casting aspersions on anyone, but obviously this

5  case changed dramatically as did the whole world -- well not

6  the whole world but as to the United States in the last three

7  weeks, three or four weeks.

8              So, Mr. Werkheiser, is that okay?  Well it may not

9  be okay, but do you understand?

10             MR. WERKHEISER:  Of course, Your Honor, we do

11  understand and let me be clear.  The reason, in part, we're

12  having this debate today is the debtors, of course, never

13  entertained the idea of trying to pay these things without,

14  you know, some court authorization -- some specific vetting

15  of these issues in front of the court given, you know, the

16  lack of consent of Wells Fargo to agreeing to pay these, even

17  if we thought they were required by the order.

18             So we, of course, will abide by Your Honor's

19  direction on these points.

20             THE COURT:  Thank you.

21             MS. FELDSHER:  Your Honor, Jennifer Feldsher.  I

22  apologize for interrupting, just for one clarification.

23             THE COURT:  Yes, ma'am.

24             MS. FELDSHER:  We have been advised -- I

25  apologize, Your Honor.  We understand Your Honor's ruling and

1  will abide by it as well.

2        Your Honor, we were advised late last night, you

3  know, as usual it's always an emergency.  But the debtors

4  have their property insurance is coming due and they need to

5  enter into a renewal on -- Mr. Werkheiser may have more

6  information but we have been told that they need to enter

7  into a renewal by tomorrow or they will have no insurance

8  related to their properties.  And, obviously, there's a

9  significant amount of inventory here.

10        So we have no objections to the debtors entering

11  into the renewal policy and we would be okay with the use of

12  cash collateral for that because we think that in any

13  instance, whether this is a Chapter 11 or a Chapter 7, we

14  will need to have, you know, a proper insurance covering the

15  inventory here.

16        While the debtors haven't been able to secure the

17  same insurance that was required under the prepetition credit

18  agreements, they have told us what's the best insurances they

19  can get and we think that's better than not having any

20  insurance.

21        THE COURT:  Well if you consent, it's okay with

22  me.  And I can guarantee you the first question the Chapter

23  7, if there is one, will ask is whether there's insurance.

24  So, obviously, that's a good idea.

25        MS. FELDSHER:  We agree, Your Honor, we just

1  didn't want to be, you know, violating a court order so we

2  wanted to make sure you were mindful of that and we will

3  consent to that being paid.

4          MR. WERKHEISER:  Thank you, Ms. Feldsher, and

5  thank you, Your Honor.

6          Yes, I think we had communicated with Wells Fargo

7  just to let them know the terms of the policy, for example,

8  is available for renewal which was less attractive than the

9  one that was in effect through today.  And we're trying to

10 ensure that that would be acceptable to them under the

11 circumstances.

12         As I understand it, we have to sign the paperwork

13 by tomorrow, but nobody need go out the door immediately that

14 there is probably for two weeks of a grace period to make

15 those payments.  So, I think between now and Friday this

16 won't change the amount of cash on hand.

17         THE COURT:  Okay.  Thank you.  Makes a lot of

18 sense.  So, Ms. Feldsher, putting you on -- can you give me

19 that waiver until Monday or do you need to talk to your

20 client?

21         MS. FELDSHER:  Your Honor, I think that I'm

22 authorized -- my client is on, but might be on a mute line,

23 but we will, of course, give Your Honor, the time necessary,

24 particularly if, you know, as we know that the cash position

25 is going to remain the same.  So, Your Honor, at the risk of

1 getting ahead of my client and somebody else being on the

2 phone on Friday, I'm going to go ahead and agree to Your

3 Honor's request.

4          THE COURT:  Okay.  Thank you.

5          I am very cognizant for the landlords on the

6 phone.  I am very cognizant of the fact that you are now as

7 of tomorrow involuntary storage facilities for many of you

8 for the debtors' inventory and property.  And I take that

9 very seriously and I know that you will not get paid your

10 rent tomorrow and I know it's not the only commercial lessee

11 who is not going to pay rent tomorrow in the United States of

12 America, and that puts you all in a very difficult situation.

13 You all have your own lenders and you all have your own

14 stockholders, your own vendors.

15          So, I take that very seriously.  I will take that

16 very seriously and we will address that as quickly as

17 possible; however, until we have some decision about a path

18 forward, which -- I mean my preference is a Chapter 7, but

19 I'm not the fiduciary, thank goodness.  And that will be up

20 to either the debtor-in-possession to make that election or a

21 creditor to move to convert.  I cannot and nor would I

22 convert sua sponte.

23          I kind of lost my cool a little bit but, you know,

24 the healthcare situation is horrible.  Among the most

25 difficult decisions I've had to make since I took the bench

1   involved terminating people's healthcare insurance.  I had to

2   do that in Fistion (phonetic) for 50,000 retirees.  It was as

3   very difficult decision for me to make, and I don't take that

4   lightly either.

5          However, at least, at this point, I think, the law

6   compels me and good sense compels me, first of all, I can't

7   create money out of thin air or force Wells Fargo to fund

8   money that they aren't legally required to fund.  There isn't

9   enough money to pay everybody including healthcare in full.

10  Paying some now and others nothing is making a choice that

11  may not be fair.

12         And there is hope, I hope, a chance that some of

13  that money might get paid through the results of a

14  liquidation of the inventory in a Chapter 7 that would be, I

15  think, probably fairly, some of it at least, administrative

16  expenses, but that's going to have to await time.  That is a

17  hardship for real people that I take very seriously, but it

18  is unfortunately, in my mind, unavoidable under the facts and

19  law in this situation.

20         I'm worried too about the deposits.  As many of

21  you will remember from early in this case, at our first day

22  hearing, I was very concerned about the deposits.  That

23  situation has gotten not better.  It's gotten much much

24  worse.  That's money people, at least, partially have a

25  priority for and, again, hopefully, Chapter 11 priority wage

1  and claims and Chapter 11 priority deposit claims, at least,

2  will get some recovery.  We'll have to wait and see how that

3  plays out but that's a very difficult situation.

4        And I am cognizant of the Commonwealth of

5  Pennsylvania and other Attorney's General being concerned

6  about consumers.  The reality is nobody is getting out of

7  this happy and we're just going to have to do the best we can

8  to weigh the different interests, preserve due process, and

9  make measured decisions that do the least harm possible, and

10  that's hopefully what we're going to accomplish.

11        So, I'll see you all, unless there's anything

12  else.  Mr. Werkheiser, I'll see you all on Friday the 3rd at

13  one.  I would like that by video just in case we have to put

14  somebody on the stand or answer questions.  We really

15  shouldn't do it over the phone like I did today without

16  swearing the witness.

17        It's probably unclear now whether I'm going to use

18  Skype for Business or Zoom, but I'll get you that

19  information, Mr. Werkheiser, and you can include it in

20  whatever notice that goes out at an appropriate time for that

21  hearing.

22        All the audio is by CourtCall, as always, when we

23  go by video.  Only the video is for the pictures and the

24  audio is CourtCall so we can make sure we have a full

25  transcript available as required by law.

1        And if you have detail you can provide me prior to

2   the hearing, as long as you copy the other side with it or

3   the other parties with it, I'd be happy for you to submit

4   this to me by email.  You can work through Ms. Werkheiser or

5   Ms. Samanski; otherwise, I can certainly -- I will need it no

6   later than the hearing.  I will need something in my hand

7   that gives me the detail and you can provide that by email.

8        Any questions?

9        MR. WERKHEISER:  Your Honor, Mr. Werkheiser.  Just

10  a couple requests for clarification here.

11       So, I understood Wells Fargo to indicate that the

12  stay is not being lifted.  I just want to confirm for the

13  record that means that the remedy notice period continues

14  through Monday.  And that's only -- well material, not only

15  material but material from the perspective of while we are

16  not authorized to make any expenditures right now -- if the

17  debtors have no access to cash collateral, we would have no

18  choice but to dismiss the remaining employees effective the

19  end of the day today.  We cannot incur the types of

20  obligations without the ability to pay them, among others.

21       So if we could just clarify for the record that

22  the remedies notice period is continuing through Monday, I

23  think that will assist in (indiscernible) assets until then.

24       THE COURT:  The remedies notice period through

25  Monday but that is not result in the fact that you can or

1  you're going to be able to pay wages from April 1 through

2  April 6th without further order of the court.  The answer to

3  that is no.  I'm not going to let you do that.  What we're

4  going to talk about Friday is through March 31st.

5           MR. WERKHEISER:  I guess, Your Honor, what we're

6  struggling with then is we would then have to effectively

7  dismiss the remaining employees today.

8           THE COURT:  No, you don't.  No, you don't.  They

9  have a --

10          MR. WERKHEISER:  Can't have people to work when I

11 can't pay them.

12          THE COURT:  They have an admin claim.  You're

13 working, you're not getting paid.  They have an admin claim.

14 I may allow it.  I may not.  I don't know.  You don't have

15 the numbers for me.

16          MR. WERKHEISER:  Okay.  Okay.

17          THE COURT:  You can't not give me the information

18 to make a decision and then complain that I can't make a

19 decision, Mr. Werkheiser.

20          MR. WERKHEISER:  Your Honor, that's not what I'm

21 doing, please, please.  What I am trying to make sure is that

22 the legal status of the debtor is not, as of today, that cash

23 collateral is fully cut off, as opposed to making

24 expenditures.  Because if the legal status as of the end of

25 the day today is that there is no more access to cash

1  collateral at all, then the debtors do have zero ability to

2  pay the delegations that might be incurred through the end of

3  the week.

4          THE COURT:  I am struggling to understand in what

5  world you think that occurred.  I didn't terminate the cash

6  collateral order.  I terminated your ability -- I froze your

7  ability to make payments under that cash collateral order

8  until further order of the court.  And I asked and got an

9  accommodation from your lender to extend the remedies notice

10 period for Monday.  That's all that happened.

11         MR. WERKHEISER:  Right.  And nobody actually used

12 the word remedies notice period, Your Honor.  And so, I just

13 wanted to make sure there was no ambiguity about that being

14 extended through Monday.  That's all I was trying to do.  I'm

15 sorry if I did it in an inarticulate way.

16         THE COURT:  All right, whatever.

17         MR. WERKHEISER:  And, Your Honor, just on the

18 issue of conversion as a whole.  I mean I just want to be

19 clear the debtors are not resisting that.  I mean

20 realistically we understand this cannot continue in Chapter

21 11 without the consent of the secured lenders because we do

22 not have the ability to provide adequate protection, given

23 the circumstances of this case.  It's really how to

24 accomplish that, that we struggle with and continue to

25 struggle with.

1          We will do everything we can between now and

2   Friday to try to move past those issues with our lenders and

3   resolve or, at least, narrow the issues that we have on

4   Friday.  Thank you.

5          THE COURT:  Thank you.  Does anyone else wish to

6   be heard?

7          MR. MIRACHI:  Your Honor, this is Commonwealth.

8          THE COURT:  Yes.

9          MR. MIRACHI:  Commonwealth of Pennsylvania; just

10  real quickly.

11         The amount of the commissions may be indicative of

12  the number of deposits or the amount of deposits that were

13  made.  Is there any way we can get a copy of whatever

14  information is going to be provided as well?

15         THE COURT:  Yes.  You'll have to get your

16  information to Mr. Werkheiser.

17         MR. MIRACHI:  We've been in touch with Mr.

18  Werkheiser.  We can do that.  Thank you, Your Honor.

19         MR. WERKHEISER:  Yes, yes.  Your Honor, this

20  hadn't been requested previously, but I'm certain we can

21  accommodate the Commonwealth and provide information about

22  the amount of customer deposits received post-petition and

23  prepetition to the Pennsylvania customers.

24         THE COURT:  Okay.

25         MR. MIRACHI:  Great.  Thanks.

1          THE COURT:  Anyone else?  Yeah, you're welcome.

2          Anybody else?

3      (No verbal response)

4          THE COURT:  All right, thank you. We're adjourned.

5      (A Chorus of "Thank you, Your Honor")

6          (Teleconference ended at 12:51 p.m.)

7

8

9                      CERTIFICATE

10

11     I certify that the foregoing is a correct transcript

12  from the electronic sound recording of the proceedings in the

13  above-entitled matter.

14
    /s/Mary Zajaczkowski              April 1, 2020
15  Mary Zajaczkowski, CET**D-531

16

17

18

19

20

21

22

23

24

25

# **EXHIBIT W**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: D.I. 252** |
| | ) |

## ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III) GRANTING RELATED RELIEF

Upon consideration of the corrected motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of an order, pursuant to section 1112(a) of the Bankruptcy Code, (i) converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, (ii) establishing a deadline for filing final chapter 11 fee applications, and (iii) granting related relief; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 1334 and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and it appearing that this is a core matter pursuant to 28 U.S.C. § 157(b)(2) and that this

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]     Capitalized terms used but not otherwise defined in this Order have the meanings ascribed to such terms in the Motion.

Court may enter a final order consistent with Article III of the United States Constitution; and it appearing that venue of these chapter 11 cases and of the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that due and adequate notice of the Motion has been given under the circumstances, and that no other or further notice need be given; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is GRANTED, as set forth herein.

2.      Effective as of 12:00 a.m. (prevailing Delaware time), on April 7, 2020 (the "<u>Conversion Date</u>"), the Chapter 11 Cases shall be converted to cases under chapter 7 of the Bankruptcy Code.

3.      The following Conversion Procedures are hereby approved:

     a.      **Professional Fees.** To the extent professionals currently or hereafter retained in the Chapter 11 case have not already submitted final fee applications to the Court (the "<u>Final Fee Applications</u>"), all professionals shall submit Final Fee Applications in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and orders of this Court by no later than thirty (30) days after the Conversion Date (the "<u>Final Fee Application Deadline</u>"). Objections, if any, to the Final Fee Applications shall be filed and served by no later than twenty-one (21) days after the Final Fee Application Deadline. The Court will schedule a hearing, if necessary, at the Court's convenience and subject to the Court's availability, on such Final Fee Applications within fourteen (14) days thereafter or such later date as the Court determines. To the extent no objections are filed to a given professional's final fee application, such professional may file a Certificate of No Objection, and the Court may, in its sole discretion, enter an order approving such fees. To the extent the Court approves a Final Fee Application after the Conversion Date, all approved amounts owed for professional fees and expenses shall be paid (x) first, from each professional's retainer to the extent such retainers exist; (y) next, from the Carve Out Reserves (as defined in the Interim CC Order) in accordance with the terms of the Interim CC Order; and (z) thereafter, from the Debtors' chapter 7 estates in accordance with the Interim CC Order and the priorities set forth in section 726(b) the Bankruptcy Code.

