# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ART VAN FURNITURE, LLC., *et al.,*[1]<br><br>                        Debtors. | Chapter 7<br><br>Case No. 20-10553 (CSS)<br><br>Jointly Administered |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated,<br><br>                        Plaintiffs,<br>v.<br><br>ART VAN FURNITURE, LLC, et al.,<br><br>                        Debtors. | Adv. Pro. No. 20-50548 (CSS) |

## PLAINTIFFS' BRIEF IN OPPOSITION TO TRUSTEE'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION TO DEFER RULING

Michael J. Joyce (No. 4563)
**JOYCE, LLC**
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302)-388-1944
Email: mjoyce@mjlawoffices.com

OF COUNSEL:

René S. Roupinian (*admitted pro hac vice*)
Jack A. Raisner (*admitted pro hac vice*)

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

**RAISNER ROUPINIAN LLP**
270 Madison Avenue, Suite 1801
New York, New York 10016
Telephone: (212) 221-1747
Facsimile: (212) 221-1747
Email: rsr@raisnerroupinian.com
Email: jar@raisnerroupinian.com

*Attorneys for Plaintiffs and the putative class*

# TABLE OF CONTENTS

STATEMENT OF NATURE AND STATUS OF PROCEEDING ................................................... 1

SUMMARY OF ARGUMENT ........................................................................................ 1

STATEMENT OF FACTS IN SUPPORT OF CROSS-MOTION TO DEFER .............................. 2

ARGUMENT ............................................................................................................ 4

    I.    Legal Standard for Summary Judgment and the Applicable Burden of Proof ........................ 4

    II.   The Court Should Defer Ruling on the Motion to Allow for Discovery ................................ 5

    III.  Defendants Were Not a Liquidating Fiduciary in March 2020 ................................. 6

    IV.  The Cause of the Employees' Termination Has Not Been Proven........................................ 11

    V.   Defendants Have Not Proved that COVID-19 is a Natural Disaster or that the Layoff was Due to it .................................................................................................................. 23

CONCLUSION .......................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AB Stable VIII LLC v. Maps Hotels and Resorts One LLC,*
  CV 2020-0310-JTL, 2020 WL 7024929 (Del. Ch. Nov. 30, 2020) ............................................. 25

*Adickes v. S. H. Kress & Co.,*
  398 U.S. 144 (1970) ................................................................................................................. 5

*Benson v. Enter. Leasing Co. of Fla., LLC,*
  No. 6:20-CV-891-ORL-LRH, 2021 WL 1078185, (M.D. Fla. Jan. 4, 2021) ...................... 15, 26

*Carver v. Foresight Energy LP,*
  No. 3:16-CV-3013, 2016 WL 3812376 (C.D. Ill. July 12, 2016) ............................................... 24

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ................................................................................................................. 5

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council,*
  467 U.S. 837, (1984) ............................................................................................................... 24

*Ciarlante v. Brown & Williamson Tobacco Corp.,*
  143 F.3d 139 (3d Cir. 1998) ................................................................................................... 24

*Connecticut Gen. Life Ins. Co. v. C.I.R.,*
  177 F.3d 136 (3d Cir. 1999) ................................................................................................... 28

*Doe v. Abington Friends School,*
  480 F.3d 252 (3d Cir. 2007) ..................................................................................................... 5

*Easom v. US Well Servs., Inc.,*
  527 F. Supp. 3d 898 (S.D. Tex. 2021) ............................................................................. passim

*Grimmer v. Lord Day & Lord,*
  937 F.Supp. 255 (S.D.N.Y.1996) ........................................................................................... 23

*Hotel Emps. & Rest. Emps. Int'l Union Local 54 v. Elsinore Shore Assocs.,*
  173 F.3d 175 (3d Cir. 1999) ................................................................................................... 28

*In Official Comm. of Unsecured Creditors of United Healthcare Sys., Inc. v. United Healthcare Sys., Inc. (In re United Healthcare Sys., Inc.),*
  200 F.3d 170 (3d Cir. 1999) .................................................................................................. 7, 8

*In re Deb Stores Holding LLC,*
  14-12676 (KG), 2018 WL 1577606 (Bankr. D. Del. Mar. 28, 2018) ......................................... 6

*In re Dewey & Leboeuf, LLP*,
    507 B.R. 522 (Bankr. S.D.N.Y. 2014) ................................................................ 23

*In re Kiwi Int'l Air Lines, Inc.*,
    344 F.3d 311 (3d Cir. 2003) .................................................................................. 5

*In re Tweeter OPCO*,
    453 B.R. 534 (Bankr. D. Del. 2011) .................................................................... 23

*In re World Mktg. Chicago, LLC*,
    564 BR 587 (Bankr. N.D. Ill. 2017) .............................................................. 7, 10

*IT Litig. Trust v. Alpha Analytical Labs (In re IT Grp., Inc.)*,
    331 B.R. 597 (Bankr. D. Del. 2005) ...................................................................... 5

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) ....................................................................................... 27

*Law v Am. Capital Strategies*,
    CIV. 3:05-0836, 2007 WL 221671 (M.D. Tenn. Jan. 26, 2007) ......................... 10

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ......................................... 5

*Newman as Tr. of World Mktg. Tr. v. Crane, Heyman, Simon, Welch, & Clar*,
    435 F. Supp. 3d 834 (N.D. Ill. 2020) .................................................................. 23

*Sides v. Macon Cty. Greyhound Park, Inc.*,
    725 F.3d 1276 (11th Cir. 2013) ........................................................................... 23

*Thomas Jefferson Univ. v. Shalala*,
    512 U.S. 504 (1994) ........................................................................................... 28

*U.S. v. Diebold, Inc.*,
    369 U.S. 654 (1962) ............................................................................................. 5

**Statutes**

11 U.S.C. § 503 ........................................................................................................ 4
11 U.S.C. § 503(b)(1)(A) .......................................................................................... 2
11 U.S.C. § 507 ........................................................................................................ 4
11 U.S.C. § 726 ........................................................................................................ 4
29 U.S.C. § 2101 ...................................................................................................... 2
29 U.S.C. § 2102(b)(2)(A) ...................................................................................... 11
29 U.S.C. § 2102 (b)(2)(B) ............................................................................... 24, 27
29 U.S.C. § 2102(b)(3) ...................................................................................... 22, 27
29 U.S.C. § 2107 .................................................................................................... 24

**Rules**

Fed. R. Bankr. P. 7056....................................................................................................... 5
Fed. R. Civ. P. 56............................................................................................................... 1
Fed. R. Civ. P. 56(a).......................................................................................................... 5
Fed. R. Civ. P. 56(c).......................................................................................................... 5
Fed. R. Civ. P. 56(d)...................................................................................................... 2, 6

**Regulations**

20 C.F.R. § 639.9................................................................................................................ 5
20 C.F.R. § 639.9(b)......................................................................................................... 12
20 C.F.R. § 639.9(c)(1)-(3).............................................................................................. 24
20 C.F.R. § 639.9(c)(3)..................................................................................................... 27
20 C.F.R. § 639.9(c)(4)..................................................................................................... 24
*Worker Adjustment and Retraining Notification*,
   54 FR 16042-01 (1989 WL 278605)........................................................................ 6, 7

## STATEMENT OF NATURE AND STATUS OF PROCEEDING

Todd Stewart and Jennifer Sawle, on behalf of themselves and all others similarly situated (the "Plaintiffs"), submit the following under Fed. R. Civ. P. 56 in opposition to the Motion for Summary Judgment (D.I. 43, 44 (the "Motion")) filed by the Chapter 7 Trustee (the "Trustee") for Debtors Art Van Furniture, LLC and its affiliates ("Art Van" or "Defendants" or "Debtors").

