## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | Case No. 20-10553 (CSS) |
| ART VAN FURNITURE, LLC, et al., | ) | |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| TODD STEWART and JENNIFER | ) | |
| SAWLE on behalf of themselves and | ) | |
| all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Adv. Pro. No.: 20-50548 (CSS) |
| | ) | Related Adv. Docket No.: 43 |
| ART VAN FURNITURE, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION[1]

**JOYCE, LLC**
Michael J. Joyce
1225 King Street
Wilmington, DE  19801

Counsel for Todd Stewart,
Jennifer Sawle and the
Putative Class

**PACHULSKI STANG ZIEHL**
**& JONES LLP**
Bradford J. Sandler
Beth Levine
Colin R. Robinson
Peter J. Keane
919 North Market Street, 17th Floor
Wilmington, DE  19801

Counsel for Alfred T. Guiliano
Chapter 7 Trustee

Date: March 21, 2022

Sontchi, J. _____

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

<u>INTRODUCTION</u>

Plaintiffs Todd Stewart and Jennifer Sawle (the "Plaintiffs") filed an adversary complaint alleging that the Debtors[2] violated the Federal Worker Adjustment and Retraining Notification Act (the "WARN Act")[3] by failing to provide them (and similarly situated persons) with at least 60 days' notice of their employment termination.  Before the Court is the Chapter 7 Trustee's Motion for Summary Judgment asserting three defenses to the Complaint: (i) notice was not required because the relevant Debtors were "liquidating fiduciaries" and not "employers" under the WARN Act; (ii) notice was not required because an "unforeseeable business circumstance" caused the mass layoffs; and (iii) notice was not required because a natural disaster caused the mass layoffs.  For the reasons set forth herein, the Court concludes that both the unforeseeable business circumstance and natural disaster exceptions apply here and, therefore, the Debtors were not required to provide the 60-days WARN Act notice to employees before the March 20, 2020 layoff.  The Trustee's Summary Judgment Motion will be granted.

<u>JURISDICTION</u>

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in the United States Bankruptcy Court for the District of Delaware

---

[2] The Debtors in these cases are: Art Van Furniture, LLC; AVF Holding Company, Inc.; AVCE, LLC; AVF Holdings I, LLC; AVF Holdings II, LLC; AVF Parent, LLC; Levin Parent, LLC; Art Van Furniture of Canada, LLC; AV Pure Sleep Franchising, LLC; AVF Franchising, LLC; LF Trucking, Inc.; Sam Levin, Inc.; and Comfort Mattress LLC (collectively, the "Debtors").

[3] 29 U.S.C. § 2101 *et seq.* (2022).

pursuant to 28 U.S.C. § 1409.  This is a core proceeding pursuant to § 157(b)(2)(A), (B) and (O), and this Court has the Constitutional authority to enter a final order.

<u>FACTS</u>

The Trustee filed a Statement of Undisputed Facts in Support of the Summary Judgment Motion (the "SOF").[4]  The Plaintiffs filed a response to the Trustee's SOF, often objecting to the Trustee's characterization of certain facts, and arguing that the Plaintiffs were not given an adequate opportunity to conduct discovery before the Trustee filed the Summary Judgment Motion.[5]  Below, however, are the facts as agreed to by the Plaintiffs and facts arising from orders or transcripts in this bankruptcy case. Because the Court concludes that this combination of undisputed facts and facts in the record provide a sufficient basis for ruling on the Trustee's Summary Judgment Motion, the Plaintiffs' Cross-Motion to Defer Ruling is denied.[6]

Art Van Furniture, LLC ("Art Van") was a brick-and-mortar furniture and mattress retailer headquartered in Warren, Michigan.[7]  Art Van was founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated

---

[4] Adv. D.I. 45.

[5] Plaintiff's Response to Trustee's Statement of Undisputed Facts (Adv. D.I. 50) ("Pl. Resp. to SOF").

[6] Plaintiffs' Brief in Opposition to Trustee's Motion for Summary Judgment and Cross-Motion to Defer Ruling (Adv. D.I. 49).

[7] Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC in Support of Chapter 11 Petitions and First Day Motions (Main Case D.I. 12), (the "Ladd Decl.") at ¶ 5.

with Thomas H. Lee Partners, L.P. ("THL") in March 2017.[8]  Pennsylvania-based Levin

Furniture and Wolf Furniture were acquired by Art Van in November 2017.[9]

On March 8, 2020, when the Debtors filed chapter 11 bankruptcy petitions, the

Debtors operated 169 locations (including 92 furniture and mattress showrooms and 77

freestanding mattress and specialty locations) throughout Michigan, Indiana, Ohio,

Illinois, Pennsylvania, Maryland, Missouri, and Virginia.[10]

In the months leading up to the Petition Date, Art Van was struggling under the

weight of poor sales and $208.5 in secured debt encumbering substantially all of its

assets, including (i) $33.5 million in an asset-backed loan ("ABL Loan") from Wells

Fargo Bank ("Wells Fargo") and (ii) a $175 million term loan (the "Tern Loan") from FS

KKR Capital Corp. (the "Term Lenders").[11]

On February 5, 2020, Art Van defaulted on the ABL Loan and obtained a

forbearance from Wells Fargo through February 28, 2020, giving it 23 days to find a

buyer, an investor or a means of recapitalizing the business.[12]  The Debtors were unable

to secure financing or attract a going concern buyer by the February 28, 2020 deadline.[13]

---

[8] Ladd Decl. at ¶ 5.

[9] Ladd Decl. at ¶ 5.

[10] Id.

[11] Pl. Resp. to SOF, ¶ 3.  The Court notes that the Trustee's SOF contains citations to declarations, orders, transcripts, news articles, and other documents to support the facts stated therein.  Unless the Court deems it helpful to a particular undisputed fact, those internal citations are not repeated here.

[12] *Id.* ¶ 4.

[13] *Id.* ¶ 5.