13308536 v4

b. **Books and Records.** As soon as reasonably practicable, but in no event later than April 10, 2020, the Debtors shall turn over or provide access to the chapter 7 trustee the books and records of the Debtors in the Debtors' possession and control, as required by Bankruptcy Rule 1019(4). For purposes hereof, the Debtors may provide copies (including electronic copies) of such books and records to the chapter 7 trustee, or instructions for locating and accessing such books and records, and may retain copies of such books and records to the extent necessary to complete the reports required herein.

c. **Schedules and SOFA.** Without prejudice to the chapter 7 trustee's ability to request further extensions and any party in interest's ability to oppose such requests, the statements and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) shall be filed within forty-two (42) days after the Conversion Date.

d. **Schedule of Unpaid Debts.** Within fourteen (14) days of the Conversion Date, the Debtors shall file a schedule of unpaid debts incurred after commencement of the Debtors' Chapter 11 Cases, including the name and address of each creditor, as required by Bankruptcy Rule 1019(5).

e. **Final Report**. Within thirty (30) days after the Conversion Date, the Debtors shall file and transmit to the chapter 7 trustee a final report and account in accordance with Bankruptcy Rule 1019(5)(A).

f. **Claims**. Within fourteen (14) days of the Conversion Date, KCC shall (i) forward to the Clerk of this Court an electronic version of all imaged claims; (ii) upload the creditor mailing list into CM/ECF; (iii) docket a final claims register in the Debtors' Chapter 11 Cases; and (iv) box and transport all original claims to the Philadelphia Federal Records Center, 14470 Townsend Road, Philadelphia, PA 19154 and docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

4.     Subject to its compliance with Del. Bankr. L.R. 2002-1(f)(x)-(xi), on the Conversion Date, KCC shall be relieved of its responsibilities as the Debtors' claims and noticing agent in the Debtors' Chapter 11 Cases and will have no further obligations to the Court, the Debtors, the chapter 7 trustee (once appointed), or any party in interest with respect to the Debtors' Chapter 11 Cases or the chapter 7 cases.

5.     Notwithstanding anything to the contrary in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured*

13308536 v4

*Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 93] (the "Interim CC Order"), KCC shall be treated as a Professional Person (as such term is defined in the Interim CC Order) solely for the purpose of KCC's eligibility to have its fees and expenses paid from the Carve Out Reserves or otherwise as part of the Carve Out (each as defined in the Interim CC Order). To the extent that KCC is entitled, or hereafter becomes entitled, to payment of its fees and expenses in accordance with the *Order Appointing KCC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* [D.I. 77] (the "Claims Agent Order") and the Agreement (as defined in the Claims Agent Order), such fees and expenses shall be Allowed Professional Fees (as defined in the Interim CC Order) for purposes of the Carve Out.

6. Notwithstanding anything to the contrary in the Interim CC Order, the Carve Out Reserves shall be established and funded as follows: (a) $2,593,000 (the "Carve Out Escrow Funds") of the Debtors' funds shall be wired into an IOLTA account at proposed general bankruptcy counsel for the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP ("Benesch"), pursuant to wire instructions Benesch has provided to the Prepetition ABL Agent, where such funds shall be held in trust for the applicable beneficiaries of the Carve Out and disbursed strictly in accordance with the terms of this Order and the Interim CC Order (as modified hereby); and (b) the Carve Out Reserve for the Chapter 7 Trustee Carve Out shall be deemed funded by allowing $50,000 of the Debtors' funds to remain in a bank account of the Debtors where such funds shall remain available to satisfy the reasonable fees and expenses of any interim or permanent chapter 7 trustee, as applicable, for the Debtors' bankruptcy cases. The Carve Out Escrow Funds shall be disbursed by Benesch only as follows: (i) with respect to the portion of the Carve Out Escrow Funds allocable to KCC for fees and expenses incurred as the Claims Agent, in accordance with the procedures set forth in the Claims Agent Order and KCC's Agreement; (ii) with respect to the

4

portions of the Carve Out Escrow Funds allocable to the Debtor Professionals (other than, for the avoidance of doubt, KCC) and the Committee Professionals, upon entry of, and in accordance with the terms of, such further order or orders of the Court as may be entered following the filing of Final Fee Applications and notice and opportunity to object thereto in accordance with the procedures set forth in Paragraph 3(a) above; and (iii) with respect to the portion allocable to fees required to be paid to (A) the Clerk of the Court and (B) the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, as may hereafter be directed by the interim or final chapter 7 trustee, as applicable.

7.      Except as expressly provided in Paragraphs 5 and 6 above, nothing in this Order or the conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code shall affect or modify the terms of the Interim CC Order, prejudice any person or entity's rights thereunder or relieve any person or entity of obligations thereunder. All rights, claims, remedies, defenses and obligations under and in connection with the Interim CC Order shall be reserved and preserved in their entirety. For the avoidance of doubt and without in any way limiting the foregoing, (a) all rights and obligations in respect of the Carve Out and the Carve Out Reserves (each as defined in the Interim CC Order) shall survive any termination of the Specified Period (as defined in the Interim CC Order), and (b) any lien priorities or superpriority claims granted pursuant to the Interim CC Order to secure payment of the Carve Out shall be limited to the Carve Out Reserves, once funded.

8.      For the avoidance of doubt, with respect to cash and cash equivalents in the possession, custody or control of any Debtor as of the date of entry of this Order, neither the entry of this Order, nor any relief granted hereunder, nor the occurrence of the Conversion Date for any Debtor's Chapter 11 Case shall have any effect on whether such cash or cash equivalents (i) are or

13308536 v4

are not funds collected on account of "trust fund taxes" and held in trust for the benefit taxing authorities or other governmental units (as defined in section 101(27) of the Bankruptcy Code) or (ii) are or are not property of any Debtor's bankruptcy estate pursuant section 541 of the Bankruptcy Code.

9.     The Debtors have a need for the services of certain independent contractors, including individuals who are former employees of the Debtors (collectively, "Independent Contractors") following the Conversion Date in order to, among other things, (a) provide on-site security at the Debtors' distribution centers, and (b) continue the collection and the Debtors' books and records for transmission to the chapter 7 trustee, prepare the Schedule of Unpaid Debts and prepare the Final Report.  The Debtors are authorized to pay the Independent Contractors from cash on hand in advance for their work and related expenses in an aggregate amount not to exceed $73,243 and as further set forth in the Estimated Disbursements Forecast April 6th - April 10th provided to the Prepetition ABL Agent on April 5, 2020.  After April 10, 2020, the chapter 7 trustee will determine whether, and to what extent, to continue to use the services of the Independent Contractors.

10.     Nothing herein shall affect the Order Granting the Motion of Jofran Sales, Inc. for Injunctive Relief entered on March 27, 2020, in Adversary Proceeding 20-50546.

11.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

**Dated: April 6th, 2020**
**Wilmington, Delaware**

**CHRISTOPHER S. SONTCHI**
**UNITED STATES BANKRUPTCY JUDGE**

6

13308536 v4

# **EXHIBIT X**

```
1                  UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
2

3                                    .   Chapter 11
     IN RE:                          .
4                                    .   Case No. 20-10553 (CSS)
     ART VAN FURNITURE, LLC, et al., .
5                                    .   Courtroom No. 6
                                     .   824 North Market Street
6                                    .   Wilmington, Delaware 19801
                                     .
7                      Debtors.      .   April 6, 2020
     . . . . . . . . . . . . . . . . .   1:00 P.M.
8

9             TRANSCRIPT OF TELEPHONIC HEARING
         BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
10             UNITED STATES BANKRUPTCY JUDGE

11   TELEPHONIC APPEARANCES:

12   For the Debtors:        Gregory G. Werkheiser, Esquire
                             Michael J. Barrie, Esquire
13                           Jennifer Hoover, Esquire
                             Kevin Capuzzi, Esquire
14                           John C. Gentile, Esquire
                             BENESCH, FRIEDLANDER, COPLAN
15                             & ARONOFF LLP
                             222 Delaware Avenue, Suite 801
16                           Wilmington, Delaware 19801

17

18   Audio Operator:         Leslie Murin

19   Transcription Company:  Reliable
                             1007 N. Orange Street
20                           Wilmington, Delaware 19801
                             (302)654-8080
21                           Email:  gmatthews@reliable-co.com

22   Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.
23

24

25
```

```
 1   TELEPHONIC APPEARANCES (Cont'd):

 2   For the Debtors:          Marua I. Russell, Esquire
                               MONTGOMERY MCCRACKEN WALKER
 3                                & RHOADS LLP
                               437 Madison Avenue, 24th Floor
 4                             New York, New York 10022

 5
     For U.S. Trustee:         Linda Richenderfer, Esquire
 6                             David Buchbinder, Esquire
                               UNITED STATES DEPARTMENT OF JUSTICE
 7                             OFFICE OF UNITED STATES TRUSTEE
                               844 King Street, Suite 2207
 8                             Lockbox 35
                               Wilmington, Delaware 19801
 9
     For Wells Fargo Bank:     Jennifer Feldsher, Esquire
10                             MORGAN LEWIS & BOCKIUS LLP
                               101 Park Avenue
11                             New York, New York 10178

12
                               - and -
13
                               Cory Falgowski, Esquire
14                             BURR & FORMAN LLP
                               1201 N. Market Street, Suite 1407
15                             Wilmington, Delaware 19801

16   For the Committee:        Bradford Sandler, Esquire
                               PACHULSKI STANG ZIEHL & JONES LLP
17                             919 North Market Street
                               Wilmington, Delaware 19801
18
     For Jofran Sales:         Jeffrey Waxman, Esquire
19                             MORRIS JAMES LLP
                               500 Delaware Avenue, Suite 1500
20                             Wilmington, Delaware 19801

21

22

23

24

25
```

1  | MATTERS GOING FORWARD:

2  | Debtors' Application for Entry of an Order Authorizing the
   | Retention and Employment of Jones Lang Lasalle Americas, Inc.
3  | as Special Real Estate Consultant to the Debtors Nunc Pro Tunc
   | to the Petition Date [Filed 03/16/2020; Docket No. 141]

4

5  | Debtors' Application for Entry of an Order Authorizing and
   | Approving the Retention of Benesch, Friedlander, Coplan &
   | Aronoff LLP as Bankruptcy Counsel to the Debtors Nunc Pro Tunc
6  | to the Petition Date [Filed 03/16/2020; Docket No. 142]

7  | **Ruling:  Matters Continued to April 27th, 2020**

8

9  | Debtors' Motion to Convert the case to Chapter 7

   | **Ruling:   28**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Proceedings commence at 1:01 p.m.)

2              THE COURT:  Good afternoon, everybody.  This is

3    Judge Sontchi.  This is the Art Van Furniture hearing; 20-

4    10553, scheduled for one p.m. on Monday afternoon.

5              Just to say what you already know which is all the

6    audio is being done through CourtCall, so if you don't have

7    CourtCall on or are not connected when you want to speak it

8    won't be registered; you have to do that to preserve a valid

9    transcript.  The audio is optional and is on. You have --

10   excuse me, the video is optional and on.  You have the

11   ability to blackout your screen.  That is not a problem, if

12   you're uncomfortable or just don't wish for us to see you

13   that's not a problem whatsoever.

14             I will turn it over to counsel for the debtors.

15             MR. WERKHEISER:  Good afternoon, Your Honor.  This

16   is Gregory Werkheiser of Benesch Friedlander.  Thank you,

17   again, for making this time available to us.

18             Your Honor, this was originally our second day

19   hearing in the case.  So it is a rather lengthy agenda in

20   terms of pages.  Obviously, only one matter of substance

21   going forward today.

22             I just want to make sure Your Honor has the most

23   current version of the agenda which is the second amended

24   agenda that the debtors filed this morning.

25             THE COURT:  I do.

1          MR. WERKHEISER:  Alright, thank you.

2          So, Your Honor, just briefly, items one through

3    eight are all adjourned.

4          Item number nine was the debtors' motion to reject

5    certain executory contracts and Your Honor was kind enough to

6    enter the order for us on that in the last couple of days.

7          Item number ten was the debtors' application to

8    retain Jones Lang Lasalle to provide certain real estate

9    related services, and with the court's permission we are

10   carrying that application to the April 27th which is an

11   omnibus date in this case.  (Indiscernible) remain on the

12   calendar as a hearing date notwithstanding the impending

13   conversion of the cases.

14         There were some comments to that from the United

15   States Trustees Office and (indiscernible) still being

16   evaluated.  Candidly, it is unclear whether Jones Lang

17   Lasalle will decide to go forward with a retention

18   application or not under the circumstances.  We contemplated

19   compensation that was largely a success fee or

20   (indiscernible).  So there may not be a need for that

21   application to be pursued, but that is being evaluated

22   currently.

23         Your Honor, item number eleven is our firm's

24   retention application.  Your Honor, we have a bit of

25   (indiscernible) activity on this, this morning.  Largely it

1  seems to be a miscommunication that occurred Friday evening

2  with Ms. Richenderfer of the U.S. Trustees Office.  We had

3  been learning with her over the last several days some

4  informal comments we received from her.  There was,

5  apparently, a miscommunication Friday night as to whether

6  this was going to go forward or not go forward.  We tried to,

7  you know, clear that up this morning to indicate that we were

8  prepared to adjourn the application if she still had

9  concerns, but I see that the U.S. Trustees Office has since

10  filed an objection to the retention application and now

11  appears at the docket at Item 260.

12         Notwithstanding that I think, you know, from our

13  firm's perspective and from the debtors' perspective, you

14  know, we think the issues that have been raised are ones that

15  we need some more time to work with the U.S. Trustees Office.

16  It should be entirely resolvable and we just need time to go

17  through the issues (indiscernible).

18         Let me pause there, Your Honor, in case you have

19  any questions or the U.S. Trustee would like to be heard on

20  this issue.

21         MS. RICHENDERFER:  Your Honor, this is Linda

22  Richenderfer from the Office of the United States Trustee.

23         I had no issue with this hearing being continued.

24  That was my understanding on Friday.  I was quite surprised

25  when the agenda did not reflect that.  And based on

1   communications it was not my understanding that the issue was

2   going to be pushed.  Believe me, I have enough to do without

3   having to file objections to retention applications at this

4   point.  Regardless, the objection has been filed.  We will

5   continue to work with the Benesch Law Firm and have no issue

6   with this being pushed to the 27th hearing date.

7            THE COURT:  Okay.  Thank you.  We will continue it

8   to April 27th.

9            In connection with the April 27th date what will

10  happen with that will depend on interactions with whoever the

11  interim trustee is, but we will certainly use that as a

12  holding date.