## SUMMARY OF ARGUMENT

1. The Trustee moves for judgment on three factual issues: (1) that Defendants were a "liquidating fiduciary"; (2) that they decided to conduct a mass layoff caused by an unforeseeable business circumstance; and (3) that the layoffs were caused by a natural disaster. Defendants have not proffered a single similar case in which any of these factual findings were made prior to discovery. This Motion must be deferred until discovery is complete.

2. But even without discovery, Defendants' own submissions show clearly that they are not entitled to judgment on any of these issues. When the Defendants terminated the putative class it was operating at least a quarter of its stores as a going concern. No court has been asked to, no less has agreed to treat such an employer as a liquidating fiduciary. That would be an oxymoron.

3. Defendants have not proved that a natural disaster caused the mass layoff, nor can it. While the COVID virus may have developed naturally, the human invention that arguably spread it disqualifies it as a "natural disaster." Absent reliable evidence as to COVID's emergence, all inferences must be drawn in favor of Plaintiffs. Nor have Defendants proved that COVID-19 was a business circumstance that *caused* the mass layoff. Even the inchoate record plausibly suggests that Defendants' board was motivated by other factors than COVID-19. Even if COVID-19 were found to be an unforeseeable natural disaster, the evidence already suggests that the board was bowing to pressures greater than the temporary COVID-19 measures when it shut down the stores.

4.  Because Defendants' Motion is premature and Plaintiffs are entitled to take discovery, Plaintiffs cross-move under Rule 56(d) to defer consideration of Defendants' Motion.

## **STATEMENT OF FACTS IN SUPPORT OF CROSS-MOTION TO DEFER**

On March 8, 2020, Defendants each filed a Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code. (Bankr. No. 20-10553, D.I. 2). On March 10, 2020, the Debtors' cases were consolidated for joint administration. (Bankr. No. 20-10553, D.I. 71). On April 7, 2020, the bankruptcy case was converted to Chapter 7 and the Chapter 7 Trustee was appointed. (Bankr. No. 20-10553, D.I. 263, 264).

On March 23, 2020, Plaintiffs commenced an adversary proceeding against the above-captioned Debtors in this Court (Adv. Proc. No. 20-01584-VFP (CSS) (the "Adversary Proceeding"), D.I.[2] 1) alleging that Debtors violated the Federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq*. (the "WARN Act") and seeking relief on behalf of a putative class of present or former employees of the Defendants.

On December 10, 2020, Defendants filed an Answer to the Complaint wherein they generally deny the allegations and assert several affirmative defenses, including that the terminations were caused by unforeseeable business circumstances, that notice was not required because the terminations were caused by a natural disaster, that Debtors acted in good faith, and that the Plaintiffs' claims are not entitled to first priority post-petition administrative expense pursuant to 11 U.S.C. § 503(b)(1)(A). (D.I. 25).

On April 28, 2021, Plaintiffs served their First Set of Interrogatories and Request for Production of Documents on Debtors.  (Declaration of René S. Roupinian ("Roupinian Decl.") and Exhibits, attached hereto as **Exhibit 1**, ¶3; Ex. A. to Roupinian Dec. )  The parties informally

---

[2] For the balance of this Memorandum, "D.I." alone refers to the docket of the Adversary Proceeding.

exchanged information regarding the composition of the putative class, covered sites and damages, discussed the substantive issues of the case, and agreed to stay formal discovery pending mediation. (Roupinian Decl., ¶4). The parties negotiated a Stipulated Scheduling Order, entered by the Court on June 10, 2021, reflecting the parties' intention to conduct informal discovery. (Roupinian Decl., ¶¶ 4-5; Ex. B to Roupinian Decl., ¶11) and "fact discovery[] shall be completed and closed within [180] days from the filing of the Mediator's report." (Ex. B to Roupinian Decl., ¶ 22).

On June 21, 2021, pursuant to the parties' agreement to informally exchange documents, Plaintiffs' Counsel emailed an informal request to Trustee's counsel seeking information regarding, *inter alia*, Defendants' efforts to raise capital, the circumstances leading to Plaintiffs' terminations, the effects of the COVID pandemic, efforts to avoid mass layoffs, and minutes of Board of Directors' meetings. (Roupinian Decl., ¶6; Ex. C to Roupinian Decl.).

On July 12, 2021, the Trustee's Counsel responded, naming certain public documents and court filings, and producing a total of three documents: (1) Art Van Holding Co., Inc. Q1 Board Member Meeting dated February 4, 2020 (heavily redacted), (2) Board Member Minutes dated April 2, 2020 (almost entirely redacted), and (3) Wind Down Plans dated March 23, 2020. (Roupinian Decl., ¶7; Ex. D to Roupinian Decl.).

On July 27, 2021, the parties participated in a mediation with the Hon. Kevin Gross but did not settle the Adversary Proceeding, as set forth in the Mediator's Final Report filed on October 15, 2021. (Roupinian Decl. ¶8; Report, D.I. 39). Thereafter, the parties were to resume written discovery pursuant to the pretrial scheduling order entered on June 10, 2021. (Ex. B to Roupinian Decl., ¶ 22). The parties exchanged Rule 26(a) disclosures on October 29, 2021. (D.I. 41-42).

On October 29, 2021, the Trustee filed a First Amended Answer to the Complaint. (Roupinian

Decl., ¶10; Ex. E to Roupinian Decl.).  In its First Amended Answer, the Trustee denies that Debtors were a WARN "employer" and asserts additional defenses, namely that Plaintiffs are required to arbitrate their claims, that at the time notice was required Art Van was a liquidating fiduciary, and that Debtors acted in good faith.  The Trustee also denies Plaintiffs' WARN claims are entitled to priority under  11 U.S.C. § 503, 11 U.S.C. § 507 and 11 U.S.C. § 726. (Ex. E to Roupinian Decl., ¶¶ 57-59, 66-67, 71).

On November 16, 2021, Plaintiffs' counsel contacted Trustee's counsel to request that the Trustee serve overdue responses to the first set of discovery requests served on April 28, 2021. (Roupinian Decl., ¶11; Ex. F to Roupinian Decl.).

On November 17, 2021, Plaintiffs served Plaintiffs' Second Request for Production of Documents to Defendants and a corresponding Certificate of Service. (Roupinian Decl., ¶12; Ex. G to Roupinian Decl.).  The Second Request for Production of Documents seeks documents relevant to the newly raised affirmative defenses in the Trustee's First Amended Answer, including communications with Defendants' owners and Wells Fargo relating to financing for the company and efforts to liquidate the company.  (Ex. G to Roupinian Decl., Request Nos. 11-17).  On December 1, 2021, two days before Plaintiffs' response to the Trustee's Motion for Summary Judgment was due, Trustee's counsel served written responses to Plaintiffs' First Set of Interrogatories and First Request for Production of Documents, which Plaintiffs had served more than 6 months prior.  The Trustee produced no documents in conjunction with those responses. (Roupinian Decl., ¶13; Ex. H to Roupinian Decl.).

## ARGUMENT

### I.    Legal Standard for Summary Judgment and the Applicable Burden of Proof

The Trustee's Motion must be denied if the Court finds a genuine dispute over any material

fact. Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056. In evaluating the evidence, the Court must view the inferences to be drawn from the facts in the light most favorable to the non-movant. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (same); *In re Kiwi Int'l Air Lines, Inc.*, 344 F.3d 311, 316 (3d Cir. 2003) (citation omitted) (same). A genuine issue of material fact exists where, given the evidence, a reasonable jury could rule in favor of the non-movant. *IT Litig. Trust v. Alpha Analytical Labs (In re IT Grp., Inc.)*, 331 B.R. 597, 600 (Bankr. D. Del. 2005). Under the WARN Act, the employer bears the burden of proof that conditions for the exceptions, that permit the giving of notice less than 60 days in advance, have been met. 20 C.F.R. § 639.9.