The Debtors negotiated a wind-down budget with Wells Fargo, hired a liquidator, and announced publicly that they were going out of business.[14]

On March 4, 2020, debtor Sam Levin, Inc. ("SLI") entered into a letter agreement (the "Levin LOI") pursuant to which SLI agreed to sell 44 stores (most of which were in Pennsylvania), two distribution centers and certain other assets (the "SLI Assets") to Robert Levin (the "Levin Sale").[15]  The Levin LOI contemplated that the Levin Sale stores would continue operating, pending the closing of the Levin Sale.[16]  Robert Levin agreed to extend $10 million of debtor-in-possession ("DIP") financing to SLI (the "Levin DIP Loan") to facilitate the Levin Sale, which $10 million then would be repaid with and deducted from the sales proceeds of the Levin Sale.[17]

On March 5, 2020, Art Van publicly announced that it was liquidating and going out of business.[18]  Also on March 5, 2020, Art Van issued a WARN Act notice (the "First WARN Notice") to approximately 1,400 potentially affected employees. Providing, in part, that:[19]

> Art Van Furniture, LLC (the "Company") made the difficult decision to winddown its operations, which will include the closure of [certain

---

[14] Id.

[15] Id. ¶ 6.

[16] Id. ¶ 7.

[17] Id.

[18] Pl. Resp. to SOF, ¶ 8.

[19] Id. ¶ 9.  See also Declaration of Bradford Sandler in Support of Chapter 7 Trustee's Motion for Summary Judgment (the "Sandler Decl.") (Adv. D.I. 46), Ex. G.  The WARN Act notice attached as Exhibit G addresses only seven Michigan facilities, but the SOF claims that similar notices were sent to two Illinois facilities and one Pennsylvania facility.  The Plaintiffs do not dispute that the Debtors sent WARN Act notices "to some of [the Debtors'] employees on March 5," but it is unclear whether WARN Act notices were sent to facilities other than the ones located in Michigan.

facilities], and will be permanently terminating the employment of all employees at these locations.

. . . .

While an exact date has not yet been established for these closures, it is anticipated that your employment with the Company will terminate on May 5, 2020 or a date within 14 days thereafter which may be provided to you by the Company (your "Termination Date").[20]

The Debtors commenced store closing sales (the "GOB Sales") and deposits from inventory sales occurring between March 5, 2020 through March 8, 2020 were in excess of $23 million.[21]

On March 8, 2020 (the "Petition Date"), the Debtors filed their Chapter 11 Cases and filed first day motions to obtain approval of, *inter alia*, the Wind-Down Budget, the Levin DIP, the GOB Sales, and the Consulting Agreement with the Liquidator.[22]   On March 11, 2020, the Bankruptcy Court entered an interim cash collateral order (the "Interim CC Order"), authorizing the Debtors to use cash collateral in accordance with the Wind-Down Budget until April 7, 2020 (unless terminated earlier due to default or entry of a final order) to conduct the GOB Sales.[23]

On March 13, 2020, then-President Trump declared a national emergency concerning the novel coronavirus disease (COVID-19) outbreak.[24]   By March 14, 2020 Governor Tom Wolf of Pennsylvania issued guidance urging all non-essential

---

[20] *Id.*

[21] Pl. Resp. to SOF, ¶ 10.

[22] *Id.* ¶ 11.  Capitalized terms not defined herein are defined in the SOF.

[23] *Id.* ¶ 13.

[24] *Id.* ¶ 15.

businesses to close.[25]   Two days later, Governor Wolf repeated and amplified that guidance, declaring: "The Wolf Administration is relying on businesses to act now before the governor or the Secretary of Health finds it necessary to compel closures under the law for the interest of public health . . . ."[26]

On March 16, 2020, Governor Gretchen Whitmer of Michigan entered an executive order that closed Michigan's bars, theaters, casinos, and other public spaces.[27] Governor Whitmer urged Michigan residents to "mak[e] smart choices" by "not putting [themselves] or others at risk by going out in public unless it is absolutely necessary."[28]

On March 19, 2020, Pennsylvania issued a "stay at home" or "shelter in place" order.[29]  Similar orders soon followed in Michigan, Ohio, and Illinois, all of which were in lock-down by March 23, 2020.[30]

During the initial days of the GOB Sales from March 5-8, 2020, deposits from inventory sales were in excess of $23 million; however, for the full week ending March 15, 2020, deposits from sales were just $8 million.[31]  On March 19, 2020, the proposed purchaser for the Levin Sale notified the Debtors that they would not proceed with the transaction.[32]

---

[25] *Id.* ¶ 16.

[26] Id.

[27] *Id.* ¶ 17.

[28] Id.

[29] Pl. Resp. to SOF, ¶ 18.

[30] Id.

[31] *Id.*, ¶ 20; Conversion Mot., Main Case D.I. 252, ¶22.

[32] Conversion Mot., Main Case D.I. 252, ¶ 26.

On March 19, 2020, Art Van issued a WARN Act notice (the "Second WARN

Notice") to some of its employees which stated, in part:

> On March 5, 2020, Art Van Furniture, LLC (the "Company") informed employees that it had made the difficult decision to wind-down its operations, to include the closure of its retail facilities located at [seven Michigan sites], which would in the permanent termination the employment [*sic*] of all employees at these locations.

> Since initial notice, the Company has been impacted by the novel COVID-19 virus and the resulting, and sudden, negative economic impact. Due to these unforeseen events, the Company can no longer support the wind-down of its retail operations through the originally projected termination date.  The Company, therefore, submits this revised notice to you to satisfy any obligation  that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act").

> All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority).  The employment of Art Van's sales associates and other commissioned employees, visuals, housekeepers, drivers, helpers, and other hub warehouse staff, Selling Managers and Outlet Managers as well as any Sales or Store Manager who is not scheduled to perform services on March 21, 2020 or March 22, 2020, will be terminated on March 20, 2020.  All CPU's and office staff, along with the Store Manager and/or Sales Manager scheduled to work on March 21, 2020 or March 22, 2020 will be terminated at the end of the business day on March 22, 2020.  Nothing in this letter alters your at-will employment status with the Company.  You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.[33]

Wells Fargo declared a default under the Interim CC Order and terminated use

of cash collateral as of March 24, 2020; later extended through March 31, 2020, and

finally through April 6, 2020.[34]  The Debtors filed a motion to convert their Chapter 11

---

[33] Pl. Resp. to SOF, ¶ 23.  *See also*  Sandler Decl., Ex. T.

[34] Pl. Resp. to SOF, ¶ 27.