13           MR. WERKHEISER:  Understood, Your Honor.  Thank

14  you.

15           Your Honor, that then brings us to the Alvarez &

16  Marsal application.  The court did enter an order on that on

17  Friday.  So thank you for that.

18           Item number thirteen was a matter that really

19  should have been continued from the very beginning, it's the

20  interim compensation procedures motion.  On the first amended

21  agenda we did reflect that that was going to be adjourned at

22  that date given where we are.

23           Item fourteen is the schedule extension motion and

24  the court did enter an order for us on that particular

25  motion.  So nothing further to do on that today.

1         Your Honor, I think that brings us to the main

2 event today which is the much talked about debtors' motion to

3 convert these cases to Chapter 7 liquidation cases. It was

4 filed Friday evening and this would make a record that after

5 filing an original version we did discover a mistake

6 (indiscernible) for the effective date and filed a corrected

7 version thereafter. That was a version that got served out

8 on all of the parties. That appears as Docket Item 252.

9 That would be the version that we are pursuing, Your Honor,

10 for purposes of today's hearing.

11         THE COURT: Okay.

12         MR. WERKHEISER: Your Honor, the relief -- the

13 basic relief that we sought is, of course, converting to

14 Chapter 7 and, you know, (indiscernible) right to do, you

15 know, for the reasons that we have set forth in the motion,

16 you know, while, obviously, I think on this call which

17 (indiscernible) the circumstances in the Chapter 11 cases are

18 such that the debtors aren't able to continue in Chapter 11

19 because of the broader circumstances with the coronavirus

20 (indiscernible) because, you know, lack of access to cash

21 collateral going forward beyond today.

22         So the debtors did feel it was important to lay

23 out, sort of, the history of these cases and the efforts that

24 have been made over the course of these cases and before they

25 were filed to, you know, (indiscernible) to salvage this

1 company and to, you know, protect the interests of the

2 various stakeholders including employees and customers.  I

3 think, you know, all of that is, really, the nature and

4 background for the relief that is being requested which is

5 to, you know, convert these cases effective 12 a.m. tomorrow,

6 Tuesday morning, April 7th to Chapter 7 liquidation cases.

7          Your Honor, the proposed order attached to the

8 motion does have some features that are a little bit unusual

9 for a motion of this nature.  And we did circulate a further

10 revised proposed order to the court just before the hearing

11 which has also been circulated to, among others, counsel for

12 the committee, counsel for the ABL term loan agent, counsel

13 for -- excuse me, counsel for the prepetition ABL agent,

14 counsel for the prepetition term loan agent, and the U.S.

15 Trustee.

16          That further revised order, which I think the

17 court has as well, reflects some changes that were made in

18 the response to comments received and ongoing review of the

19 order as filed with the motion.  We can pursue that however

20 Your Honor would like.  You know, I can walk you through

21 changes at this point or if you'd like me to pause to answer

22 any questions the court has or let other people to make

23 whatever comments they feel they need to make for the record;

24 however Your Honor wants to proceed.

25          THE COURT:  Alright, thank you.

1    Given the motion to shorten we have the objection

2 deadline is actually the hearing, let's just open this up.

3 First I'd like to hear from the committee and Wells Fargo,

4 and then anyone else who wishes to be heard in connection

5 with the motion.

6    I will start with the committee.  Mr. Sandler?

7    MR. SANDLER:  Good morning, Your Honor.

8    It's very unfortunate that this case is

9 converting.  It's something that, you know, we were hoping to

10 see a going concern sale. I think I mentioned that one of the

11 status conferences I was talking to both professionals for

12 Mr. Van Elslander who expressed an interest in the Michigan

13 stores and also with Mr. Levin's counsel who is interested in

14 some of the Pennsylvania stores.

15    So this is unfortunate, but, you know, we all know

16 the history of these cases.  We are where we are and at this

17 point the committee has no objection to the conversion.

18    THE COURT:  Thank you.

19    Ms. Feldsher?

20    MS. FELDSHER:  Good afternoon, Your Honor.  Thank

21 you.

22    I would echo Mr. Sandler's statements and why two

23 decades of practicing it's my first case to convert from an

24 11 to a 7.  On a personal level, you know, its deeply

25 troubling that we couldn't do more to salvage it, but it's

1  just a circumstance of a case caught in the cross-hairs of

2  what is, you know, certainly in my lifetime and hopefully in

3  the lifetime of all those around us who would be a once in a

4  lifetime pandemic and disaster in the country.  So we have no

5  objection to the conversion.

6          We did have some issues with the revised order.

7  There were several versions of the order that had gone

8  around, the latest of which came just before the hearing

9  began.  There is a couple of things, I wouldn't call them

10 objections, per say, but things that we could have cleared up

11 with a little bit more time, but since we're doing it in real

12 time unfortunately we need to, you know, bring them up with

13 the court.

14         The first is, this is Paragraph -- apologies, Your

15 Honor, Paragraph 9.  The debtors have requested a funding of

16 $88,243 to pay for employees that the debtors have identified

17 as being critical to this next week.  Those, I think, as they

18 have been explained to us, fall into two buckets.  The first

19 is security, the second is employees that are necessary to

20 put together information for the Chapter 7 Trustee and also

21 some information that's been requested by the ABL lenders

22 which we think will be integral to the Chapter 7 Trustee as

23 well.

24         The $15,000 of security costs, Your Honor, have

25 already been funded per our last status conference which I

1  believe was on Friday at which time the court had approved up

2  to $40,000 of security costs.  They actually were $15,000 at

3  the time.  I think Your Honor just gave everybody a little

4  bit of leeway so we didn't have to have an emergency which we

5  appreciated, but those costs have already been paid.  So if

6  you net those out the actual amount, which I believe ties to

7  what the company has already requested, but the ABL lender

8  fund is $73,243 and not the $88,243.

9        I just -- you know, I didn't want -- I appreciate

10  that the language has not to exceed which protects us, but

11  the $40,000 number created some confusion with some vendors

12  after the last hearing and we got calls from the debtors

13  about that.  So I just wanted to be more precise on this one

14  so that there wasn't any ambiguity on what could and couldn't

15  be funded.

16        The ABL lender has no objection to the funding of

17  the amounts for these employees who have committed to working

18  throughout this week to assist the debtors in getting the

19  information over to the Chapter 7 Trustee.

20        Your Honor, with that the ABL lender has

21  requested, which are the three critical pieces of information

22  as we see it that we're hopeful the debtors will be putting

23  together during this week.

24        The first is information about the debtors'

25  inventory.  A lot of inventory, Your Honor, has been moved

1   recently as a result of the debtors rejecting a variety of

2   leases that this court has approved, but as a result there's

3   a lot of uncertainty as to where inventory resides.  That,

4   obviously, goes to the issue of whether or not there is

5   appropriate security at the locations as well.  We want to

6   make sure we know where the inventory is.

7        So we have asked the debtors to put together

8   inventory by location and also, if possible, by skew number.

9   We have been told that that would be provided to us by end of

10   the day tomorrow, but the debtors were not willing to put

11   something into the order requiring them to do so.  I just

12   would like the court to know that we view that as being

13   absolutely critical to the Chapter 7 Trustee being able to

14   get involved quickly, understand where the inventory is and

15   make sure that the trustee can secure it.

16        Secondly, as has been brought up to the court

17   previously, the debtors' insurance policies, its property

18   insurance lapsed and the debtors did get approval to go ahead

19   and pay for replacement insurance  My understanding that that

20   is in progress, but, obviously, we would like to make sure

21   that that gets bound and finalized before, you know,

22   hopefully as part of the (indiscernible), but the Chapter 7

23   Trustee has very current information on what, if anything,

24   remains to be done to have that insurance bounded and

25   completed.

1        And the third, which I believe was resolved as we

2    were on the phone, is we would ask about the Levin sites who

3    was going to be providing security at those sites which I

4    believe has just been -- the information was just provided to

5    us.  So, Your Honor, we had agreed to fund the $73,243 but it

6    was under the agreement of the parties that the people would

7    continue to work notwithstanding the conversion.  They would

8    work throughout this week for which they are being funded and

9    that they would put this information together.

10   Unfortunately, we're not able to get there with the debtors

11   to include some language that would assure that that was

12   going to occur.

13        Obviously, we're not looking to hold anybody in

14   contempt of court.  If the debtors need some extra time we

15   are, obviously, going to work with them, but we do view this

16   information as being critical to the conversion itself.

17            THE COURT:  Alright, thank you.

18            Mr. Werkheiser, would you like to respond to that?

19            MR. WERKHEISER:  Sure, Your Honor.

20        I think we're largely on the same page in terms of

21   what we are trying to accomplish both with the Chapter 7

22   Trustee and for Wells Fargo who is our other secured lender,

23   whose collateral is implicated in these cases.  So Ms.

24   Feldsher is correct, the amount that remains to be funded

25   under the proposed budget for the week that the debtors would

1  seek to pre-fund today, Your Honor, and this is why we didn't

2  reflect it in Paragraph 9 of the further revised order that

3  w3as circulated just before the hearing.  It would be

4  $73,243.

5        That covers some -- it covers, essentially, the

6  debtors' personnel who will be providing some functions

7  ancillary to the security functions that the court recently

8  approved and working on collecting books and record, and

9  collecting the categories and information that Ms. Felder

10  referred to.

11        So, you know, that is something that we would hope

12  the court would consider authorizing the debtor to

13  (indiscernible) cash collateral with the consent of our

14  secured lenders (indiscernible).

15        In terms of the inclusion of language or non-

16  inclusion of language in the order to that effect I think,

17  you know, we had some concerns about because as everyone has

18  acknowledged we are doing this real time and because the

19  debtors did have to make decisions on Friday to relieve the

20  remaining employees that they have, the 40 or 50 employees

21  that was left after prior elections enforced they had to

22  terminate everyone effective the end of the day Friday.

23        We then were in discussions throughout the weekend

24  about these issues and I think reached agreement on what

25  would be (indiscernible) staffing for the security issues and

1  for these information issues to be addressed over the next

2  several days, and an appropriate budget for that which is

3  reflected in Paragraph 9.  But given the circumstances and

4  the lack of resources available to the debtors and the fact

5  that some of the employees, you know, we couldn't be certain

6  that the employees would be available to the debtors to

7  (indiscernible).

8       We did have concerns about eliminating every

9  single item of information that the Chapter 7 Trustee or

10  Wells might like in the text of the order and then even

11  create a situation where intentionally or unintentionally

12  parties were put in the position of having violated the

13  order.

14       I can confirm, however, for the record, that the

15  debtors are working on assembling all the information that

16  Wells Fargo and the Chapter 7 Trustee would want relative to

17  the inventory.  So this would be inventory detailed by

18  location and skewed.  I think we had indicated, through

19  correspondence over the weekend, that that is a somewhat more

20  regular intensive process especially given how much an

21  employee has been moved over the last few weeks; objections

22  to various incidents and so on in the case.  That is

23  something that we understand from personnel of the debtors to

24  be completed by (indiscernible) tomorrow.

25       I can also, I think, provide information, and I

1  didn't realize this was still an open item as far as Wells

2  Fargo was concerned, as to the status of property insurance.

3  In one of our recent prior hearings we did, I believe,

4  discuss this on the record and the debtors have executed a

5  binder for new property insurance to request a policy that

6  expired on March 31st at various locations.

7  It is our understanding that the debtors have a

8  thirty day grace period to pay the premiums on that.  So I

9  don't know right here today whether those premiums have been

10  funded, but, you know, there is no, to our understanding, any

11  gap in the insurance at this time and wouldn't be so long as

12  the premiums are funded within thirty days of the binder

13  having been signed.

14  And then one last point, Your Honor, again, to

15  correct -- just to make sure the record is clear on this

16  point.  The debtors did have to terminate the remaining

17  employees at the end of the day Friday.  So any former

18  employees that are among the personnel that are being asked

19  to provide these services this week are being brought in,

20  effectively, as any contractors at this point and not any

21  employees of the debtors.  I just want to make sure the

22  record is clear on that point because among other things that

23  have expired these debtors they no longer have Worker's

24  Compensation insurance at this point in time.

25  THE COURT:  Thank you, Mr. Werkheiser.  Question:

1  I thought in the context of authorizing the debtors to renew

2  property insurance that there was a sum of money that was

3  involved with that, which I assumed was an initial premium or

4  something along those lines, and now you're saying you don't

5  know if the premiums have been paid.  So what's the status?

6           MR. WERKHEISER:  Yes, Your Honor.  Sorry if I

7  wasn't clear.  So I think we had a discussion about the

8  premium, which was, you know, quite expensive to renew under

9  the circumstances, in excess of, I think, $2 million in

10  total, and then had a discussion on the record at one of the

11  recent prior hearings about the timing of funding of that

12  premium.  And I think what we said at that time is, to my

13  knowledge, still true that there was not a need to fund the

14  premium immediately, that there was a 30-day grace period,

15  and we're still well within that grace period right now.

16           So, given the broader situation with our, you

17  know, limited access to cash collateral and the other things

18  going on in the case, the debtors haven't felt it appropriate

19  to fund that premium prior to the appointment of the trustee.

20  But, you know, certainly, you know, we'd fully cooperate and

21  support the decision to fund that premium once the trustee is

22  in place.

23           THE COURT:  Okay.  All right.  Ms. Feldsher, any

24  response?

25           MS. FELDSHER:  I'm sorry, Your Honor, I could not

1  get off mute early enough.

2        Your Honor, my only concern with that is, one,

3  these amounts have already been authorized by the Court, so

4  I'm not sure what benefit is gained from the grace period or

5  being with the grace period.  My only concern is, you know,

6  for the Chapter 7 trustee to have sufficient time to get

7  involved, and I don't know what orders of the Court the

8  Chapter 7 trustee will feel they will need, you know, to go

9  ahead and authorize the payment of this premium, if they will

10 need an order to operate the debtors' businesses, and I just

11 didn't want the timing of that to become an issue in the

12 case.  We just want to make sure that the company has

13 appropriate insurance; it's not as fulsome as what we had

14 prepetition, but it is, we understand from the debtors, the

15 best that they could get and it's certainly better than

16 nothing.

17        So, you know, our view would be the debtors are

18 authorized to go ahead and pay it and we don't see the

19 benefit of not paying it.  But if Your Honor thinks the

20 Chapter 7 trustee will have sufficient time to address it as

21 well, that's fine, as long as the debtors make the Chapter 7

22 trustee aware of the timing, so that it isn't something that

23 slips, you know, as the Chapter 7 trustee is trying to get

24 his arms around all that is coming over with respect to this

25 case.

1      THE COURT:  Ms. Richenderfer, do you have any

2  thoughts on this?