## II.     The Court Should Defer Ruling on the Motion to Allow for Discovery

The Trustee's Motion is premature because Plaintiffs have not had an opportunity to conduct meaningful discovery on his fact-intensive affirmative defenses, one of which he only first asserted days before filing his Motion.

A party seeking summary judgment must support its position by citing to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[,] ... admissions, interrogatory answers, or other materials ...." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the record in the light most favorable to the non-moving party while drawing all reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). This standard assumes that there is a fully developed evidentiary record to examine. *Doe v. Abington Friends School*, 480 F.3d 252, 257 (3d Cir. 2007) ("[I]t is well established that a court "is obliged to give a party opposing summary judgment an adequate opportunity to obtain discovery … This is necessary because, by its very nature, the summary judgment process presupposes the existence of an adequate record.").

As attested to in the Roupinian Declaration, Plaintiffs have not received documents, or been able to take depositions, concerning Defendants' purported liquidation process, the operations of the stores during the pendency of the bankruptcy, Defendants' efforts to obtain financing, and the decision-making process that led to the terminations of Defendants' employees. These facts directly relate to the Trustee's liquidating fiduciary defense, unforeseeable business circumstances defense, and natural disaster defense. Because of the lack of meaningful discovery on these issues, Plaintiffs are unable to justify their opposition to most of the facts asserted in the Trustee's Motion. (Roupinian Decl., ¶15; Pls.' Resp. to Trustee's Statement of Undisputed Material Facts, filed contemporaneously herewith). Pursuant to Fed. R. Civ. P. 56(d), the Court should therefore defer ruling on the Motion until Plaintiffs have had the opportunity to take relevant discovery. *See In re Deb Stores Holding LLC*, 14-12676 (KG), 2018 WL 1577606, at *3 (Bankr. D. Del. Mar. 28, 2018) (deferring summary judgment ruling under Rule 56(d) because "[t]he Court agrees with the Plaintiff and finds that further discovery is necessary.")

### III.     Defendants Were Not a Liquidating Fiduciary in March 2020

The phrase "liquidating fiduciary" neither appears in the text of the WARN Act or its notice and comment Regulation. It appears only in a preamble that the Department of Labor ("DOL") appended to the Regulation in the Federal Register. *Worker Adjustment and Retraining Notification*, 54 FR 16042-01 (1989 WL 278605). The preamble recounts that a commentator had asked whether a bankruptcy fiduciary should be treated as a WARN "employer" required to provide notice. The DOL opined "that a fiduciary whose *sole function* in the bankruptcy process is to liquidate a failed business for the benefit of creditors does not succeed to the notice obligations of the former employer because the fiduciary is not operating a 'business enterprise' [the statutory definition of "employer"] in the normal commercial sense." *Id.* at *16045. The DOL qualified

that further by stating "where the fiduciary may continue to operate the business for the benefit of creditors, the fiduciary *would* succeed to the WARN obligations of the employer precisely because the fiduciary continues the business in operation." *Id.* (emphasis added). Given that the Code authorizes Chapter 11 debtors in possession to operate their businesses, the DOL's explanation of "liquidating fiduciary" excludes, on its face, Chapter 11 debtors. *In re World Mktg. Chicago, LLC*, 564 BR 587, 600 (Bankr. N.D. Ill. 2017) (under the Code, "the sole function of the chapter 11 debtor in possession or trustee is *not* to liquidate").

The Third Circuit's *United Healthcare* decision is the sole authority in this Circuit interpreting the DOL's preamble language of "operating business" and "normal commercial sense." *In Official Comm. of Unsecured Creditors of United Healthcare Sys., Inc. v. United Healthcare Sys., Inc.* (*In re United Healthcare Sys., Inc.*), 200 F.3d 170 (3d Cir. 1999) ("*United Healthcare*"). Under *United Healthcare*, Defendants here were indisputably operating their business not as a liquidating fiduciary but rather as a going concern employer when they terminated the putative class.

In *United Healthcare*, the defendant hospital's board accepted an offer to sell its assets to another hospital and close. Three days later, United Healthcare announced that it would close and surrendered its certificates of need. *Id.* at 173. The same day, it (1) filed a voluntary Chapter 11 bankruptcy petition, (2) provided its approximately 1,300 employees with 60 days' notice of termination, and (3) filed an emergency application for the sale of its goodwill. *Id.*

Within the next 48 hours, United Healthcare had transferred or sent home all its patients. *Id.* Thereafter, United Healthcare's employees were "unable to perform their regular duties but instead cleaned, took inventory, and prepared the company assets for sale." *Id.* They were terminated two weeks later, well short of their 60 days' notice. *Id.* Although the employees were awarded WARN backpay, the Committee appealed, claiming that the debtor had ceased to be a "business enterprise"

at the point when they had been reduced from care-givers to caretakers.

Reversing, the Third Circuit panel held:

> [W]hether a bankrupt entity is an 'employer' under the WARN Act depends on the nature and extent of the entity's business and commercial activities while in bankruptcy. … The more ore closely the entity's activities resemble those of a business operating as a going concern, the more likely it is that the entity is an "employer;" the more closely the activities resemble those of a business winding up its affairs, the more likely it is the entity is not subject to the WARN Act."

*Id*. at 178. Given the hospital's complete abandonment of its ability to do business and the replacement of all its employees normal activities with cleaning and inventory-taking, the panel held that the activities no longer resembled those of going concern. *Id.*

Defendants have not pointed to a single employee whose activities changed before they were terminated. Not only did the company *resemble* a going concern, it was largely, in fact, a going concern. Defendants declared when filing their Chapter 11 petition on March 8, that they planned to conduct a "going concern" sale of 44 stores and two distribution centers during its proceedings. (Ladd Declaration, D.I. 46-1 at 11-12[3]). Those stores comprised almost half of the 92 furniture showrooms. (*Id.*, D.I. 46-1 at 16, ¶27). The goal was to "preserve the going concern on the balance and hopefully save those thousands of jobs" and provide a benefit to creditors. (Transcript of Hearing on March 10, 2020, D.I. 46-1 at 45 lines 11-13.)

Defendants were operating, in large part, as a retailer seller in the "ordinary course" throughout the period of March 8 to March 19 under its Cash Collateral order, which required that it do so. (Cash Collateral Order, D.I. 46-1 at 151.) According to its own motion and proposed Order, which the Court entered on March 16, as a DIP loan borrower Debtor was prohibited from sales "outside the ordinary course of business[.]" (*Id.*) Not only did Defendants have to sell in the "ordinary

---

[3] Page citations to docket entries refer to the page number assigned by the ECF system, e.g., "Pages 10-11 of 201" here.

course," they were given authorization to purchase inventory in the *ordinary course* of business during the bankruptcy. (DIP Motion, D.I. 46-2 at 11). They were precluded from deviating in any respect from "ordinary course" of business. (*Id.*, D.I. 46-2 at 14 ("Limitations on Use of Proceeds"). They were prohibited from "[s]ubstantially chang[ing] the nature of the business in which [they were] currently engaged" or "purchas[ing] or invest[ing], directly or indirectly, in any assets or property *other than in the ordinary course* of business or other than those which are useful in, necessary for and are to be used in [their] business, as presently conducted." (DIP Credit Agreement, D.I. 46-2 at 60.)

Defendants also planned to wind down their other stores and operations through "going-out-of-business" ("GOB") sales. (Ladd Declaration, D.I. 46-1 at 4, ¶6.) It had begun the process prepetition, with a "soft launch" of GOB sales on March 5. (*Id.*, D.I. 46-1 at 11, ¶18.) Between that date and March 8, the date of the petition, Defendants' "deposits from inventory sales were in excess of $23.0 million." (Conversion Motion, D.I. 46-2 at 112, ¶22.) Its deposits from sales for the post-petition week ending March 15th, were $8.0 million. (*Id.*) Defendants' operating reports through October 2020 show receipts of millions of dollars each month, presumably from receipts from its sale of goods to its customers in its stores. (2020 Monthly Operating Reports of Art Van Furniture, LLC for May-Oct., Bankr. D.I. 790, 842, 1025, 1026, 1027, 1079).