Cases to cases under Chapter 7 (the "Conversion Motion").[35]   On April 6, 2020, the Court entered an Order granting the Conversion Motion.[36]

PROCEDURAL BACKGROUND

On March 23, 2020, the Plaintiffs (both former employees of the Debtors at locations in Michigan), filed a Class Action Adversary Proceeding Complaint for Violation of the WARN Act.[37]   The parties stipulated to extend the time for the Chapter 7 Trustee to respond to the Complaint.   After the Trustee answered the Complaint, the parties engaged in mediation, which was unsuccessful.[38]   The Trustee filed an amended answer to the complaint on October 29, 2021.[39]

On November 12, 2021, the Chapter 7 Trustee filed a Motion for Summary Judgment.[40]   On December 3, 2021, the Plaintiffs filed a Brief in Opposition to the Trustee's Motion for Summary Judgment and Cross-Motion to Defer Ruling.[41]   On December 17, 2021, the Trustee filed a Reply in Further Support of the Motion for Summary Judgment.[42]   A Notice of Completion of Briefing regarding the Motion for Summary Judgment was filed, and the matter is ripe for adjudication.[43]

---

[35] Sandler Decl., Ex. H.

[36] Pl. Resp. to SOF, ¶ 28.

[37] Adv. D.I. 1 (the "Complaint").

[38] Adv. D.I. 39.

[39] Adv. D.I. 40.

[40] Adv. D.I. 43.

[41] Adv. D.I. 49.

[42] Adv. D.I. 52.

[43] Adv. D.I. 57.  The Trustee filed a Request for Oral Argument (Adv. D.I. 56), but the Court declines the offer as unnecessary.

## STANDARD OF REVIEW- SUMMARY JUDGMENT

"Summary judgment is a mechanism used to ascertain the existence of a genuine factual dispute between the parties that would necessitate a trial."[44]  Federal Rule of Civil Procedure 56, made applicable to these proceedings through Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[45]

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.[46]  A fact is material if it could "alter the outcome of a case."[47] An issue about a material fact is genuine when it is "triable, that is, when reasonable minds could disagree on the result."[48]  "In other words, the movant's goal is 'to establish an absence of evidence to support the nonmoving party's case.'"[49]

The burden then shifts to the nonmoving party to produce "evidence in the record creating a genuine issue of material fact."[50]  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts;"

---

[44] *In re FBI Wind Down, Inc.*, 614 B.R. 460, 472 (Bankr. D. Del. 2020).

[45] Fed. R. Civ. P. 56(c).

[46] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553,  91 L.Ed.2d 265 (1986).

[47] *FBI Wind Down*, 614 B.R. at 473 (quoting *The Liquidating Tr. v. Huffman (In re U.S. Wireless Corp.),* 386 B.R. 556, 560 (Bankr. D. Del. 2008)).

[48] *U.S. Wireless*, 386 B.R. at 560 (quoting *Argus Mgmt. Grp. v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 214 (Bankr. D. Del. 2005) (internal punctuation omitted)).

[49] *FBI Wind Down*, 614 B.R. at 473 (quoting *U.S. Wireless*, 386 B.R. at 560).

[50] *FBI Wind Down*, 614 B.R. at 473 (citing *In re W.R. Grace & Co.*, 403 B.R. 317, 319 (Bankr. D. Del. 2009)).

the nonmoving party must demonstrate "sufficient evidence (not mere allegations) upon which a reasonable trier of fact could return a verdict in favor of the nonmoving party."[51]

"[A]t the summary judgment stage, the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."[52] The court must "view the facts in the light most favorable to the non-moving party and draw all inferences in that party's favor."[53] If the nonmoving party's evidence "is merely colorable or not significantly probative, summary judgment may be granted."[54] On the other hand, if the "record could lead reasonable minds to draw conflicting inferences, summary judgment is improper, and the action must proceed to trial."[55] In short, "[s]ummary judgment is proper only where one reasonable inference or interpretation of the facts can be drawn in favor of the moving party."[56]

## ANALYSIS

The WARN Act provides that "[a]n employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order" to each affected employee.[57] "The purpose of the WARN Act is to protect workers and their families by providing them with advance notice of a layoff."[58] This advance notice is intended to provide "workers and their families some transition

---

[51] *FBI Wind Down*, 614 B.R. at 473 (citations omitted).

[52] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

[53] *FBI Wind Down*, 614 B.R. at 473 (quoting *Saldana v. Kmart*, 260 F.3d 228, 231-32 (3d Cir. 2001)).

[54] *Id.* (quoting *Whitlock v. Pepsi Ams.*, No. C 08-24742 SI, 2009 WL 3415783, at *7 (N.D. Cal. Oct. 21, 2009)).

[55] *FBI Wind Down*, 614 B.R. at 473 (quoting *O'Connor v. Boeing N. Am.*, 311 F.3d 1139, 1150 (9th Cir. 2002)).

[56] *Id.*

time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market."[59]

If an employer fails to comply with the WARN Act, the employer "is liable to provide 'each aggrieved employee' with back pay and benefits for each day that the WARN Act was violated."[60]

"To prove a WARN Act violation, a plaintiff must show that: (1) the defendant was 'an employer;' (2) the defendant ordered a 'plant closing' or 'mass layoff;' (3) the defendant failed to give employees 60-days' notice before the closing or layoff; and (4) the plaintiff is an 'aggrieved' or 'affected' employee."[61]   If a plaintiff proves these elements, "the employer may avoid liability by proving as an affirmative defense that it qualifies for one of the Act's three exceptions:  the 'faltering company' exception; the 'unforeseen business circumstances' exception; or the 'natural disaster' exception."[62]

The Trustee, here, moves for summary judgment in his favor, arguing that: (i) at the time of the layoffs, the Debtors were "liquidating fiduciaries" which are excluded from the definition of "employer" under Department of Labor ("DOL") commentary to

---

[57] 29 U.S.C. § 2102(a)(1).

[58] *Czyzewski v. Jevic Transportation, Inc. (In re Jevic Holding Corp.)*, 496 B.R. 151, 158 (Bankr. D. Del. 2013) (citing 20 C.F.R. § 639.1(a)).

[59] 20 C.F.R. § 639.1(a).

[60] In re World Marketing Chicago, LLC, 564 B.R. 587, (Bankr. N. D. Ill. 2017) (quoting Ellis v. DHL Exp. Inc. (USA), 633 F.3d 522, 525-26 (7th Cir. 2011)).  See also Off'l Comm. of Unsecured Creditors v. United Healthcare System, Inc. (In re United Healthcare System, Inc.), 200 F.3d 170, 176 (3d Cir. 1999) ("If the employer fails to [provide WARN Act notice], it may be liable for up to sixty days' back pay.") (citing 29 U.S.C. § 2104(a)).