3      MS. RICHENDERFER:  Your Honor, I have a couple of

4  thoughts that I think are interrelated to this question.  One

5  has to do with the form of order itself.  On paragraph 3(b)

6  as (indiscernible) it talks about turning over the books and

7  records to the trustee as soon as reasonably practicable.

8  Your Honor, I have asked that the language be changed to make

9  it clear that the trustee has immediate access to all of the

10  debtors' books and records.  The trustee will make

11  arrangements as need be to obtain physical possession, but

12  the reading of this would have you believe that the trustee

13  does not have immediate access.  I mean, the trustee

14  immediately becomes responsible for the debtor, has the

15  fiduciary duty and is running the business, so to speak, is

16  that they are the debtor, they are the debtors.

17      So I think paragraph (b) needs to be changed to

18  state that the Chapter 7 trustee will have immediate access

19  and can work with the appropriate individuals with respect to

20  the turnover of the information.

21      I do have a general concern, Your Honor, in that

22  we're talking about certain requests for information that are

23  going to go past the date when the Chapter 7 trustee is going

24  to take over the role.  At 12:01 tomorrow morning, it will be

25  the Chapter 7 trustee, and it will be their responsibility

1  and they work with the lender and whomever as they need to

2  with respect to requests for information, with respect to the

3  direction of anyone working on behalf of the debtors.

4          And I guess I'm confused also, Your Honor, because

5  I thought that there was supposed to be a payment that was

6  being made, that was authorized, so that the property

7  insurance would be in place, because it would take the

8  Chapter 7 trustee some time to get their arms around this and

9  to get the property insurance and have it be in place.  So

10  I'm not clear why there wasn't a payment that was made, as

11  Ms. Feldsher has suggested was supposed to have been.

12          MR. WERKHEISER:  Your Honor, this is Mr.

13  Werkheiser, may I speak to Ms. Richenderfer's comments?

14          THE COURT:  Yes.

15          MR. WERKHEISER:  Okay.  Your Honor, so -- you

16  know, subject to -- I believe Mr. Stogsdill is on the line

17  today for the hearing, who is a (indiscernible) at Alvarez

18  and Marsal -- so subject to him piping up and telling us that

19  there's not the present ability to make the premium payment

20  for the property insurance today before the conversion orders

21  become effective, we're not objecting to doing that.  This is

22  really the first we've been told that there was an

23  expectation that would be done pre-conversion versus post

24  conversion.  So I think we can deal with that issue and, if

25  the wires do go out today, you know, we would try to make

1  that happen, if that's the consensus that that should be

2  happening today.

3          THE COURT:  All right, let's pay the insurance.

4  Let's get it done today.

5          MR. WERKHEISER:  Okay.

6          THE COURT:  Please, yes, because the Court so

7  authorizes.

8          MR. WERKHEISER:  Thank you, Your Honor.  And I'd

9  be happy to speak to Ms. Richenderfer's comments about the

10  access information issue --

11          THE COURT:  Yes, please, go ahead.

12          MR. WERKHEISER:  -- if Your Honor wants to hear --

13  sure.

14          THE COURT:  Yeah, please.

15          MR. WERKHEISER:  So I think, again, this is just

16  situation where we're struggling with some of the realities

17  of the situation of having a debtor that until very recently

18  was still an operating debtor with, you know, a hundred to

19  200 locations throughout different areas of the country and,

20  not only that, Your Honor, had really two distinct business

21  lines, the Art Van Furniture line and the Levin and Wolf

22  furniture lines, and the systems for those hadn't been fully

23  integrated.  So what we've been trying to work through with

24  the U.S. Trustee's Office on this issue is just the fact

25  that, as a practical matter, it's not like flipping a switch

1  and we can deliver access, you know, immediately as of the

2  effective date of conversion to trustee to all of the

3  documents and information that the debtors have.

4        Technically, is the trustee at that point in

5  charge of all that information and does the trustee have a

6  right to it?  Absolutely, nobody is contending otherwise.

7  But practically can, you know, we connect the trustee into

8  all of the computer systems of the debtors or, you know,

9  provide access to all the books of the debtor in hard copy

10  or, you know, located remotely someplace as of midnight, you

11  know, this evening?  No.

12        And so really I think the -- this is more of a

13  semantic issue than a difference of view on when things

14  should happen.  We are committed to getting all of this

15  information to the trustee as soon as possible, I just didn't

16  want to again set up the client for somebody to say later

17  that they did not do what they were supposed to do by saying

18  access was going to be delivered immediately to everything as

19  of the effective date of conversion when there isn't a

20  practical ability to do that.

21        THE COURT:  All right.  Okay, thank you.  I hear

22  you on that and I think that's reasonable.  I was playing

23  around with drafting some language on the draft and there's

24  really no way to realistically say something needs to be made

25  immediately available at 12 midnight tonight, but I think 14

1  days is way too long.  First of all, you're not going to have

2  anyone around past Friday, so unless the trustee decides to

3  pay them.  So I'm going to say four days, no later than four

4  days.

5          MR. WERKHEISER:  Understood, Your Honor.

6          THE COURT:  That means Friday, so -- unless I did

7  the math wrong, I think that's Friday.  Do you want to put --

8          MR. WERKHEISER:  Thank you.

9          THE COURT:  -- Friday instead of four days, just

10  to be clear -- whatever, either four days or Friday, either

11  is fine.

12          MR. WERKHEISER:  All right, Your Honor, we'll make

13  that change.

14          THE COURT:  We have to fix paragraph 9 to make the

15  number 73,243.  Let me just ask Wells and the U.S. Trustee,

16  did you have any other comments on the order that we haven't

17  already heard?

18          MS. RICHENDERFER:  Your Honor, this is Linda

19  Richenderfer.  No, I do not.

20          THE COURT:  Thank you.

21          MS. FELDSHER:  And, Your Honor, this is Jennifer

22  Feldsher, I didn't as well.

23          THE COURT:  Okay, very good.  Thank you very much.

24          Is there anyone else on the phone who would like

25  to be heard in connection with the debtors' conversion motion

1  and/or the form of order?

2          MR. WAXMAN:  Your Honor, this is Jeff Waxman, if I

3  may be heard?

4          THE COURT:  Yes, Mr. Waxman.  Good afternoon.

5          MR. WAXMAN:  Good afternoon.  First, Your Honor, I

6  did get a version of the order on Friday that includes the

7  language that we had requested from the debtors, and I want

8  to thank the debtors for its inclusion.  I just haven't seen

9  a revised order, and so I would just ask that Mr. Werkheiser

10 confirm on the record that the language that's in what was

11 paragraph 8 is still in the order in whatever paragraph it's

12 now in.

13         THE COURT:  I'll do that --

14         MR. WERKHEISER:  Yes --

15         THE COURT:  -- it's paragraph 10 now, but it's the

16 same language, there's been no change.

17         MR. WAXMAN:  Okay.  Thank you very much, Your

18 Honor.  I have nothing further.

19         THE COURT:  Okay.  Thank you, Mr. Waxman.

20         Sorry to cut you off, Mr. Werkheiser.

21         MR. WERKHEISER:  No problem, Your Honor.

22         THE COURT:  Anyone else have anything they'd like

23 to say?

24     (No vocal response)

25         THE COURT:  All right, I hear none.  I had no

1  comments to the order myself.  Let me look at it again.  I

2  assume we didn't have any problem with what I had seen on

3  Friday.

4           MS. FELDSHER:  Your Honor, this is Jennifer

5  Feldsher again.  If I might just highlight for the Court,

6  this isn't something that we would have an issue with, but I

7  didn't think Mr. Werkheiser brought it up, but there is a

8  change in this order from what was in the cash -- the interim

9  cash collateral order in that Wells is going to be funding

10  the carveout reserve for the professionals to an account at

11  the Benesch law firm.  The initial -- the interim cash

12  collateral order had required a segregated account be set up

13  at Wells Fargo, but administratively that takes some time and

14  in excess of the time that we would have had on the schedule

15  that the debtors laid out for conversion.  So in order to

16  effectuate the spirit, if not the letter, of what was in the

17  interim cash collateral order, we've arranged for the Benesch

18  firm to hold the funds for the professionals, and then of

19  course any distributions to professionals would be subject to

20  the Court's interim compensation provisions, as well as some

21  of the additional provisions that the debtors have put into

22  this order with respect to professional fees.

23           THE COURT:  Okay.  I did see that.  And I never

24  let Mr. Werkheiser walk through the order, so that's not his

25  fault that we didn't get to that, but I did see that.  Thank

1  you very much.  And I did walk through the order, which I got

2  before the hearing, which was extremely helpful.  Thank you

3  very much for sending that to Ms. Gadson.

4          MR. WERKHEISER:  Of course, Your Honor.

5          THE COURT:  I do have --

6          MR. WERKHEISER:  Your Honor, I --

7          THE COURT:  -- a question about -- I'm sorry -- I

8  do have a question about 7, paragraph 7, at the end, there's

9  a new (b) about lien priorities, what's that about?

10          MR. WERKHEISER:  Your Honor, that is language that

11  the debtors agreed to add at the request of our secured

12  lenders and it simply means that, once the carveout is fully

13  funded, that we don't have any special super-priority status

14  or lien status outside of the carveout reserves that are

15  being funded for, you know, professional fees and the like.

16          THE COURT:  Yep, I got it.  Okay.  All right, well

17  -- yes?  I'm sorry, Mr. Werkheiser.

18          MR. WERKHEISER:  Oh, yes, Your Honor, one other

19  thing I just had wanted to highlight for the Court is that

20  we've had to do just a little bit of gymnastics here with

21  KCC, just because their status as the claims agent is not

22  technically that of a professional.  So some of the language

23  that appears in paragraph of the motion -- or the order as

24  originally filed, and then as carried over through paragraph

25  6 as well, just deals with that issue.

1    So, in addition to the professional fees and the

2 fees that they've -- the U.S. Trustee quarterly fees, the

3 fees for KCC's services as the claims agent are included in

4 the carveout reserves escrow that Benesch would hold and then

5 would disburse in accordance with the language that is set

6 forth in paragraph 6.

7    THE COURT:  Thank you.  I saw that, yes.

8    Ms. Richenderfer, when will the panel -- when will

9 the interim trustee be appointed, tomorrow morning?

10    MS. RICHENDERFER:  Your Honor, I have to admit,

11 I'm not clear whether or not we can file something prior to

12 12:01 this morning -- tomorrow morning, I mean, in

13 anticipation --

14    THE COURT:  My --

15    MS. RICHENDERFER:  -- of that --

16    THE COURT:  -- my experience is that your office

17 has not done that in the past, that it requires the actual

18 conversion before they'll do that, is my experience.

19    MS. RICHENDERFER:  And I think that's the same

20 case here, Your Honor, and so that would mean that it would

21 be filed first thing tomorrow morning.

22    THE COURT:  Okay.  Like Ms. Feldsher, this is not

23 my first experiencing converting a Chapter 11 to a Chapter 7

24 and it's never a good experience.  This case is very

25 unfortunate.  It's really been a parade of unfortunate events

1  that has kind of conspired to put a long-standing, solid

2  business into liquidation.  And, as I sit here today, I

3  certainly don't have enough information to blame anyone or

4  anything other than the coronavirus and the disaster it has

5  left in its wake.

6          Obviously, this was always a partial liquidation,

7  although through a GOB sale process and a partial going-

8  concern sale, which as retail cases in 2020 go is pretty

9  doggone good, but events have led us elsewhere.  And I feel

10  very strongly that it is -- I feel very strong sympathy for

11  the creditors who are not going to get paid their

12  administrative expense claims, at least right away.  The

13  employees who have health care reimbursements, some of them

14  never got -- according to the letters I've received, some of

15  them never got their retention, promised retention payments.

16  I don't think we had a retention program in this case, if I

17  remember correctly, but at least some of the letters had

18  mentioned that that was the case.  And a variety of other

19  claimants.  Obviously, of great concern to me from the very

20  beginning was the deposits, which I think at one point I was

21  told were 35 million.

22          In any event, it is what it is, we are where we

23  are, and we can only do the best we can under the

24  circumstances.  The debtors have presented a perfectly

25  reasonable and acceptable conversion order.  The debtors

1  have, in my mind, the absolute right to convert, and I'm

2  really constrained to, but I would not -- in any way not

3  approve this motion at this time.  We just need to make

4  changes to paragraph 3(b) and 9 that are consistent with what

5  we discussed on the record, but with those changes I will

6  grant the motion and enter the order.

7          If you file -- if you upload a clean with those

8  changes, Mr. Werkheiser, and simply email Ms. Gadson or Ms.

9  Szymanski a redline to show those two changes, that will be

10  sufficient.  I'm not going to make you go through the hula-

11  hoops of filing another COC with just two changes on it.

12  Anyone who cares about what's going on is on the phone or on

13  the video today.

14          So as soon as that gets -- as soon as I get that

15  redline and as soon as the new clean is uploaded, the order

16  will be executed and on the docket, and the conversion will

17  happen at midnight.

18          MR. WERKHEISER:  Thank you, Your Honor.  And,

19  yeah, we can get that over immediately after the hearing.

20          Your Honor, I just wanted to take this opportunity

21  to -- again, I think we tried to communicate our message and

22  wanted to be clear to all of our stakeholders in the motion

23  to convert, you know, how deeply the debtors regret this

24  situation and wish that, you know, circumstances had not

25  conspired to result in this outcome, but, you know,

1    understand that this is adversely affecting a large number of
2    people for reasons beyond, you know, most everybody's
3    control.

4           And, Your Honor, we also wanted to take this
5    opportunity to thank Your Honor for your availability, for
6    your close attention to this case.  And as bad as this is, it
7    certainly could have been a lot worse without everyone
8    working, you know, very diligently, and without the Court's
9    supervision to help us at least deal with the situation in
10   the most orderly way possible.

11          Your Honor, I also wanted to take the opportunity
12   just to clarify one thing about the record, just because the
13   customer deposits, as you might imagine, is an issue that is
14   being paid close attention to by various state's attorney
15   generals.  And I'm not sure that we ever used the number 35
16   million for purposes of the record and I think the number as
17   it stands now might be quite, quite a bit less than even the
18   debtors thought it was earlier in the case for a number of
19   reasons, something south of ten.  But be that as it may, you
20   know, a lot of individuals and small businesses probably have
21   suffered to some degree because the debtors have been unable
22   at this stage of the proceedings to honor those customer
23   deposit obligations and, whatever the number is, we
24   understand that people do -- you know, forced at minimum to
25   wait, then may not get a recovery at the end of the day,

1    depending how things play out from here.