Unlike the United Healthcare employees, Defendants' employees were performing their jobs exactly as they had prepetition on the day they were terminated. Defendants needed "GOB" signage so that customers would be aware they were going to go out of business. Indeed, the stores from which Defendants terminated approximately 1,000 class members on March 19 were ones that Defendants told the Court on March 19 they were "attempting to operate as much as possible in the ordinary course." (Transcript of Hearing on March 19, 2020, D.I. 46-5 at 25 lines 8-12.)

*In re World Marketing Chicago* is instructive here because, like Art Van, the World Marketing business entered bankruptcy hoping to keep itself afloat for 60 days. 564 B.R. at 602. World Marketing announced that it was shutting down operations, yet had also filed motions to use cash collateral, claiming the cash was necessary "to operate its business." *Id.* It further stated that failure to pay its payroll in a timely fashion would "jeopardize its ability to reorganize." *Id.*

The *World Marketing* court found that even "if the Debtors were conducting their business solely for the purposes of a sale, they were engaged in some form of business," and found several compelling reasons not to apply the "court-made liquidating fiduciary exception." *Id.* at 603. First, exceptions to WARN should be "applied sparingly" given it is "remedial legislation and its exceptions are to be construed narrowly." *Id.* Second, the debtor's public representations regarding reorganization should have some binding effect. Even under the *United Healthcare* exception the court found the debtor "unentitled to the benefit of the liquidating fiduciary exception." *Id.* Here, Defendants' continuing of its business with either "going" appellation, "going concern" or "going out" still denotes business is going on. Customers are enticed to come in and do business equally. United Healthcare's patients were not invited to come in for medical care when its employees were sweeping up. Defendants stretch the loose concept of "liquidation" to cover the monetization of any assets once a shutdown is planned. But Congress enacted WARN precisely to require notice to employees 60 days before a planned shutdown. As one court explained when granting the plaintiff's motion to strike the liquidating fiduciary defense, the exception would "swallow the rule" and "eviscerate [WARN]" if taking the "preliminary steps towards liquidation, while otherwise continuing to carry on its business" exempted an employer from notice. *Law v Am. Capital Strategies,* CIV. 3:05-0836, 2007 WL 221671, at *17 (M.D. Tenn. Jan. 26, 2007).

## IV.     The Cause of the Employees' Termination Has Not Been Proven

On the surface, Defendants' narrative of their unforeseeable business circumstances ("UBC") defense seems plausible: a company accelerates its WARN mass layoff from 60 days of notice to fifteen, because COVID-19-triggered government orders prevented it from continuing its wind down sales.  On closer inspection, however, the record, such as it is, indicates a different story— one that warrants formal discovery.  It shows that the Art Van Board of Directors were officers of its private equity owner, T.H. Lee, which had steered it into a disastrous LBO and steep decline. (AVF Holding Company Inc. Board Minutes, Apr. 2, 2020, attached hereto as **Exhibit 2**).  They were "out-of-the-money" custodians serving, in effect, the under-secured lenders.  Unsurprisingly, while the professionals were in Bankruptcy Court, approaching the temporary COVID issues with the constructive, problem-solving creativity valued there, the Board raced ahead to terminate the workforce permanently - triggering obligations that promptly led the cases to convert.

The WARN Act provides: "An employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A).  The Department of Labor's WARN regulation interprets "circumstances" as meaning those *outside* the company's control that are sufficiently extreme:

(1) An important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition ***outside the employer's control***. …

(2) The test for determining when business circumstances are not reasonably foreseeable focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market. …

20 C.F.R. § 639.9(b) (emphasis added). Whether the cause of the mass layoff's acceleration was the onrush of COVID-19 or the fated, final liquidity crisis in the long death spiral can be discerned in the statement of the parties before the Bankruptcy Court in March 2020.

In January 2020, as the world fell into the grip of COVID-19, Art Van fell into the control of its secured lenders. The company's situation became critical as its ABL facility borrowing base was further restricted and its access to credit tightened. (Ladd Declaration, D.I. 46-1 at 8, ¶13.)

On January 31, 2020, the World Health Organization issued a Global Health Emergency[4] and the U.S. declared a Public Health Emergency.[5] On February 5, the company defaulted on its ABL facility and Wells Fargo agreed to forbear until February 28 to allow it to explore a capital raise. But Wells Fargo took "cash dominion" and required the company to begin immediate GOB liquidation before the 28th if the effort was unsuccessful. (Ladd Declaration, D.I. 46-1 at 8, ¶14.)

In February, COVID-19 crossed paths with Art Van and it was fateful. T.H. Lee Partners had formed a Consortium with Art Van's founders to attempt the capital raise. But on February 27, COVID set off the sharpest fall of the stock markets since 2008, with the Dow falling 1,191 points, its largest one-day drop in history.[6] The Consortium purportedly failed to secure the necessary capital commitments because the coronavirus made the Consortium investors' unwilling to contribute the capital. (Ladd Declaration, D.I. 46-1 at 8-9, ¶15.) What followed was no surprise.

When Defendants filed their bankruptcy petition on March 8th, Defendants owed its secured lenders approximately $208.5 million: a Term Loan of $175 million under its Term Loan and $33.5 to Wells Fargo its ABL lender, all secured by its assets. (Ladd Declaration, D.I. 46-1 at 17, ¶31).

---

[4] *Coronavirus Declared Global Health Emergency by WHO*, BBC News, Jan. 31, 2020, available at https://www.bbc.com/news/world-51318246.
[5] *US Declares Public Health Emergency Over Coronavirus,* ABC News, Feb. 1, 2020, available at https://abcnews.go.com/Health/delta-suspends-us-flights-china-amid-coronavirus/story?id=68666037.
[6] *Dow Falls 1,191 Points – The Most in History*, CNN, Feb. 27, 2020, available at https://www.cnn.com/2020/02/27/investing/dow-stock-market-selloff/index.html.

Their only cash on hand was $11.6 million in cash dominion. (Transcript of Hearing on March 10, 2020, D.I. 46-1 at 78 line 19 to 79 line 6).

Under the plan budget, Defendants would sell collateral through GOB sales that would pay for expenses of Chapter 11 and pay down the ABL revolver. (Transcript of Hearing on March 10, 2020, D.I. 4-1 at 80 line 16 to 81 line 19). Under Wells Fargo's dominion order, Defendants would give Wells Fargo a schedule, saying they need certain things funded and the bank would fund based on the items that it approved to be funded. (*Id.*). Having received deposits from its Store Closing Sales from March 5-8, 2020, in excess of $23.0 million, Defendants reaped $8.0 million more from sales in the first week of its bankruptcy through March 15th. (Conversion Motion, D.I. 46-2 at 112, ¶22). Starting around March 14 some states in which Art Van operated issued "guidance" or closure orders for certain establishments. (Conversion Motion, D.I. 46-2 at 112-113, ¶¶ 22-23.) All these orders were "temporary." (*See, e.g.*, Wolf Order, D.I. 46-4 at 90; Whitmer Order, D.I. 46-4 at 93).