[61] *Easom v. US Well Serv., Inc.*, 527 F.Supp.3d 898, 903-04 (S.D. Tex. 2021) (citing 29 U.S.C.  §§ 2102, 2104)).

[62] *Id.* at 904 (citing, *inter alia*,  29 U.S.C. § 2102).

the WARN Act regulations, or (ii) the Trustee can demonstrate that either the "unforeseen business circumstances" or "natural disaster" exception to WARN Act liability applies here under the undisputed facts. The Plaintiffs, however, oppose the Trustee's Summary Judgment Motion, arguing that (i) the Debtors operated as "employers" under the Act by using its employees to hold postpetition going out of business sales (or "GOB Sales") or to keep certain stores operating as going concerns pending a bulk sale under the Levin LOI, and (ii) there are disputed issues of material fact regarding the *cause* of the Debtors' mass layoff, which prevent application of the WARN Act exceptions and require more discovery and a trial on the merits.

(A)    The Liquidating Fiduciary Exception

The WARN Act defines an "employer" as "any business enterprise that employs (A) 100 or more employees, excluding part-time employees; or (B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime)."[63]    The DOL's comments to its regulations implementing the WARN Act (the "DOL Commentary") addresses whether a bankrupt entity is an "employer" under the WARN Act, writing:

> [T]he Department does not think it appropriate to [exclude all bankrupt companies from the definition of "employer"]. Further, DOL agrees that a fiduciary whose sole function in the bankruptcy process is to liquidate a failed business for the benefit of creditors does not succeed to the notice obligations of the former employer because the fiduciary is not operating a "business enterprise" in the normal commercial sense. In other situations, where the fiduciary may continue to operate the business for the benefit of creditors, the fiduciary would succeed to the WARN

---

[63] 29 U.S.C. § 2101(a)(1).

obligations of the employer precisely because the fiduciary continues the business in operation.[64]

This language provides the basis for the "liquidating fiduciary" exception to the WARN Act.[65]

The Third Circuit considered the liquidating fiduciary exception in the 1999 *United Healthcare* case and decided that a debtor-hospital that ceased operations shortly after its bankruptcy filing and was selling its assets in a chapter 11 case was not an "employer" under the WARN Act when it laid off its employees.[66]  Pre-bankruptcy, United Healthcare had been actively seeking a merger partner or purchaser who would keep operating the business, but its efforts came to a halt after its secured creditor issued a notice of default and terminated financing.[67] Shortly thereafter, United Healthcare filed a Chapter 11 bankruptcy petition and, on the same day, advised the New Jersey Department of Health that it would close and surrender its certificates of need.[68]  Also on the same day, United Healthcare provided WARN Act notices to its employees notifying them that their employment would end in 60 days.  However, 48 hours after issuing the WARN Act notices, all of United Healthcare's hospital patients had either been transferred or sent home and its employees could not perform their

---

[64] *United Healthcare*, 200 F.3d at 177  (citing 54 Fed. Reg at 16045).

[65] *World Marketing*, 564 B.R. at 598-99 ("[B]ankruptcy courts that have considered the specific question of whether a liquidating fiduciary exception to the WARN Act applies have uniformly concluded that it does.").

[66] *United Healthcare*, 200 F.3d at 179.

[67] *Id.* at 172-73.

[68] Under New Jersey law, health care facilities are required to maintain certificates of need issued by the Department of Health.  *United Healthcare*, 200 F.3d at 173 n. 1 (citing N.J.S.A. 26:2H-7 (West 1999)).

regular duties. Within 16 days after filing Chapter 11, United Healthcare informed 1,200

of its 1,300 employees that they were no longer to report to work. The 100 employees

retained would secure the plant facility and maintain necessary equipment.  The

bankruptcy court determined that, as a debtor-in-possession and fiduciary, United

Healthcare was subject to the WARN Act notification requirements.[69]  The Third Circuit

disagreed, finding that United Healthcare's intent to liquidate was evident from the

start of the Chapter 11 case, and "the employees were no longer engaged in their

regular duties but instead were performing tasks solely designed to prepare United

Healthcare for liquidation" from the date the hospital patients were all transferred or

sent home.[70]  The Third Circuit wrote that:

> [W]hether a bankrupt entity is an "employer" under the WARN Act
> depends on the nature and extent of the entity's business and commercial
> activities while in bankruptcy, and not merely on whether the entity's
> employees continue to work "on a daily basis." The more closely the
> entity's activities resemble those of a business operating as a going
> concern, the more likely it is that the entity is an "employer;" the more
> closely the activities resemble those of a business winding up its affairs,
> the more likely it is the entity is not subject to the WARN Act.[71]

The Trustee argues that this case is analogous to *United Healthcare*. Between

March 5, 2020 - - just prior to the Petition Date - - and continuing post-petition through

March 20, 2020 (the "Layoff Date"), the Debtors' activities were focused on winding up

its business affairs and liquidating its assets.  The Debtors negotiated a wind-down

budget with Wells Fargo, hired a liquidator, and announced that they were liquidating

---

[69] *United Healthcare*, 200 F.3d at 177-78.

[70] *Id.* at 178.

[71] Id.

and going out of business.[72]  The Debtors decided to liquidate through an orderly wind-down process compromised of GOB Sales and the anticipated bulk sale of the SLI Assets to a third-party buyer.[73]  The Debtors argue that between the Petition Date and the Layoff Date, the Debtors did not operate as a "business enterprise in the normal commercial sense,"[74] but only conducted such business activities as were necessary to liquidate their assets through GOB Sales and the Levin Sale.

The Plaintiffs dispute the Trustee's characterization of the Debtors' activities. The Plaintiffs argue that the Debtors continued operations as a retail seller post-petition and, unlike the employees in *United Healthcare*, the Debtors' employees continued their normal activities between the Petition Date and the Layoff Date.  The Plaintiffs point out that the Interim CC Order provided that "[n]othing in this Interim Order shall authorize the disposition of assets of the Debtors or their estates *outside the ordinary course of business*."[75] The Plaintiffs assert that the Debtors' First Day Declaration advised the Court that the purpose of the Levin LOI was to "provide for the continued operations of approximately 44 retail store locations under the Wolf and Levin store banners and two related distributed centers" and to "preserve nearly 1,000 jobs."[76]  The

---

[72] Ladd Decl. ¶¶ 16-18; Interim CC Order, pp. 12-13; Sandler Decl. at ¶ 5, Ex. D.  *See also* Pl. Resp. to SOF, ¶ 5.