2              But, again, thank you, Your Honor.  I have nothing

3    further to say, unless the Court has anything else for us,

4    and that concludes our business today.

5              THE COURT:  No, I have nothing further.  Anyone

6    else?  Last chance.

7              All right, thank you all.  We are adjourned.  I'll

8    await the order.  Have a good day.

9              COUNSEL:  Thank you, Your Honor.

10         (Proceedings concluded at 1:45 p.m.)

11

12

13

14                          CERTIFICATE

15

16       We certify that the foregoing is a correct transcript

17   from the electronic sound recording of the proceedings in the

18   above-entitled matter.

19
     /s/Mary Zajaczkowski              May 16, 2021
20   Mary Zajaczkowski, CET**D-531

21
     /s/ Tracey J. Williams            May 16, 2021
22
     Tracey J. Williams, CET-914
23

24

25

# **EXHIBIT Y**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ART VAN FURNITURE, LLC, et al.,[1]<br><br>       Debtors. | Chapter 11<br>Bankr. Case No.  20-10553<br>**Joint Administration Pending** |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated,<br><br>       Plaintiff,<br><br>  v.<br><br>ART VAN FURNITURE, LLC, et al.,<br><br>       Defendants. | Adv. Pro. No. _____ - \_\_\_\_\_ |

## CLASS ACTION
## ADVERSARY PROCEEDING COMPLAINT FOR
## <u>VIOLATION OF WARN ACT 29 U.S.C. § 2101, ET SEQ.</u>

Plaintiffs Todd Stewart and Jennifer Sawle ("Plaintiffs") alleges on behalf of themselves and a putative class of similarly situated former employees of Debtor Art Van Furniture, LLC and its affiliates (together "Debtors" or "Defendants") by way of this Class Action Adversary Proceeding Complaint against Defendants as follows:

## <u>NATURE OF THE ACTION</u>

1.  The Plaintiffs brings this action on behalf of themselves, and other similarly

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

situated former employees who worked for Defendants and who were terminated without cause as part of, or as the result of, mass layoffs or plant closings ordered by Defendants beginning on March 4, 2020, who were not provided 60 days advance written notice of their terminations by Defendants, as required by the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq, (the "WARN Act").

2.　Plaintiffs were terminated along with approximately 700 other similarly situated employees as part of, or as the foreseeable result of a mass layoffs or plant shutdowns ordered by Defendants.  These terminations failed to give Plaintiffs and other similarly situated employees of Defendants at least 60 days' advance notice of termination, as required by the WARN Act.  As a consequence of the violation, Plaintiffs and other similarly situated employees of Defendants seek their statutory remedies, pursuant to 29 U.S.C. § 2104.

## JURISDICTION AND VENUE

3.　This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1334, and 29 U.S.C. § 2104(a)(5).

4.　This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O).

5.　Venue is proper in this District pursuant to 28 U.S.C. § 1409 and 29 U.S.C. § 2104(a)(5).

## THE PARTIES

### *Plaintiffs*

6.　Plaintiff Stewart was employed by Defendants as the Store Manager at Defendants' facility at 14055 Hall Rd. Shelby Township Michigan 48315 one of seven WARN-covered facilities (the "WARN Facilities") until his termination.

7.　Plaintiff Sawle was employed by Defendants as a salesperson at one of Defendants' WARN Facilities located at 8748 West Saginaw Highway, Lansing, Michigan until her

2

termination.

8.     On March 4, 2020, Plaintiffs received a letter notifying them that terminations at the Facilities where they worked would commence on May 5, 2020 or within 14 days thereafter.

9.     Plaintiffs were not terminated on May 5, 2020. Instead, on evening of March 19, 2020, Defendants abruptly notified its employees, including Plaintiffs that terminations would occur immediately for non-leader personnel and March 22, for lead personnel.

10.     Plaintiff Sawle's last day of employment was March 20, 2020.

11.     Plaintiff Stewart was, and other store leaders were, specifically told they would not get paid unless they continued to work through the Saturday and Sunday, March 21 and 22.

12.     With the power off at the facility, Plaintiff Stewart and colleagues worked in the dark through the week carrying purchased furniture out to the cars of waiting customers.

13.     Along with Plaintiffs, hundreds of other employees of Defendants who worked at, reported to, or received assignments from Defendants' Facilities were terminated on or about March 19, 2020 without advanced written notice.

### *Defendants*

14.     Upon information and belief and at all relevant times, Defendant Art Van Furniture LLC is a Delaware corporation with its principal place of business located at 6500 E. 14 Mile Road, Warren, Michigan (the "Headquarters Facility") and it conducted business in this district.

15.     Upon information and belief at all relevant times, Defendants owned, maintained and operated its corporate headquarters at the Headquarters Facility, and operated additional facilities as that term is defined by the WARN Act in the United States.

16.     Debtors operate 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations. Debtors do business under several brand names,

3

including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture.

17.     The Debtors were founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("THL") in March 2017.

18.     As of the Petition Date of March 9, 2020, Debtors operated stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia, with approximately 4,500 employees.

19.     Upon information and belief, on March 19, 2020, Defendants terminated approximately 700 employees who worked at or reported to their WARN Facilities, and the rest of the employees who worked at non-WARN-covered stores (because they did not employee 50 full-time employees as required by the WARN Act definition of a mass layoff or plant shutdown).

20.     By late-January, 2020, Debtors had sunk into a liquidity crisis leading to a default of the Defendant's revolver facility with its lender, Wells Fargo, and some leases. Wells Fargo agreed to forebear until February 28, 2020 conditioned on taking control of Defendant's cash and on Defendant immediately begin preparing for a "going-out-of-business" liquidation if was unable to raise capital by then.

21.     By January 31, 2020, the United States reported its first confirmed case of person-to-person transmission of the Wuhan coronavirus and the WHO determined that the outbreak constitutes a Public Health Emergency of International Concern.

22.     In February, 2020, KKR investigated then quickly dropped consideration of make a new money investment in Art Van. Debtor's private equity parent THL, along with Van Eslander family, and some important suppliers formed a "Consortium."

4

23.     The Consortium proposed to infuse new capital into Art Van, but by month's end failed to secure the capital purportedly due in part to the impact of coronavirus on the equity markets during the week of February 24, 2020.

24.     According Debtors, the market drop had a "deleterious effect" on the Consortium investors' "willingness to contribute capital." (Doc. 12, Mar. 9, 2020, First Day Declaration of David Ladd.)

25.     As a result of the Consortium investors' unwillingness, Debtors began to execute on its planned liquidation.

26.     On March 5, 2020, Art Van announced its store closing sales and that it would complete the closures with six to eight weeks.

27.     That day, it informed it WARN Facility employees in a WARN notice that they would be retained and paid through May 5th and terminated then or within 14 days thereafter, whether there was work for them or not.  Their benefits including health coverage would be maintained until their termination.

28.     The Debtors' March 5, 2020 WARN notice did not condition the 60 days' of pay and benefits on any contingency.  It did not mention coronavirus or any factor that could reduce the 60-day period of anticipated employment.

29.     By March 8, 2020, at least eight states had declared a State of Emergency due to coronavirus.

30.     On March 9, 2020, Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code. Joint administration of those cases is pending.

## FEDERAL WARN ACT CLASS ALLEGATIONS

31.     Plaintiffs bring this Claim for Relief for violation of 29 U.S.C. § 2101 et seq., on

5

behalf of himself and on behalf of all other similarly situated former employees, pursuant to 29 U.S.C. § 2104(a)(5) and Fed. R. Civ P. 23(a), who worked at, reported to, or received assignments from Defendants' Facilities and were terminated without cause beginning on or about March 19, 2020, and within 30 days of that date, or were terminated without cause as the reasonably foreseeable consequence of the mass layoffs and/or plant closings ordered by Defendants on or about March 19, 2020 and who are affected employees, within the meaning of 29 U.S.C. § 2101(a)(5) (the "WARN Class").

32.    The persons in the WARN Class identified above ("WARN Class Members") are so numerous that joinder of all members is impracticable.  Although the precise number of such persons is unknown, the facts on which the calculation of that number can be based are presently within the sole control of Defendants.

33.    Upon information and belief, Defendants employed more than 100 full-time employees who worked at or reported to the Facilities.

34.    On information and belief, the identity of the members of the class and the recent residence address of each of the WARN Class Members is contained in the books and records of Defendants.

35.    On information and belief, the rate of pay and benefits that were being paid by Defendants to each WARN Class Member at the time of his/her termination is contained in the books and records of Defendants.

36.    Common questions of law and fact exist as to members of the WARN Class, including, but not limited to, the following:

(a)    whether the members of the WARN Class were employees of the Defendants who worked at or reported to Defendants' Facilities;

(b)     whether Defendants unlawfully terminated the employment of the members of the WARN Class without cause on their part and without giving them 60 days advance written notice in violation of the WARN Act; and

(c)     whether Defendants unlawfully failed to pay the WARN Class members 60 days wages and benefits as required by the WARN Act.

37.     Plaintiffs' claims are typical of those of the WARN Class.  Plaintiffs, like other WARN Class members, worked at or reported to Defendants' Facilities and was terminated beginning on or about March 19, 2020, due to the mass layoff and/or plant closing ordered by Defendants.

38.     Plaintiffs will fairly and adequately protect the interests of the WARN Class. Plaintiffs have retained counsel competent and experienced in complex class actions, including the WARN Act and employment litigation.

39.     On or about March 19, 2020, Plaintiffs were terminated by Defendants.  These terminations were part of mass layoffs or plant closings as defined by 29 U.S.C. § 2101(a)(2), (3), for which they were entitled to receive 60 days advance written notice under the WARN Act.

40.     Class certification of these claims is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the WARN Class predominate over any questions affecting only individual members of the WARN Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation – particularly in the context of WARN Act litigation, where individual plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against corporate Defendants, and damages suffered by individual WARN Class members are small compared to the expense and burden of individual prosecution of this litigation.

41. Concentrating all the potential litigation concerning the WARN Act rights of the members of the Class in this Court will obviate the need for unduly duplicative litigation that might result in inconsistent judgments, will conserve the judicial resources and the resources of the parties and is the most efficient means of resolving the WARN Act rights of all the members of the Class.

42. Plaintiffs intend to send notice to all members of the WARN Class to the extent required by Rule 23.

## CLAIM FOR RELIEF

### Violation of the Federal WARN Act

43. Plaintiffs reallege and incorporates by reference all allegations in all preceding paragraphs.

44. At all relevant times, Defendants employed more than 100 employees who in the aggregate worked at least 4,000 hours per week, exclusive of hours of overtime, within the United States.

45. At all relevant times, Defendants were an "employer," as that term is defined in 29 U.S.C. § 2101 (a)(1) and 20 C.F.R. § 639(a) and continued to operate as a business until it decided to order mass layoffs or plant closings at the Facilities.

46. At all relevant times, Plaintiffs and the other similarly situated former employees were employees of Defendants as that term is used in 29 U.S.C. §2101.

47. On or about March 19, 2020, the Defendants ordered mass layoffs or plant closings at the Facilities, as that term is defined by 29 U.S.C. § 210l(a)(2).

48. The mass layoffs or plant closings at the Facilities resulted in "employment losses," as that term is defined by 29 U.S.C. §2101(a)(2) for at least fifty of Defendants' employees as well

8

as thirty–three percent of Defendants' workforce at the Facilities, excluding "part-time employees," as that term is defined by 29 U.S.C. § 2l01(a)(8).

49.     Plaintiffs and the Class Members were terminated by Defendants without cause on their part, as part of or as the reasonably foreseeable consequence of the mass layoffs or plant closings ordered by Defendants at the Facilities.

50.     Plaintiffs and the Class Members are "affected employees" of Defendants, within the meaning of 29 U.S.C. § 2101(a)(5).

51.     Defendants were required by the WARN Act to give Plaintiffs and the Class Members at least 60 days advance written notice of their terminations.

52.     Defendants failed to give Plaintiffs and the Class members written notice that complied with the requirements of the WARN Act.

53.     Plaintiffs and each of the Class Members are "aggrieved employees" of the Defendants as that term is defined in 29 U.S.C. § 2104(a)(7).

54.     Defendants failed to pay Plaintiffs and each of the Class Members their respective wages, salary, commissions, bonuses, health and life insurance premiums, accrued holiday pay and accrued vacation for 60 days following their respective terminations, and failed to provide employee benefits including health insurance, for 60 days from and after the dates of their respective terminations.

55.     The relief sought in this proceeding is predominately equitable in nature.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all other similarly situated persons, prays for the following relief as against Defendants:

A.     Certification of this action as a class action;

9

B.      Designation of Plaintiffs as Class Representatives;

C.      Appointment of the undersigned attorneys as Class Counsel;

D.      A judgment in favor of the Plaintiffs and each of the affected employees equal to the sum of: their unpaid wages, salaries, commissions, bonuses, accrued holiday pay, accrued vacation pay, pension and 401(k) contributions and other ERISA benefits, for up to 60 days, that would have been covered and paid under the then-applicable employee benefit plans had that coverage continued for that period all determined in accordance with the federal WARN Act, 29 U.S.C. §2104(a)(1)(A);

E.      Allowance of all damages as first priority post-petition administrative expense pursuant to 11 U.S.C. § 503(b)(1)(A) or, alternatively wage priority status pursuant to 11 U.S.C. § 507(a)(4) and (5) up to $13,650, and the remainder as a general unsecured claim;

F.      Reasonable attorneys' fees and the costs and disbursements that Plaintiffs will incur in prosecuting this action, as authorized by the federal WARN Act, 29 U.S.C. § 2104(a)(6);

G.      Interest as allowed by law on the amounts owed under the preceding paragraphs; and

H.      Such other and further relief as this Court may deem just and proper.


[*Signature Page to Follow*]

Dated: March 23, 2020

Respectfully submitted,

/s/ Michael Joyce
Michael J. Joyce (No. 4563)
THE LAW OFFICES OF JOYCE, LLC
1225 King Street
Suite 800
Wilmington, DE 19801
(302)-388-1944
Email: mjoyce@mjlawoffices.com

-and-

OF COUNSEL:

Jack A. Raisner
René S. Roupinian
RAISNER ROUPINIAN LLP
500 Fifth Avenue, Suite 1600
New York, New York 10110
Telephone: (212) 221-1747
Facsimile: (212) 221-1747
Email: rsr@raisnerroupinian.com
Email: jar@raisnerroupinian.com

*Attorneys for the and the putative class*
*Plaintiffs*

# **<u>EXHIBIT Z</u>**

Column: Declassified report offers no support for the lab-leak theory - Los Angeles Times



# Los Angeles Times

LOG IN



**Moving Forward Post Pandemic**

**SPONSORED BY MERRILL**

SEE MORE

BUSINESS

# Column: A declassified government report offers no support for the lab-leak theory of COVID's origin



A thoroughfare in Wuhan, China, shows the effect of a government lockdown in January 2020 after the first reports of a COVID-19 outbreak in the teeming city. (Hector Retamal / AFP/Getty Images)

BY MICHAEL HILTZIK | BUSINESS COLUMNIST

NOV. 1, 2021 12:19 PM PT



For months, adherents of the theory that COVID-19 originated in a Chinese government laboratory have hoped that an assessment President Biden ordered from the nation's intelligence agencies would validate their suspicions.