At the March 19 Court status conference, Defendants' counsel downplayed the impact of the government guidance and directives. Defendants' counsel touched on the "different buckets of stores" some of which were the subject of "going concern sales that were largely completed" and eight whose "store closing sales had begun before the filing" and others that were going to be the Levin-Wolf going concern stores." (Transcript of Conference on March 19, 2020, D.I. 46-5 at 25 line 19 to 26 line 7). Counsel then added that, as to those "where we still had ongoing GOBs and -- or were attempting to operate as much as possible in the ordinary course, the company has made the -- you know, the difficult decision, effective as of today, to tell employees not to report to work at those locations." (*Id.*, D.I. 46-5 at 25 lines 8-12).

Defendants' counsel stated the it was the company's "hope" that the locations it had "at least temporarily, shuttered" that day would not be "forever," but asserted the need to "adapt consistent with our obligations and fiduciary duties." (*Id.*, D.I. 46-5 at 25 lines 12-18).

Defendants' counsel echoed the sentiment of America's employers when it expressed the need for its clients to act as fiduciaries by adapting to the hoped-for temporary crisis that faced the country. Indeed, in the week Defendants let go their employees over 3.3 million others were filing for unemployment, nearly five times more than the one-week record set during the Great Recession.[7]

But many of those 3.3 million Americans were *not* laid off *permanently.* Employees may file for unemployment when they are no longer paid, such as when they were told to take temporary unpaid time off as in temporary layoffs or furloughs. Employers adopted such approaches, included pay cuts, or reduced hour arrangements rather that terminating their employees permanently, due to the temporary nature of COVID-19. To help them meet the unprecedented challenge, the federal government began enacting unprecedented solutions and support. On March 6, after Defendants gave 60 days' notice to its workforce, and prior to its bankruptcy filing, the president signed the first, $8 billion coronavirus relief bill.[8] The day prior to the second WARN notice, on March 18, he signed a $192 billion bill.[9] Then, on March 25, the Senate unanimously passed and the president signed two days later, the largest economic stimulus package in U.S. history - a $2.2 trillion dollar package that included, among other things, payroll money,

---

[7] *A Record 3.3 Million Americans Filed for Unemployment Benefits,* Washington Post, March 26, 2020, available at https://www.washingtonpost.com/business/2020/03/26/unemployment-claims-coronavirus-3-million/.
[8] *Trump Signs $8.3 Billion Emergency* Package, CBS News, Mar. 6, 2020, available at https://www.cbsnews.com/news/trump-signs-8-3-billion-emergency-package-to-combat-coronavirus/.
[9] *Trump Signs Coronavirus Relief Measure*, ABC News, Mar. 18, 2020, available at https://abcnews.go.com/Politics/mcconnell-urges-colleagues-support-coronavirus-economic-relief-bill/story?id=69664853.

unemployment benefits money, and health care coverage.[10]  Starting in mid-March, temporary paid time in the form of furloughs, layoffs and workforce reductions become prevalent. Millions of employees were put on extended leaves while they waited (and hoped) to be recalled back to work.  While many others lost their jobs, only a dozen WARN Act cases arose in the next six months.[11]  Until today, only two COVID-era WARN Act cases have been reported in the case law - suggesting that COVID did not require kneejerk terminations violating WARN. *See Benson v. Enter. Leasing Co. of Fla., LLC*, No. 6:20-CV-891-ORL-LRH, 2021 WL 1078185, (M.D. Fla. Jan. 4, 2021), vacated sub nom. *Benson v. Enter. Leasing Co. of Orlando*, LLC, No. 6:20-CV-891-RBD-LRH, 2021 WL 1080914 (M.D. Fla. Feb. 4, 2021); *Easom v. US Well Servs., Inc*., 527 F. Supp. 3d 898, 900 (S.D. Tex. 2021).

Upon learning that the Defendants had suspended store operations, the Court "cut to the chase" and inferred that Defendants' counsel was communicating that the final interim cash collateral order hearing would not be going forward the next day, on March 20.  Although not denying it, Counsel segued into a discussion of the company's alternatives to dispel any thought of an immediate shutdown.  (Transcript of Conference on March 19, 2020, D.I. 46-5 at 27 lines 3-14).

Defendants' Counsel sought to immediately make "clear" that "we are trying to explore with our lenders and our other stakeholders … other options short of outright liquidation."  (*Id.*, D.I. 46-5 at 27 lines 9-14).  Counsel specifically mentioned the ongoing "Craftworks" case currently pending before Judge Shannon, in which a pause in the Chapter 11 closing sale plan process was being entertained to adapt to the COVID directives.  (*Id.*).  Counsel continued by intoning the spirit of problem-solving and dialogue:

---

[10] *Trump Signs $2 Trillion Coronavirus Relief Bill*, CNBC, Mar. 27, 2020, available at https://www.cnbc.com/2020/03/27/house-passes-2-trillion-coronavirus-stimulus-bill-sends-it-to-trump.html.
[11] *As Fall Approaches, WARN Act Lawsuits Likely to Heat Up*, National Law Review, Sept. 1, 2020, available at https://www.natlawreview.com/article/fall-approaches-warn-act-lawsuits-likely-to-heat.

So let me just say then, conceptually, we are looking at the possibility of…going idle or going into a state of dormancy for a period of time, and then the possibility then of either…reopening stores, some subset of stores as, either in furtherance of the going concern transaction…or…closing sales and an orderly liquidation, you know, essentially, once the economic and retail environment and the safety environment have improved to a degree that we can do that. … [T]here are a number of scenarios under consideration… we are right now, engaging in a dialogue with Wells Fargo and our term loan lenders to see if there's a way to pursue that alternative.

(*Id.*, D.I. 46-5 at 27 line 23 to 28 line 13).  Defendants' counsel warned, however, that Wells Fargo needed to cooperate, stating the need for

cooperation from the ABL agent and the term loan lenders and… assurances that, while we are having these dialogues…they'll ***take no precipitous action*** to make that -- an already difficult situation worse by [] sweeping all of the cash, for example, that are in the debtors' cash collection accounts and leaving us without even the cash necessary to fund those operating and restructuring expenses already incurred or that might be incurred imminently, as we're [] trying to navigate this situation.

(*Id.*, D.I. 46-5 at 28 line 17 to 29 line 3) (emphasis added).

There was a marked difference, however, between what Defendants told the Court and what it told its employees on March 19.  That day, Defendants sent WARN notices telling their thousands of employees that they were permanently terminated. They would receive no pay and no benefits, including health insurance, after that day.  (WARN Notice, D.I. 46-5 at 14).  But, in Bankruptcy Court, it was Defendants' counsel who was pressuring Wells Fargo not to act precipitously.

Wells Fargo's counsel, Jennifer Feldsher stated: "Debtors' decisions, unfortunately, are coming at us minutes before these hearings."  (Transcript of Conference on March 19, 2020, D.I. 46-5 at 30 lines 1-2).  She continued that while the bank wanted "to try to find a path forward…for all stakeholders," the debtors here, "as opposed to other cases," had not "fully come to their creditors, other than to say this is somebody else's problem and, put -- you know, fix it for us or don't sweep or do these things."  (*Id.*, D.I. 46-5 at 30 lines 2-9).  She said "unfortunately, we haven't gotten the information that we need from the company to be able to even consider a full wind-down plan.  (*Id.*, D.I. 46-5 at 30 lines 16-18).

Creditors' committee counsel, Mr. Sandler, appointed the day before, carried forward the spirit of cooperation and resistance to simply "pull the plug" as the hallmarks of professionalism. (*Id.*, D.I. 46-5 at 36 lines 14-19). He said "there are other things besides, you know, dollar recoveries." (*Id.*, D.I. 46-5 at 35 lines 15-17). He mentioned the hope that "44 stores would be saved, thousands of jobs would be saved. Maybe that will happen down the road." (*Id.*, D.I. 46-5 at 35 lines 18-21). He emphasized the probability that putting the winddown "on ice" would be advantageous:

> We're talking about something that is not perishable. [F]urniture, whether[] it's in the store today or…a month…or two months from now, it's still the same furniture. So it should be relatively easy to shut the debtor down without any value that would dissipate because of the furniture somehow [] getting destroyed or damaged.