[73] *Id.*; Ladd Decl. ¶¶ 40-41; Sandler Decl., Ex. E.  *See also* Pl. Resp. to SOF, ¶¶ 6, 7.

[74] 54 Fed. Reg. 16042, 16045 (Apr. 20, 1989).

[75] Interim CC Order, at 15 (emphasis added).

[76] Ladd Decl., ¶ 19.

Plaintiffs also assert that in the DIP Motion with SLI, the Debtors sought approval to "purchase inventory in the ordinary course of business"[77] and agreed not to:

> substantially change the nature of the business in which it is currently engaged, nor, except as specifically permitted hereby purchase or invest, directly or indirectly, in any assets or property other than in the ordinary course of business or other than those which are useful in, necessary for and are to in its business, as presently conducted.[78]

Chapter 11 of the Bankruptcy Code is entitled "Reorganization," but it is also used by debtors to facilitate an orderly liquidation process. Applying the liquidating fiduciary exception in a Chapter 11 case requires careful analysis of the particular facts and circumstances of that case to determine whether the entity's activities resemble a business enterprise operating as a going concern or a business enterprise engaged in the winding-up of its affairs.[79] But what if the debtor's activities are a hybrid of these options? It is not uncommon for a debtor-in-possession[80] to commence a liquidating chapter 11 case intending to preserve value by operating the business as a going concern pending a sale of substantially all of the assets of the debtor. Is the debtor-in-possession an "employer" under the WARN Act while operating in a liquidating Chapter 11 case?

DOL Commentary to the WARN Act regulations provides that:

> [T]he term "employer" includes public and quasi-public entities which *engage in business* (i.e., take part in a commercial or industrial enterprise,

---

[77] DIP Motion, ¶ 13.

[78] Debtor-In-Possession Credit and Security Agreement, ¶ 8(f) (Main Case D.I. 46-2 at 60).

[79] *United Healthcare*, 200 F.3d at 178.

[80] A debtor-in-possession or a trustee managing a Chapter 11 case is a fiduciary. *World Marketing*, 564 B.R. 599 (citations omitted).

supply a service or good on a mercantile basis, or provide independent management of public assets, raising revenue and making desired investments).[81]

Consider also the plain language of the DOL Commentary creating the "liquidating fiduciary" exception:

> DOL agrees that a fiduciary whose *sole function* in the bankruptcy process is to liquidate a failed business for the benefit of creditors does not succeed to the notice obligation of the former employer because the fiduciary is not operating a "business enterprise" in the normal commercial sense.  In other situations, *where the fiduciary may continue to operate the business for the benefit of creditors*, the fiduciary would succeed to the WARN obligations of the employer precisely because the fiduciary continues the business in operation.[82]

In *United Healthcare*, the Third Circuit applied the liquidating fiduciary exception when the debtor surrendered its certificates of need to the New Jersey Department of Health the day it filed its petition and shuttered the hospital within 48 hours of the filing.  The court concluded that upon assuming the role of a debtor-in-possession fiduciary, United Healthcare "ceased operating its business as a going concern and was simply preparing itself for liquidation."[83]  The Third Circuit also recognized, however, that:

> Although we find WARN Act liability does not attach under these facts and circumstances, we do not foreclose the possibility that WARN Act liability may apply to other situations where an employer files for bankruptcy and then terminates its employees.  An employer as fiduciary will succeed to its WARN Act obligations if an examination of the debtor's

---

[81] *United Healthcare*, 200 F.3d at 177 (quoting 20 C.F.R. § 639(a)(1)(ii), 54 Fed. Reg. 16042, 16065 (1989) (emphasis added)).  In *United Healthcare*, the Third Circuit decided it was appropriate considered the DOL regulations and commentary when the plain language of the WARN Act does not resolve the issue.  *Id.*

[82] 54 Fed. Reg. at 16045 (emphasis added).

[83] *United Healthcare*, 200 F.3d at 179.

economic activities leading up to and during the bankruptcy proceedings reveals that the fiduciary has continued in an "employer" capacity, operating the business as an ongoing concern.[84]

In the case before the Court, the Debtors announced their intention to liquidate prior to the Chapter 11 filing, but the Debtors' orderly wind-down process contemplated continued postpetition operations.[85]  The Debtors' GOB Sales are a perfect example of a hybrid of engaging in business (i.e., continuing operations with its employees for the retail sales of goods) while liquidating at the same time.  Also, as the Plaintiffs point out, the Levin LOI called for the continued operation of approximately 44 retail store locations and two related distributed centers pending the proposed sale. In this case, the Debtors intended to continue their operations in the Chapter 11 bankruptcy case for the benefit of creditors and, based on these facts, the Court concludes that the Debtors were subject to an employer's WARN obligations.  The "liquidating fiduciary" exception does not apply to this case.[86]

(B) The Unforeseen Business Circumstances Exception

The Unforeseen Business Circumstances ("UBC") exception to the WARN Act provides that:

---

[84] Id.

[85] The Debtors, rightfully, provided the First WARN Notice to its employees just prior to the bankruptcy filing, demonstrating its intention that to continue operations for 60 days The Debtors' intention, however, was interrupted by the COVID-19 pandemic, as discussed *infra*.

[86] The Court recognizes that not all debtors operating in a liquidating Chapter 11 case will be subject to WARN Act obligations.  The facts and circumstances must be evaluated in light of *United Healthcare* to determine whether there is an immediate shutdown and the fiduciary's sole function is liquidation. Some liquidating Chapter 11 debtors assert the statutory exceptions to the WARN Act, *i.e.*, the faltering company, unforeseen business circumstances, or natural disaster exceptions.  Each case must be evaluated on its own merits.