Their hopes are now dashed. The intelligence report was declassified and released on Oct. 29. It effectively demolishes the lab-leak theory.

The release of the full report follows the publication of a brief declassified summary in August, stressing the intelligence community's inability to reach a firm conclusion about

whether SARS-CoV-2, the virus responsible for the COVID pandemic, originated from natural sources or a Chinese laboratory.

> *Extensive wildlife and livestock farming, wildlife trafficking, and live animal markets in China…increase the probability that initial transmission occurred along these lines.*
>
> U.S. INTELLIGENCE SERVICES REPORT ON COVID ORIGINS

ADVERTISEMENT

The latest version, which is likely to be the most complete assessment to be released publicly, is couched in the same conditional and qualified language.

The report avoids offering a firm conclusion about the two prevailing theories. But it provides details of the agencies' findings that make clear they looked into the specific assertions that have been proposed in support of the lab-leak theory and found them wanting.

---



### Get the latest from Michael Hiltzik

Commentary on economics and more from a Pulitzer Prize winner.

Enter email address

SIGN ME UP

You may occasionally receive promotional content from the Los Angeles Times.

The intelligence agencies also noted that although no animal source for the virus has yet been identified, that doesn't necessarily undermine the theory of a natural source.

In many previous outbreaks, the report says, "the identification of animal sources has taken years, and in some cases, animal sources have not been identified."

The report was published by the Office of the Director of National Intelligence, an umbrella agency for 17 government intelligence services, including the CIA, FBI, four Cabinet agencies and the intelligence arms of the military services.

Experts who were contacted by the intelligence services preparing the report have said they were impressed by the agents' commitment to a scientific analysis. "These folks were really knowledgeable, had PhDs in molecular biology, they had read all of the papers in detail," Tulane virologist Robert Garry told science writer Amy Maxmen of Nature in August.

---

BUSINESS

**Column: New evidence undermines the COVID lab-leak theory — but the press keeps pushing it**

Sept. 28, 2021

---

The lab-leak theory has been kept on life support for more than a year by partisan propagandists, abetted by amateurs posting on social media and credulous journalists reluctant to relinquish a story that would be, as the saying goes, "interesting, if true."

As we've reported before, the hypothesis that the SARS-CoV-2 virus escaped from a Chinese laboratory to wreak havoc on the world originated with a clutch of anti-China

ideologues in the State Department under Trump.

In its initial incarnation, the hypothesis held that the virus was developed by the Beijing government as a biological weapon. Its proponents soon abandoned that claim as too fantastical to win over many believers, so they retreated to the claim that it was merely genetically engineered in standard virological research and reached the outside world through inattention or accident.

In its most recent form, the theory is that a precursor virus was brought from the wild to a Chinese lab in Wuhan and evolved there, and *that* was what sneaked out into the open.

The intelligence assessment dismisses the first two versions outright. It suggests that while it's "plausible" that a lab worker unwittingly became the carrier, that's "less likely than an infection occurring through numerous hunters, farmers, merchants, and others who have frequent, natural contact with animals."

---

BUSINESS

**Column: When will the Wall Street Journal stop publishing lab-leak propaganda?**

Oct. 8, 2021

---

The report states that the agencies judged the bioweapon allegation to be "supported by scientifically invalid claims," adding that its "proponents are suspected of spreading disinformation."

It says that the intelligence agencies found no "genetic signatures in SARS-CoV-2" that would indicate genetic engineering, such as deliberate manipulation of a virus in the lab to make it more dangerous to humans.

Nor did they find evidence of any virus strains that "could have plausibly served as a backbone" — that is, a biological foundation — for a genetically engineered version.

The agencies examined one of the more popular claims by lab-leak proponents, involving the so-called furin cleavage site on SARS-CoV-2. This is a feature of the virus' spike, the structure that allows it to penetrate healthy cells and pass along infectious material. To be effective, the spike has to be cut in two, a process achieved by the enzyme furin.

Lab-leak proponents have asserted that the furin site is so rare and so well-adapted to human infection that it's certain to have been added to the virus in a lab. Just as many academic virologists have noted, the report observes that furin sites have been found in naturally occurring viruses and can be the product of natural evolution.

The intelligence services found support for the so-called zoonotic theory that the pandemic resulted from a natural spillover of the virus from animals to humans in virological history. Many virological outbreaks have happened this way, the report observes.

---

BUSINESS

**Column: The lab-leak origin claim for COVID-19 is in the news, but it's still fact-free**

June 3, 2021

---

"Extensive wildlife and livestock farming, wildlife trafficking, and live animal markets in China," along with historically lax government oversight, "increase the probability that initial transmission occurred along these lines."

Support for the lab-leak hypothesis, the services say, comes chiefly from reports questioning whether the Wuhan institute conducted its research under adequate biological safeguards. But the services found "no indications that the institute's research involved SARS-CoV-2 or a close progenitor virus."

The report does state that, among its contributing agencies, four "assess with low confidence" that the virus probably sprung from natural sources; one finds with "moderate confidence" that the pandemic "most likely" resulted from a laboratory incident, and three couldn't decide between the two theories. The report doesn't link specific agencies to those findings, however.

The intelligence services also reproach the Chinese government for hindering international investigations of COVID-19's origins, in part by refusing to share information about WIV research or its own findings about the early course of the disease in Wuhan.

"These actions reflect, in part, China's government's own uncertainty about where an investigation could lead," the U.S. report says, "as well as its frustration the international community is using the issue to exert political pressure on China."

The services are generally dismissive of what it calls "open-source" theories of the pandemic's origin, typically passed around on social media. "These theories generally do not provide diagnostic information on COVID-19 origins, and in some cases are not supported by the information available to us."

Whether the government report will stifle the propaganda about a Chinese lab-leak is uncertain, but that may not be the way to bet. Too many people are ideologically committed to the claim, and a scientific debunking of a theory that has had little science to support it from the start probably won't matter.

LATEST FROM MICHAEL HILTZIK ›

Column: Inflation has spiked. Don't freak out

Column: Billionaire anti-deficit hawks are already attacking Biden's spending plan. Ignore them

Column: The infrastructure bill offers lots for California, and social spending you wouldn't expect

BUSINESS



### Get the latest from Michael Hiltzik

Commentary on economics and more from a Pulitzer Prize winner.

| Enter email address |
| --- |

| SIGN ME UP |
| --- |

You may occasionally receive promotional content from the Los Angeles Times.



Michael Hiltzik

🐦 Twitter    📷 Instagram    ✉ Email    f Facebook

Los Angeles Times columnist Michael Hiltzik writes a daily blog appearing on latimes.com. His seventh book, "Iron Empires: Robber Barons, Railroads, and the Making of Modern America," has just been published by Houghton Mifflin Harcourt. Follow him on Twitter at twitter.com/hiltzikm and on Facebook at facebook.com/hiltzik.

MORE FROM THE LOS ANGELES TIMES

BUSINESS

**After Twitter poll, Elon Musk sells off more than $5 billion in Tesla shares**

Nov. 11, 2021

BUSINESS

**SpaceX crew launch marks 600 space travelers in 60 years**

Nov. 10, 2021

BUSINESS

**Hot inflation report slams bond market, sends stocks lower**

Nov. 10, 2021

TECHNOLOGY

**Justice Department sues Uber over wait-time fees charged to disabled passengers**

Nov. 10, 2021

SUBSCRIBERS ARE READING

CALIFORNIA

Gov. Newsom returns to public eye after sudden absence sparked social media speculation

LIFESTYLE

The L.A. Times 2021 holiday gift guide

CALIFORNIA

FOR SUBSCRIBERS

Colonialism, power and race. Inside California ethnic studies classes

---

LIFESTYLE

The 27 coolest made-in-L.A. gifts to give this year

---

BUSINESS

Cargo jam at L.A. and Long Beach ports begins to ease as hefty fines loom

---

LATEST BUSINESS ›

---

TECHNOLOGY

Rivian skyrockets in 2021's biggest IPO

Nov. 10, 2021

---

LIFESTYLE

Black Girl Magic meets Jazz Age speakeasy at this new L.A. pot shop

Nov. 10, 2021

---

REAL ESTATE

Liberace's former townhouse above the Sunset Strip is listed for $3.4 million

Nov. 10, 2021

---

BUSINESS

U.S. consumer prices soared 6.2% in past year, most since 1990

Nov. 10, 2021

BUSINESS

Which retirement option is better: Lump sum or monthly payout?

Nov. 10, 2021

Subscribe for unlimited access

Follow Us

eNewspaper

Coupons

Find/Post Jobs

Place an Ad

Media Kit: Why the
L. A. Times?

Bestcovery

Copyright © 2021, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell My Personal Information

# **EXHIBIT AA**



OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE

NATIONAL INTELLIGENCE COUNCIL



Updated Assessment on

# COVID-19 ORIGINS

# Updated Assessment on COVID-19 Origins

## Key Takeaways

*Scope Note: This assessment responds to the President's request that the Intelligence Community (IC) update its previous judgments on the origins of COVID-19.  It also identifies areas for possible additional research.  Annexes include a lexicon, additional details on methodology, and comments from outside experts.  This assessment is based on information through August 2021.*

The IC assesses that SARS-CoV-2, the virus that causes COVID-19, probably emerged and infected humans through an initial small-scale exposure that occurred no later than November 2019 with the first known cluster of COVID-19 cases arising in Wuhan, China in December 2019.  In addition, the IC was able to reach broad agreement on several other key issues.  We judge the virus was not developed as a biological weapon.  Most agencies also assess with low confidence that SARS-CoV-2 probably was not genetically engineered; however, two agencies believe there was not sufficient evidence to make an assessment either way.  Finally, the IC assesses China's officials did not have foreknowledge of the virus before the initial outbreak of COVID-19 emerged.

After examining all available intelligence reporting and other information, though, the IC remains divided on the most likely origin of COVID-19.  All agencies assess that two hypotheses are plausible: natural exposure to an infected animal and a laboratory-associated incident.

- Four IC elements and the National Intelligence Council assess with low confidence that the initial SARS-CoV-2 infection was most likely caused by natural exposure to an animal infected with it or a close progenitor virus—a virus that probably would be more than 99 percent similar to SARS-CoV-2.  These analysts give weight to China's officials' lack of foreknowledge, the numerous vectors for natural exposure, and other factors.

- One IC element assesses with moderate confidence that the first human infection with SARS-CoV-2 most likely was the result of a laboratory-associated incident, probably involving experimentation, animal handling, or sampling by the Wuhan Institute of Virology.  These analysts give weight to the inherently risky nature of work on coronaviruses.

- Analysts at three IC elements remain unable to coalesce around either explanation without additional information, with some analysts favoring natural origin, others a laboratory origin, and some seeing the hypotheses as equally likely.

- Variations in analytic views largely stem from differences in how agencies weigh intelligence reporting and scientific publications and intelligence and scientific gaps.

The IC judges they will be unable to provide a more definitive explanation for the origin of COVID-19 unless new information allows them to determine the specific pathway for initial natural contact with an animal or to determine that a laboratory in Wuhan was handling SARS-CoV-2 or a close progenitor virus before COVID-19 emerged.

- The IC—and the global scientific community—lacks clinical samples or a complete understanding of epidemiological data from the earliest COVID-19 cases.  If we obtain information on the earliest cases that identified a location of interest or occupational exposure, it may alter our evaluation of hypotheses.

**NIC** | **NATIONAL INTELLIGENCE COUNCIL**

China's cooperation most likely would be needed to reach a conclusive assessment of the origins of COVID-19. Beijing, however, continues to hinder the global investigation, resist sharing information, and blame other countries, including the United States. These actions reflect, in part, China's government's own uncertainty about where an investigation could lead as well as its frustration the international community is using the issue to exert political pressure on China.

# NIC ▌▌▌▌▌▌▌▌ | NATIONAL INTELLIGENCE COUNCIL

## IC Assessments of COVID-19 Origins



**AREAS OF
BROAD AGREEMENT**

- First known cluster of COVID-19 cases emerged in Wuhan, China in December 2019
- Virus not developed as a biological weapon
- Virus not genetically engineered
- China's officials unaware of virus before pandemic emerged



**TWO PLAUSIBLE
HYPOTHESES ON
INITIAL HUMAN
EXPOSURE**

- Natural transmission from animal to human
- Laboratory-associated incident
- Evidence not strongly diagnostic of either hypothesis



**CHINA'S
COOPERATION KEY
TO UNDERSTANDING
ORIGINS**

- Beijing's lack of cooperation on origins not diagnostic of either hypothesis
- Numerous information gaps, particularly related to technical data

## Introduction

The IC has prepared several assessments examining the origins of COVID-19.  Analysts have focused on whether SARS-CoV-2, the causative virus of COVID-19, was genetically engineered—particularly as a biological weapon—was transmitted to humans naturally or transmitted due to a laboratory-associated incident, perhaps during sampling or experimentation.  China's reaction to and handling of the pandemic have given analysts insights into these issues, but Beijing's actions have also impeded the global scientific community and our ability to confidently determine how the virus first infected humans.

## SARS-CoV-2 Probably Not a Biological Weapon

The IC assesses China did not develop SARS-CoV-2 as a biological weapon.

- We remain skeptical of allegations that SARS-CoV-2 was a biological weapon because they are supported by scientifically invalid claims, their proponents do not have direct access to the Wuhan Institute of Virology (WIV), or their proponents are suspected of spreading disinformation.  [*See appendix B.*]

## Most Analysts Assess SARS-CoV-2 Not Genetically Engineered

Most IC analysts assess with low confidence that SARS-CoV-2 was not genetically engineered.  Their assessment is based on technical analysis of SARS-CoV-2 and the IC's growing understanding of traits and the potential for recombination in other coronaviruses.  Two agencies believe there is not sufficient evidence to make an assessment either way.

- As of August 2021, we still have not observed genetic signatures in SARS-CoV-2 that would be diagnostic of genetic engineering, according to the IC's understanding of the virus.  Similarly, we have not identified any existing coronavirus strains that could have plausibly served as a backbone if SARS-CoV-2 had been genetically engineered.