(*Id.*, D.I. 46-5 at 36 lines 6-13). But, he continued, "pulling the plug" would be detrimental:

> Restructuring professionals are…supposed to come up with creative solutions to very very tough problems. And it may be easy to … pull the plug and say let's convert the case to a Chapter 7. I'm not really sure what that gets you. … And it seems to me that this is a creative approach to put everything on ice. And hopefully [] at some time period, whether it's 30 days, 60 days, 90 days…to [] turn the lights back on and resume the liquidation of the stores and hopefully find a going concern for the Wolf Levin properties.

(*Id.*, D.I. 46-5 at 36 line 14 to 37 line 3). He said the committee favored "put[ting] everything on ice and let's come back to in[]a month or two and see." (*Id.*, D.I. 46-5 at 37 lines 4-9).

As he spoke these words, Mr. Sandler, the Court, and perhaps even Defendants' counsel may not have realized that the Defendants *had* effectively "pulled the plug" that day. Defendants had already terminated their workforce *permanently* triggering insurmountable obligations. This came to light at the March 31 conference, when Defendants announced the cases were about to convert to Chapter 7. As counsel made clear, the company had, on March 19, steered the company off the course charted by counsel in open court. Without consultation or communication, Defendants accelerated the terminations and resultant payments with the improbable expectation that the bank would cover them, including the D&O liability Defendants had brought upon themselves.

Reporting to the Court what had happened, Defendants' counsel Mr. Werkheiser put it genteelly that "we were not able to get to a point where we had the agent support and consent for the mothball arrangement primarily because of the company's liquidity issues and cash needs, both as they exist today based on obligations that have accrued thus far since the filing and the expected obligations[.]" (Transcript of Hearing on Mar. 31, 2020, D.I. 46-5 at 53 lines 1-6).

Mr. Werkheiser then explained that many of the more than 4,000 employees were salespeople. They earned commission when furniture was delivered - which meant a "long tail" of outstanding commissions on over $30 million in sales, earned "in the couple of weeks that the debtors were operating in bankruptcy" were suddenly now due. (*Id.*, D.I. 46-5 at 53 lines 15-21). Moreover, there was an even more substantial tail created by the partially self-funded health plan which had been cancelled on March 19. Those obligations were "approaching $10 million" and the cash in the estate was, he believed, $12 to $13 million. (*Id.*, D.I. 46-5 at 53 line 22 to 54 line 7). He said that unless the company could get beyond "the next 12 hours," the debtors would "likely have no choice but to move forward with seeking conversion of these cases to a Chapter 7 liquidation" - insinuating that the estate's fate was up to others. (*Id.*, D.I. 46-5 at 56 lines 15-22).

Wells Fargo's counsel then presented the stark reality: the problem was Defendants' *uncontemplated mass terminations*, which accelerated obligations - already at $16.5 million - that Defendants insisted the bank underwrite to insulate their D&O's.

Ms. Feldsher noted the importance of a "willing partnership between the debtors and their stakeholders." (*Id.*, D.I. 46-5 at 58 lines 5-10). To that end, "Wells Fargo has funded every single payroll request that the debtors have made for current pay." (*Id.*, D.I. 46-5 at 58 lines 20-23). But Defendants' decision to immediately suspend operations, including where there were no shutdown orders in place, and "to terminate all" or "significantly all of their employees," she said, "was not

something that was done in coordination with the lenders, either the ABL lender or the term lender, or even the [Gordon Brothers store-closing] consultant …who…had remained to support the debtor's efforts to try to continue a GOB sale." (*Id.*, D.I. 46-5 at 59 lines 1-13).  Ms. Feldsher continued: "[s]o, as a result of terminating their employees, … the debtors now have significant accrued PTO commissions, other benefits related to the terminated employees as well as healthcare obligations.  Most of these were not included in any budget and certainly in the cash collateral budget because there was **no contemplation of a wholesale mass termination of employees**." (*Id.*, D.I. 46-5 at 59 lines 14-20) (emphasis added).

She indicated these obligations could have been avoided had employees been laid off temporarily: "Could these have been mitigated if employees had been furloughed [or by] less drastic more spaced out termination we will never know… but now these expenses exist." (*Id.*, D.I. 46-5 at 59 lines 20-25).  "[J]ust the employee obligation alone" were over $14 million.  (*Id.*, D.I. 46-5 at 60 lines 1-4).  But Defendants were seeking another $2.5 million for a professional fee carve out - thus the demand of the estate was for $16.5 million not taking into account any other expenses that might result.  (*Id.*, D.I. 46-5 at 60 line 22 to 61 line 2).  She stated that "there is no scenario the debtors have put forth that they believe provides the ABL lenders with payment in full." (*Id.*, D.I. 46-5 at 61 lines 8-10).  Wells Fargo had "no issue paying for employee wages that are coming due" for further operations but could not make the blank-check assurances Defendants were demanding (*Id.*, D.I. 46-5 at 61 line 21 to 62 line 4). Ms. Feldsher pointed out Wells was being asked to undertake "obligations for which [Defendants] perceive that there might be D&O liability." (*Id.*, D.I. 46-5 at 62 lines 17-19).

She stated that Defendants would only provide the information creditors needed if Wells Fargo made "guarantee that all potential liabilities for the directors and officers are taken care of full

stop." (*Id.*, D.I. 46-5 at 63 lines 16-21). Wells Fargo, she explained, was "not in a position to do that today. We simply can't." (*Id.*, D.I. 46-5 at 63 lines 21-25). As Ms. Feldsher described it, Wells Fargo would "prefer that we did this consensually" but Defendants were making "late in the evening demands that say you must pay what we believe are $16 and a half million dollars of obligations and we'd like to take that money today." (*Id.*, D.I. 46-5 at 64 lines 1-12). Ms. Feldsher ended by returning to Wells' commitment:

> If the debtors want to work cooperatively, we are here. … we will fund payroll expenses for employees and [] we will fund payroll expenses for employees that remain at the company today and certain those that we need going forward. But we cannot give the debtors assurances that we are going to fund something to deal with D&O liabilities today. It's just not appropriate and we're not in position to do so.

(*Id.*, D.I. 46-5 at 65 line 19 to 66 line 1).

When the Court tried to drill down on the unfunded employee obligations, Ms. Feldsher asked to speak, but Mr. Werkheiser interjected, and was told:

> THE COURT: …You will get your opportunity to speak. I'm trying to figure out the facts and, frankly, I'm not getting them very well from you where I have to ask your client and others to tell me what's actually going on.

(*Id.*, D.I. 46-5 at 79 line 23 to 80 line 2).

As Defendants' financial advisor, Mr. Stogsdill, had informed the Court, the commissions for March would have been paid in April but, "because we terminated everybody and shut down the operations, we moved them up to be paid one to two weeks after the closing" - i.e., $2.2 million had to be paid that very week. (*Id.*, D.I. 46-5 at 77 lines 2-11).

Ms. Feldsher restated the problem: "So, the commissions, Your Honor, have not been paid yet and they have not been paid because as you heard from Mr. Werkheiser, *these were delayed and they were accelerated*, as Mr. Stogsdill said. *They have been accelerated unilaterally by the company to be payable now.* (*Id.*, D.I. 46-5 at 81 lines 21-25) (emphasis added). There were no provisions for those obligations or the unpaid PTO or vacation that were triggered by the

20

unanticipated termination of "all of their workforce." (*Id.*, D.I. 46-5 at 81 lines 6-8). Emphasizing

the issue of transparency, she stated:

> "We've tried very very hard with the debtors … but we need definitive numbers,
> not estimates. We need actual numbers. We need to know exactly what is being
> requested.