An employer may order a plant closing or mass layoff before the
conclusion of the 60-day period if the closing or mass layoff is caused by
business circumstances that were not reasonably foreseeable as of the time
that notice would have been required.[87]

The employer bears the burden of proving that this exception applies by
establishing that two conditions are met: (1) the circumstance was unforeseeable, and
(2) the layoffs were caused by that circumstance.[88]

The DOL regulations state that "[a]n important indicator of a business
circumstance that is not reasonably foreseeable is that the circumstance is caused by
some sudden, dramatic, and unexpected action or condition outside the employer's
control."[89] The regulations further state:

The test for determining when business circumstances are not reasonably
foreseeable focuses on an employer's business judgment. The employer
must exercise such commercially reasonable business judgment as would
a similarly situated employer in predicting the demands of its particular
market. The employer is not required, however, to accurately predict
general economic conditions that also may affect demand for its products
or services.[90]

The Trustee claims that COVID-19, and the government-ordered business
closures (or threatened closures), and the restriction of residents to their homes
prevented the Debtors from conducting the GOB Sales and completing the orderly
liquidation of its business. The Trustee argues that the UBC exception applies here

---

[87] 29 U.S.C. §2102(b)(2)(A).

[88] *Gross v. Hale-Halsell Co.*, 554 F.3d 870, 875 (10th Cir. 2009) (citing *Roquet v. Arthur Andersen LLP*, 398 F.3d 585, 588 (7th Cir. 2005)).

[89] 20 C.F.R. §639.9(b)(1).

[90] 20 C.F.R. §639.9(b)(2).

because in January 2020 (60 days before the Layoff), no one could have foreseen the effect of COVID-19 on the Debtors' business operations.

The Plaintiffs, however, do not contest foreseeability; they argue that the Trustee has not and cannot prove that the pandemic *caused* the Layoff. In response, the Trustee argues that the undisputed facts show that:

> [T]he COVID-19 pandemic was clearly the immediate cause of the Debtors' abrupt change-of-course determination to abandon the Planned Liquidation Process and immediately shut down their business. The pandemic made it impossible for the Debtors to continue their GOB Sales post-petition as planned as the various governmental authorities required citizens to stay at home or shelter in place to limit the spread of COVID-19.  The threat of infection, illness and death from COVID-19 made customers stay away from the GOB Sales even prior to the mandatory shut down orders, but regardless, as of March 19, 2020, Pennsylvania had locked down, and Michigan would soon follow.[91]

The Plaintiffs argue, however, that COVID-19 did not *mandate* the Debtors' mass layoff of employees on March 20, 2020. Instead, they claim that the Debtors could have engaged in a "transparent, problem-solving approach" and temporarily furloughed employees, rather than order a permanent mass layoff.  They claim that the Debtors "froze out stakeholders and ran roughshod over its 'Planned Liquidation Process' … to cause the ultimate liquidity crisis when terminating its workforce."[92]   In short, the Plaintiffs seek additional discovery to show that the Debtors' insiders used COVID-19 as an excuse for the accelerated the mass layoff.

To support this argument, the Plaintiffs rely on statements made by counsel for the Debtors, Wells Fargo, and the Creditor Committee at a hearing on March 19, 2020,

---

[91] Trustee's Br., Adv. D.I. 44, at 22, ¶ 56.

[92] Plaintiffs' Br., Adv. D.I. 49 at 22.

where counsel all suggested that the parties were working on alternatives to "pulling the plug" and avoid an immediate shutdown.[93]   The Plaintiffs also point out that the permanent mass layoff triggered "insurmountable obligations" of at least $16.5 million arising from commissions suddenly due when salespeople were laid off, and an even more substantial tail created by the partially self-funded health plan which was cancelled on March 19, 2020.[94]

When interpreting the phrase "caused by" in WARN Act cases, courts "have generally required defendants to show that an unforeseen business circumstance was the immediate cause of a layoff."[95]   Further, when applying the UBC exception to layoffs occurring after multiple potential causes, courts "have typically held that the

---

[93] The Plaintiffs rely upon the following statements, among others:  (i) Defendants' counsel said that "we are trying to explore with our lenders and our other stakeholders … other options short of outright liquidation." (Tr. 3/19/2020, D.I. 46-5, at 27, lines 9-14);  and "So, let me just say then, conceptually, we are looking at the possibility of … going idle or going into a state of dormancy for a period of time, and then the possibility then of either … reopening stores, some subset of stores as, either in furtherance of the going concern transaction … or … closing sales and an orderly liquidation, you know, essentially, once the economic and retail environment and the safety environment have improved to a degree that we can do that." (*Id.*, D.I. 46-5 at 27 line 23 to 28 line 13);  (ii) Wells Fargo's counsel said: "Debtors' decisions, unfortunately, are coming at us minutes before these hearings," (*Id.*, D.I. 46-5 at 30 lines 1-2) and the bank wanted "to try to find a path forward for all stakeholders," but the Debtors had not "fully come to their creditors, other than to say this is somebody else's problem and … fix it for us or don't sweep or do these things." (*Id.*, D.I. 46-5 at 30, lines 2-9); and (iii) Creditor Committee's counsel said that the committee favored "put[ting] everything on ice and let's come back in [ ] a month or two and see." (*Id.*, D.I. 46-5 at 37 lines 4-9).

[94] The Plaintiffs rely, in part, on the following statements: Wells Fargo's counsel said "as a result of terminating their employees, … the debtors now have significant accrued PTO, commissions, other benefits related to the terminated employees as well as healthcare obligations.  Most of these were not included in any budget and certainly [not] in the cash collateral budget because there was no contemplation of a wholesale mass termination of employees." (*Id.*, D.I. 46-5 at 59 lines 14-20).

[95] *Easom* 527 F.Supp.3d at 914-15 (citing *Gross v. Hale-Halsell Co.*, 554 F.3d 870, 877-78 (10th Cir. 2009) ("[The defendant's] decision to shut down came in the immediate wake of [its partner's] withdrawal … [even though] it had been suffering from financial troubles for months."); *Jevic Holding*, 496 B.R. at 164-6 ("[T]he 'immediate precipitant of the decision to terminate employees' was [the lender's] refusal to extend forbearance," even though there were "other reasons" for the lender's refusal and employer's financial difficulties.)).

unforeseen business circumstances do not need to be the sole cause of a plant closing or mass layoff, but they must be the 'straw that broke the camel's back.'"[96]

Here, it is undisputed that the Debtors were in dire financial straits leading up to the Chapter 11 filing.  It is also undisputed that the Debtors filed Chapter 11 to pursue an orderly wind-down of operations and liquidation of their assets.  On March 5, 2020, the Debtors provided the First WARN Notice to many of their employees, anticipating the winding-down of operations and permanent layoffs by May 5, 2020.  It is also undisputed that in mid-March 2020, COVID-19 caused Pennsylvania, and then Michigan, and then other states where the Debtors operated, to issue "stay at home" or "shelter in place" orders.  This unquestionably impacted the Debtors' operations. The Debtors issued the Second WARN Notice as COVID-19 and the ensuing government-ordered shutdowns prevented the Debtors from operating and completing its anticipated wind-down plans.