- Our growing understanding of the similarities of SARS-CoV-2 to other coronaviruses in nature and the ability of betacoronaviruses—the genus to which SARS-CoV-2 belongs—to naturally recombine suggests SARS-CoV-2 was not genetically engineered.  For instance, academic literature has noted that in some instances betacoronaviruses have recombined with other viruses in nature and that furin cleavage sites (FCS)—a region in the spike protein that enhances infection—have been identified in naturally occurring coronaviruses in the same genetic location as the FCS in SARS-CoV-2.  This suggests that SARS-CoV-2 or a progenitor virus could have acquired its FCS through natural recombination with another virus.

IC analysts do not have higher confidence that SARS-CoV-2 was not genetically engineered because some genetic engineering techniques can make modifications difficult to identify and we have gaps in our knowledge of naturally occurring coronaviruses.

- Some genetic engineering techniques may make genetically modified viruses indistinguishable from natural viruses, according to academic journal articles.  For instance, a 2017 dissertation by a WIV student showed that reverse genetic cloning techniques—which are standard techniques used in advanced molecular laboratories—left no trace of genetic modification of SARS-like coronaviruses.

- It will be difficult to increase our confidence that the distinguishing features in SARS-CoV-2 emerged naturally without a better understanding of the diversity of coronaviruses in nature and how often recombination occurs during co-infection of multiple coronaviruses within a particular host.  For example, academic literature has indicated that a FCS had previously been inserted into SARS-CoV-1, the causative agent of SARS, complicating differentiation of how such a feature may have appeared.

**NIC** ▌▌▌▌▌    NATIONAL INTELLIGENCE COUNCIL

## Closest Known Relatives of SARS-CoV-2, as of August

As of August, the closest known whole genome match to SARS-CoV-2—around **96 percent** identical—is **RaTG13**, a coronavirus collected from a bat in 2013 by the Wuhan Institute of Virology (WIV), according to academic literature. Scientific literature examining the genome of SARS-CoV-2 has identified at least some similarities to those of other naturally occurring coronaviruses in bats and pangolins, but an immediate precursor virus strain and animal reservoir have not been identified.

| VIRUS NAME | PERCENT IDENTITY TO COVID-19 VIRUS | YEAR COLLECTED | LOCATION COLLECTED | ANIMAL COLLECTED |
|---|---|---|---|---|
| **RaTG13** | **96.2** | **2013** | **Yunnan Province, China** | Bat |
| RpYN06 | 94.5 | 2020 | Yunnan Province, China | Bat |
| RmYN02 | 93.3 | 2019 | Yunnan Province, China | Bat |
| RShSTT200 | 92.7 | 2010 | Cambodia | Bat |
| RacCS203 | 91.5 | 2020 | Thailand | Bat |
| PrC31 | 90.7 | 2018 | Yunnan Province, China | Bat |
| Pangolin-CoV Guangdong | 90.1 | 2019 | Guangdong Province, China | Pangolin |
| ZC45 | 88.1 | 2015 | Zhejiang Province, China | Bat |
| ZXC21 | 88.0 | 2015 | Zhejiang Province, China | Bat |
| Guangxi pangolin-CoV | 85.5 | 2017, 2018 | Guangxi Zhuang Autonomous Region, China | Pangolin |
| Rc-o319 | 79.2 | 2013 | Japan | Bat |
| RaTG15 | 77.6 | 2015 | Yunnan Province, China | Bat |

- The WIV previously created chimeras, or combinations, of SARS-like coronaviruses, but this information does not provide insight into whether SARS-CoV-2 was genetically engineered by the WIV.

No IC analysts assess that SARS-CoV-2 was the result of laboratory adaptation, although some analysts do not have enough information to make this determination. Repeated passage of a closely related virus through animals or cell culture—which we consider laboratory adaptation and not genetic engineering—could result in some features of SARS-CoV-2, according to publicly available information.  However, it probably would take years of laboratory adaptation using the appropriate cell types and a virus that is more closely related to SARS-CoV-2 than ones currently known to generate the number of mutations separating SARS-CoV-2 from any known coronavirus strains, judging from scientific journal articles.  Such processes would require differentiation and maintenance of primary cells and the development of appropriate animal models.

## China's Lack of Foreknowledge of SARS-CoV-2

The IC assesses China's officials probably did not have foreknowledge that SARS-CoV-2 existed before WIV researchers isolated it after public recognition of the virus in the general population. Accordingly, if the pandemic originated from a laboratory-associated incident, they probably were unaware in the initial months that such an incident had occurred.

- Early in the pandemic, the WIV identified that a new virus was responsible for the outbreak in Wuhan. It is therefore assessed that WIV researchers pivoted to COVID-19-related work to address the outbreak and characterize the virus. These activities suggest that WIV personnel were unaware of the existence of SARS-CoV-2 until the outbreak was underway.

## Two Plausible Hypotheses of Pandemic Origin

IC analysts assess that a natural origin and a laboratory-associated incident are both plausible hypotheses for how SARS-CoV-2 first infected humans. Analysts, however, disagree on which is more likely, or whether an assessment can be made at all, given the lack of diagnosticity of the available information. Most agencies are unable to make higher than low confidence assessments for these reasons, and confidence levels are tempered by plausible arguments for the opposing hypothesis. For these hypotheses, IC analysts consider an exposure that occurs during animal sampling activity that supports biological research to be a laboratory-associated incident and not natural contact. What follows is a look at the cases that can be made for these competing hypotheses.

## The Case for the Natural Origin Hypothesis

Some IC analysts assess with low confidence that the first human COVID-19 infection most likely was caused by natural exposure to an animal that carried SARS-CoV-2 or a close progenitor virus—a virus that would likely be more than 99 percent similar to SARS-CoV-2.

Four IC elements, the National Intelligence Council, and some analysts at elements that are unable to coalesce around either explanation are among this group. Analysts at these agencies give weight to China's officials' lack of foreknowledge and highlight the precedent of past novel infectious disease outbreaks having zoonotic origins, the wide diversity of animals that are susceptible to SARS-CoV-2 infection, and the range of scenarios—to include animal trafficking, farming, sale, and rescue—in China that enable zoonotic transmission. Although no confirmed animal source of SARS-CoV-2 has been identified, to include a reservoir or intermediate species, analysts that assess the pandemic was due to natural causes note that in many previous zoonotic outbreaks, the identification of animal sources has taken years, and in some cases, animal sources have not been identified.

- These analysts assess that WIV's activities in early 2020 related to SARS-CoV-2 are a strong indicator that the WIV lacked foreknowledge of the virus.

- They also see the potential that a laboratory worker inadvertently was infected while collecting unknown animal specimens to be less likely than an infection occurring through numerous hunters, farmers, merchants, and others who have frequent, natural contact with animals.

- Given China's poor public health infrastructure and the potential for asymptomatic infection, some analysts that lean towards a natural origin argue that China's infectious disease surveillance system would not have been able to detect the SARS-CoV-2 exposure as quickly as a suspected exposure in a laboratory setting.

### History of Zoonotic Pathogen Emergence, Conditions in China Ripe for Zoonotic Spillover

Analysts that find the natural zoonotic spillover hypothesis the most likely explanation for the pandemic also note the wide diversity of animals that are susceptible to SARS-CoV-2 infection, range of scenarios—to include animal trafficking, farming, sale, and rescue—in China that would enable zoonotic

NIC ▐▐▐▐▐▐▐  NATIONAL INTELLIGENCE COUNCIL

## Comparing COVID-19 Pandemic to Past Select Viral Zoonotic Outbreaks

| | Location of Emergence | Asymptomatic Infection Common | Reservoir Species and Year Identified | Probable Intermediate Species and Year Identified |
|---|---|---|---|---|
| **COVID-19** *(2019–Present)* | China | ✔ Yes | ❓ Unknown | ❓ Unknown |
| **Ebola** *(2014–16)* | Guinea | ✖ No *(Probably)* | Bats *(Probably)*; N/A | Nonhuman primate *(Probably)*; N/A |
| **MERS** *(2012)* | Saudi Arabia, Jordan | ✔ Yes | Bats *(Probably)*; N/A | Dromedary camels; 2013 |
| **SARS** *(2002–04)* | China | ✖ No *(Probably)* | Horseshoe bats; 2016 | Masked palm civets and Raccoon dogs *(Possibly)*; 2003 |
| **Nipah** *(1998–99)* | Malaysia | ✔ Yes | Fruit bats; 1999 | Pigs; 1998 |
| **HIV-1**[a] *(1970s–Present)* | Democratic Republic of Congo *(Probably)* | ✖ No *(Probably)* | Chimpanzees *(Probably)*; 1999 | N/A |

*a. HIV is believed to have crossed from chimpanzees to humans in the 1920s; the first documented death occurred in the late 1960s.*

transmission, and precedent of novel human infectious disease outbreaks originating from zoonotic transmission. Previous human coronavirus outbreaks, to include SARS-CoV-1 and Middle East Respiratory Syndrome coronavirus (MERS-CoV), occurred naturally and were linked to animal reservoirs with zoonotic transmission to humans, according to scientific literature.

- Extensive wildlife and livestock farming, wildlife trafficking, and live animal markets in China and historically lax government regulation—and even promotion—of these activities increase the probability that initial transmission occurred along one of these routes.

- Academic literature has revealed Wuhan markets sold live mammals and dozens of species—including raccoon dogs, masked palm civets, and a variety of other mammals, birds, and reptiles—often in poor conditions where viruses can jump among species, facilitating recombination events and the acquisition of novel mutations. SARS-CoV-2 can infect a range of mammals, including cats, dogs, pangolins, minks, raccoon dogs, and a variety of wild and domestic animals, according to academic literature.

- Wider Hubei Province has extensive farming and breeding of animals that are susceptible to SARS-CoV-2, including minks and raccoon dogs.

These analysts note that there is a precedent for viral vectors to travel long distances in China and cause infection elsewhere because of transportation and trade nodes, thereby widening and complicating the search for the specific zoonotic spillover incident.  For instance, the bat coronavirus that is currently the closest known relative to the original SARS-CoV-1 was identified in Yunnan Province, even though the first SARS outbreak detected in humans occurred in Guangdong Province, hundreds of kilometers away.

## The Case for the Laboratory-Associated Incident Hypothesis

One IC element assesses with moderate confidence that COVID-19 most likely resulted from a laboratory-associated incident involving WIV or other researchers—either through exposure to the virus during experiments or through sampling.  Some analysts at elements that are unable to coalesce around either explanation also assess a laboratory origin with low confidence.  These analysts place emphasis on academic articles authored by WIV employees indicating that WIV scientists conducted research on other coronaviruses under what these analysts consider to be inadequate biosafety conditions that could have led to opportunities for a laboratory-associated incident.  These analysts also take into account SARS-CoV-2's genetic epidemiology and that the initial recorded COVID-19 clusters occurred only in Wuhan—and that WIV researchers who conducted sampling activity throughout China provided a node for the virus to enter the city.

### WIV Research Includes Work With Animals That Carry Relatives of SARS-CoV-2

The analysts that find the laboratory-associated origin theory most likely assess that WIV researchers' inherently risky work with coronaviruses provided numerous opportunities for them to unwittingly become infected with SARS-CoV-2.  Although the IC has no indications

> ### WIV Illnesses in Fall 2019 Not Diagnostic
>
> The IC assesses that information indicating that several WIV researchers reported symptoms consistent with COVID-19 in autumn 2019 is not diagnostic of the pandemic's origins.  Even if confirmed, hospital admission alone would not be diagnostic of COVID-19 infection.

that WIV research involved SARS-CoV-2 or a close progenitor virus, these analysts  note that it is plausible that researchers may have unwittingly exposed themselves to the virus without sequencing it during experiments or sampling activities, possibly resulting in asymptomatic or mild infection.  Academic literature indicates that WIV researchers conducted research with bat coronaviruses or collected samples from species that are known to carry close relatives of SARS-CoV-2.

- Based on currently available information, the closest known relatives to SARS-CoV-2 in bats have been identified in Yunnan Province, and researchers bringing samples to laboratories provide a plausible link between these habitats and the city.

- These analysts also note that China's investigations into the pandemic's origin might not uncover evidence of a laboratory-associated incident if it involved only a small number of researchers who did not acknowledge or have knowledge of a potential infection.

### Biosafety Conditions for Specific Work Could Have Led to an Incident

The analysts that assess COVID-19 most likely originated from a laboratory-associated incident also place emphasis on information suggesting researchers in China used biosafety practices that increased the risk of exposure to viruses.  Academic publications suggest that WIV researchers did not use adequate biosafety precautions at least some of the time, increasing the risk of a laboratory-associated incident.

### The Role of the Huanan Seafood Wholesale Market

Some scientists and China's public health officials have shifted their view on the role of the Huanan Seafood Wholesale Market in the pandemic since early 2020.  Some now view the market as a potential site of community spread rather than where the initial human infection may have occurred.

- On January 1, 2020, China's security authorities shut down the market after several workers fell ill in late December 2019.  China focused early source tracing on the market and Hubei Province; association with the market was included as part of the early case definition.

- In January 2020, a scientific article that described clinical features of initial COVID-19 infections in China found that some COVID-19 patients did not have any known association with the market.  Furthermore, there continues to be conflicting data with some academic articles and preprints noting that phylogenetic analysis of the available data on the earliest cases suggests that the progenitor virus may not have originated from the market.

## China's Transparency Key to Determining COVID-19 Origin

The IC judges that closing persistent information gaps on the origins of COVID-19 is very likely to require greater transparency and collaboration from Beijing.  The scientific community lacks technical data on a reservoir species, possible intermediate species, and closer relatives to SARS-CoV-2.

**Data and Samples From Initial Cases:** The global scientific community does not know exactly where, when, or how the first human infection with SARS-CoV-2 occurred.  It lacks a complete picture of the initial cases in Wuhan—or potentially elsewhere in China—that would allow it to better understand potential sources of infection or conduct phylogenetic analysis that would help validate both hypotheses.

**Information That Would Confirm Natural Outbreak:** Searching for a natural reservoir or potential intermediate host requires collecting, isolating, and sequencing viruses from samples taken from potential host species and environments to search for viruses related to SARS-CoV-2, endeavors that require international collaboration, resources, and time.

- Information that the earliest confirmed COVID-19 cases were in individuals or families who spent time in rural regions or who were involved in animal trade or environments that facilitate close human-to-animal interactions could indicate that the virus was circulating within an animal reservoir and a zoonotic spillover event caused the first COVID-19 case in humans.