 (*Id.*, D.I. 46-5 at 83 lines 4-9).

Defendants' counsel argued that Wells Fargo shared the blame for the "impossible situation,"

because as the ABL lender, it had committed to the payroll expenses and it needed to "pay the

freight," including the healthcare plan benefits. (*Id.*, D.I. 46-5 at 83 lines 21-23). He stated:

> I do appreciate the difficult situation and perhaps the impossible situation that the
> court is in and everybody else is in. But what I'm talking about is enforcing a choice
> that not just the debtor but the lenders made in the order that they agreed to and had
> Your Honor enter. That order explicitly says that the debtors had the ability to use
> the cash collateral to meet the payroll obligations.

(*Id.*, D.I. 46-5 at 88 lines 13-20). But the Court referred Mr. Werkheiser to the interim cash

collateral order:

> THE COURT: It says payroll obligations and irreparable harm expenses.
>
> MR. WERKHEISER: Yes, Your Honor.
>
> THE COURT: And the only payroll obligations that I've heard are salary, wages,
> and commissions that have been (indiscernible) but unpaid through today. …The
> healthcare reimbursements are not payroll obligations. They're just not. Under no
> reasonable definition of what payroll obligations are would they include healthcare
> reimbursements under a terminated healthcare policy, many of which are
> prepetition. And it's terrible and it's ridiculous that in this country you have to have
> a job to have health insurance, but that is the law.

(*Id.*, D.I. 46-5 at 89 lines 1-14).

Of course, twelve days earlier, on March 19, Defendants had eliminated the employees' jobs

and health insurance at the height of the pandemic - passing the unpredictable risks on to them.

Just as Defendants insinuated to the Court that the closures were temporary, and that they would

work constructively with the stakeholders, they had in fact foreclosed any opportunity to defer

obligations and negotiate alternatives by taking unilateral permanent action against the employees.

Responding to the Court, Mr. Werkheiser called the employee obligations the "dirty laundry" which he had not prepared himself to discuss: "I understand where the court is coming from. Your Honor, again, despite us airing our *respective* dirty laundry in front of the court today which is not what we had set out to do this afternoon[.]" (*Id.*, D.I. 46-5 at 89 lines 15-19) (emphasis added). He again put it on the lenders to "pay the freight." (*Id.*, D.I. 46-5 at 90 lines 2-21).

Although Defendants may have been liberal in passing some taint along with their burdens, they were less liberal when it came to sharing their financials and plans. This observation is not a matter of hindsight: it was articulated in court at the time. Defendants froze out the stakeholders and ran roughshod over its "Planned Liquidation Process" deciding to cause the ultimate liquidity crises when terminating its workforce. No one had demanded that they do that on March 19 - not Wells Fargo and certainly not COVID-19. What COVID-19 demanded of employers was a transparent, problem-solving approach - the hallmark of Chapter 11 stewardship, not what Defendants did.

WARN, in particular, requires such transparency. Congress required employers to spell out specifically in their WARN notice what prevented them from providing full notice. 29 U.S.C. § 2102(b)(3). That means Defendants had to identify in the March 19 notice why they could not keep employees employed until May 5 as promised - with or without pay or deferments. The notice provided platitudes, not specifics: "Since initial notice, the Company has been impacted by the novel COVID-19 virus and the resulting, and sudden, negative economic impact." (WARN Notice, D.I. 46-5 at 14). COVID-19 forced every employer to adapt. But that did not result in universal mass terminations. It was not COVID-19 alone, but COVID-19 *plus something else* that caused Defendants to permanently terminate its workforce on March 19. In the end, it was their

own impetuosity. Defendants chose to keep others in the dark, pull the plug and play the blame game. Defendants, not an unforeseeable outsider - caused the mass layoff that day.

Summary judgment is not appropriate in favor of Defendants, but it may well be in favor of Plaintiffs - even before the commencement of discovery.   The statement in a shortened WARN notice must provide "reasonably specific facts that make an exception to the statutory notice period applicable, 'providing an adequate, specific explanation to affected workers'"). *Grimmer v. Lord Day & Lord,* 937 F.Supp. 255, 256-57 (S.D.N.Y.1996), *cited in In re Tweeter OPCO,* 453 B.R. 534, 547 (Bankr. D. Del. 2011) (striking UBC defense because notice merely stated: "Unfortunately, due to adverse business conditions outside our control, we are not able to give you advance notice.").  To say the company was "impacted by the novel COVID-19 virus … resulting, and sudden, negative economic impact" is amorphous.   It would permit Defendants to "assert litigation-convenient but factually post-hoc justifications for their actions" which is why their defenses may warrant dismissal as a gating issue. *Newman as Tr. of World Mktg. Tr. v. Crane, Heyman, Simon, Welch, & Clar*, 435 F. Supp. 3d 834, 843–44 (N.D. Ill. 2020), *quoting Sides v. Macon Cty. Greyhound Park, Inc.*, 725 F.3d 1276, 1285-86 (11th Cir. 2013). *See also In re Dewey & Leboeuf, LLP*, 507 B.R. 522, 533-34 (Bankr. S.D.N.Y. 2014) (striking affirmative defenses where notice stated the firm was "unexpectedly experiencing extraordinary difficulties [and] [u]nfortunately, the situation is deteriorating at a more rapid pace than was initially anticipated").

## V.  Defendants Have Not Proved that COVID-19 is a Natural Disaster or that the Layoff was Due to it

To carry their burdens of proof, Defendants must prove that COVID-19's spread was a natural disaster, and that the mass layoffs were a direct result of COVID-19.   They have not done so because they cannot. The WARN Act provides an exception to the 60-day notice requirement in

the case of "natural disaster."  It provides in pertinent part:

> No notice under this chapter shall be required if the plant closing or mass layoff is due to any form of natural disaster, such as a flood, earthquake, or the drought currently ravaging the farmlands of the United States.

29 U.S.C. § 2102 (b)(2)(B). Although Congress did not define the phrases "natural disaster" or "due to," it expressly delegated to DOL authority to promulgate interpretive regulations.  29 U.S.C. § 2107. In the Third Circuit, these regulations are given "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Ciarlante v. Brown & Williamson Tobacco Corp.*, 143 F.3d 139, 145 (3d Cir. 1998), *citing Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843–44, (1984).  The regulation states in pertinent part:

> (1) Floods, earthquakes, droughts, storms, tidal waves or tsunamis and similar effects of nature are natural disasters under this provision.
>
> (2) To qualify for this exception, an employer must be able to demonstrate that its plant closing or mass layoff is a direct result of a natural disaster.
>
> (3) While a disaster may preclude full or any advance notice, such notice as is practicable, containing as much of the information required in §639.7 as is available in the circumstances of the disaster still must be given, whether in advance or after the fact of an employment loss caused by a natural disaster.

20 C.F.R. § 639.9(c)(1)-(3).  To ensure the exception is narrowly construed, the DOL added:

> (4) Where a plant closing or mass layoff occurs as an indirect result of a natural disaster, the exception does not apply but the "unforeseeable business circumstance" exception described in paragraph (b) of this section may be applicable.

20 C.F.R. § 639.9(c)(4).

For Defendants to carry their defense, they must prove that the SARS-CoV-2 virus is naturally occurring and that the spread of COVID-19 was free of human intervention. *Easom v. US Well Services, Inc.*, 527 F. Supp. 3d 898, 907 (S.D. Tex. 2021), citing *Carver v. Foresight Energy LP*, No. 3:16-CV-3013, 2016 WL 3812376, at *1, 4 (C.D. Ill. July 12, 2016), ("human involvement in the origins of the combustion events would seem to preclude the events from being considered a

natural disaster.)" Although the Defendants rely on *Easom,* that case was decided in August 2020, well before the scrutiny over COVID-19's origins shifted from the wet market to the laboratory in Wuhan. Nor were those points raised in the only case cited in *Easom* that COVID-19 "emerged naturally." *AB Stable VIII LLC v. Maps Hotels and Resorts One LLC*, CV 2020-0310-JTL, 2020 WL 7024929, at \*58 (Del. Ch. Nov. 30, 2020). Hewing to the general rule recognized by the *Eason* and *Carver* courts, the Delaware Chancery court opined that a human intervention such as the human creation of COVID-19 as a "bioweapon", if true "could undermine its status as natural disaster" but that the record did not support that contention. *Id*. at fn. 214.