Given these undisputed facts, the Plaintiffs' proffered evidence that COVID-19 was merely a pretext for the mass layoff is tenuous at best. Statements showing that the Debtors' actions were unanticipated or resulted in greater financial distress do not indicate disputed facts concerning the *cause* of the layoff. Rather, those facts underscore that the impact of COVID-19 was sudden and unexpected to other parties as well as the Debtors.  Counsels' statements expressing a hope that the closure would only "pause" the orderly liquidation process as the parties explored alternatives to "outright

---

[96] *Easom*, 527 F. Supp. 3d at 914 n. 15 (quoting *Gross*, 554 F.3d at 877-78; citing *Jones v. Kayser-Roth Hosiery, Inc.*, 748 F. Supp. 1276, 1285 (E.D. Tenn. 1990) (an employer's loss of its largest customer was the "last straw" that made it economically infeasible to continue operating the plant.)).

liquidation" also do not refute the *cause* of the layoff. The Plaintiffs' argument that temporary furloughs could have been a better option for the Debtors is not a factual dispute, but merely debating the Debtors' actions in hindsight.

The Court should evaluate the UBC WARN Act exception objectively and at the time the decisions were made.[97]   The undisputed facts support the finding that the COVID-19 was the proverbial "straw that broke the camel's back" and caused the March 20, 2020 layoff. Even viewing all inferences in favor of the Plaintiffs, the Plaintiffs' proffered evidence does not demonstrate disputed issues of material facts that cast doubt on that causation.[98]

Finally, the Plaintiffs also argue that the Second WARN Notice was insufficient to allow application of the UBC exception.  The statute requires that "[a]n employer relying on [the WARN Act exceptions] shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period."[99]

The shortened WARN Act notice must "set forth the underlying factual events which led to the shortened [notice] period."[100]   "Congress' purpose in requiring the

---

[97] *Jevic Holding*, 496 B.R. at 161 (citations omitted).

[98] "The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (quoting *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Id.* (citations omitted).

[99] 29 U.S.C. § 2102(b)(3).

[100] *Grimmer v. Lord Day & Lord*, 937 F. Supp. 255, 257 (S.D.N.Y. 1996) (quoting *Alarcon v. Keller Indus.*, 27 F.3d 386 (9th Cir. 1994)).

brief statement must have been to provide employees with information that would assist them in determining whether the notice period was properly shortened."[101] Merely stating a statutory exception - - such as "we are a faltering company" or "termination arises from unforeseeable business circumstances" - - is not sufficient.[102]

> The Second Notice stated, in part:
>
> Since the initial notice, the Company has been impacted by the novel COVID-19 virus and the resulting, and sudden, negative economic impact.  Due to these unforeseen events, the Company can no longer support the wind-down of its retail operations through the originally projected termination date.

The Plaintiffs argue that this language is amorphous and permits the Debtors to "assert litigation-convenient but factually post-hoc justifications for their actions."[103] Other courts have determined that a shortened WARN Act notice is insufficient when it "simply parroted a statutory exception,"[104] or was arguably given in "the form of billboard ads, third-party newspaper articles, internet postings and memoranda,"[105]  or was "a statement read to affected employees on the date of termination."[106] The statement in the Second WARN Notice is brief, but that is what the statute requires. The statement specifically mentions why the shortened notice was necessary - - that the

---

[101] *Id.* (internal punctuation omitted).

[102] *Id.*

[103] Plaintiff's Br., Adv. D.I. 49, at 23 (quoting *Newman v. Crane, Heyman, Simon, Welch, & Clar*, 435 F.Supp.3d 834, (N.D. Ill. 2020)).

[104] *Grimmer*, 937 F. Supp. At 257.

[105] *Sides v. Macon County Greyhound Park, Inc.*, 725 F.3d 1276, 1285 (11th Cir. 2013).

[106] *Newman*, 435 F.Supp.3d at 842.  The *Newman* court found the statement insufficient writing that the defendants "present[ed] no evidence that this statement was ever actually read (even assuming the brief statement did not need to be in writing, which the Court highly doubts.") *Id.*

unforeseen effects of COVID-19 prevented the Debtors from completing the planned wind-down of the retail operations. The notice is sufficient to pass muster.

For all the reasons set forth above, the Court concludes that the UBC exception applies here, and the Trustee is entitled to summary judgment.

(C)    The Natural Disaster Exception

Although the Court concludes that the UBC exception applies here, the Debtors also argue that the natural disaster exception also applies to this matter.  The natural disaster exception provides that:

> No notice under [the WARN Act] shall be required if the plant closing or mass layoff is due to any form of natural disaster, such as a flood, earthquake, or the drought currently ravaging the farmlands of the United States.[107]

The Trustee argues that the exception applies here because the COVID-19 pandemic is a natural disaster and the March 20, 2020 layoff was "due to" the pandemic. The Plaintiffs, however, argue that the Trustee cannot prove that COVID-19 is a "natural disaster," or that the March 20, 2020 layoff was caused by COVID-19.

The statute and the DOL regulations state broadly that the "natural disaster" exception applies to "any form of a natural disaster."[108]  The regulations list "[f]loods, earthquakes, droughts, storms, tidal waves or tsunamis *and similar effects of nature*" as natural disasters under the WARN Act.[109]  The issue here is whether COVID-19 arose from the "effects of nature."

---

[107] 29 U.S.C. § 2102(b)(2)(B).

[108] *Id.*; 20 C.F.R. § 639.9(c). "

[109] 20 C.F.R. § 639.9(c) (emphasis added).