- However, some transmission pathways are fleeting, meaning an animal acquires a virus and evidence of infection vanishes, particularly if the animals are reared and harvested for agricultural or commercial purposes.

**Information That Would Confirm Laboratory-Associated Incident:** China's coronavirus research or related information from origins investigations by Beijing or international organizations could provide clear indications of a laboratory-associated incident or at least yield some new insights.

**WIV's Publicly Available Coronavirus Research**

IC analysts are examining published research from China for any indicators that would inform our understanding of COVID-19's origins. The WIV and other research groups in China published coronavirus articles in 2020 and 2021, including the discovery of the closest known relative of SARS-CoV-2, but at least some relevant data on coronaviruses of interest has either been unavailable or has not been published.

Although the WIV described the sampling trip to the mineshaft in Mojiang in Yunnan Province where it collected RaTG13 in 2016, it did not explicitly state that RaTG13 was collected from that mine until 2020. Similarly, the WIV collected eight other coronaviruses from the same mine in 2015 that it did not fully disclose until 2021. In some of these instances, however, the WIV has described unpublished work in webinars and interviews prior to publishing.

## China Likely To Impede Investigation

The IC judges they will be unable to provide a more definitive explanation for the origin of COVID-19 unless new information allows them to determine the specific pathway for initial natural contact with an animal or to determine that a laboratory in Wuhan was handling SARS-CoV-2 or a close progenitor virus before COVID-19 emerged.

- For instance, Beijing limited the World Health Organization (WHO) investigation team's access to sites.

- In late July, China denounced a WHO plan for future investigations into COVID-19 origins, claiming that the proposal for future investigations was politicized. China's officials publicly rebuked the WHO's plans for a future study of labs in China,

saying Beijing would not allow the WHO to engage in the "conspiracy theory."

China is also pushing its narrative that the virus originated outside China.

- Public statements from China's Government have continued to claim the virus originated from imported frozen food, an extremely unlikely theory.

- China's Government continues to spread allegations that the United States created or intentionally spread SARS-CoV-2 to divert attention away from Beijing.

## Annex A: Definitions

**Antibody:** A protein produced during an immune response to a part of an infectious agent called an antigen.

**Backbone:** A genetic sequence used as a chassis upon which to build synthetic constructs, such as those used for cloning, protein expression, and production.

**Biological weapon:** A weapon that uses bacteria, viruses, toxins, fungi, and biochemical/biomolecule agents that can cause death or injury to humans, plants, or animals or destroy materials.

**Biosafety:** The application of knowledge, techniques, and equipment to prevent personal, laboratory, and environmental exposure to potentially infectious agents or biohazards. Four **Biosafety levels (BSL)** define the containment conditions under which biological agents can be safely manipulated. These standards range from moderate safety requirements for low-risk agents (BSL-1), to the most stringent controls for high-risk agents (BSL-4). China's standards range from P1–4.

**Biosecurity:** The protection, control of, and accountability for biological agents, toxins, and biological materials and information to prevent unauthorized possession, loss, theft, misuse, diversion, and accidental or intentional release.

**Coronavirus:** A common type of virus that can infect humans and/or animals. The human illness caused by most coronaviruses usually last a short time and presents symptoms consistent with the "common cold," such as a runny nose, sore throat, cough, and a fever.

**COVID-19:** An infectious disease caused by the **SARS-CoV-2** virus, which is a betacoronavirus.

**Diagnostic information:** Information that allows IC analysts to distinguish between hypotheses—in this case, the laboratory origin and natural origin theories.

**DNA (deoxyribonucleic acid):** A molecule that carries an organism's genetic blueprint for growth, development, function, and reproduction.

**Epidemiology:** The study of the distribution and determinants of health-related events in specified populations, and the application of this study to prevent and control health problems.

**Furin cleavage site (FCS):** A region in the spike protein of SARS-CoV-2 that enhances infection.

**Gain-of-function:** The IC considers this as a research method that involves manipulating an organism's genetic material to impart new biological functions that could enhance virulence or transmissibility (e.g., genetically modifying a virus to expand its host range, transmissibility, or severity of illness). The IC assesses that genetic engineering, genetic modification, and laboratory-adaptation can all be used for gain-of-function experiments, but are not inherently so. We address both genetic engineering and laboratory-adaptation in the body of this assessment; the IC is unaware of an agreed, international definition.

**Genetically engineered or genetically modified viruses** are intentionally altered, created, or edited using biotechnologies, such as Clustered Regularly Interspaced Short Palindromic Repeat (CRISPR), DNA recombination, or reverse genetics. These viruses have intentional, targeted edits to the genome designed to achieve specific results, but unintentional genomic changes may also occur.

**Genome:** The genetic material of an organism. It consists of DNA (and sometimes RNA for viruses).

**Genome sequencing:** The process of determining the DNA or RNA sequence of an organism's genome, or its "genetic code." An organism's genetic code is the order in which the four nucleotide bases—adenine, cytosine, guanine, and thymine—are arranged to direct the sequence of the 20 different amino acids in the proteins that determine inherited traits.

**Intermediate species/host:** An organism that can be infected with a pathogen from a reservoir species and

passes the pathogen to another host species; infection is not sustained in this population.

**Laboratory-adapted viruses** have undergone natural, random mutations through human-enabled processes in a laboratory—such as repeated passage through animals or cells—that put pressure on the virus to more rapidly evolve. Specific changes to the viral genome are not necessarily anticipated in these processes, though the virus can be expected to gain certain characteristics, like the ability to infect a new species. This is a common technique used in public health research of viruses. We consider directed evolution to be under laboratory adaptation.

**Laboratory-associated incidents** include incidents that happen in biological research facilities or during research-related sampling activities.

**Molecular biology:** Study of the molecular basis of activities in and between cells. This includes techniques to amplify or join genetic sequences.

**Naturally occurring viruses** have not been altered in a laboratory. Viruses commonly undergo random mutations as part of the evolutionary process and can continue to change over time; mutations may enable a virus to adapt to its environment, such as evading host immune responses and promoting viral replication.

**Outbreak:** A sudden increase in occurrences of a disease in a particular time and place. Outbreaks include **epidemics**, which is a term that is reserved for infectious diseases that occur in a confined geographical area. **Pandemics** are near-global disease outbreaks.

**Pangolin:** An African and Asian mammal that has a body covered in overlapping scales. Pangolins are a natural reservoir of coronaviruses and researchers are investigating their potential role as an intermediate host for SARS-CoV-2.

**Pathogen:** A bacterium, virus, or other microorganism that can cause disease.

**Phylogenetics:** The study of the evolutionary relationships among groups of organisms.

**Progenitor virus:** A virus that is closely related enough—probably more than 99 percent—to SARS-CoV-2 to have been its direct ancestor or plausible immediate origin of the outbreak. The closest known relative to SARS-CoV-2 is only around 96 percent similar; to put this into context, humans and chimps are around 99 percent similar, demonstrating the significant differences even at this similarity.

**RaTG13:** A coronavirus with the closest known whole genome to SARS-CoV-2, although it is widely believed to not be a direct ancestor of SARS-CoV-2.

**Resevoir species/host:** An organism that harbors a pathogen, which is endemic within the population.

**RNA (ribonucleic acid):** A molecule essential for gene coding, decoding, regulation, and expression. Certain viruses use RNA as a genetic blueprint.

**Transmissibility:** The measure of new infections initiated by an existing infection.

**Virus:** A replicating piece of genetic material—DNA or RNA—and associated proteins that use the cellular machinery of a living cell to reproduce.

**Wet market:** A market where fresh food and live and dead animals, including wildlife, are sold.

**Zoonosis:** An infection or a disease that is transmissible from animals to humans under natural conditions. A **zoonotic pathogen** may be viral, bacterial, or parasitic, and can sometimes be transmitted through insects, such as mosquitoes.

**Zoonotic spillover:** An initial infection or disease that is caused by contact between an animal and human under natural conditions.

**NIC** ▮▮▮▮▮▮▮    NATIONAL INTELLIGENCE COUNCIL

## Annex B: IC Examination of Open-Source Theories

IC analysts have examined a number of open-source articles from a variety of sources that have raised theories about SARS-CoV-2 and COVID-19's origin. The IC assesses that these theories generally do not provide diagnostic information on COVID-19 origins, and in some cases, are not supported by the information available to us. However, several have drawn on insightful methods or identified potential leads.

### Theory of Abnormal Activity at the WIV in Fall 2019

The IC assesses that an assessment about abnormal activity at the WIV in fall 2019 lacks support and does not offer diagnostic insight. The Multi-Agency Collaboration Environment (MACE) published a report assessing that the pandemic began in October 2019 because of a release at the WIV.

- Although the methodology is insightful, the IC has concerns with the small data set and analytic rigor used to derive the group's findings, and our review of information directly contradicts some of its findings.

### Theory That SARS-CoV-2 Was a Biological Weapon

The IC assesses that public claims from a Hong Kong virologist that Beijing created SARS-CoV-2 as a biological weapon are inconsistent with available technical information on coronaviruses. We assess that the articles contain several technical inaccuracies and omit key data points.

- Since September 2020, a virologist who worked in a WHO-affiliated laboratory in Hong Kong has publicly stated that Beijing created SARS-CoV-2 from bat coronaviruses and that China's researchers intentionally released it. The scientific community did not peer review these articles and some publicly rejected the articles' claims as scientifically unsound.

### Theory That SARS-CoV-2 Was Genetically Engineered

The IC assesses that public claims that some distinguishing features in SARS-CoV-2 are the result of genetic engineering are not diagnostic of genetic engineering. The IC has been evaluating how SARS-CoV-2 could have developed these features and notes that the furin cleavage site (FCS)—a region in the spike protein that enables infection and has been the topic of open-source debate—can also be consistent with a natural origin of the virus.

We do not fully understand the diversity of natural coronaviruses or how often they recombine, suggesting that there are plausible natural means by which these features in SARS-CoV-2 could have emerged beyond what we currently understand.

- For example, the author of an article in April notes the SARS-CoV-2's FCS is unique among known betacoronaviruses. The author argues that such features are rare and so well-adapted for human infection that they are more likely emerged from laboratory work than from natural selection.

- Although an IC review of scientific literature has indicated that no known betacoronaviruses in the same subgenus have this FCS in the same region of the spike protein as SARS-CoV-2, similar FCSs are present in the same region of the spike protein as other naturally occurring coronaviruses, according to scientific articles.

We also do not find credible a now-withdrawn preprint article from two Indian educational institutes posted in January 2020 that asserted SARS-CoV-2 was genetically engineered using sequences from the human immunodeficiency virus. We assess it is unlikely that scientists would have chosen to intentionally engineer the specific sequences that were the focus of the scientific article.

## Theory That SARS-CoV-2 Originated Outside China

We are aware of scientific studies claiming to have found SARS-CoV-2 viral fragments or antibodies in samples taken before November 2019 outside China. However, technical flaws in some of these studies, uncertainties in the methodologies, and in some cases, the lack of a credible review process make us skeptical of their utility in determining the pandemic's origin.

- We assess that the first cluster of confirmed COVID-19 cases arose in Wuhan, China, in late 2019, but we lack insight—and may never have it—on where the first SARS-CoV-2 infection occurred. Although all of the earliest confirmed cases of COVID-19 were documented in China's Hubei Province, where Wuhan is located, according to Western and China's press reports, it is plausible that a traveler came in contact with the virus elsewhere and then went to Wuhan.

- We continue to monitor scientific publications and discuss these issues with experts. Even if the virus is found to have existed outside China before the Wuhan outbreak, credible evidence of human infection would also be necessary to determine if the first COVID-19 outbreak began there.

**NIC** ▌▌▌▌▌▌    NATIONAL INTELLIGENCE COUNCIL

## Annex C: IC Approach to 90-Day Study

The NIC collaborated closely with the National Counterproliferation Center (NCPC), the National Intelligence Management Council (NIMC), IC agencies, and other USG entities and departments on this assessment.  The IC kicked off the 90-day study by outlining the core intelligence questions that would be addressed over lines of effort—collection and analysis.  These questions included:

- Did the outbreak begin through contact with infected domestic or wild animals or was it the result of a laboratory-associated incident?

- Was the virus genetically engineered?

- Is SARS-CoV-2 a biological weapon?

**Collection:** At the kick-off meeting for the 90-day study, the IC discussed core intelligence gaps to drive collection moving forward.

**Analysis:** The NIC had two separate structured analytic exercises to discuss both the underlying reporting and to strengthen argumentation moving into the drafting phase.  Analysts at individual agencies also pursued various structured analytic techniques to build their own assessments.

- During a two-day-long in-person IC-wide **Analysis of Competing Hypothesis (ACH)** analytic exercise in June, analysts determined whether existing reporting was consistent or inconsistent with information in individual reports.  This exercise allowed analysts to determine that most reporting was consistent with both hypotheses and the reporting that was inconsistent was deemed to be not credible.

- Before the start of drafting, the NIC hosted an IC-wide **Team A/Team B** analytic exercise to explore how the IC could strengthen either hypothesis through a debate style format.  Agencies pulled from these conversations—along with the work conducted during and before the study—to solidify their consensus positions.

 **NATIONAL INTELLIGENCE COUNCIL**

## Annex D: Outside Review

The NIC conducted four rounds of outside review of the draft assessment. These sessions provided valuable feedback that we incorporated into the assessment. The NIC made some organizational changes in response to comments; comments included:

- Emphasize points of agreement.

- Provide additional definitions in the lexicon and ensure technical or intelligence jargon is explicitly explained.

NIC ||||||||                    NATIONAL INTELLIGENCE COUNCIL

## Annex E: Questions

Answers to the following questions would help us better evaluate hypotheses related to the origins of COVID-19:

What additional information—to include timing, location, relevant animal exposures, occupational information, and clinical samples—is there on the earliest cases of COVID-19?

How were early cases investigated?  What questions or tools were utilized for tracing contacts and contacts of those contacts?

What direct or indirect indicators of COVID-19 clusters is China aware of from early in the outbreak?  This may include things like hospital occupancy rates or efforts to triage medical care outside of hospital facilities.

What insight can China provide on the search for the reservoir and potential intermediate species of the COVID-19 virus?

What insight can China provide on the search for the identification of a progenitor virus?  Have any leading candidates or regions for spillover been identified?

What information, data, and/or samples does China have on wildlife or other animals present in the following markets in Wuhan:

- Huanan Seafood Wholesale Market

- Qiyimen Live Animal Market

- Baishazhou Market

- Dijiao Outdoor Pet Market

What information, data, and/or samples does China have on wildlife present in the other markets, wildlife rescue centers, and/or farms in Wuhan, across Hubei, in neighboring provinces, or in locations where live animals in Hubei Province are sourced from?