In the absence of any certainty regarding origins of COVID-19, no court can "rule" as to whether COVID-19 is, or is not, a natural disaster at this point. Defendants cannot avail themselves of this affirmative defense on which they bear the burden of proof, for there is no proof at this time. The natural inference that the Court must make in Plaintiffs' favor, however, is bolstered by the intelligence community. It accords greater "confidence" to the laboratory leak theory than any other. Although Defendants are correct that the "bioweapon" theory has been effectively debunked, the report requested by President Biden elevated the creditability of the "laboratory leak" theory above the "market" hypothesis. After examining all available intelligence, the National Intelligence Council and "four [Intelligence Community] elements" assessed with *low confidence* that the initial SARS-CoV-2 infection was most likely caused by natural exposure to an animal infected with it. (Report, D.I. 46-5 at 173) (emphasis added). But "one Intelligence Community element assesse[d] with *moderate confidence* that the first human infection with SARS-CoV-2 most likely was the result of a laboratory-associated incident. (*Id.*) (emphasis added). These analysts assessed that it probably involved experimentation, animal handling, or sampling by the Wuhan Institute of Virology. They gave "weight to the inherently risky nature of

work on coronaviruses." (*Id.*)  In the end "[a]nalysts at three IC elements remain unable to coalesce around either explanation without additional information. (*Id*.)  As a matter of summary judgment, however, Plaintiffs are entitled to the benefit of the laboratory origin inference.

Even assuming *arguendo*, COVID-19 is a "natural disaster" Defendants have not proved that the mass layoff directly resulted from it, as opposed to being an indirect result.  The only authority to rule on this issue held mass layoffs caused by COVID-19-related business downturns are only "indirectly" caused by COVID-19.  *Benson v. Enter. Leasing Co. of Fla., LLC*, 620CV891ORL37LRH, 2021 WL 1078185, at *4 (M.D. Fla. Jan. 4, 2021), *vacated sub nom. Benson v. Enter. Leasing Co. of Orlando, LLC*, 6:20-CV-891-RBD-LRH, 2021 WL 1080914 (M.D. Fla. Feb. 4, 2021). Neither in *Benson*, nor here, has anyone alleged that the COVID-19 disease harmed anyone directly, as a flood or earthquake might destroy a factory.  *Id*. at *4   As the *Benson* Court described: "a dramatic downturn in business" is "more akin to a factory that closes after nearby flooding depressed the local economy." *Id*.

Here, Defendants appear to be arguing that their sales volume dropped due to COVID-19 related restrictions, which led them to lay off their employees.  That would be an indirect result of COVID-19, negating the natural disaster defense.  Only a UBC defense could be available.  *Id.*

The *Benson*  decision stands, for the case has settled.  For its part, the *Easom* Court interpreted the "due to natural disaster" clause in the WARN Act as offering the widest possible, "but for" scope.  *Easom*, 527 F. Supp. 3d at 915.  But that interpretation does not withstand scrutiny.  First, the Court gave no deference to DOL's express and reasonable interpretation of  the words "due to"  as precluding the limitless "indirect" effects of natural disasters.  Second, the grounds on which the *Easom* Court invalidated the regulation was wholly unrelated to DOL's interpretation of those words. The *Easom* Court did so based on its misconstruction of other words of the statute as DOL

has now explained in an amicus brief filed on its behalf in *Benson*'s Court of Appeals docket  (See Amicus of United States, attached hereto as **Exhibit 3**).

The *Easom* Court ruled the Department of Labor had no authority to prescribe its rule that "[a]n employer relying on this subsection shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." 20 C.F.R. § 639.9(c)(3); *Easom*, 527 F. Supp. 3d at 906.

The *Easom* Court found that incompatible with the statute itself which states that "no notice under this chapter" is necessary in the case of a natural disaster.  29 U.S.C. § 2102 (b)(2)(B).  *See Easom*, 527 F. Supp. 3d at 906.  But the "no notice" provision refers to the advance notice "in this chapter."   The "chapter" is the entire WARN Act whose sole purpose is to a mandate advance notice.  The sentence in the sub-subsection relieves *advance* notice because, as the DOL explains, it would be absurd to require *advance* notice ahead of earthquakes and the like.   Congress unambiguously stated in § 2102 (b)(3) that the employer relying on subsection (b) (faltering company, UBC, and natural disasters) give as much notice as practicable.  (Ex. 3 at 17-18).

Inexplicably, the *Easom* court did not cite or refer to Congress's words in 2102(b)(3). It may have, therefore, wrongly assumed that the "such notice as is practicable" language was a creature of the Department of Labor rather than the statute itself.  Although the *Easom* court relied on several courts that simply quoted the "no notice" phrase from the natural disaster clause, none of those cases involved a natural disaster defense.

The defendant in *Benson* sought, in its aborted appeal, to have the Eleventh Circuit Court of Appeal adopt the *Easom*'s court's findings, including its invalidation of the Secretary's regulation and broad interpretation of the natural disaster's causation standard.  The DOL's amicus brief sets forth the agency's interpretation of its own rule, which is entitled to deference. *Kisor v. Wilkie*,

139 S. Ct. 2400, 2424 (2019) (Roberts, J. concurring in part) ("the reasons that a court might be persuaded to adopt an agency's interpretation of its own regulation: The agency thoroughly considered the problem, offered a valid rationale, brought its expertise to bear, and interpreted the regulation in a manner consistent with earlier and later pronouncements."); *Connecticut Gen. Life Ins. Co. v. C.I.R.*, 177 F.3d 136, 144 (3d Cir. 1999) ("Once an agency has adopted regulations interpreting the statute, the agency's consistent interpretation of its own regulation will also be accorded substantial deference" and court "must defer to the [agency's] interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation'"), *quoting Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

The DOL's amicus brief relies, in part, on the authority of the Third Circuit, citing *Hotel Emps. & Rest. Emps. Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 182 (3d Cir. 1999). (Ex. 3 at 10, 12). The brief explains that "Congress understood the natural disaster exception as applying in a narrow range of circumstances—i.e., where advance notice is generally not practicable." (*Id.* at 19). And that the Secretary sensibly read "due to" as requiring layoffs be the "direct result" of a natural disaster, while recognizing that a layoff indirectly caused by a natural disaster might be covered by the broader unforeseeable business circumstances exception. (*Id.*)

Given this stage of the litigation, in which inferences in favor of the non-movant are required, Defendants have not proved their claim that COVID-19 is a natural disaster that obviates all notice.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that this Court deny the Trustee's motion.

Dated: December 3, 2021                    Respectfully Submitted,

/s/ Michael J. Joyce
Michael J. Joyce (No. 4563)
**JOYCE, LLC**
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302)-388-1944
Email: mjoyce@mjlawoffices.com

OF COUNSEL :

René S. Roupinian (*admitted pro hac vice*)
Jack A. Raisner (*admitted pro hac vice*)
**RAISNER ROUPINIAN LLP**
270 Madison Avenue, Suite 1801
New York, New York 10016
Telephone: (212) 221-1747
Facsimile: (212) 221-1747
Email: rsr@raisnerroupinian.com
Email: jar@raisnerroupinian.com

*Attorneys for Plaintiffs and the putative class*