The Plaintiffs argue that uncertainty regarding the origins of COVID-19, including theories that the initial human infection resulted from "human involvement"[110] through a laboratory-associated incident, prevents any court from ruling that it is a natural disaster.  Numerous courts, however, have considered this issue and concluded that the COVID-19 pandemic is a natural disaster.[111]  As part of its thorough analysis of the issue, the *Easom* court wrote:

> COVID-19 qualifies as a disaster under the WARN Act. COVID-19 is clearly a "disaster." *See Disaster*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("[a] calamity; a catastrophic emergency"); *Natural Disaster*, OXFORD ENGLISH DICTIONARY ("[a] natural event that causes great damage or loss of life"). In a year, two million people lost their lives, and over one hundred million people were diagnosed with infections. *See AB Stable VIII LLC*, 2020 WL 7024929, at *58 ("[The COVID-19 pandemic] is a terrible event that emerged naturally in December 2019, grew exponentially, and resulted in serious economic damage and many deaths."); *Coronavirus World Map: Tracking the Global Outbreak*, N.Y. TIMES (Feb. 10, 2021, 7:37 AM) (tracking nationwide and global deaths due to COVID-19).

---

[110] *Carver v. Foresight Energy LP*, No. 3:16-cv-3013, 2016 WL 3812376 (C.D. Ill. July 12, 2016) (deciding that coal fires in a mine were not natural disasters).  In denying a motion to dismiss a WARN Act claim, the *Carter* court found that the complaint did not allege facts that unambiguously established the existence of a natural disaster exception. *Id.* at *5.  The complaint alleged that the fires, although consisting of the interaction between natural elements such as coal and oxygen, were fueled by "poor underground housekeeping, such as failure to properly clean up spilled oil and grease" or were ignited by exposing oxygen to the coal through the mine's ventilation system. *Id.* at *1.  Thus, the Court decided that "human involvement in the origins of the combustion events would seem to preclude the events from being considered a natural disaster." *Id.* at *4.

[111] *Easom v. US Well Services, Inc.*, 527 F.Supp.3d 898, 906-11 (S.D. Tex. 2021) (citing, *inter alia*, *JN Contemporary Art LLC v. Phillips Auctioneers LLC*, 507 F.Supp.3d 490, 501 (S.D.N.Y. 2020) (after reviewing dictionary definitions for the common meaning of "natural disaster," (as used in a *force majeure* clause in a consignment agreement), the court decided that "it cannot be seriously disputed that the COVID-19 pandemic is a natural disaster"); *AB Stable VIII LLC v. Maps Hotels and Resorts One LLC*, C.A. No. 2020-0310-JTL, 2020 WL 7024929, *58 (Del. Ch. Nov. 30, 2020) (deciding that the COVID-19 pandemic fits the definition of "natural disaster," and noting that "[i]t is a terrible event that emerged naturally in December 2019, grew exponentially, and resulted in serious economic damage and many deaths."); *Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 370 (Pa. 2020) ("We have no hesitation in concluding that the ongoing COVID-19 pandemic equates to a natural disaster" under a Pennsylvania statute); and *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 889 (Pa. 2020) ("The COVID-19 pandemic is, by all definitions, a natural disaster" under a Pennsylvania statute.)).

COVID-19 also qualifies as a "natural" disaster because human beings were not responsible for starting or consciously spreading the virus. Unlike coal fires, which did not occur in *Carver* without humans digging mines and introducing coal to oxygen, COVID-19, like other viruses, did not require conscious human effort to appear or spread, as individuals without symptoms infected others. *See* Angela L. Rasmussen, *On the Origins of SARS-CoV-2*, 27 NATURE MEDICINE 9, 9 (2021) ("[A]ll indications suggest that, like SARS-CoV and MERS-CoV, this virus probably evolved in a bat host until an unknown spillover event into humans occurred."); Murat Seyran, *et al.*, *Questions Concerning the Proximal Origin of SARS CoV-2*, JOURNAL OF MEDICAL VIROLOGY 1, 1 (2020) ("There is a consensus that severe acute respiratory syndrome coronavirus (SARS-CoV-2) originated naturally from bat coronaviruses (CoVs), in particular RaTG13."); *see also AB Stable VIII LLC*, 2020 WL 7024929, at *58 n.214 ("The record in this case does not support a finding that the virus was anything other than a natural product of germ evolution.").  While humans can take precautions to slow the spread of COVID-19 or engage in behavior that fosters contagion, the possibility of slowing the virus spread does not suggest that humans caused the pandemic.[112]

Based on the reasoning in *Easom* and the many cases cited therein, the Court is satisfied that the COVID-19 pandemic qualifies is a natural disaster and may be invoked under the natural disaster exception to the WARN Act.

The next issue is whether the natural disaster - - COVID-19 - - *caused* the mass layoff.  The Trustee argues that the *Easom* court recently analyzed the natural disaster exception and determined that it requires a lesser "but for" standard for causation, rather direct or proximate cause.[113] The Trustee claims that "but for" COVID-19, the Debtors would have completed the planned liquidation process as originally planned,

---

[112] *Easom*, 527 F.Supp.3d at 908.

[113] *Easom*, 527 F.Supp.3d at 911-915 ("But-for causation is established whenever a particular outcome would not have happened 'but for' the purported cause … Proximate causation generally refers to the basic requirement that … there must be some direct relation between the outcome and the purported cause." *Id.* at 911 n. 10 (citations and internal punctuation omitted).

including the provision of adequate notice of the layoff.  The Court does not need to decide whether it agrees that the "but for" standard applies to the natural disaster exception.  Even assuming that the more stringent standard of causation applies here, the Court has already analyzed the causation issue in the discussion of the UBC exception, *supra*. The undisputed facts in this case support the finding that the COVID-19 was an immediate cause of the March 20, 2020 layoff.

For all the reasons set forth above, the Court concludes that the natural disaster exception applies here, and the Trustee is entitled to summary judgment.

<u>CONCLUSION</u>

For the reasons set forth above, the Court determined that it had sufficient undisputed facts and facts of record in the bankruptcy case to decide the Trustee's Summary Judgment Motion, so the Plaintiffs' Cross-Motion to Defer Ruling is denied.

Further, for the reasons set forth above, (i) the Court rejects the Trustee's argument that the Debtors were "liquidating fiduciaries" and not WARN Act "employers" under the particular facts and circumstances of this case, but (ii) the Court concludes that both the unforeseen business exception and the natural disaster exception to the WARN Act's 60-day notice requirement applies to the undisputed facts in this case.  Accordingly, the Trustee's motion for summary judgment will be granted. An order will be issued.